# EXHIBIT A

EFiled: Nov 24 2021 04:27PM EST
Transaction ID 67122855
Case No. N21C-11-222 MMJ CCLD

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| ALLY FINANCIAL, Inc. a Delaware corporation, | |
| Plaintiff, | |
| v. | C.A. No. _____ [CCLD] |
| U.S. SPECIALTY INSURANCE COMPANY, a Texas corporation, ILLINOIS NATIONAL INSURANCE COMPANY, an Illinois corporation, MARKEL BERMUDA LTD., a Bermuda corporation | **TRIAL BY JURY OF TWELVE DEMANDED** |
| Defendants. | |

## COMPLAINT

Plaintiff Ally Financial, Inc. ("Ally" or "Plaintiff"), for its Complaint against Defendants U.S. Specialty Insurance Company ("US Specialty"), Illinois National Insurance Company ("Illinois National"), and Markel Bermuda Ltd. ("Markel") (together, "Insurers" or "Defendants"), alleges, with knowledge as to its own acts and on information and belief as to the acts of all others, as follows:

### Nature of Action

1.      This is an insurance coverage lawsuit against Ally's excess insurers for declaratory relief against all Defendants and breach of contract and other relief against Defendant US Specialty only.  The lawsuit arises out of Defendants' failure and refusal to honor their contractual and legal obligations to Ally in connection

with excess Bankers Professional Liability insurance policies they sold to Ally that provide coverage for, among other things, the defense costs and other loss associated with a consumer class action settlement Ally, and its subsidiary Ally Bank, entered into on March 17, 2021 which required Ally to pay $87,500,000 for the benefit of various nationwide and Missouri class plaintiffs, and forgive an additional $700 million in loan debt.   Ally also incurred more than $3,000,000 in the defense of the counterclaims in the civil action styled *Ally Financial Inc.v. Alberta Haskins and David Duncan*, Case No. 16JE-AC01713-01 in the Circuit Court of Jefferson County, Missouri (the "Class Action").

2.      Although Ally has incurred significant defense costs and settlement amounts in resolving the Class Action that exceeded both the self-insured retention and the underlying insurance for the excess policies, Defendants have refused to acknowledge that they have any coverage obligations to Ally for those losses. Instead, Insurers have asserted or adopted unreasonable coverage positions to avoid coverage for Ally's losses, including applying an unreasonably broad interpretation of the applicable policies' Prior Acts Exclusion.   Ally seeks reimbursement for its losses, and compensatory damages for Defendants' breaches of their insurance contracts with Ally.

## **The Parties and Jurisdiction**

3.      Ally is a corporation organized under the laws of the State of Delaware, with its principal place of business in Detroit, Michigan.

4.      US Specialty is an insurance company organized under the laws of the Texas, with its principal place of business believed to be in Farmington, Connecticut.   US Specialty has written insurance policies covering risks for Delaware citizens and/or is otherwise transacting insurance business in the State of Delaware.  US Specialty is part of the TokioMarine Group of insurance companies and is a subsidiary of HCC Insurance Holdings Inc.

5.      Illinois National is an insurance company organized under the laws of the State of Illinois, with its principal place of business in New York, NY. Illinois National has written insurance policies covering risks for Delaware citizens and/or is otherwise transacting insurance business in the State of Delaware. Illinois National is part of the AIG group of insurance companies and is a subsidiary of AIG Property & Casualty US Inc.

6.      Markel is an insurance company organized under the laws of Bermuda, with its principal place of business believed to be in Hamilton, Bermuda. Markel has written insurance policies covering risks for Delaware citizens and/or is otherwise transacting insurance business in Delaware.

## **The Underlying Class Action**

7.     In or about March 2017, Alberta Haskins and David Duncan ("the Class Representatives") brought counterclaims against Ally and Ally Bank in the Class Action.   Attached hereto as Exhibit A is a true and correct copy of the Defendants' Second Amended Answer and Counterclaim.   The Counterclaim asserted claims and sought relief against Ally for alleged violations of the Uniform Commercial Code as enacted in various states, as well as Missouri Chapter 408 and Missouri Chapter 365, for allegedly failing to provide presale and post-sale notices to borrowers before and after their personal property was repossessed in the form and manner required under the UCC, among other allegations.

8.     In June 2017, Ally, through its broker, promptly notified Defendants of its receipt of the Counterclaim.

9.     Each of the Defendants acknowledged receipt of Ally's notice of the Counterclaim.

10.     During the pendency of the Class Action, Ally provided regular updates to the Defendants regarding the status of the case and settlement discussions.

11.     On or about December 31, 2020, Ally reached a settlement in principle to settle the Class Action (the "Class Action Settlement").

12.     On February 23, 2021, US Specialty provided Ally its initial coverage position, stating that the Prior Acts Exclusion, Endorsement No. 2 to the policy, bars all coverage.

13.     On October 25, 2021, US Specialty supplemented its initial coverage position and reaffirmed its view that there is no coverage under its policy, because the Prior Acts Exclusion bars coverage for the Class Action in its entirety.

14.     Defendants AIG and Markel have also stated their view that the Prior Acts Exclusion bars likely coverage under its policies.

15.     On March 17, 2021, Ally finalized a settlement agreement to settle the Class Action ("Settlement Agreement").  Attached hereto as Exhibit B is a true and correct copy of the Settlement Agreement.

16.     To date, Defendants have not covered any of Ally's loss associated with the Class Action.

**<u>Ally's Insurance Coverage for the Class Action</u>**

17.     US Specialty issued Policy Number 24-MGU-16-A39492 to Ally for the policy period December 15, 2016 to December 15, 2017 (the "US Specialty Policy")  Attached hereto as Exhibit C is a true and correct copy of the US Specialty Policy.

18.     The US Specialty Policy provides limits of $15 million per claim excess of $25 million of underlying insurance and a $25 million self-insured

retention.   The US Specialty Policy follows form to a primary Bankers Professional Liability Policy issued by Federal Insurance Co. (the "Federal Primary Policy").  Attached hereto as Exhibit D is a true and correct copy of the Federal Primary Policy.

19.     Illinois National issued Policy No. 03-582-65-11 to Ally for the policy period December 15, 2016 to December 15, 2017 (the "Illinois National Policy"). The Illinois National Policy provides limits of $15 million per claim excess of $40 million in underlying insurance and follows form to the Federal Primary Policy. Attached hereto as Exhibit E is a true and correct copy of the Illinois National Policy.

20.     Markel issued Policy No. 1353272-8469-PLFF-2016 to Ally for the policy period December 15, 2016 to December 15, 2017 (the "Markel Policy", and together with the US Specialty Policy and the Illinois National Policy, the "Excess Policies").  The Markel Policy provides limits of $15 million per claim excess of $55 million in underlying insurance and follows form to the Federal Primary Policy.  Attached hereto as Exhibit F is a true and correct copy of the Markel Policy.

21.     Under the terms of the Federal Primary Policy, which each of the Excess Policies adopted, the Excess Policies agreed to provide BPL Services

Liability Coverage to Ally, per Endorsement 15, para. 1 of the Federal Primary Policy which states, in relevant part:

> The Company shall pay, on behalf of an **Insured**, **Loss** on account of any **BPL Claim** first made against such **Insured** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **BPL Wrongful Act** committed by an **Insured** or any person for whose acts the **Insured** is legally liable solely while performing **BPL Services**, including failure to perform **BPL Services**.

22.     The Federal Primary Policy defines "Loss," in relevant part, as "the amount that an Insured becomes legally obligated to pay on account of any covered Claim, including but not limited to damages . . ., judgments, settlements, pre-judgment and post-judgment interest and Defense Costs." See End. 19, ¶ 4.

23.     BPL Claim means:

> a.     a written demand for monetary damages or non-monetary relief;
>
> b.     a civil proceeding commenced by the service of a complaint or similar pleading;
>
> c.     an arbitration or mediation proceeding, including any foreign equivalent thereof, commenced by receipt of a written request or demand for arbitration or mediation, including any foreign equivalent thereof, brought by or on behalf of a **BPL Customer**

against an **Insured** for a **BPL Wrongful Act**, including any appeal therefrom; or

d.      a criminal proceeding commenced by the service of an indictment or similar document, against an **Insured** for a **BPL Wrongful Act**, including any appeal therefrom.

24.    **BPL Customer** means any person or entity that:

a.      has or had a written agreement with the Organization;

b.      submitted a written application to the Organization; or

c.      is a named beneficiary of any account held by the Organization's Trust Department and who is entitled to receive **BPL Services** permitted by law or regulation. **BPL Customer** shall also include any person or entity that is a borrower of any **BPL Customer** for which **BPL Customer** the **Organization** provides **Loan Servicing**.

25.    BPL Services means those services, including Loan Servicing, performed or required to be performed by an Insured for or on behalf of a BPL Customer:

a.      for a fee, commission or other monetary consideration;

b.      where a fee, commission or other monetary consideration would usually be received by the **Insured** but for business or other reasons is waived by the **Insured**; or

c.      for other remuneration which inures to the benefit of such **Insured**.

26.     BPL Wrongful Act means any error, misstatement, misleading statement, act, omission, neglect, or breach of duty that:

a.      is committed, attempted, or allegedly committed or attempted, before or during the Policy Period by an Insured or any person for whose acts the Insured is legally liable; and

b.      arises solely from the performance of **BPL Services**.

27.     The Policy also provides the following definition of "Loan Servicing": **Loan Servicing** means the servicing of any loan, lease or extension of credit (whether consumer, commercial, mortgage banking or otherwise, but not including financing for investment banking, or leveraged or management buyouts). **Loan Servicing** includes but is not limited to the following servicing activities: record keeping, billing and disbursements of principal or interest, receipt or payment of insurance premiums and taxes, credit reporting or statements of creditworthiness, determination of the depreciation amount of property (but not projections of or an appraisal for residual or future value of property), master servicing activities in

connection with Securitized Debt Instruments, or any similar administrative activity. **Loan Servicing** shall also include, but solely with respect to the servicing of a loan, lease or extension of credit: foreclosure activities, management and preservation of collateral, or administration or liquidation of real estate properties.

28.   As previously noted, Defendants have relied on the Federal Primary Policy's "Prior Acts Exclusion" endorsement in denying coverage to Ally.  That exclusion provides as follows:

> The Company shall not be liable for **Loss** on account of any **Claim** based upon, arising from, or in consequence of:
>
> (1)   any **Wrongful Act** committed, attempted, or allegedly committed or attempted prior to December 15, 2013; or
>
> (2)   any **Wrongful Act** committed, attempted, or allegedly committed or attempted subsequent to December 15, 2013 that is causally connected to a **Wrongful Act** committed, attempted, or allegedly committed or attempted prior to December 15, 2013.

End. 2.

29.    "Claim," as amended by Endorsement 19, ¶ 2, is defined by the Policy to include "any BPL Claim."  "Wrongful Act," as amended by Endorsement 19, ¶ 6, is defined to include "any BPL Wrongful Act."

30.     All conditions and requirements imposed by the Excess Policies on Ally, including, among other things, the retention(s), payment of premiums and timely notice of claims and settlement have been satisfied and/or have been waived and/or are subject to an estoppel or other avoidance against Defendants by reason of Defendants' conduct and/or by operation of law.

## The Excess Policies Provide Coverage for the Class Action

31.     The Class Action meets the definition of a BPL Claim, as it is brought by a BPL Customer against the Insured for an alleged BPL Wrongful Act, as these terms are defined by the Federal Primary Policy.

32.     The Prior Acts Exclusion does not bar coverage, in whole or in part, for the Class Action because the allegations made in the Class Action do not satisfy the provisions of the Prior Acts Exclusion.

33.     Accordingly, the Excess Insurers have an immediate obligation to cover Ally's loss in connection with the Class Action because Ally has suffered loss that exceeds the underlying limits of each of the Excess Policies as a result of a covered claim.

34.     Defendants disagree with Ally's position and have insisted that the Prior Acts Exclusion bars all coverage for the Class Action.

**COUNT I**
Against All Defendants
(Declaratory Relief)

35.     Ally repeats and realleges the foregoing allegations, which are incorporated, in full, by this reference.

36.     Ally has notified Defendants of the Class Action and of the Class Action Settlement pursuant to the terms of their Policies and/or applicable law. Ally has exhausted and/or satisfied any self-insured retentions, deductibles, underlying limits or other sums required to be exhausted and/or satisfied by the terms and conditions of the Excess Policies such that Defendants currently are obligated to Ally with respect to the Loss it has incurred with respect to the Class Action and the Class Action Settlement.

37.     An actual, present and justiciable controversy exists between Ally and Defendants with respect to Ally's rights and Defendants' obligations under the Policies.

38.     WHEREFORE, Ally seeks a declaratory judgment that:

a. Defendants are obligated to cover Ally's Loss under the Excess Policies in connection with the Class Action and the Class Action Settlement.

b. The Prior Acts Exclusion does not bar coverage under the Excess Policies for the Class Action.

## COUNT II
Against Defendant US Specialty
(Breach of Contract)

39.     Ally repeats and realleges the foregoing allegations, which are incorporated, in full, by this reference.

40.     Defendant US Specialty failed to timely and thoroughly investigate Ally's claim.

41.     Defendant US Specialty failed and refused to reimburse Ally's Loss as a result of the Class Action and the Class Action Settlement and otherwise acknowledge its insuring obligations to Ally.

42.     By its conduct, including, but not limited to, its failure and refusal to thoroughly investigate Ally's coverage claim, and to reimburse Ally's Loss for amounts incurred as a result of the Class Action, Defendant US Specialty has breached its Policy with Ally.

43.     As a direct result of the foregoing breach of contract, Ally has been denied the benefits of insurance coverage for which Defendants collected substantial premiums and has suffered damages in an amount to be proven at trial, including all incidental and consequential damages proximately resulting from Defendant US Specialty's breach of contract.

## **PRAYER FOR RELIEF**

WHEREFORE, Ally respectfully prays for the Court to enter judgment in its favor and against Defendants as follows:

(a)   With respect to Count I, a declaration that:

      i.   The Prior Acts Exclusion does not preclude coverage for the Class Action; and

     ii.   Defendants must pay to Ally, Ally's Loss pursuant to the Excess Policies in connection with the Class Action and the Class Action Settlement;

(b)   With respect to Count II, award monetary damages against Defendant US Specialty for its breach of contract in an amount to be determined at trial proximately resulting from its breach of contract;

(c)   Award Ally its costs and expenses, including but not limited to its attorneys' fees, in bringing and pursuing this action;

(d)   Award Ally pre-judgment and post-judgment interest; and

(e)   Award Ally any other and further relief to which it is entitled.

## **JURY DEMAND**

Ally hereby demands a trial by jury of twelve for any and all issues so triable.

- 14 -

Dated:  November 24, 2021          Respectfully submitted,

OF COUNSEL:                        REED SMITH LLP

REED SMITH LLP                     */s/ Brian M. Rostocki*
David M. Halbreich                 Brian M. Rostocki (No. 4599)
Lilit Asadourian                   Alexandria P. Murphy (No. 6686)
355 S. Grand Ave., 29th Floor      1201 Market Street, Suite 1500
Los Angeles, CA 90071             Wilmington, DE 19801
Telephone:  (213) 457-8000        Telephone:  (302) 778-7500
Facsimile:  (213) 457-8080        Facsimile:   (302) 778-7575

                                   *Counsel for Plaintiff*

# SUPERIOR COURT
## CIVIL CASE INFORMATION STATEMENT (CIS)

EFiled: Jan 04 2021 04:27PM EST
Transaction ID 67122855
Case No. N21C-11-222 MMJ CCLD

COUNTY: [N]  K  S          CIVIL ACTION NUMBER: _____ [CCL

| Caption: | Civil Case Code: __CCLD_____ |
|---|---|
| ALLY FINANCIAL, INC., | Civil Case Type: _Complex Commercial Litigation Division_ |
| | (SEE REVERSE SIDE FOR CODE AND TYPE) |
| Plaintiff, | MANDATORY NON-BINDING ARBITRATION (MNA) _____ |
| v. | Name and Status of Party filing document: |
| U.S. SPECIALTY INSURANCE COMPANY, ILLINOIS NATIONAL INSURANCE COMPANY AND MARKEL BERMUDA LTD. | ALLY FINANCIAL, INC.., Plaintiff |
| Defendants. | Document Type:(E.G.; COMPLAINT; ANSWER WITH COUNTERCLAIM) |
| | Complaint |
| | JURY DEMAND: YES___X___No ____ |

| ATTORNEY NAME(S): | IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT OR ANY RELATED CASES THAT HAVE BEEN CLOSED IN THIS COURT WITHIN THE LAST TWO YEARS BY CAPTION AND CIVIL ACTION NUMBER INCLUDING JUDGE'S INITIALS: |
|---|---|
| Brian M. Rostocki, Alexandria P. Murphy | |
| ATTORNEY ID(S): | |
| 4599, 6686 | |
| FIRM NAME: | |
| Reed Smith LLP | EXPLAIN THE RELATIONSHIP(S): |
| ADDRESS: | |
| 1201 N. Market Street, Suite 1500 | |
| Wilmington, DE 19801 | |
| TELEPHONE NUMBER: | |
| 302-778-7500 | |
| FAX NUMBER: | OTHER UNUSUAL ISSUES THAT AFFECT CASE MANAGEMENT: |
| 302-778-7575 | |
| E-MAIL ADDRESS: | |
| Brostocki@reedsmith.com; Amurphy@reedsmith.com | |
| | (IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGE) |

**THE PROTHONOTARY WILL NOT PROCESS THE COMPLAINT, ANSWER, OR FIRST RESPONSIVE PLEADING IN THIS MATTER FOR SERVICE UNTIL THE CASE INFORMATION STATEMENT (CIS) IS FILED. THE FAILURE TO FILE THE CIS AND HAVE THE PLEADING PROCESSED FOR SERVICE MAY RESULT IN THE DISMISSAL OF THE COMPLAINT OR MAY RESULT IN THE ANSWER OR FIRST RESPONSIVE PLEADING BEING STRICKEN.**

Revised 01/2019

EFiled:  Nov 24 2021 04:27PM EST
Transaction ID 67122855
Case No. N21C-11-222 MMJ CCLD

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| ALLY FINANCIAL, Inc. a Delaware corporation, | |
| Plaintiff, | |
| v. | C.A. No. _____ [CCLD] |
| U.S. SPECIALTY INSURANCE COMPANY, a Texas corporation, ILLINOIS NATIONAL INSURANCE COMPANY, an Illinois corporation, MARKEL BERMUDA LTD., a Bermuda corporation | **TRIAL BY JURY OF TWELVE DEMANDED** |
| Defendants. | |

## <u>SUMMONS</u>

**TO THE STATE OF DELAWARE,**
**TO THE SHERIFF OF KENT COUNTY**
**YOU ARE COMMANDED:**

To summon above-named Defendant U.S. Specialty Insurance Company so that, within 20 days after service hereof upon said Defendant, exclusive of the day of service, said Defendant shall serve upon Reed Smith LLP (Attn.: Brian M. Rostocki, Esq.), Plaintiff's attorney, whose address is 1201 N. Market Street, Suite 1500, Wilmington, Delaware 19801, an answer to the Complaint, and if an affidavit of demand has been filed, an affidavit in defense.

To serve upon Defendant a copy hereof and of the Complaint.

Dated: _____

Lisa Fontello_____
Chief Deputy Prothonotary

_____
Per Deputy

**TO THE ABOVE-NAMED DEFENDANT:**

In the case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney named above an answer to the Complaint and, if an affidavit of demand has been filed, an affidavit of defense, judgment by default will be rendered against you for the relief demanded in the Complaint, or in the affidavit of demand, if any.

Lisa Fontello
Chief Deputy Prothonotary

_____
Per Deputy

EFiled: Nov 24 2021 04:27PM EST
Transaction ID 67122855
Case No. N21C-11-222 MMJ CCLD

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |
|---|---|
| ALLY FINANCIAL, Inc. a Delaware corporation, | |
| Plaintiff, | |
| v. | C.A. No. _____ [CCLD] |
| U.S. SPECIALTY INSURANCE COMPANY, a Texas corporation, ILLINOIS NATIONAL INSURANCE COMPANY, an Illinois corporation, MARKEL BERMUDA LTD., a Bermuda corporation | TRIAL BY JURY OF TWELVE DEMANDED |
| Defendants. | |

## SUMMONS

**TO THE STATE OF DELAWARE,**
**TO THE SHERIFF OF KENT COUNTY**
**YOU ARE COMMANDED:**

To summon above-named Defendant Illinois National Insurance Company so that, within 20 days after service hereof upon said Defendant, exclusive of the day of service, said Defendant shall serve upon Reed Smith LLP (Attn.: Brian M. Rostocki, Esq.), Plaintiff's attorney, whose address is 1201 N. Market Street, Suite 1500, Wilmington, Delaware 19801, an answer to the Complaint, and if an affidavit of demand has been filed, an affidavit in defense.

To serve upon Defendant a copy hereof and of the Complaint.

Dated: _____          Lisa Fontello_____
                                Chief Deputy Prothonotary


                                _____
                                Per Deputy

**TO THE ABOVE-NAMED DEFENDANT:**

In the case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney named above an answer to the Complaint and, if an affidavit of demand has been filed, an affidavit of defense, judgment by default will be rendered against you for the relief demanded in the Complaint, or in the affidavit of demand, if any.

Lisa Fontello
Chief Deputy Prothonotary


Per Deputy

- 2 -

EFiled: Nov 24 2021 04:27PM EST
Transaction ID 67122855
Case No. N21C-11-222 MMJ CCLD

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| ALLY FINANCIAL, Inc. a Delaware corporation, | |
| Plaintiff, | |
| v. | C.A. No. _____ [CCLD] |
| U.S. SPECIALTY INSURANCE COMPANY, a Texas corporation, ILLINOIS NATIONAL INSURANCE COMPANY, an Illinois corporation, MARKEL BERMUDA LTD., a Bermuda corporation | **TRIAL BY JURY OF TWELVE DEMANDED** |
| Defendants. | |

## <u>SUMMONS</u>

**TO THE STATE OF DELAWARE,
TO THE SHERIFF OF KENT COUNTY
YOU ARE COMMANDED:**

To summon above-named Defendant Markel Bermuda Ltd. so that, within 20 days after service hereof upon said Defendant, exclusive of the day of service, said Defendant shall serve upon Reed Smith LLP (Attn.: Brian M. Rostocki, Esq.), Plaintiff's attorney, whose address is 1201 N. Market Street, Suite 1500, Wilmington, Delaware 19801, an answer to the Complaint, and if an affidavit of demand has been filed, an affidavit in defense.

To serve upon Defendant a copy hereof and of the Complaint.

Dated: _____

Lisa Fontello_____
Chief Deputy Prothonotary

_____
Per Deputy

**TO THE ABOVE-NAMED DEFENDANT:**

In the case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney named above an answer to the Complaint and, if an affidavit of demand has been filed, an affidavit of defense, judgment by default will be rendered against you for the relief demanded in the Complaint, or in the affidavit of demand, if any.

Lisa Fontello
Chief Deputy Prothonotary

Per Deputy

EFiled: Nov 24 2021 04:27PM EST
Transaction ID 67122855
Case No. N21C-11-222 MMJ CCLD

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| ALLY FINANCIAL, Inc. a Delaware corporation, | |
| **Plaintiff,** | |
| v. | C.A. No. _____ [CCLD] |
| U.S. SPECIALTY INSURANCE COMPANY, a Texas corporation, ILLINOIS NATIONAL INSURANCE COMPANY, an Illinois corporation, MARKEL BERMUDA LTD., a Bermuda corporation | **TRIAL BY JURY OF TWELVE DEMANDED** |
| **Defendants.** | |

## <u>PRAECIPE</u>

TO:  PROTHONOTARY OF NEW CASTLE COUNTY

PLEASE ISSUE a Summons and two copies of the Complaint and the Civil Information Sheet to the Sheriff of Kent County to be served on Defendant U.S. Specialty Insurance Company at the following address:

U.S. Specialty Insurance Company
c/o Delaware Department of Insurance
1351 North Street, Suite 101
Dover, DE 19904

Dated:  November 24, 2021

Respectfully submitted,

REED SMITH LLP

*/s/ Brian M. Rostocki*
Brian M. Rostocki (No. 4599)
Alexandria P. Murphy (No. 6686)
1201 Market Street, Suite 1500
Wilmington, DE 19801
Telephone:  (302) 778-7500
Facsimile:  (302) 778-7575

*Counsel for Plaintiff*

**EFiled:  Nov 24 2021 04:27PM EST**
**Transaction ID 67122855**
**Case No. N21C-11-222 MMJ CCLD**

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| ALLY FINANCIAL, Inc. a Delaware corporation, | |
| Plaintiff, | |
| v. | C.A. No. _____  [CCLD] |
| U.S. SPECIALTY INSURANCE COMPANY, a Texas corporation, ILLINOIS NATIONAL INSURANCE COMPANY, an Illinois corporation, MARKEL BERMUDA LTD., a Bermuda corporation | **TRIAL BY JURY OF TWELVE DEMANDED** |
| Defendants. | |

## <u>PRAECIPE</u>

TO:  PROTHONOTARY OF NEW CASTLE COUNTY

PLEASE ISSUE a Summons and two copies of the Complaint and the Civil

Information Sheet to the Sheriff of Kent County to be served on Defendant Illinois

National Insurance Company at the following address:

Illinois National Insurance Company
c/o Delaware Department of Insurance
1351 North Street, Suite 101
Dover, DE 19904

Dated:  November 24, 2021

Respectfully submitted,

REED SMITH LLP

*/s/ Brian M. Rostocki*
Brian M. Rostocki (No. 4599)
Alexandria P. Murphy (No. 6686)
1201 Market Street, Suite 1500
Wilmington, DE 19801
Telephone:  (302) 778-7500
Facsimile:   (302) 778-7575

*Counsel for Plaintiff*

**EFiled:  Nov 24 2021 04:27PM EST
Transaction ID 67122855
Case No. N21C-11-222 MMJ CCLD**

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| ALLY FINANCIAL, Inc. a Delaware corporation, | |
| Plaintiff, | |
| v. | C.A. No. _____  [CCLD] |
| U.S. SPECIALTY INSURANCE COMPANY, a Texas corporation, ILLINOIS NATIONAL INSURANCE COMPANY, an Illinois corporation, MARKEL BERMUDA LTD., a Bermuda corporation | **TRIAL BY JURY OF TWELVE DEMANDED** |
| Defendants. | |

## <u>PRAECIPE</u>

TO:  PROTHONOTARY OF NEW CASTLE COUNTY

PLEASE ISSUE SUMMONS to Plaintiffs' counsel of record, commanding Plaintiff to summon and direct the below-named Defendant to answer the Complaint by serving the below-named Defendant pursuant to 10 *Del. C.* § 3104 in a manner comporting with Article 10 of the Hague Convention with a copy of the Summons and Complaint as follows:

Markel Bermuda Ltd.
c/o an officer, a managing or general agent
Markel House
2 Front Street
Hamilton HM 11
Bermuda

Dated:  November 24, 2021

Respectfully submitted,

REED SMITH LLP

*/s/ Brian M. Rostocki*
Brian M. Rostocki (No. 4599)
Alexandria P. Murphy (No. 6686)
1201 Market Street, Suite 1500
Wilmington, DE 19801
Telephone:  (302) 778-7500
Facsimile:   (302) 778-7575

*Counsel for Plaintiff*

EFiled:  Nov 24 2021 04:27PM EST
Transaction ID 67122855
Case No. N21C-11-222 MMJ CCLD

# EXHIBIT A

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY,
## STATE OF MISSOURI

Ally Financial Inc.,

     Plaintiff,

v.

Alberta Haskins and David Duncan,

     Defendant.

Case No. 16JE-AC01713-01

### Defendants' Second Amended Answer and Counterclaim

Defendants, through their undersigned attorneys, answer Plaintiff's Petition and counterclaim against Plaintiff:

### Answer

1.     Defendants are without sufficient information or knowledge to admit or deny the allegations in Paragraph 1, and therefore deny same.

2.     Defendants admit the allegations in Paragraph 2.

3.     Defendants admit the allegations in Paragraph 3.

4.     Defendants admit they executed the Retail Installment Contract to purchase the vehicle, but are without sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 4, and therefore deny same.

5.     Defendants admit the allegations contained in Paragraph 5.

6.     Defendants deny receiving a Notice of Right to Cure. The remaining balance of the allegation is a legal conclusion to which no response is required. If a response is required, Defendants deny the remaining allegations in Paragraph 6.

7.     Defendants admit Plaintiff repossessed Defendants' vehicle, but deny the remaining allegations in Paragraph 7.



EXHIBIT
A

1

8.      Defendants admit the allegations in Paragraph 8.

9.      Defendants admit Plaintiff sold the vehicle, but deny Plaintiff complied with UCC Article 9.

10.     Defendants deny the allegations in Paragraph 10.

11.     Defendants deny the allegations in Paragraph 11.

WHEREFORE, having fully answered Plaintiff's Petition, Defendants pray for an order dismissing all claims against Defendants with prejudice and costs expended taxed to Plaintiff; and awarding all other relief as the Court deems just or necessary under the circumstances.

## Affirmative Defenses

1.      Plaintiff's Petition fails to state a claim upon which relief can be granted because Plaintiff has failed to plead facts sufficient to show compliance with sections 400.9-601 to 400.9-629, RSMo., as required by sections 408.556.1 and 408.557, RSMo.

2.      Plaintiff's Petition is barred by the absolute bar rule because Plaintiff did not strictly comply with the Uniform Commercial Code, including sections 400.9-601 to 400.9-629, RSMo.

3.      Plaintiff's Petition is barred as set forth in the counterclaim below, which is incorporated by this reference.

4.      Collateral estoppel bars Plaintiff's Petition:

   a.  Defendant seeks to invoke collateral estoppel defensively.

   b.  The presale notice in *Ally Financial Inc. v. Marino*, No. 16WY-CV00069 (Mo. Cir. June 22, 2016) restricted the methods for redemption.

   c.  The *Marino* presale notice is attached as **Exhibit A**. Both presale notices to Defendants and the *Marino* presale notice restricted the methods by which a consumer could redeem the vehicle.

d. The *Marino* court held language restricting the method of redemption was misleading and made the presale notice unreasonable under § 400.9-614. A copy of the *Marino* judgment and motion incorporated into the judgment are attached as **Exhibit B**.

e. The *Marino* suit resulted in a final judgment on the merits.

f. Ally participated as a party in the *Marino* adjudication.

g. Ally had a full and fair opportunity to litigate the issue of the sufficiency of its presale notice.

h. Ally is precluded from litigating the sufficiency of its presale notice in this litigation.

i. The insufficiency of Ally's presale notice destroys its right to pursue a deficiency judgment.

---

## Counterclaim

### Nature of Case

1. This is a consumer class action against Ally, and its predecessors or successors, seeking relief to redress an unlawful and deceptive pattern of wrongdoing followed by Ally regarding collection, enforcement, repossession and disposition of collateral, and collection of alleged deficiencies.

2. Ally mailed Defendants and many other consumers a presale notice, which did not comply with the Uniform Commercial Code ("UCC") adopted by each state.[1]

---

[1]   Defendants cite to the sections of the official text of the UCC. All 50 states have adopted the sections of the UCC, cited by Defendants, with no material variation that would affect the claims of the putative class members, regardless of where the putative class member resides, the loan originated, or the repossession took place. Missouri adopted Article 9 of the UCC at § 400.9-101, *et seq.* Missouri's UCC adds the prefix of 400 to the statutory numbering scheme. For example, § 9-614 of the UCC is denominated § 400.9-614 in Missouri's statutes.

3.      Ally's form presale notice is attached to its Petition as **Exhibit B2**.

4.      Ally mailed Defendants and numerous other consumers a post-sale notice, which did not comply with the UCC.

5.      Ally's form post-sale notice is attached to its Petition as **Exhibit 1** to **Exhibit C**.

6.      Defendants sue for themselves and all other similarly situated consumers. They seek actual damages not less than the statutory minimum provided for under the UCC, and such other further relief as this Court may deem appropriate.

### Parties

1.      Defendants are residents of Jefferson County, Missouri.

2.      Ally is a Delaware corporation with its principal place of business in Michigan. Ally was previously known as GMAC Inc. Ally does substantial business in Missouri.

3.      All allegations of acts or omissions by Ally include, but are not limited to, acts and omissions of Ally's officers, directors, operators, managers, supervisors, employees, affiliates, subsidiaries, vice-principals, partners, agents, servants, and owners; and that such acts and omissions were made with Ally's express and/or implied authority, or were ratified or otherwise approved by Ally; or that such acts or omissions were made in the routine normal course and scope of their agency and employment as Ally's officers, directors, operators, managers, supervisors, employees, affiliates, subsidiaries, vice-principals, partners, agents, servants, and owners.

### Jurisdiction and Venue

4.      This is a civil case, so this Court has jurisdiction.

5.      Venue is proper in this Court under § 508.010 because Defendants are residents of Jefferson County, Missouri and Ally may be found in Jefferson County, Missouri. Venue is also

proper in this Court under Rule 55.32 because Defendants are counterclaiming on Ally's Petition originally brought in Jefferson County, Missouri.

## General Allegations

6.      Defendants signed a consumer credit contract for the purchase of a motor vehicle ("Property").

7.      Defendants' loan documents indicated the primary use for the purchase of the Property was for personal, family or household purposes.

8.      The Property was bought for use primarily for personal, family or household purposes.

9.      The consumer credit contract was for the sale of a motor vehicle by a retail seller to a retail buyer on time under a retail installment contract for a time sale price payable in one or more deferred installments

10.     Defendants and each class member were debtors or obligors in a consumer-goods transaction as those terms are defined under the UCC.

11.     Ally never obtained Defendants' written consent to repossess the Property.

12.     Ally never obtained the written consent from the members of the Missouri Subclass (defined below) to repossess their property.

13.     Defendants did not waive their right to notice of the consumer credit contract obligation's acceleration.

14.     No class member waived their right to notice of the consumer credit contract obligation's acceleration.

15.     Ally never mailed Defendants notice of acceleration before repossessing the Property.

16.     Ally never mailed members of the Class (defined below) notice of acceleration before repossessing their property.

17.     After repossessing the Property, Ally mailed presale notices to Defendants and the Class, advising of Ally's intent to dispose of their property in purported compliance with the UCC.

18.     The presale notices mailed to Defendants and the Class were not reasonable as required by § 9-611(b) because, among other reasons:

a.      The presale notices were misleading because they state the redemption amount must be paid by certified funds, cashier's check, Western Union or MoneyGram, but neither the contract nor the law requires redemption to be paid only through these methods.

b.      The presale notices were misleading because the debt had not been properly accelerated, so a consumer wishing to redeem need only pay the delinquent payments plus the creditor's expenses.

c.      The presale notices are misleading because they indicate to the recipient no one else owes money on the agreement.

d.      The information contained in the presale notices was inaccurate because the debt had not been properly accelerated.

19.     The presale notices mailed to Defendants and the Missouri Subclass, were not reasonable as required by § 400.9-611(b) because, among other reasons:

a.      The presale notices were unreasonable for all the reasons they were unreasonable as to the Class.

b.      The presale notices stated a redemption balance including interest accruing after default but before a judgment was obtained, which violates § 408.553.

6

      c.      The presale notice stated the balance owed will increase each day from the date of the letter, which is contrary to § 408.553.

20.      Ally failed to send Defendants and the classes reasonable authenticated notices of disposition as required by § 9-611.

21.      Ally or someone at Ally's direction disposed of the Property ("Disposition") after mailing a presale notice.

22.      After Disposition, Ally or someone at Ally's direction mailed post-sale notices to Defendants and each member of the Class explaining how it calculated their deficiency balances.

23.      Ally's post-sale notices to Defendants and the Class failed to comply with § 9-616 because the notices, among other reasons:

      a.      Did not provide all the information, in the requisite order, as required by § 400.9-616(c)(3).

      b.      Misstated the aggregate amount of obligation (as required by § 9-616(c)(1)) and the amount of the deficiency (as required by §§ 9-616(a)(1)(A), (c)(6)) by including improperly accelerated amounts.

      c.      On information and belief, the information contained in the post-sale notices is otherwise inaccurate.

24.      The post-sale notices mailed to Defendants and the Missouri Subclass failed to comply with § 400.9-616 for all the reasons they were unreasonable as to the Class and because they misstated the aggregate amount of obligation (as required by § 400.9-616(c)(1)) and the amount of the deficiency (as required by §§ 400.9-616(a)(1)(A), (c)(6)) by including unpaid balances or interest that had not become due.

25.     Ally's failure to provide a statutorily compliant post-sale notice is part of a pattern, or consistent with a practice, of noncompliance.

26.     Ally sued Defendants and the Missouri Subclass without giving proper notice required by § 408.557.

27.     Ally or someone at Ally's direction unlawfully collected or attempted to collect unpaid balances and interest that had not become due.

28.     Ally or someone at Ally's direction unlawfully collected or attempted to collect deficiency balances from Defendants and other consumers issued defective presale and post-sale notices.

29.     Ally or someone at Ally's direction unlawfully collected or attempted to collect the time price differential, delinquency and collection charges from Defendants and other Missouri consumers issued defective presale and post-sale notices.

30.     Ally has maintained a practice and policy of reporting derogatory information regarding the class members to local consumer reporting agencies and the three national consumer credit reporting agencies: Equifax Credit Information Services, Inc., Experian, Inc., and TransUnion, LLC (collectively, "CRAs"), despite its failure to comply with the presale and post-sale notice requirements.

31.     The defective presale and post-sale notices, and the reporting of false or inaccurate derogatory information on the class members' credit reports harmed the class members' credit worthiness, credit standing, credit capacity, character, and general reputation.

32.     The defective presale and post-sale notices, and the reporting of false or inaccurate derogatory information on the class members' credit reports were oral or written publication of material that defames, slanders or libels the class members.

33. The defective presale and post-sale notices, and the reporting of false or inaccurate derogatory information on the class members' credit reports were oral or written publication of material that invaded the class members' privacy rights.

**Class Allegations**

34. Defendants counterclaim for themselves and classes designated under Rules 52.08(a) and 52.08(b)(3) to remedy the ongoing unfair, unlawful, or deceptive business practices alleged, and seeks redress for all those persons harmed.

35. The Class comprises all persons ("Class") within the applicable statute of limitations:

    a. who are named as borrowers or buyers on a loan or financing agreement with Ally, assigned to Ally or owned by Ally;

    b. whose loan or financing agreement was secured by collateral;

    c. whose collateral was repossessed, voluntarily or involuntarily; and

    d. whose collateral was disposed.

36. Alternatively, the Class comprises all persons ("Class") within the applicable statute of limitations:

    a. who Ally failed to send a presale notice;

    b. who Ally mailed a presale notice that stated anywhere in the notice one or all of the following phrases: "certified funds," "cashier's check," "Western Union," or "Moneygram;"

    c. who Ally failed to send a post-sale notice; or

    d. who Ally mailed a post-sale notice after disposing the collateral or receiving insurance proceeds for the same.

37.     The Missouri Subclass comprises all persons within the Class ("Missouri Subclass"):

    a.   who obtained a Missouri Certificate of Title for a motor vehicle identifying Ally as the lienholder, or who are named as borrowers or buyers with a Missouri address on a loan or financing agreement with Ally, assigned to Ally or owned by Ally;

    b.   whose loan or financing agreement was secured by a motor vehicle or other collateral;

    c.   whose motor vehicle or other collateral was repossessed, involuntarily or voluntarily; and

    d.   whose motor vehicle or other collateral was disposed.

38.     Alternatively, the Missouri Subclass comprises all persons within the Class ("Missouri Subclass") who obtained a Missouri Certificate of Title for a motor vehicle identifying Ally as the lienholder, or who are named as borrowers or buyers with a Missouri address on a loan or financing agreement with Ally, assigned to Ally or owned by Ally; and:

    a.   who Ally failed to send a presale notice;

    b.   who Ally mailed a presale notice that stated anywhere in the notice one or all the following phrases: "certified funds," "cashier's check," "Western Union," or "Moneygram;"

    c.   who Ally failed to send a post-sale notice; or

    d.   who Ally mailed a post-sale notice after disposing the collateral or receiving insurance proceeds for the same.

39.     Members of the classes are so numerous their individual joinder is impracticable. Defendants are informed and believe the Class contains over 20,000 individuals who had their motor vehicles or other collateral repossessed, involuntarily or voluntarily, and disposed. Defendants are informed and believe the Missouri Subclass contains over 1,000 individuals who had their motor vehicles or other collateral repossessed, involuntarily or voluntarily, and disposed. The classes are sufficiently numerous to make joinder impracticable, if not impossible. The precise number of Class members is unknown.

40.     Ally has a company policy of requiring redemption by certified funds after Ally has repossessed collateral. This policy is not in the class members' consumer credit contracts and is first communicated to the class members in the presale notice.

41.     From at least 2009 through November 2012, Ally's form presale notice stated "You must pay the amount required in certified funds."

42.     From at least February 2013 through the present, Ally's form presale notice stated "You must pay the amount required by cashier's check sent to Ally Financial at the address at the top of this letter by mail or overnight delivery service or use the services of Western Union or Moneygram."

43.     None of the class members' consumer credit contracts required payment or redemption by certified funds, cashier's check, Western Union or Moneygram.

44.     None of the class members' consumer credit contracts precluded payment or redemption by ACH, debit cards, or credit cards, which Ally invited consumers to use as methods of payment on its website, and in its account statements and summaries mailed to consumers before repossession and after disposition of the collateral.

45.     Ally's presale notice mailed to Defendants stated "You must pay the amount required in certified funds."

46.     Ally mailed over 1,000 presale notices to persons other than Defendants that stated "You must pay the amount required in certified funds."

47.     There are questions of law and fact common to the classes, which predominate over any issues involving individual class members.

48.     Ally mailed the same or substantially similar presale notice to each member of the classes that it mailed to Defendants. Each presale notice mailed to the class members restricts redemption payments to certain methods outlined in the presale notice. Each presale notice also contained language suggesting redemption required payment of the full accelerated balance when the debt had not been properly accelerated.

49.     Ally mailed the same or substantially similar post-sale notice to each member of the classes that it mailed to Defendants.

50.     The principal legal question common to Defendants and each class member is whether the presale and post-sale notices mailed by Ally, or someone at its direction, complied with the UCC.

51.     The principal legal question common to Defendants and each Missouri Subclass member is whether § 408.553 precludes interest from accruing after default until a judgment is obtained, and if so, whether the presale and post-sale notices are defective by including or discussing interest Ally was precluded from charging.

52.     Defendants' claims are typical of the claims of the class members.

53.     Defendants' and the classes' claims are based on the same factual and legal theories.

54.     Defendants' and the Class's rights derive from written, form contracts and a uniform statute adopted by all 50 states with no material variation for the claims asserted here.

55.     All presale notices mailed to the Class stated somewhere in the notice one of the following phrases: "certified funds," "cashier's check," "Western Union," or "Moneygram."

56.     The violations alleged by Defendants and the Class derive from written, form presale and post-sale notices that violate the UCC adopted by each state.

57.     The violations alleged by Defendants and the Missouri Subclass derive from written, form presale and post-sale notices that violate § 408.553 and the UCC.

58.     Defendants and each class member were damaged and may recover actual damages not less than the minimum damages provided by the UCC due to Ally's failure to provide proper presale notices and post-sale notices.

59.     Defendants will fairly and adequately represent and protect the interests of the classes.

60.     Defendants have no interests antagonistic to the class members.

61.     Defendants' counsel is competent and experienced in consumer and class litigation.

62.     Defendants and all class members have an interest in determining the adequacy of the presale notices and post-sale notices mailed by Ally and to recover damages due to the defective presale notices and post-sale notices.

63.     The questions of law or fact common to the classes predominate over questions affecting only individual members.

64.     Defendants and each class member will rely on the same basic evidence (i.e., the form notices).

65.     Determining the deficiency of the presale notices and post-sale notices resolves all class members' claims because each notice mailed to the class members suffers from at least one of the same deficiencies as Defendants' notices.

66.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

67.     The class members are consumer debtors, who likely cannot locate or afford to hire lawyers.

68.     Most class members are probably unaware Ally violated their rights and the law.

69.     If each of the class members were forced to bring an individualized suit, such suits would burden judicial resources and would create the risk of multiple inconsistent results for similarly situated parties.

70.     Concentrating the litigation of Defendants' and the class members' claims is also desirable and logical given the predominance of common questions of law and fact alleged above.

71.     The classes should be certified under Rule 52.08(b)(3), as the superior method for the fair and efficient adjudication of this controversy.

72.     Defendants seek a declaration that the form presale notices and post-sale notices used by Ally violate Missouri or other applicable law.

## Collateral Estoppel

73.     Defendants and the classes seek to invoke collateral estoppel offensively.

74.     The presale notice in in *Ally Financial Inc. v. Marino*, No. 16WY-CV00069 (Mo. Cir. June 22, 2016) restricted redemption to certain methods not required by the contract.

75.     The *Marino* presale notice is attached as **Exhibit A**. The presale notices to the class members and the *Marino* presale notice restricted the methods by which a consumer could redeem the vehicle.

76.    The *Marino* court held such language was misleading and made the presale notice unreasonable under § 400.9-614. A copy of the *Marino* judgment and motion incorporated into the judgment are attached as **Exhibit B**.

77.    The *Marino* suit resulted in a final judgment on the merits.

78.    Ally participated as a party in the *Marino* adjudication.

79.    Ally had a full and fair opportunity to litigate the issue of the sufficiency of its presale notice.

80.    Ally is precluded from litigating the sufficiency of its presale notice in this litigation.

81.    The insufficiency of Ally's presale notice destroys its right to pursue a deficiency judgment and makes Ally liable to the class members for actual damages not less than the statutory minimum provided by the UCC.

## Count I – Class's Claim

82.    Defendants repeat the allegations set forth above as if set forth in Count I.

83.    Ally violated the UCC by failing to provide the presale notice in the form and manner required under the UCC before disposing of collateral secured by loans entered by, assigned to, or owned by Ally.

84.    Ally did not use the form of notification provided in § 9-614(3) of the UCC when sending presale notices to Defendants and the Class.

85.    Ally's presale notice to Defendants and the Class included additional language or content not authorized or allowed by law, rendering the presale notices misleading or unreasonable in violation of §§ 9-611 and 9-614 of the UCC.

86.     As required under § 9-611 of the UCC, Ally failed to provide "reasonable authenticated notice of disposition" to Defendants and the Class.

87.     Ally did not mail post-sale notices, or any other explanation or writing, to Defendants and the Class providing all the information, in the requisite order, as required by § 9-616 of the UCC.

88.     Ally's failure to provide a statutorily compliant post-sale notice is part of a pattern, or consistent with a practice, of noncompliance because Ally mailed the same noncompliant post-sale notice to Defendants and the Class.

89.     As a direct and proximate result of failure to comply with the requirements of Subchapter 6 of Article 9 of the UCC, Defendants and the Class suffered actual damages not less than the minimum damages provided by § 9-625(c)(2), including:

     a.   loss of use of tangible property and cost of alternative transportation;

     b.   loss resulting from the inability to obtain, or increased costs of, alternative financing;

     c.   harm to credit worthiness, credit standing, credit capacity, character, and general reputation;

     d.   harm caused by defamation, slander and libel;

     e.   harm caused by invasion of privacy; and

     f.   other uncertain and hard-to-quantify actual damages.

WHEREFORE, Defendants pray this Court certify the Class and enter a judgment for Defendants and the Class against Ally:

     a.   awarding actual damages not less than the minimum damages provided by § 9-625(c)(2);

b.  statutory damages of $500 for each defective post-sale notice mailed or that Ally failed to send;

c.  prejudgment and post-judgment interest;

d.  a preliminary and permanent injunction enjoining Ally from engaging in the practices alleged, including without limitation, enjoining Ally from collecting deficiency judgments, time price differential, delinquency and collection charges from Defendants and the Class;

e.  a mandatory injunction compelling Ally to return any money collected for deficiency judgments, time price differential, delinquency and collection charges from Defendants and the Class;

f.  a mandatory injunction compelling Ally to remove any adverse credit information wrongfully reported on Defendants' and the Class' consumer credit reports;

g.  a declaration that the presale and post-sale notices mailed by Ally to Defendants and the Class fail to comport with the statutory requirements; and

h.  for such other and further relief as this Court deems just and proper.

### Count II – Missouri Subclass' Claim

90.  Defendants repeat the allegations set forth above as if set forth in Count II.

91.  Ally wrongfully charged interest after default but before a final judgment in violation of § 408.553, which also violates § 365.145.

92.  Ally's wrongful charge of interest renders the presale notices unreasonable and misleading in violation of §§ 400.9-611 and 400.9-614(5).

93.  Ally's wrongful charge of interest renders the post-sale notices unreasonable and misleading in violation of § 400.9-616 because, among other reasons, it misstates the amount of

the obligation and the deficiency balances owed by including unpaid balances or interest that had not become due.

94.    Ally did not mail post-sale notices, or any other explanation or writing, to Defendants and the Missouri Subclass providing all the information, in the requisite order, as required by § 400.9-616.

95.    Ally's failure to provide a statutorily compliant post-sale notice is part of a pattern, or consistent with a practice, of noncompliance because Ally mailed the same noncompliant post-sale notice to Defendants and the Missouri Subclass.

96.    Ally's failure to provide notices sufficient under §§ 400.9-611, 400.9-614 and 400.9-616 before commencing its claim for a deficiency judgment violates sections §§ 408.556, 408.557, and 365.145.

97.    Under § 365.150.2, Ally's violation of § 365.145 requires it return any time price differential, delinquency or collection charge on the consumer credit contracts that it collected from Defendants and the Missouri Subclass.

98.    As a direct and proximate result of Ally's wrongful acceleration and repossession, and failure to send the requisite notices, Defendants and the Missouri Subclass suffered actual damages not less than the minimum damages provided by § 400.9-625(c)(2), including:

      a.  loss of use of tangible property and cost of alternative transportation;

      b.  loss resulting from the inability to obtain, or increased costs of, alternative financing;

      c.  the surplus after disposition of the collateral that would be equal to the proceeds of disposition less the unaccelerated balance due on the consumer loan contracts and less any wrongfully charged interest;

d.  all monies paid to Ally by Defendants and the Missouri Subclass for the time price differential and delinquency and collection charges on the consumer credit contracts;

e.  harm to credit worthiness, credit standing, credit capacity, character, and general reputation;

f.  harm caused by defamation, slander and libel;

g.  harm caused by invasion of privacy; and

h.  other uncertain and hard-to-quantify actual damages.

99.   Defendants and the Missouri Subclass are entitled to attorney's fees under § 408.562.

100.   Defendants and the Missouri Subclass are entitled to punitive damages under § 408.562.

101.   Ally's actions were wanton, outrageous, and/or malicious because of its reckless indifference to or conscious disregard of the consumer rights of Defendants and the Missouri Subclass.

WHEREFORE, Defendants pray this Court certify the Missouri Subclass and enter a judgment for Defendants and the Missouri Subclass against Ally:

a.  awarding actual damages not less than the minimum damages provided by § 400.9-625(c)(2);

b.  statutory damages of $500 for each defective post-sale notice mailed;

c.  prejudgment and post-judgment interest;

d.  attorney's fees;

e.  punitive damages;

f.  a preliminary and permanent injunction enjoining Ally from engaging in the practices alleged, including without limitation, enjoining Ally from collecting deficiency judgments, time price differential, delinquency and collection charges from Defendants and the Missouri Subclass;

g.  a mandatory injunction compelling Ally to return any money collected for deficiency judgments, time price differential, delinquency and collection charges from Defendants and the Missouri Subclass;

h.  a mandatory injunction compelling Ally to remove any adverse credit information wrongfully reported on Defendants' and the Missouri Subclass's consumer credit reports;

i.  a declaration that the right to cure, presale, and post-sale notices mailed by Ally to Defendants and the Missouri Subclass fail to comport with the statutory requirements; and

j.  for such other and further relief as this Court deems just and proper.

THE ONDER LAW FIRM

By:   */s/ Jesse B. Rochman*
      Martin L. Daesch, #40494
      Jesse B. Rochman, #60712
      110 E. Lockwood Ave.
      St. Louis, MO  63119
      (314) 963-9000 (telephone)
      (314) 963-1700 (facsimile)
      daesch@onderlaw.com
      rochman@onderlaw.com

*Attorneys for Defendants*

## Certificate of Service

I certify on March 29, 2017, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all attorneys of record.

*/s/ Jesse B. Rochman*

# EXHIBIT B

## CLASS ACTION SETTLEMENT AGREEMENT AND RELEASE

This CLASS ACTION SETTLEMENT AGREEMENT AND RELEASE ("Agreement"), made on March 17, 2021 ("Execution Date"), subject to final approval by the Circuit Court of Jefferson County, Missouri ("Court"), is between (a) Alberta Haskins and David Duncan ("Class Representatives"), individually and as the representatives of the Classes, and (b) Ally Bank and Ally Financial Inc. The Class Representatives, Ally Bank, Ally Financial Inc., and the Classes are sometimes individually called a "Party" and collectively called the "Parties." Other capitalized terms are defined in Paragraph 2 or elsewhere in this Agreement.

WHEREAS, the Class Representatives are the named defendants and counterclaimants in the civil action pending before the Court, styled *Ally Financial Inc. v. Alberta Haskins and David Duncan*, Case No. 16JE-AC01713-01 (together with any and all actions that may be consolidated, the "Litigation"); and

WHEREAS, the Class Representatives are asserting claims and seeking relief against Ally for alleged violations of the Uniform Commercial Code as enacted in the various states, as well as Missouri Chapter 408 and Missouri Chapter 365, for themselves and two classes of Persons who had or have Covered Contracts; and

WHEREAS, the Court certified two counterclaimant classes in the Litigation by its Order entered May 9, 2018, and modified the definition of those classes by its Order and Order on Disputed Statutes of Limitation both entered November 25, 2019; and

WHEREAS, Class Counsel and Ally's Counsel have investigated the facts relating to the claims alleged and the events and transactions underlying the Litigation, through formal and informal discovery, and have made a thorough study of the legal principles applicable to the claims being asserted against Ally; and

- 1 -

WHEREAS, Ally denies each and all of the claims and allegations of liability or wrongdoing made by the Class Representatives in the Litigation, matters involving the certification of the Classes and the exercise of jurisdiction by the Court, and all other claims and allegations of liability or wrongdoing arising out of, relating to, or connected with any of the conduct, statements, acts, or omissions that have been or could be alleged by the Classes against Ally; and

WHEREAS, Class Members have disputed and continue to dispute the original amount and enforceability of the deficiency balances that Ally's records reflect as remaining under their Covered Contracts after disposition of the related Collateral; and

WHEREAS, the Parties and their respective counsel have engaged in substantial arm's-length negotiations, including multiple mediation sessions spanning many months, about the settlement of the Litigation; and

WHEREAS, the Parties have agreed, subject to final approval by the Court, to fully, finally, and forever settle and resolve the Litigation as among the Class Representatives, the Classes, and Ally under the terms and provisions of this Agreement; and

WHEREAS, the Class Representatives and Class Counsel have concluded that the settlement with Ally reflected in this Agreement is fair, just, equitable, reasonable, adequate, and in the best interests of the Classes based upon their comprehensive investigation, study, negotiations, and discovery taken, and considering the contested issues, the legal and factual assertions and defenses of Ally, the expense and time to prosecute the Litigation against Ally through trial, the delays and the risks and costs of further prosecution against Ally, the uncertainties of this complex and protracted litigation, and the benefits to be received by the Classes under this Agreement; and

WHEREAS, while maintaining the positions referenced earlier, the Parties have agreed to enter into this Agreement to avoid the further burden, expense, and uncertainty of protracted litigation and to fully put to rest all controversies as set forth in the Released Claims;

NOW THEREFORE, intending to be legally bound and acknowledging the sufficiency and adequacy of the consideration in this Agreement, the Parties and Class Counsel agree, subject to final approval of this Agreement by the Court, that the Litigation and the Released Claims against the Released Persons are fully, finally, and forever compromised and settled and will be dismissed with prejudice as against the Released Persons as set forth in this Agreement.

## 1.     Denial of Liability; No Admissions

1.1     As further described in the recitals, the Parties are entering into this Agreement to resolve vigorously disputed claims and allegations that have arisen among them and to avoid the further burden, expense, uncertainty, and risk of protracted litigation.

1.2     None of the following are admissible under Mo. Rev. Stat. § 435.014.2, Missouri Supreme Court Rule 17, or any similar rule of evidence or procedure in any applicable jurisdiction or are an admission of liability or wrongdoing by the Parties, any Released Person, or any other Person: (a) this Agreement, any prior drafts of it, or any related correspondence or other communications, (b) the Memorandum of Understanding re: Class Action Settlement dated December 31, 2020, any prior drafts of it, or any related correspondence or other communications ("Memorandum of Understanding"), (c) any term or provision of this Agreement or the Memorandum of Understanding, (d) any conduct, statement, or document relating to this Agreement or the Memorandum of Understanding, (e) any conduct, statement, or document relating to settlement negotiations about the Litigation or any claim or allegation relating to the Litigation (whether or not in any mediation session), and (f) any conduct,

statement, or document relating to the submission of this Agreement to the Court or requests for its consideration and approval.

1.3     Ally denies each and all of the claims and allegations of liability or wrongdoing made by the Class Representatives in the Litigation, the propriety of the certification of the Classes for purposes of litigation and trial, the exercise of jurisdiction by the Court to adjudicate without the express written consent of Ally the claims and allegations of members of the Nationwide Class who are not residents of or have no other relevant connection to Missouri, and all other claims and allegations of liability or wrongdoing arising out of, relating to, or connected with any of the conduct, statements, acts, or omissions that have been or could be alleged by the Classes against Ally.

1.4     Class Members have disputed and continue to dispute the original amount and enforceability of the deficiency balances that Ally's records reflect as remaining under their Covered Contracts after disposition of the related Collateral.

1.5     Subject to the terms and provisions of this Agreement, the Parties reserve the right to maintain their positions and all of their other rights, remedies, objections, arguments, defenses, and positions.

## 2.     Definitions

The following definitions, in addition to those set forth in other Paragraphs, apply in this Agreement:

2.1     **Ally**. "Ally" means Ally Bank, Ally Financial Inc., their subsidiaries, and all of the direct and indirect successors and predecessors of any of them (whether by merger, consolidation, reorganization, or otherwise).

2.2     **Ally's Counsel**. "Ally's Counsel" means Todd W. Ruskamp and the law firm of Shook, Hardy & Bacon L.L.P., 2555 Grand Blvd., Kansas City, Missouri 64108.

2.3     **Business Day**. "Business Day" means any day other than a Saturday, a Sunday, or a day on which banks in New York, New York, Charlotte, North Carolina, or St. Louis, Missouri are authorized or obligated by law or executive order to be closed.

2.4     **Cash Fund.** "Cash Fund" is defined in Paragraph 4.1.1.

2.5     **Certification Notice.** "Certification Notice" is defined in Paragraph 3.3.

2.6     **Class Counsel**. "Class Counsel" means James G. Onder, Martin L. Daesch, Jesse B. Rochman, and the law firm OnderLaw, LLC, 110 E. Lockwood Avenue, St. Louis, Missouri 63119.

2.7     **Class Mail Notice**. "Class Mail Notice" means the documents in a form substantially the same as those attached as **Exhibit A**.

2.8     **Class Member Payment**. "Class Member Payment" is defined in Paragraph 15.7.

2.9     **Class Members**. "Class Members" means all Persons, including the Class Representatives, who are members of either of the Classes and who have not timely and validly excluded themselves in compliance with procedures established by the Court and set forth in Paragraphs 8.1 and 8.2.

2.10    **Class Period**. "Class Period" is defined in Paragraph 3.4.

2.11    **Class Representatives**. "Class Representatives" is defined in the first paragraph of this Agreement.

2.12    **Classes**. "Classes" mean the Nationwide Class and the Missouri Class. This term includes the Class Representatives.

- 5 -

2.13    **Collateral**. "Collateral" means personal property in which Ally holds or held a security interest under a Covered Contract.

2.14    **Court**. "Court" is defined in the first paragraph of this Agreement.

2.15    **Covered Account**. "Covered Account" is defined in Paragraph 4.2.1.

2.16    **Covered Contract**. "Covered Contract" means any loan, promissory note, financing agreement, or installment sale contract that is or was with, assigned to, or owned by Ally.

2.17    **Covered Tradeline**. "Covered Tradeline" is defined in Paragraph 4.3.1.

2.18    **CRA**. "CRA" is defined in Paragraph 4.3.1.

2.19    **Deficiency Reduction Percentage**. "Deficiency Reduction Percentage" is defined in Paragraph 4.2.2.

2.20    **Effective Date**. "Effective Date" is defined in Paragraph 12.

2.21    **Execution Date**.  "Execution Date" is defined in the first paragraph of this Agreement.

2.22    **Final Approval Order**. "Final Approval Order" means a final order of the Court consistent with Paragraph 10.1.

2.23    **Final  Hearing**. "Final Hearing" means the hearing to be held by the Court to determine whether this Agreement receives final approval under Missouri Supreme Court Rule 52.08.

2.24    **Final Hearing Date**. "Final Hearing Date" means the date of the Final Hearing.

2.25    **Final Judgment**. "Final Judgment" means a final judgment of the Court consistent with Paragraph 10.1.

2.26    **First Deficiency Waiver Amount**. "First Deficiency Waiver Amount" is defined in Paragraph 4.2.2.

2.27    **Gross Deficiency Waiver Amount**. "Gross Deficiency Waiver Amount" is defined in Paragraph 4.2.1.

2.28    **Gross Settlement Fund**. "Gross Settlement Fund" is the sum of the Cash Fund and the Gross Deficiency Waiver Amount.

2.29    **Litigation**. "Litigation" is defined in the recitals of this Agreement.

2.30    **Long-Form Notice**. "Long-Form Notice" means the documents in a form substantially the same as those attached as **Exhibit B**.

2.31    **Memorandum of Understanding**. "Memorandum of Understanding" is defined in Paragraph 1.2.

2.32    **Missouri Class**. "Missouri Class" is defined in Paragraph 3.2.

2.33    **Nationwide Class**. "Nationwide Class" is defined in Paragraph 3.1.

2.34    **Net Distributable Settlement Fund**. "Net Distributable Settlement Fund" means the Cash Fund, *plus* any interest earned on the Cash Fund while in the QSF Account, *minus* the sum of any Incentive Award, Cost Award, and Fee Award and any other deduction from the Cash Fund approved by the Court under Paragraphs 6.1, 6.2, and 6.3.

2.35    **Opt-Out**. "Opt-Out" is defined in Paragraph 8.1.

2.36    **Party**. "Party" is defined in the first paragraph of this Agreement.

2.37    **Person**. "Person" means any person or entity of any nature, including any individual, corporation, limited liability company, partnership, limited partnership, limited liability partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or governmental authority. This term includes such a person's or entity's spouses,

heirs, predecessors, successors, executors, administrators, trustees, representatives, beneficiaries, assignees, and any Person claiming by, through, or on behalf of the person or entity.

2.38    **Preliminary Approval Order**. "Preliminary Approval Order" means an order of the Court consistent with Paragraph 7.

2.39    **QSF**. "QSF" is defined in Paragraph 15.1.

2.40    **QSF Account**. "QSF Account" is defined in Paragraph 4.1.1.

2.41    **Released Claims**. "Released Claims" means—in addition to any and all defenses, objections, rights, remedies, and benefits that may be derived from applicable law in any jurisdiction that may limit the extent or effect of the releases and other actions in this Agreement—any and all claims, demands, actions, suits, causes of action, cross-claims, counter-claims, rights, offsets, setoffs, debts, obligations, judgments, damages, charges, liens, harm, costs, surcharges, losses, attorneys' fees, expenses, and liabilities of any kind whatsoever, whether class or individual, in law or in equity, or otherwise, for or in connection with any consideration, thing of value, remedy, or relief of any kind whatsoever, whether joint or several, in law or in equity, substantive or nominal, or otherwise, including monetary, statutory, general, compensatory, special, liquidated, indirect, incidental, expectation, consequential, aggravated, and punitive damages, injunctive and declaratory relief, rescission, restitution, changes to credit, fees, penalties, fines, attorneys' fees, costs, and expenses, whether known or unknown, alleged or not alleged, suspected or unsuspected, contingent or vested, choate or inchoate, accrued or not accrued, liquidated or unliquidated, matured or not, that any Releasor ever had, now has, or in the future can, shall, or may have, whether individually, representatively, derivatively, or otherwise, from or against any Released Person that concern, relate to, arise out of, or are connected with a factual predicate of the Litigation, including any conduct, statement, act, or

- 8 -

omission that has been or could be alleged by any Releasor concerning, arising out of, relating to, or connected with any Covered Contract, including (a) the origination, financing, assignment, and servicing of any Covered Contract, (b) the repossession, surrender to, and control of any Collateral by Ally or any Person on its behalf (regardless of whether the Collateral was subsequently redeemed by, returned to, or otherwise recovered by the owner, co-owner, purchaser, co-purchaser, borrower, co-borrower, obligor, co-obligor, buyer, co-buyer, guarantor, or any other Person), (c) the charging, payment, collection, and attempted collection of amounts relating to any Covered Contract or Covered Account (including deficiencies after the sale or other disposition of any Collateral), (d) any notice or other communication delivered or required to be delivered before, after, or otherwise in connection with the repossession, surrender, control, or sale or other disposition of any Collateral, (e) any sale or other disposition of any Collateral, and (f) the furnishing of information to credit reporting agencies relating to any Covered Contract or Covered Account and any notices related to such furnishing. "Released Claims" also includes any claim or other matter of any kind whatsoever (as more fully set forth in the preceding sentence) that concerns, relates to, arises out of, or is connected with (i) any act, omission, or error of a CRA in connection with Paragraph 4.3 or (ii) any breach, failure to perform, or other act, omission, or error by any Person other than Ally in connection with this Agreement. Excluded from "Released Claims," however, is any claim or other matter whatsoever involving the enforcement of this Agreement against Ally.

2.42   **Released Persons**. "Released Persons" means Ally, and any or all of Ally's direct and indirect and past, present, and future affiliates, divisions, parents, subsidiaries, and related Persons, and any or all of Ally's and their past, present, and future officers, directors, managers, members, partners, shareholders, agents, attorneys, employees, representatives, trustees, heirs,

executors, administrators, predecessors, successors, assignees, contractors, vendors, and insurers, and any Person acting or purporting to act on behalf of any of them.

2.43   **Releasors**. "Releasors" means, individually and collectively, the Class Members, for and on behalf of themselves, and any or all of their past, present, and future affiliates, divisions, parents, subsidiaries, and related Persons, and any or all of their past, present, and future officers, directors, managers, members, partners, shareholders, agents, attorneys, employees, representatives, trustees, heirs, executors, administrators, predecessors, successors, assignees, contractors, vendors, and insurers, and any Person acting or purporting to act or claim by, through, or on behalf of any of them, in each case whether they object to this Agreement, the Preliminary Approval Order, the Final Approval Order, or the Final Judgment, whether they receive actual notices or other communications in connection with any of the foregoing, or whether they receive, realize, or derive any funds, property, benefit, or thing of value from any of the foregoing or the Cash Fund, the Gross Deficiency Waiver Amount, or any other consideration described in this Agreement. Excluded from "Releasors," however, are any Persons who timely and validly exclude themselves in compliance with procedures established by the Court and Paragraphs 8.1 and 8.2.

2.44   **Remaining Covered Account**. "Remaining Covered Account" is defined in Paragraph 4.2.2.

2.45   **Second Deficiency Waiver Amount**. "Second Deficiency Waiver Amount" is defined in Paragraph 4.2.2.

2.46   **Settlement Administrator**.  "Settlement Administrator" means, subject to Court approval, First Class, Inc.

- 10 -

2.47   **Settlement Website.**  "Settlement Website" means the website that the Settlement Administrator and Class Counsel will establish no later than thirty (30) days after entry of the Preliminary Approval Order as a means for the Class Members to obtain notice of and information about the settlement reflected in this Agreement, through and including hyperlinked access to the operative petition and answer in the Litigation, this Agreement, the Class Mail Notice, the Long-Form Notice, the Preliminary Approval Order, any applications for an Incentive Award, Cost Award, or Fee Award, and other documents that Class Counsel and Ally's Counsel agree to post or that the Court orders posted on the website. These documents must remain on the Settlement Website at least until the Effective Date. The URL of the Settlement Website will be www.allynoticeclass.com or such other URL as Class Counsel and Ally's Counsel may subsequently agree upon in writing. Ownership of the Settlement Website URL will be fully assigned, by operation of this Agreement without further action, and transferred to Ally within ten (10) Business Days after the date on which operation of the Settlement Website ceases consistent with this Agreement, which must be mutually agreed by the Parties or ordered by the Court.

3.   **The Classes**

3.1   **Nationwide Class**.  The "Nationwide Class" means and is composed of each Person (a) who was named as a borrower, co-borrower, obligor, co-obligor, buyer, co-buyer, purchaser, co-purchaser, guarantor, owner, or co-owner in a Covered Contract, (b) whose Covered Contract was secured by Collateral, (c) whose Collateral was repossessed, voluntarily or involuntarily, and (d) whose Collateral was disposed of during the Class Period.

3.2   **Missouri Class**.  The "Missouri Class" means and is composed of each Person (a) who obtained a Missouri Certificate of Title for a motor vehicle identifying Ally as the

- 11 -

lienholder as a result of entering into a Covered Contract, or who was named as a borrower, co-borrower, obligor, co-obligor, buyer, co-buyer, purchaser, co-purchaser, guarantor, owner, or co-owner with a Missouri address in a Covered Contract, (b) whose Covered Contract was secured by Collateral, (c) whose Collateral was repossessed, voluntarily or involuntarily, and (d) whose Collateral was disposed of during the Class Period.

3.3     **Exclusions.**  Excluded from the Classes is any Person (a) against whom Ally obtained a final judgment during the Class Period for the deficiency remaining under a Covered Contract after disposition of the related Collateral, (b) who filed a Chapter 7 bankruptcy petition after the date of the Person's pre-sale notice covering Collateral under a Covered Contract and whose Chapter 7 bankruptcy case ended in a discharge, not a dismissal, during the Class Period, (c) who filed a Chapter 13 bankruptcy petition after the date of the Person's pre-sale notice covering Collateral under a Covered Contract and whose Chapter 13 bankruptcy case is still pending as of the date on which the Court enters the Preliminary Approval Order or ended in a discharge, not a dismissal, during the Class Period, or (d) who timely and validly excluded themselves in compliance with procedures set forth in the Notice of Pending Class Action dated July 17, 2020 sent to the Classes (the "Certification Notice") or in compliance with procedures established by the Court and set forth in Paragraphs 8.1 and 8.2 of this Agreement.

3.4     **Class Period.**  The "Class Period" is the period from and after (a) the date shown on Exhibit A to the Court's Order on Disputed Statutes of Limitation entered on November 25, 2019, for the state of the applicable Class Member's address as stated on the related Covered Contract, to and including (b) the entry date of the Preliminary Approval Order.  The specific start and end dates for the Class Period by state will be stated in the Long-Form Notice.

4.    **Settlement Consideration from Ally**.  In consideration of the settlement reflected in this Agreement (including Paragraph 5), Ally will provide the following:

4.1    **Cash Fund**.

4.1.1    At its own expense, Ally will deliver eighty-seven million five hundred thousand U.S. dollars ($87,500,000) in immediately available funds (the "Cash Fund") by wire transfer to a qualified settlement fund account (within the meaning of 468B-1 of the Treasury Regulations (26 C.F.R. § 1.468B-1)) established by Class Counsel and the Settlement Administrator in accordance with Paragraph 15 (the "QSF Account"). Ally will make the wire transfer within ten (10) Business Days after the later of (a) the Effective Date and (b) receipt by Ally's Counsel of written confirmation of the establishment of the QSF Account, written wiring instructions for the QSF Account, and a completed W-9 Tax Form from Class Counsel and the Settlement Administrator.

4.1.2    Under no circumstances will Ally be required to pay any amount in addition to the Cash Fund under the terms and provisions of this Agreement.

4.2    **Deficiency Waiver**.

4.2.1    Ally will waive and forgive, in the aggregate, seven hundred million U.S. dollars ($700,000,000) (the "Gross Deficiency Waiver Amount") in deficiency balances that Ally's records reflect as outstanding as of the Effective Date on the accounts of Class Members associated with the Covered Contracts described in Paragraphs 3.1 and 3.2 (each a "Covered Account" and collectively, the "Covered Accounts").

4.2.2    Within ninety (90) days after the Effective Date, Ally will apply the Gross Deficiency Waiver Amount to the Covered Accounts associated with one or more Class Members in the following manner and order:

- 13 -

(a)    First, for each Covered Account having an outstanding balance greater than zero as of the Effective Date according to Ally's records, Ally will apply the Gross Deficiency Waiver Amount to reduce the outstanding balance of each of these Covered Accounts by the lesser of one thousand three hundred U.S. dollars ($1,300) or the remaining balance of the Covered Account (in the aggregate for all Covered Accounts, the "First Deficiency Waiver Amount"). Each Covered Account, regardless of the number of Class Members associated with it, will be credited with its applicable share of the First Deficiency Waiver Amount only once. The Parties expect that the First Deficiency Waiver Amount will be less than the Gross Deficiency Waiver Amount. If this turns out not to be the case, Ally will calculate the greatest amount (in whole dollars) less than one thousand three hundred U.S. dollars ($1,300) that would not cause the Gross Deficiency Waiver Amount to be less than zero after its application in the first sentence of this subparagraph (a), and that amount will be substituted in place of one thousand three hundred U.S. dollars ($1,300) in the first sentence of this subparagraph (a) and applied to reduce the outstanding balance of each of these Covered Accounts accordingly.

(b)    Second, Ally will calculate an amount (the "Second Deficiency Waiver Amount") equal to the Gross Deficiency Waiver Amount *minus* the First Deficiency Waiver Amount.

(c)    Third, for each Covered Account still having an outstanding balance greater than zero according to Ally's records after application of the First Deficiency Waiver Amount (each a "Remaining Covered Account" and

- 14 -

collectively, the "Remaining Covered Accounts"), Ally will calculate the percentage (the "Deficiency Reduction Percentage"), rounded down to the nearest tenth of a percent, equal to the quotient of (i) the Second Deficiency Waiver Amount divided by (ii) the aggregate deficiency balances that Ally's records reflect as outstanding in all of these Remaining Covered Accounts after application of the First Deficiency Waiver Amount. Ally will then credit each of these Remaining Covered Accounts with an amount equal to the product of (i) the deficiency balance that Ally's records reflect as outstanding in the Remaining Covered Account after application of the First Deficiency Waiver Amount *multiplied by* (ii) the Deficiency Reduction Percentage. Each Remaining Covered Account, regardless of the number of Class Members associated with it, will be credited with its applicable share of the Second Deficiency Waiver Amount only once.

4.2.3    The deficiency balances that Ally's records reflect as outstanding on the Covered Accounts on the Effective Date will not be increased by the addition of further finance charges or late charges.

4.2.4    Ally reserves all claims, rights, and remedies relating to the amount, enforceability, and collection of any outstanding deficiency balances remaining on the Covered Accounts after the application of Paragraphs 4.2.2 and 4.2.3.

4.3    **Credit Reporting**.

4.3.1    Within one hundred twenty (120) days after the Effective Date, Ally will request that each of the three national consumer credit reporting agencies to whom Ally furnishes information (Experian, Equifax, and TransUnion, each a "CRA") delete any

- 15 -

trade line reported to the CRA with respect to a Covered Account (each a "Covered Tradeline"). Except as described in Paragraph 4.3.2, Ally will cease furnishing information on the Covered Tradelines to the CRAs on and after the date of transmittal of the deletion requests to the CRAs as described in this Paragraph 4.3.1.

      4.3.2   The Parties acknowledge that no CRA is affiliated with or otherwise under the control of Ally, that Ally cannot, and does not, guarantee, warrant, or otherwise take responsibility for any CRA acting on the deletion requests described in Paragraph 4.3.1 or deleting any Covered Tradeline as so requested, and that a significant amount of time may pass before any CRA may act on the deletion requests described in Paragraph 4.3.1. If a Class Member notifies Ally in writing after the date that is ninety (90) days after the deletion requests described in Paragraph 4.3.1 were transmitted that a CRA did not delete the Class Member's Covered Tradeline as so requested, Ally will submit, one time, a "Universal Data Form" or similar request to the CRA to delete the Class Member's Covered Tradeline. Such a notice from a Class Member to Ally may be sent to Ally by email to: HaskinsCreditBureauInquiry@ally.com or by U.S. Mail to: Executive Customer Relations, c/o Haskins Class Action Settlement, 500 Woodward Avenue, Tenth Floor, Detroit Michigan 48226. No act, omission, or error by any CRA will constitute a breach of this Agreement by Ally.

      4.4   **No Other Consideration Given**. This Paragraph 4 describes all of the consideration that Ally will provide for the settlement reflected in this Agreement (including Paragraph 5).

5.      **Releases**

5.1      On the Effective Date and in consideration of the settlement reflected in this Agreement (including Paragraph 4), by operation of this Agreement, the Final Approval Order, and the Final Judgment and without further action by the Court or any other Person, each of the Releasors (a) fully, finally, and forever waives, releases, relinquishes, and discharges the Released Persons of all Released Claims; (b) consents to the dismissal with prejudice of the Litigation and all Released Claims against the Released Persons; (c) consents to be permanently enjoined and barred from initiating or prosecuting any action, suit, or proceeding in any forum or before any governmental authority, either individually or as part of or on behalf of a class or in any other capacity, based on or alleging any Released Claim; and (d) agrees and covenants not to sue or otherwise initiate or prosecute any action, suit, or proceeding in any forum or before any governmental authority, either individually or as part of or on behalf of a class or in any other capacity, based on or alleging any Released Claim.

5.2      The Parties acknowledge that the Released Persons will suffer irreparable harm if any Releasor takes action or does anything else inconsistent with Paragraph 5.1. In such a case, each Released Person may seek an injunction and other relief at law or in equity without further showing of irreparable harm.

5.3      After the Effective Date, a Releasor may discover material or immaterial legal or factual matters other than or different from those that the Releasor understood or believed as of the Effective Date, but regardless of the reason for the discovery or the legal or factual matter so discovered, the scope, effect, operative finality, and enforceability of all of this Paragraph 5 will not be limited or otherwise affected in any manner whatsoever.

5.4     On the Effective Date, by operation of this Agreement, the Final Approval Order, and the Final Judgment and without further action by the Court or any other Person, each of the Releasors waives, releases, relinquishes, and discharges, to the fullest extent permitted by law, the rights, remedies, and benefits of California Civil Code section 1542 and all similar state, local, or federal statutes and other laws. California Civil Code section 1542 provides:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

## 6.     Incentive Awards, Attorney Fees, and Costs

6.1     Each of the Class Representatives may petition the Court for an incentive award in recognition of services rendered to benefit the Classes throughout the Litigation ("Incentive Award"). Any Incentive Award will be payable solely from the Cash Fund, will be deducted from the Cash Fund in calculating the Net Distributable Settlement Fund available to Class Members, and will be distributed by the Settlement Administrator to the Class Representatives with their Class Member Payments as described in Paragraph 15.  Ally will not object to each Class Representative's petition for or receipt of an Incentive Award in an amount not to exceed twenty thousand U.S. dollars ($20,000).  Any application for an Incentive Award must be filed with the Court and posted to the Settlement Website no later than forty-five (45) days after the Class Mail Notice is sent and at least fifteen (15) days prior to the deadline to object to the Agreement.

6.2     Class Counsel and the Class Representatives may petition the Court for an award of litigation expenses, fees and expenses for the Settlement Administrator, and court costs ("Cost Award"). Any Cost Award will be payable solely from the Cash Fund, will be deducted from the

- 18 -

Cash Fund in calculating the Net Distributable Settlement Fund available to Class Members, and will be distributed by the Settlement Administrator to Class Counsel as described in Paragraph 15. Ally will not object to a petition by Class Counsel and the Class Representatives for or their receipt of a Cost Award in an amount not to exceed one million two hundred thousand U.S. dollars ($1,200,000). Any application for a Cost Award must be filed with the Court and posted to the Settlement Website no later than forty-five (45) days after the Class Mail Notice is sent and at least fifteen (15) days prior to the deadline to object to the Agreement. Any settlement-administration fees and expenses of any kind in excess of the Cost Award will be paid by Class Counsel and, if and to the extent approved by the Court, reimbursed from the Cash Fund.

6.3     Class Counsel and the Class Representatives may petition the Court for an award of attorneys' fees ("Fee Award"). Any Fee Award will be payable solely from the Cash Fund, will be deducted from the Cash Fund in calculating the Net Distributable Settlement Fund available to Class Members, and will be distributed by the Settlement Administrator to Class Counsel as described in Paragraph 15. Ally will not object to a petition by Class Counsel and the Class Representatives for or Class Counsel's receipt of a Fee Award in an amount not to exceed 11% of the Gross Settlement Fund. Any application for a Fee Award must be filed with the Court and posted to the Settlement Website no later than forty-five (45) days after the Class Mail Notice is sent and at least fifteen (15) days prior to the deadline to object to the Agreement.

6.4     Except as provided in this Paragraph 6, each Party will bear its own attorneys' fees, costs, and expenses in the prosecution, defense, and settlement of the Litigation.

6.5     Paragraphs 6.1, 6.2, and 6.3 are severable from the remainder of this Agreement. This Agreement will be fully effective even if the Court denies any Incentive Award, Cost

Award, or Fee Award or approves such awards in amounts less than Class Counsel or the Class Representatives request.

## 7.    Preliminary Approval Order

Within ten (10) days after the Execution Date, after consulting with and providing a reasonable opportunity for comment by Ally's Counsel, the Class Representatives and Class Counsel will prepare and file a motion with the Court for a Preliminary Approval Order that is in a form agreed on by Class Counsel and Ally's Counsel and that:

7.1    Preliminarily approves this Agreement as fair, reasonable, and adequate under Missouri Supreme Court Rule 52.08, subject to a final determination by the Court;

7.2    Approves the Class Mail Notice to be sent to Class Members;

7.3    Approves the Long-Form Notice to be provided to Class Members on request and to be posted on the Settlement Website;

7.4    Approves the appointment of the Settlement Administrator;

7.5    Directs the Settlement Administrator to (a) mail the Class Mail Notice within thirty (30) Business Days after Ally provides the information described in Paragraph 14.1, (b) post the Long-Form Notice on the Settlement Website within twenty (20) Business Days after the Court enters the Preliminary Approval Order, and (c) mail the Long-Form Notice, promptly after receipt of a request from any Class Member, to the Class Member by first-class mail to the address specified by the Class Member;

7.6    Establishes a procedure consistent with Paragraph 8 of this Agreement for Class Members to request to be excluded from the Classes, and sets a specific deadline after the date when Class Mail Notices are mailed, after which no Class Member may request to be excluded from the Classes;

- 20 -

7.7     Establishes a procedure consistent with Paragraph 9 of this Agreement for Class Members to appear and object to the settlement reflected in this Agreement, and sets a specific deadline after the later of (a) the date when the Class Mail Notices are mailed or (b) the date when Class Counsel and the Class Representatives file their motions for approval of any Incentive Award, Cost Award, and Fee Award as provided in Paragraphs 6.1, 6.2, and 6.3, or such other date as the Court directs, after which no Class Member may object;

7.8     Sets the Final Hearing Date at least fifteen (15) days after the deadline for Opt-Out requests and at least fifteen (15) days after the deadline for objections;

7.9     Authorizes the establishment of the QSF and the QSF Account; and

7.10     Stays all other proceedings in the Litigation and preliminarily enjoins Class Members after the deadline for Opt-Out requests from initiating or prosecuting any other action, suit, or proceeding in any forum or before any governmental authority, either individually or as part of or on behalf of a class or in any other capacity, based on or alleging any Released Claim, pending the entry of the Final Approval Order and the Final Judgment or a final order denying approval of this Agreement.

## 8.     Opt-Outs

8.1     The Preliminary Approval Order will set a deadline for Class Members to request to be excluded from the Classes ("Opt-Out").  Any Opt-Out request from a Class Member must (a) be in writing, (b) signed by the Class Member and all other Class Members on the applicable Covered Contract, (c) state the name, address, telephone number, account number, and last four digits of the Social Security Number of the Class Member and all other Class Members on the applicable Covered Contract, (d) include a statement that the Class Member and all other Class Members on the applicable Covered Contract request to Opt Out of the Classes, and (e) include a

reference to "*Ally Financial Inc. v. Haskins*, Case No. 16JE-AC01713-01." No Opt-Out request from a Class Member may be submitted or signed by an actual or purported agent or attorney acting on behalf of the Class Member, except in the case of a deceased Class Member, the Opt-Out request may be submitted and signed by an executor or similar administrator for the Class Member's estate if accompanied by a death certificate and proof of appointment. No Opt-Out request may be submitted on behalf of a group of Class Members, except that a single Opt-Out request may be submitted and signed by all Class Members on a single Covered Contract. Class Counsel will cause the Settlement Administrator to send each Opt-Out request to Class Counsel and Ally's Counsel via email within two (2) Business Days after receiving the request.

8.2     To be timely and effective, any Opt-Out request from a Class Member must comply with Paragraph 8.1, be mailed to the Settlement Administrator at the address designated in the Class Mail Notice, and be postmarked on or before the deadline set forth in the Preliminary Approval Order.  Each Class Member who does not submit an Opt-Out request that complies with this Paragraph 8 will be fully, finally, and forever a Class Member included in the applicable Classes and bound by the settlement reflected in this Agreement if approved by the Court. Class Counsel and Ally's Counsel will provide to the Court, on or before the Final Hearing Date, a list of all Persons, by reference to a unique identifier and last four digits of the Person's Social Security Number, who have timely mailed a valid Opt-Out request.

8.3     If Opt-Out requests result in the exclusion of 1,000 or more Persons in the Classes from the settlement reflected in this Agreement, Ally, in its sole and absolute discretion, may elect to rescind this Agreement, with effects as further described in Paragraph 13.

8.4     Ally may elect to exercise the unilateral rescission right described in Paragraph 8.3 by delivering written notice to Class Counsel on or before the date that is ten (10) Business

Days after the deadline for Opt-Out requests set forth in the Preliminary Approval Order. Notwithstanding anything to the contrary in this Agreement, if Ally elects to rescind this Agreement under this Paragraph 8, Ally will reimburse Class Counsel, in an amount not to exceed six hundred thousand U.S. dollars ($600,000), for the reasonably documented expenses and costs actually incurred by the Settlement Administrator and paid by Class Counsel in providing Class Mail Notices to Class Members prior to Ally exercising its unilateral rescission right.

**9.      Objections to Settlement or Incentive, Cost, or Fee Awards**

9.1      Any Class Member who has not timely and validly Opted Out of the Classes under Paragraph 8 may object, at the Class Member's own expense, to Court approval of this Agreement or any requested Incentive Award, Cost Award, or Fee Award. Such an objection must (a) be in writing, (b) be filed with the Court and served on Class Counsel and Ally's Counsel at the addresses set forth in Paragraph 2 on or before the deadline set forth in the Preliminary Approval Order, and (c) include (i) the objecting Class Member's name, address, telephone number, account number, email address (if available), and last four digits of the Class Member's Social Security Number, (ii) if the objecting Class Member is represented by counsel, the name, address, telephone number, and email address (if available) of the counsel, (iii) a specific statement of each objection asserted, (iv) a description of any facts or legal authorities on which each objection is based, (v) all documents and other evidence on which the objecting Class Member intends to rely, including each of the expert's opinions and the factual and substantive bases for that opinion, (vi) the name, address, telephone number, and email address (if available) of each expert and each witness on whose testimony the objecting Class Member intends to rely, (vii) a statement whether the objecting Class Member intends to appear at the Final Hearing in person or through the designated counsel, (viii) the name, court, and docket

number associated with any other class-action settlement where the objecting Class Member has objected (whether through a formal appearance or otherwise) or provided legal assistance with respect to an objection; (ix) the name, court, and docket number associated with any other class-action settlement where the objecting Class Member's counsel has appeared as an objector's attorney or provided legal assistance with respect to an objection; and (x) a reference to "*Ally Financial Inc. v. Haskins*, Case No. 16JE-AC01713-01."

9.2    An objecting Class Member need not attend the Final Hearing for the Class Member's objection to be considered. However, any Class Member who fails to comply with Paragraph 9.1 will have waived any objection and will forever be barred from making any objection, unless otherwise excused by the Court for good cause shown.

## 10.    Final Approval Order, Final Judgment, and Final Accounting

10.1    If the Preliminary Approval Order is entered by the Court and Ally does not exercise its unilateral rescission right under Paragraph 8.3, the Class Representatives and Class Counsel—appropriately in advance of the Final Hearing Date and after consulting with and providing a reasonable opportunity for comment by Ally's Counsel—will prepare and file a motion with the Court requesting entry of a Final Approval Order and a Final Judgment that are in forms agreed on by Class Counsel and Ally's Counsel and that, in each case as applicable:

(a)    Confirms the certification of the Classes and the appointment of the Class Representatives as representatives of the Classes for purposes of the settlement reflected in this Agreement;

(b)    Approves this Agreement as fair, reasonable, and adequate and in the best interest of the Classes;

(c)     Finds that the Class Mail Notice, the Long-Form Notice, and the procedures involving notice to Class Members constituted due, adequate, and sufficient notice of the settlement reflected in this Agreement and meets all of the requirements of due process and Missouri rules of procedure;

(d)     Declares that all Releasors are bound by Paragraph 5, and orders the Parties, Class Counsel, and the Settlement Administrator to carry out this Agreement's terms and provisions;

(e)     Fully dismisses the Litigation with prejudice;

(f)     Orders that the Releasors are permanently enjoined and barred from initiating or prosecuting any action, suit, or proceeding in any forum or before any governmental authority, either individually or as part of or on behalf of a class or in any other capacity, based on or alleging any Released Claim;

(g)     Reserves continuing and exclusive jurisdiction over this Agreement, the settlement reflected in this Agreement, the QSF, and the QSF Account, including their administration, enforcement, and consummation; and

(h)     Incorporates Paragraph 13 of this Agreement and contains such other terms and provisions consistent with this Agreement as the Court may deem advisable.

10.2    The Settlement Administrator and Class Counsel will file a final accounting with the Court within five hundred (500) days after the Effective Date. The final accounting will include a summary of all distributions of the Cash Fund, and Class Counsel will request Court approval of the final accounting.

**11.      Certifications to the Court**

11.1      On or before the Final Hearing Date, Class Counsel will file with the Court an affidavit verifying that, as ordered by the Court, (a) the Court-approved Class Mail Notices have been duly sent by first-class mail to the Class Members, (b) the Court-approved Long-Form Notice and other settlement documents have been duly posted on the Settlement Website and have been accessible to the Class Members, and (c) the Court-approved Long-Form Notice has been duly sent by first-class mail to any Class Member promptly after receipt of a request from the Class Member.

11.2      On or before the Final Hearing Date, Class Counsel will file with the Court an affidavit verifying that the procedures for returned Class Mail Notices in Paragraph 14.4 have been fully performed.

**12.      Effectiveness of this Agreement**.

The "Effective Date" of this Agreement will be the date on which all of the following conditions have occurred without Ally having exercised its right of rescission under Paragraph 8.3:

12.1      This Agreement has been executed and delivered by the Class Representatives, Class Counsel, Ally Financial Inc., Ally Bank, and Ally's Counsel; and

12.2      The Preliminary Approval Order has been entered by the Court as required by Paragraph 7; and

12.3      The Court-approved Class Mail Notices have been duly mailed to Class Members as ordered by the Court; and

12.4      The Court-approved Long-Form Notice has been posted on the Settlement Website as ordered by the Court; and

- 26 -

12.5    The Final Approval Order and the Final Judgment have been entered by the Court as required by Paragraph 10.1 without material change (excluding changes affecting any Incentive Award, Cost Award, or Fee Award or any matter for which Ally is not liable under Paragraph 15.15); and

12.6    The Final Approval Order and the Final Judgment required by this Agreement have become final (whether after original entry or after any remand and subsequent entry) because (a) no appeal has been filed and the time for commencing any appeal has expired, or (b) an appeal has been filed and either (i) the appeal has not been accepted or has been dismissed, and any time for commencing any further appeal has expired, or (ii) the Final Approval Order and the Final Judgment have been affirmed in their entirety in all respects material to the Parties (including the settlement consideration from Ally in Paragraph 4 and the releases in Paragraph 5 but excluding any Incentive Award, Cost Award, or Fee Award), and any time for commencing any further appeal has expired. An appeal of any Incentive Award, Cost Award, or Fee Award or an appeal relating to any obligation, responsibility, interest, or liability for which Ally has no obligation, responsibility, interest, or liability under Paragraph 15.15, however, will not prevent or otherwise affect the Final Approval Order and the Final Judgment from being final and the Effective Date from occurring under this Agreement. For purposes of this Paragraph, an appeal includes a motion to reconsider, an appeal as of right, a discretionary appeal, an interlocutory appeal, a proceeding involving a writ (including a writ of certiorari, mandamus, or prohibition), and any other proceeding of a similar kind.

## 13.    Failure of Condition

If a condition described in Paragraph 12 is not and cannot reasonably be satisfied, this Agreement, the Memorandum of Understanding, and all of the orders and judgments entered or

to be entered under this Agreement or the Memorandum of Understanding will be void *ab initio* and totally vacated, abrogated, and annulled so as to return the Parties to their positions before the execution of this Agreement and the Memorandum of Understanding as if neither had been executed, with all the pre-settlement rights, remedies, objections, arguments, defenses, and positions of each Party fully restored. In addition, in such a case, this Agreement, the Memorandum of Understanding, and all matters arising out of, relating to, or connected with any of them (including the matters described in Paragraph 1.2) will be without prejudice to the Parties, matters described in Paragraph 1.2 will not be admissible, an admission of, or used against any Party, and no doctrine of waiver, estoppel, or preclusion will be asserted in the Litigation or any other action, suit, or proceeding of any kind. Notwithstanding anything to the contrary in this Agreement, if a failure of a condition as described in this Paragraph 13 occurs, Ally will reimburse Class Counsel, in an amount not to exceed three hundred thousand U.S. dollars ($300,000), for one-half of the reasonably documented expenses and costs actually incurred by the Settlement Administrator and paid by Class Counsel in providing Class Mail Notices to Class Members prior to the failure of the condition.

**14.    Class Notice**

14.1    Within ten (10) Business Days after the Court enters the Preliminary Approval Order, Ally will supplement its previously produced summaries of Class Member information for Class Counsel, in the same Excel format provided to Class Counsel on or about March 10, 2020, which must include names, last known addresses, and outstanding deficiency balances on the Covered Accounts of Class Members as reflected in Ally's records as of the entry date of the Preliminary Approval Order, and any other information mutually agreed by the Parties or ordered by the Court. Within twenty (20) Business Days after receipt of the Cash Fund in the

QSF Account, Ally will supplement the Class Member information further to include the Social Security Numbers for all Class Members on a Covered Account where the related Class Member Payment equals or exceeds six hundred U.S. dollars ($600).

14.2    The Settlement Administrator will update the addresses provided under Paragraph 14.1 using the United States Postal Service's National Change of Address database or another equivalent address database service (e.g., Accurint or Intelius) and use the addresses as so updated in mailing the Class Mail Notices under Paragraph 14.3.

14.3    Within twenty-five (25) Business Days after the Court enters the Preliminary Approval Order, the Settlement Administrator will post the Court-approved Long-Form Notice on the Settlement Website.  Within thirty (30) Business Days after Ally provides the supplemental Class Member information to Class Counsel as described in the first sentence of Paragraph 14.1, the Settlement Administrator will mail the Court-approved Class Mail Notice to each Class Member by first-class mail. Notwithstanding anything to the contrary in this Agreement, if the Certification Notice was returned by the United States Postal Service as undeliverable and no different address was provided by Ally under Paragraph 14.1 or located by the Settlement Administrator for the applicable Class Member, the Settlement Administrator need not mail the Class Mail Notice to the Class Member.

14.4    If any Class Mail Notice is returned by the United States Postal Service, the Settlement Administrator will re-mail the Class Mail Notice to any new address of the Class Member disclosed by the United States Postal Service. If a Class Mail Notice is returned a second time, the Settlement Administrator will undertake reasonable efforts to locate a then current address for the Class Member.

14.5     The Settlement Administrator will mail a Long-Form Notice, promptly after receipt of a request from any Class Member, to the Class Member by first-class mail to the address specified by the Class Member.

14.6     Subject to entry of the Final Approval Order and the Final Judgment (including a finding in substance similar to the one described in Paragraph 10.1(c)), none of actual receipt of a Class Mail Notice, actual knowledge of the Long-Form Notice, or actual notice or knowledge of the Litigation, this Agreement, the Preliminary Approval Order, the Final Approval Order, or the Final Judgment will prevent or delay a Class Member under Paragraph 8.2 from being fully, finally, and forever a Class Member included in the applicable Class and bound by the settlement reflected in this Agreement (including Paragraph 5).

## 15.     Character and Distribution of the Cash Fund

15.1     The Cash Fund delivered by Ally under Paragraph 4.1.1 will be maintained as a "qualified settlement fund" ("QSF") within the meaning of Treasury Regulation Section 1.468B-1 promulgated under Section 468B of the Internal Revenue Code of 1986 as amended. The Settlement Administrator will be the "administrator" within the meaning of Treasury Regulation §1.468B-2(k)(3).

15.2     Upon establishment of the QSF, the Settlement Administrator will apply for an employer identification number for the QSF utilizing Internal Revenue Service Form SS-4 and in accordance with Treasury Regulation §1.468B-2(k)(4).

15.3     If requested by either Ally or the Settlement Administrator, the Settlement Administrator and Ally will cooperate in filing a relation-back election under Treasury Regulation §1.468B-1(j)(2) to treat the QSF as coming into existence as a settlement fund as of the earliest possible date.

15.4    Class Counsel will cause the Settlement Administrator to file, on behalf of the QSF, all required federal, state, and local tax returns, information returns, and tax withholdings statements under Treasury Regulation §1.468B-2(k)(1) and Treasury Regulation §1.468B-2(1)(2)(ii).

15.5    Subject to any needed supervision and direction by the Court, the Settlement Administrator will be responsible for and will administer and oversee the distribution of the Cash Fund under the terms and provisions of this Agreement.

15.6    Class Counsel will prepare calculations of the Net Distributable Settlement Fund and the amount to be distributed to each Class Member from the Net Distributable Settlement Fund and will deliver the calculations and appropriate disbursement instructions in writing to the Settlement Administrator. The minimum, average, and maximum amount of the Net Distributable Settlement Fund to be distributed to each Class Member and the Gross Deficiency Waiver Amount allocated to each Covered Account will be stated in the Long-Form Notice.

15.7    Within sixty (60) days after receipt of the Cash Fund in the QSF Account, the Settlement Administrator will distribute any Incentive Award, any Cost Award, any Fee Award, and the Net Distributable Settlement Fund consistent with the calculations and instructions provided by Class Counsel, or as the Court may otherwise provide in the Final Approval Order and Final Judgment.  Such distributions to the Class Members from the Net Distributable Settlement Fund are referred to as the "Class Member Payments."

15.8    The Settlement Administrator will distribute the Class Member Payments by checks mailed to the Class Members. Class Members need not submit claims in order to receive Class Members Payments. If any check is returned by the United States Postal Service, the Settlement Administrator will re-mail the check to any new address of the Class Member

- 31 -

disclosed by the United States Postal Service. If a check is returned a second time, the Class

Counsel and the Settlement Administrator will undertake reasonable efforts to locate a then

current address for the Class Member.

15.9    If any Class Member refuses to accept a Class Member Payment or does not cash

the associated check within sixty (60) days of mailing, Class Counsel and the Settlement

Administrator will undertake reasonable efforts to locate and contact the Class Member about

receiving, accepting, and cashing the check.

15.10   Following the expiration of one hundred and twenty (120) days after the date of

first mailing, all initially issued checks that have not been cashed will be deemed void, and the

Settlement Administrator must open a new account with the same EIN as the first account to stop

payment on all uncashed checks.  Following the expiration of two hundred and ten (210) days

after the date of first mailing, all reissued checks that have not been cashed will be deemed void,

and the Settlement Administrator must open a new account with the same EIN as the first

account to stop payment on all uncashed checks.

15.11   The Settlement Administrator will, promptly after stopping payment on all

uncashed checks under Paragraph 15.10, make a secondary distribution of the remaining balance

of the Net Distributable Settlement Fund, after deduction of any administrative costs, stop

payment fees on uncashed checks, and other charges incurred in reissuing checks, only if that

remaining balance exceeds seven hundred fifty thousand U.S. dollars ($750,000). This secondary

distribution, if made, will be allocated and made by sending checks, in equal amounts, to all

Class Members who cashed previously issued checks. If the remaining balance of the Net

Distributable Settlement Fund, after deduction of any administrative costs, stop payment fees on

uncashed checks, and other charges incurred in reissuing checks, would not exceed seven

hundred fifty thousand U.S. dollars ($750,000), the remaining balance of the Net Distributable Settlement Fund, after deduction of any administrative costs and stop payment fees on uncashed checks, will be allocated and made by sending one or more checks to Legal Services of Eastern Missouri or any other organizations approved by the Court.

15.12   Following the expiration of one hundred and twenty (120) days after the date of any secondary distribution under Paragraph 15.11, all secondary-distribution checks that have not been cashed will be deemed void, and the Settlement Administrator will request closure of the account to stop payment on all uncashed checks within ten (10) Business Days thereafter.

15.13   The Settlement Administrator will, promptly after stopping payment on all uncashed checks under Paragraph 15.12, make a final distribution of the remaining balance of the Net Distributable Settlement Fund, after deduction of any administrative costs, stop payment fees on uncashed checks, and other charges incurred in reissuing checks. This final distribution will be allocated and made by sending one or more checks to Legal Services of Eastern Missouri or any other organization approved by the Court.

15.14   Any Class Member who receives a Class Member Payment in connection with a Covered Account will be solely responsible for notifying all Class Members on the Covered Account of receipt of the Class Member Payment and distributing and allocating the Class Member Payment among them, regardless of whether the associated check has been made payable to all or only some of the Class Members on the Covered Account. Each Class Member, by accepting a Class Member Payment, represents and warrants that the Class Member is entitled to receive the Class Member Payment and has not assigned, by operation of law or otherwise, the right to the Class Member Payment. If such an assignment has been made, the Class Member

will not accept the Class Member Payment and instead will, promptly after receipt, remit the Class Member Payment to the assignee.

15.15   Except as expressly set forth in this Agreement, Ally will have no obligation or responsibility for, interest in, or liability in connection with the administration of the settlement reflected in this Agreement, including (a) the location, notification, and solicitation of Class Members, (b) the preparation and distribution of the Class Mail Notice, (c) the preparation, posting, and provision of the Long-Form Notice, (c) the establishment and maintenance of the QSF and the QSF Account, (d) the investment, allocation, and distribution of the Cash Fund, (e) the filing, receipt, and processing of release and other forms, (f) the determination, administration, calculation, and delivery of the Class Member Payments and any Incentive Award, Cost Award, Fee Award, or other distribution from the Cash Fund, (f) the payment or withholding of taxes, (g) any losses in connection with the Gross Settlement Fund or the implementation of this Agreement, and (h) communications and resolutions with Class Members, any taxing or other governmental authority, or any other Person.

15.16   If a Class Member has filed for bankruptcy, the Class Member will be solely responsible for providing any required notice to the bankruptcy trustee and the bankruptcy court of this Agreement and the Class Member Payment.

**16.     General Provisions**

16.1     The Parties agree to hold in abeyance, pending the Final Hearing, all proceedings (including discovery) in the Litigation, except proceedings that are necessary to implement this Agreement and consummate the settlement reflected in this Agreement.

16.2     Class Counsel and Ally's Counsel will act in good faith and use their best efforts to cause the Court to enter the Preliminary Approval Order, the Final Approval Order, and the

Final Judgment as promptly as practicable consistent with the terms and provisions of this Agreement. Before filing any motion in the Court raising a dispute relating to this Agreement, the Parties will meet and confer with each other and certify to the Court that they have consulted.

16.3   The Parties will execute all documents and perform all other acts necessary and appropriate to effect this Agreement.

16.4   This Agreement constitutes the full, complete, and entire understanding, agreement, and arrangement of and among the Parties and Class Counsel in connection with the subject matter of this Agreement, including the compromise and settlement of the Litigation and the Released Claims.  This Agreement supersedes all prior oral or written understandings, agreements, and arrangements among the Parties and Class Counsel of any kind in connection with the subject matter of this Agreement, including the Memorandum of Understanding. Except for those set forth expressly in this Agreement, there are no agreements, covenants, promises, representations, or arrangements among the Parties and Class Counsel of any kind in connection with the subject matter of this Agreement.

16.5   This Agreement may be amended, modified, or waived, in whole or in part, only in a writing signed by all Parties. This Agreement may not be orally amended, modified, or waived, in whole or in part. Unless otherwise ordered by the Court, nonmaterial changes to the Class Mail Notice and the Long-Form Notice will be permitted without amending this Agreement or any order issued by the Court pursuant to this Agreement.

16.6   The Class Representatives, Ally Bank, Ally Financial Inc., Class Counsel, and Ally's Counsel will sign two copies of this Agreement in any number of counterparts, and all of these copies and counterparts will constitute an original and together will constitute one agreement.

- 35 -

16.7     Each of the Parties and Class Counsel represents and warrants that the Person is acting upon the Person's independent judgment and upon the advice of the Person's own counsel and not in reliance upon any representation or warranty, express or implied, of any kind by any other Person, other than the express representations and warranties made in this Agreement.

16.8     This Agreement will be governed by and interpreted, construed, enforced, and administered under the laws of the State of Missouri, without regard to principles of conflict of laws. This Agreement will be enforced in the Court. Ally, the Class Representatives, and the Class Members waive any objection that each such party may now have or hereafter have to the Court being the exclusive venue for such an enforcement proceeding and irrevocably consent to the exclusive jurisdiction of the Court over such an enforcement proceeding.

16.9     Consistent with Paragraph 10.1(g), the Parties consent to the Court's reservation of continuing and exclusive jurisdiction over this Agreement, the settlement reflected in this Agreement, the QSF, and the QSF Account, including their administration, enforcement, and consummation.

16.10   This Agreement will bind and will inure to the benefit of the Parties and Class Counsel as well as their respective successors, assigns, executors, administrators, heirs, and legal representatives.

16.11   This Agreement will not be construed more strictly against one Person than another, it being recognized that because of the arm's-length negotiations, all Parties and Class Counsel have contributed equally to preparing this Agreement.

16.12   The term "include" introduces a non-exhaustive list.  A reference to any law is to that law as amended or supplemented to the applicable time. All personal pronouns used in this Agreement, whether used in the masculine, feminine, or neutral gender, will include all other

genders, and the singular will include the plural and vice versa, in each case, unless the context requires otherwise.

16.13   None of the Class Representatives, Class Counsel, or any Person on their behalf or with their permission or influence will issue or cause to be issued any press release or similar communication relating to this Agreement or the settlement reflected in this Agreement, make or cause to be made any public statement (including through news media or social media) relating to this Agreement or the settlement reflected in this Agreement, or disparage or comment on Ally in any way.  Nothing in this Paragraph 16.14 limits Class Counsel's obligations and duties to communicate in good faith with Class Members or the Court, including as required by applicable rules of professional responsibility or by Missouri Supreme Court Rule 52.08.

16.14   Each of the Parties and Class Counsel represents, warrants, and covenants that (a) the Person has full power and authority to enter into and consummate all transactions contemplated by this Agreement and has duly authorized the execution, delivery, and performance of this Agreement, (b) the person executing this Agreement on behalf of the Person has the full right, power, and authority to enter into this Agreement and all related documents on behalf of the Person, and (c) this Agreement is enforceable against the Person according to its terms (except as enforceability may be limited by principles of equity or insolvency).

16.15   The exhibits attached to the Agreement are incorporated as though set forth in this Agreement.

16.16    Notwithstanding anything in this Agreement to the contrary, except for the Gross Deficiency Waiver Amount as applied in Paragraph 4, nothing in this Agreement is intended to or does waive or release any claims, rights, and remedies that Ally may have on any Covered

Contract or Covered Account or against any Class Member, insurance company, or broker. All such claims, rights, and remedies are expressly preserved.

16.17   This Agreement references data and other information that Ally has utilized and produced in connection with the Litigation and describes data and other information that Ally may or must utilize and produce in connection with the implementation of this Agreement.  All of this data and other information, including in connection with the Covered Contracts, has been and will be based on Ally's electronic records as reasonably available at the time of utilization or production as applicable.

16.18   Within ten (10) Business Days after the Effective Date, Ally will file a motion to dismiss its petition for a writ of certiorari regarding the Litigation (*Ally Financial Inc. v. Haskins et al*., No. 20-177) under United States Supreme Court Rule 46.

In witness whereof, the undersigned, being duly authorized, have signed this Agreement on the dates beside their signatures.

DATED:  March 17, 2021

_Alberta Haskins_

Alberta Haskins, individually
and on behalf of Class Members

DATED:  March 17, 2021

David Duncan, individually
and on behalf of Class Members

DATED:  March ___, 2021          ALLY FINANCIAL INC.

By: _____

David Shevsky
Chief Operating Officer – Auto Finance

DATED:  March ___, 2021          ALLY BANK

By: _____

David Shevsky
Chief Operating Officer – Auto Finance

DATED:  March _18_, 2021          ONDERLAW, LLC

By: _____

Martin L. Daesch
Class Counsel

In witness whereof, the undersigned, being duly authorized, have signed this Agreement on the dates beside their signatures.

DATED: March___, 2021

_____
Alberta Haskins, individually
and on behalf of Class Members

DATED: March ___, 2021

_____
David Duncan, individually
and on behalf of Class Members

DATED: March ___, 2021        ALLY FINANCIAL INC.

By: _____
              David Shevsky
    Chief Operating Officer – Auto Finance

DATED: March ___, 2021        ALLY BANK

By: _____
              David Shevsky
    Chief Operating Officer – Auto Finance

DATED: March ___, 2021        ONDERLAW, LLC

By: _____
              Martin L. Daesch
              Class Counsel

- 39 -

DATED:  March /7, 2021               SHOOK, HARDY & BACON L.L.P.


                                     By:  _Todd / L why_____
                                            Todd W. Ruskamp
                                            Ally's Counsel

# EXHIBIT A

## Notice of Class Action Settlement

*A court authorized this notice.  This is not a solicitation from a lawyer.*

If you obtained a loan or financing agreement held by Ally Financial Inc. or Ally Bank (including their subsidiaries, successors, and predecessors) ("Ally") under which personal property, such as a vehicle you purchased, was pledged as collateral, you may be eligible for valuable benefits from a class-action settlement.

### This notice may affect your rights. Please read it carefully.

A settlement has been reached in a class action alleging Ally sent improper notices to you in connection with attempting to collect your loan and repossessing and selling your personal property. The name of the case is *Ally Financial Inc.  v. Alberta Haskins and David Duncan*, Case No. 16JE-AC01713-01, and it's pending in Jefferson County, Missouri Circuit Court. Consult your tax adviser about the tax issues related to the settlement. Although Ally disputes the allegations and denies liability, the parties have agreed to a settlement to avoid the cost, expense, and inherent unpredictability of litigation. The settlement does not constitute an admission of wrongdoing by Ally.

### SETTLEMENT BENEFITS

- Money: Ally will pay $87,500,000 to pay Class Members, attorneys' fees, and costs to Class Counsel and an incentive award to the Class Representatives.  More information about your Class Member Payment will be available at: www.allynoticeclass.com.

- Deficiency Waiver: Ally will no longer seek to collect a portion of any deficiency balance Ally's records reflect as outstanding after Ally repossessed and sold the personal property.  The value of this benefit to the entire Class is at least $700,000,000.  The amount of the deficiency waiver will vary by Class Member, but will be at least the lesser of the amount of your deficiency balance or $1,300.

- Cessation of Interest / Finance Charge Accrual: Ally will stop accruing finance charges and late charges on Class Members' deficiency balances as of the Effective Date of the settlement.

- Credit Bureau Reporting: Ally will request that the three nationwide consumer reporting companies—Equifax, Experian, and TransUnion—delete trade-line information on your credit report related to your account with Ally this is the subject of this case.

### You do not need to do anything to receive these benefits.

### IMPORTANT DEADLINES AND DATES

- Exclusion Deadline: If you don't want benefits from this settlement, but you want to keep the right to sue or continue to sue Ally, on your own, about the legal issues in this case, then you must request to be excluded by _____, 2021. If postmarked by this date, the Court will exclude you as a Class Member. You can request to exclude yourself as a Class Member by using the procedure described in the Long-Form Notice.  The Long-Form Notice also explains what you gain or give up by either participating in or excluding yourself from the settlement and is available as described below.

- Objection Deadline: You may object to the settlement. To object to the settlement, you must file and serve objections postmarked by _____, 2021, using the procedure described in the Long-Form Notice.

- Final Approval and Fairness Hearing: The Court will hold a final approval and fairness hearing on _____, 2021 at ____ a.m./p.m. You don't have to attend the hearing to receive the benefits of this settlement, but you may attend if you choose. The hearing will occur at the Twenty Third Judicial Circuit Court, 300 Main Street, Hillsboro, Missouri 63050. The Long-Form Notice advises you on what you must do to speak at the hearing.

**This notice summarizes certain aspects of the proposed settlement. More details are in a Long-Form Notice and the Agreement. You can get a copy of both by calling 1-844-735-5572 toll free; writing to First Class, Inc./ J14032-Ally, 5410 W. Roosevelt Rd., Ste 222, Chicago, IL 60644-1490; or visiting www.allynoticeclass.com.**

# EXHIBIT B

# If you owned property repossessed by Ally Financial Inc., you could get valuable benefits from a class-action settlement.

*A court authorized this notice. This is not a solicitation from a lawyer.*

- You may be eligible to participate in a settlement with benefits, including money, the reduction of certain debts, the cessation of finance and late charges, and the deletion of certain negative credit information from credit reports if you obtained a loan or financing agreement held by Ally Financial Inc. or Ally Bank (including their subsidiaries, successors, and predecessors) ("Ally") under which personal property, such as a vehicle you purchased, was pledged as collateral and repossessed.

- The settlement resolves a lawsuit over whether Ally sent proper notices to you in connection with attempting to collect your loan and repossessing and selling your property. This settlement avoids costs and risks to you from the lawsuit; provides benefits to borrowers like you; and releases Ally from liability.

- The two sides disagree on whether the borrowers could've won and on how much money they would've been entitled to had they won. Ally has denied liability and continues to do so.

- Your legal rights are affected whether you act or don't act. Read this notice carefully.

- Consult your tax adviser about the tax issues associated with this settlement. Relief provided under this settlement, including money and debt reduction, may be subject to the payment of taxes.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **DO NOTHING** | By doing nothing, you will receive the benefits that come from the settlement, including money. But you give up rights to separately sue Ally concerning your financing transaction that resulted in a repossession. |
| **EXCLUDE YOURSELF** | Get no money or benefits. This is the only option that allows you to ever be part of any other lawsuit against Ally about the legal claims. |
| **OBJECT** | Write to the Court about why you don't like the settlement. |
| **GO TO A HEARING** | Ask to speak in Court about the fairness of the settlement. |

- These rights and options—**and the deadlines to exercise them**—are explained in this notice.

- The Court must still decide whether to approve the settlement. Money and benefits will be provided if the Court approves the settlement and after any appeals are resolved. Please be patient.

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION**.................................................................**PAGE 3**
1. Why did I get this notice package?
2. What is this lawsuit about?
3. What is a class action and who is involved?
4. Why is there a settlement?

**WHO IS IN THE SETTLEMENT**....................................................**PAGE 4**
5. How do I know if I am part of the settlement?
6. Are there exceptions to being included?
7. I'm still not sure if I am included.

**THE SETTLEMENT BENEFITS—WHAT YOU GET**.........................**PAGE 5**
8. What does the settlement provide?
9. What can I get from the settlement?

**HOW YOU GET SETTLEMENT BENEFITS**....................................**PAGE 5**
10. How can I get my settlement benefits?
11. When would I get my settlement benefits?
12. What am I giving up to get settlement benefits?

**EXCLUDING YOURSELF FROM THE SETTLEMENT**.......................**PAGE 6**
13. How do I get out of the settlement?
14. If I don't exclude myself, can I sue Ally for the same thing later?
15. If I exclude myself, can I get benefits from this settlement?

**THE LAWYERS REPRESENTING YOU**.........................................**PAGE 7**
16. Do I have a lawyer in this case?
17. How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT**...........................................**PAGE 7**
18. How do I tell the Court that I don't like the settlement?
19. What's the difference between objecting and excluding?

**THE COURT'S FAIRNESS HEARING**..........................................**PAGE 9**
20. When and where will the Court decide whether to approve the settlement?
21. Do I have to come to the hearing?
22. May I speak at the hearing?

**GETTING MORE INFORMATION**...............................................**PAGE 9**
23. Are there more details about the settlement?
24. How do I get more information?

# BASIC INFORMATION

## 1. Why did I get a notice?

Ally's records show you might have had a loan or financing agreement directly with or that was assigned to Ally where Ally repossessed the motor vehicle securing the loan. The Court sent you a short form notice because you should know about a proposed settlement of a class action lawsuit in which you may be a Class Member, and about all your options, before the Court decides whether to approve the settlement. If the Court approves it, and after objections and appeals are resolved, Ally will reduce certain debts, cease accrual of late or finance charges, and request that certain credit reporting agencies delete deficiency balance information from your credit reports related to the repossessed personal property. Class Members will also receive payments, as described more fully in this notice.

This notice explains in greater detail about the lawsuit, the settlement, your legal rights, what benefits are available, who is eligible for them, and how to get them.

Judge Katherine Hardy-Senkel of the Twenty-Third Judicial Circuit Court for Jefferson County, Missouri is overseeing this class action. The lawsuit is known as *Ally Financial Inc. v. Haskins*, No. 16JE-AC01713-01.

## 2. What is this lawsuit about?

The claims against Ally allege that notices the borrowers received from Ally before and after their personal property was repossessed failed to comply with the form and content requirements the Uniform Commercial Code adopted by each state. Ally contends that it may assert claims for unpaid amounts due, if any, on the loans extended to Class Members (including you) for the purchase of the vehicles which were repossessed. Class Representatives contend Ally cannot assert claims against Class Members and that you and other Class Members owe no money to Ally. The Court hasn't decided who is correct on any contentions of the parties. You can read the claims against Ally in more detail at: http://allynoticeclass.com/docs/Second_Amended_Counterclaim.pdf.

## 3. What is a class action and who is involved?

In a class action, one or more people called Class Representatives (in this case Alberta Haskins and David Duncan or Counterclaimants) sue for other people who have similar claims. The people together are a "Class" or "Class Members."

## 4. Why is there a settlement?

The parties disagree over who would have won and what Class Representatives or the Classes would've recovered if they had won. Class Representatives believed they could recover 10% of the principal amount of their loan, the interest charge, and other relief. Ally believed Class Representatives and the Classes were entitled to nothing. To resolve the dispute, and because both parties are unsure of what would've happened on the merits, they agreed to a settlement. That way, they avoid the cost of continued litigation, the risk of

losing, and the people affected will get money and other benefits. Class Representatives and their attorneys believe the settlement is fair and equitable for all Class Members.

# WHO IS IN THE SETTLEMENT

## 5. How do I know if I am part of the settlement?

Judge Hardy-Senkel decided everyone who fits this description is a Class Member:

**Nationwide Class.** The "Nationwide Class" means and is composed of each Person (a) who was named as a borrower, co-borrower, obligor, co-obligor, buyer, co-buyer, purchaser, co-purchaser, guarantor, owner, or co-owner in a Covered Contract, (b) whose Covered Contract was secured by Collateral, (c) whose Collateral was repossessed, voluntarily or involuntarily, and (d) whose Collateral was disposed of during the Class Period.

**Missouri Class.** The "Missouri Class" means and is composed of each Person (a) who obtained a Missouri Certificate of Title from a motor vehicle identifying Ally as the lienholder as a result of entering into a Covered Contract, or who was named as a borrower, co-borrower, obligor, co-obligor, buyer, co-buyer, purchaser, co-purchaser, guarantor, owner, or co-owner with a Missouri address in a Covered Contract, (b) whose Covered Contract was secured by Collateral, (c) whose Collateral was repossessed, voluntarily or involuntarily, and (d) whose Collateral was disposed of during the Class Period.

The meaning of capitalized terms not explained in this notice are available in the settlement agreement posted at www.allynoticeclass.com.

## 6. Are there exceptions to being included?

You are not a Class Member if (a) Ally obtained a final judgment against you during the Class Period for the deficiency remaining under a Covered Contract after disposition of the related Collateral, (b) you filed a Chapter 7 bankruptcy petition after the date of your pre-sale notice covering Collateral under a Covered Contract and your Chapter 7 bankruptcy case ended in a discharge, not a dismissal, during the Class Period, (c) you filed a Chapter 13 bankruptcy petition after the date of your pre-sale notice covering Collateral under a Covered Contract and your Chapter 13 bankruptcy case is still pending as of the date on which the Court enters the Preliminary Approval Order or ended in a discharge, not a dismissal, during the Class Period, or (d) you timely and validly excluded yourself in compliance with procedures set forth in the Notice of Pending Class Action mailed July 17, 2020 to the Classes (the "Certification Notice") or in compliance with procedures established by the Court and set forth below.

## 7. I'm still not sure if I am included.

If you are still not sure whether you are included, you can ask for free help. You can call 1-844-735-5572 or visit www.allynoticeclass.com for more information.

# THE SETTLEMENT BENEFITS—WHAT YOU GET

| 8. What does the settlement provide? |
| --- |

Ally has agreed to provide Class Members with settlement benefits valued over **$787,500,000**, which include:

**MONEY**
Ally will pay $87,500,000 to pay Class Members, attorneys' fees, and costs to Class Counsel and an incentive award to the Class Representatives. This amount is called the Cash Fund.

**DEFICIENCY WAIVER**
Ally will no longer seek to collect a portion of any deficiency balance Ally's records reflect as outstanding after Ally repossessed and sold the personal property. The value of this benefit to all the Class Members is at least $700,000,000 and is called the Gross Deficiency Waiver Amount. The amount of the deficiency waiver will vary by Class Member, but will be at least the lesser of the amount of your deficiency balance or $1,300.

**CESSATION OF FINANCE AND LATE CHARGES**
Ally will not accrue finance charges and late charges on Class Members' deficiency balances as of the Effective Date of the settlement.

**CREDIT BUREAU REPORTING**
Ally will request that the three nationwide consumer reporting companies—Equifax, Experian, and TransUnion—delete trade-line information on your credit report related to your account with Ally that is the subject of this case.

| 9. What can I get from the settlement? |
| --- |

Every Class Member will get the benefits that come from the settlement. The average cash payment Class Members will receive from the Cash Fund is expected to be $_____, the maximum is $_____, and the minimum is $_____.

# HOW YOU GET SETTLEMENT BENEFITS

| 10.   How can I get my settlement benefits? |
| --- |

By doing nothing, you will receive the benefits that come from the settlement, including money.

| 11.   When would I get my settlement benefits? |
| --- |

The Court will hold a hearing on _____, **2021**, to decide whether to approve the settlement. Even if Judge Hardy-Senkel approves the settlement, there may be appeals. It's always uncertain how an appeal will be resolved and how long it will take. Some appeals take more than a year. Please be patient. You'll receive your payment if the settlement is approved and after that approval becomes a "final judgment" (i.e. after any appeals are resolved or the time for appealing has passed).

| **12.    What am I giving up to get settlement benefits?** |
| --- |

Unless you exclude yourself by following the procedure below, you are a Class Member and will be included in one or more of the Classes, and that means you can't sue, continue to sue, or be part of any other lawsuit against Ally about the legal issues in this case.  For example, you won't be able to make any independent claim against Ally arising from the written notices (right-to-cure notices, presale notices, deficiency notices) or any other claims this lawsuit is about. Staying in the Classes also means all the Court's orders in this lawsuit will apply to you and legally bind you. To see exactly the legal claims and defenses you give up if you get settlement benefits, please view the settlement agreement at www.allynoticeclass.com.

# EXCLUDING YOURSELF FROM THE SETTLEMENT

If you don't want benefits from this settlement, but you want to keep the right to sue or continue to sue Ally on your own about the legal issues in this case, then you must take steps to get out of the settlement. This is called "excluding" yourself—or is sometimes called "opting out" of the Classes.

| **13.   How do I get out of the settlement?** |
| --- |

To exclude yourself from the settlement, you must send a letter by mail saying you want to be excluded from *Ally Financial Inc. v. Alberta Haskins, et al,* Case No. 16JE- AC1717-01. Include your name, address, telephone number, account number, last four digits of your Social Security Number, and the name of any other person on your agreement with Ally, along with your signature. The exclusion request must be signed by you and by any co-borrower on your agreement, unless the co-borrower is deceased, in which case you must include a death certificate with your request. You cannot exclude yourself by having someone else sign the letter for you. You must mail your exclusion request postmarked no later than _____, **2021**, to:

> First Class, Inc./ J14032-Ally
> 5410 W. Roosevelt Rd., Ste. 222
> Chicago, IL 60644

If you timely request to be excluded, you'll get no settlement benefits, and you cannot object to the settlement. You won't be legally bound by the settlement if it is approved. You may sue (or continue to sue) Ally about the claims asserted in the case.

| **14.   If I don't exclude myself, can I sue Ally for the same thing later?** |
| --- |

No. Unless you exclude yourself, you give up any right to sue Ally for any claims you may have against Ally concerning your transaction that resulted in a repossession. If you have a pending lawsuit against Ally, speak to your lawyer in that case immediately. You must exclude yourself from the Classes to continue with that lawsuit. Remember, the exclusion deadline is _____, **2021**. Exclusion requests postmarked later than this date will be rejected.

**15.   If I exclude myself, can I get benefits from this settlement?**

No. But you may sue, continue to sue, or be part of a different lawsuit against Ally about the same claims that were made in this case.

# THE LAWYERS REPRESENTING YOU

**16.   Do I have a lawyer in this case?**

The Court appointed James G. Onder, Martin L. Daesch, Jesse B. Rochman and their law firm, OnderLaw, LLC to represent you and other Class Members. These lawyers are called Class Counsel. You won't be charged any amounts for these lawyers' services. They are experienced in handling similar class actions. More information about these lawyers and their firm is available at www.onderlaw.com. You needn't hire your own lawyer because Class Counsel is working for you. If you want to be represented by your own lawyer, you may hire one at your own expense.

**17.   How will the lawyers be paid?**

Class Counsel has prosecuted this litigation on a contingent basis and has incurred or advanced all costs, expenses, and attorneys' fees associated with the lawsuit since their investigation of claims against Ally began in 2016. Class Counsel hasn't been paid for their work or received reimbursement for the expenses they have incurred or advanced for the Class Representatives and Class Members. Class Counsel will ask the Court to approve payment up to 11% of the value of the settlement benefits to them for attorneys' fees, up to $1.2 million in expenses, and payment of $20,000 to each of the Class Representatives for their services to the Class Members. The fees and expenses would pay Class Counsel for investigating the facts, litigating the case, negotiating the settlement, and paying the costs to administer the settlement.

# OBJECTING TO THE SETTLEMENT

You can tell the Court you don't agree with some or all parts of the settlement.

**18.   How do I tell the Court I don't like the settlement?**

If you're a Class Member, you can object to the settlement if you don't like it. You can explain why you think the Court shouldn't approve it. The Court will consider your views. To object, you must send a letter saying you object to *Ally Financial Inc. v. Alberta Haskins, et al., Case No.* 16JE- AC1717-01. Your letter must include your name, address, telephone number, facsimile number (if available), email address (if available), account number, last four digits of your Social Security Number, a statement of your objections,

and the reasons and facts you contend support your objections. Your objection must include any documents (including loan documents) you rely upon to support your objection and identify any witnesses you plan to use at the Final Hearing (described below). If there is other evidence (e.g., documents) that you rely upon for your objection, you must attach copies to your objection. If you plan to use expert witnesses to support your objection, you must provide—with your objection—an expert report for each expert outlining the expert's opinions and the facts and reasons for the expert's opinions. You must also state whether you intend to appear at the Final Hearing and provide copies of any evidence you intend to use at the hearing. Your objection must also state the name, court, and docket number associated with any other class-action settlement where the objecting Class Member has objected (whether through a formal appearance or otherwise) or provided legal assistance with respect to an objection. Finally, you must sign and date the objection and include a statement substantially in this form: "I declare (or certify, verify, or state) under penalty of perjury that all of the information in the objection is true and correct. Executed on (date). (Signature)."

Mail the objection to the Court, to Class Counsel, and to Ally's Counsel at the separate addresses below. Your objection must be postmarked no later than **_____, 2021**:

| COURT | CLASS COUNSEL | ALLY'S COUNSEL |
|---|---|---|
| Jefferson County Circuit Clerk's Office 300 Main Street Hillsboro, MO 63050 | Martin L. Daesch Jesse Rochman OnderLaw, LLC 110 E. Lockwood Ave. St. Louis, MO 63119 | Todd W. Ruskamp Shook, Hardy & Bacon, L.L.P. 2555 Grand Blvd. Kansas City, MO 64108 |

If an attorney is submitting the objection for you, besides information and materials discussed above, the objection must also include the name, address, telephone number, facsimile number (if available), and email address (if available) of your attorney and a detailed description of the legal authorities supporting each objection. Your attorney submitting the objection must also provide the name, court, and docket number associated with any other class-action settlement where the objecting Class Member's counsel has appeared as an objector's attorney or provided legal assistance with respect to an objection.

If you file an objection, Class Counsel or Ally's Counsel may notice and take your deposition, consistent with the Missouri Supreme Court Rules, at an agreed-upon location before the Final Hearing and seek any documentary evidence or other tangible things relevant to the objection. Failure by an objector to comply with discovery requests may cause the Court to strike the objection and otherwise deny that person the opportunity to be heard further. The Court reserves the right to tax the costs of any such discovery to the objector or objector's counsel should the Court determine the objection is frivolous or is made for an improper purpose.

## 19.   What's the difference between objecting and excluding?

Objecting is telling the Court you don't like something about the settlement. You can object only if you stay in the Class. Excluding yourself is telling the Court you don't want to be part of the Class. If you exclude yourself, you have no basis to object because the case no longer affects you.

# THE COURT'S FINAL HEARING

The Court will hold a hearing to decide whether to approve the settlement. You may attend and you may ask to speak, but you don't have to.

## 20.   When and where will the Court decide whether to approve the settlement?

The Court will hold a Final Hearing at _____ **a.m./p.m.** on _____, _____, **2021**, at the Twenty-Third Judicial Circuit, 300 Main Street, Hillsboro, MO 67050, in Division 13. At this hearing, the Court will consider whether the settlement is fair, reasonable, and adequate. If there are objections, the Court will consider them.  Judge Hardy-Senkel will listen to people who have asked to speak at the hearing. The Court will also decide how much to pay to Class Counsel and the Class Representative. After the hearing, the Court will decide whether to approve the settlement. We don't know how long these decisions will take.

## 21.   Do I have to come to the hearing?

No. Class Counsel will answer questions that Judge Hardy-Senkel may have. But you are welcome to come at your own expense. If you submit an objection, you don't have to come to Court to talk about it. If you mailed your written objection on time with all the required information, the Court will consider it. You may also pay your own lawyer to attend, but that is unnecessary.

## 22.   May I speak at the hearing?

You may ask the Court for permission to speak at the Final Hearing. You may speak either for or against the settlement. To speak for the settlement, you must send a letter saying it is your "Notice of Intention to Appear in *Ally Financial Inc. v. Alberta Haskins, et al.*, Case No. 16JE- AC1717-01." Include your name, address, telephone number, last four digits of your Social Security Number, and your signature. Your "Notice of Intention to Appear" must be postmarked no later than _____, **2021**, and be sent to the Circuit Clerk's Office, Class Counsel, and Ally's Counsel, at the three addresses provided in question 18.

If you plan to speak at the Final Hearing to tell the Court you don't like something about the settlement, you must submit a written objection as detailed in question 18 and include with that objection a statement you intend to appear at the Final Hearing. The identity of any witnesses or experts you plan to present at the Final Hearing, with evidence you intend to present at the Final hearing, must also be included with your objection.

You cannot speak at the hearing if you excluded yourself or if you don't send in a request with the required information and documents.

# GETTING MORE INFORMATION

## 23.   Are there more details about the settlement?

This notice summarizes the proposed settlement. More details are in the settlement agreement.  This notice does not change or supersede the settlement agreement in any way. You can get a copy of the settlement

agreement by writing to First Class, Inc./ J14032-Ally, 5410 W. Roosevelt Rd., Ste 222, Chicago, IL 60644-1490, or by visiting www.allynoticeclass.com.

| 24. | How do I get more information? |
|-----|-------------------------------|

You can call 1-844-735-5572 toll free; write to First Class, Inc./ J14032-Ally, 5410 W. Roosevelt Rd., Ste 222, Chicago, IL 60644-1490; or visit the website www.allynoticeclass.com, where you will find information about this lawsuit and to help you determine whether you are a Class Member.

DATE: _____, 2021

# EXHIBIT C

## Corporate Insurance Programs
## Policy Review Checklist

Reviewer's Name *Bao*

Date *3/15/17*

Insurance Program *MLB Blended*

Corrections to Insurer?   YES   (NO)   N/A

Broker/Contact *Marsh - Paul Huelbig*

Corrections Received?   YES   NO   (N/A)

Policy Reissued?   YES   NO   (N/A)

Broker Re-cap Items   YES   (NO)   N/A

Comments _____

|  | Current Policy | Current Binder | Previous Year Policy |
|---|---|---|---|
| Insurer/Parent Co. | U.S. Specialty | Tokio Marine HCC | U.S. Specialty |
| Policy/Binder No. | 24-mgu-16-a39492 | 24-mgu-16-a39492 | 24-mgu-15-a36515 |
| Policy Period | 12/15/16 - 12/15/17 | 12/15/16 - 12/15/17 | 12/15/15 - 12/15/16 |
| Policy Limit | $15,000,000 | $15,000,000 x $25,000,000 | $15,000,000 |
| Retention/Deductible | Underlying | Underlying | Not stated |
| Policy Form No. | USSIC 994 (04/2002) | USSIC 994 (04/2002) | USSIC 994 (04/2002) |
| Policy Premium | $1,581,903 | $1,581,903 | $1,665,161 |
| Commission | Not stated | 12.5% | Not stated |

### Endorsements

| New | Not Carried Forward |
|---|---|
| N/a | -Amend Notice Provision   994-9037 |
|  | - Fully Earned Premium   P0003 |
|  |  |

### Notable Changes

| Broadens Coverage | Reduces Coverage |
|---|---|
| N/a | N/a |
|  |  |
|  |  |

### List of Corrections / Questions to Insurer

| N/a |
|---|
|  |
|  |
|  |

T:\Corporate Insurance\Secured\ADM001 Departmental Management & Administration\Administrative Documents\Templates\Blank Policy Review Form.xls

3/7/2017                                                                                                                      1

# U.S. SPECIALTY INSURANCE COMPANY

**THIS IS A CLAIMS MADE EXCESS POLICY WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMITS OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED, AND MAY BE EXHAUSTED, BY THE PAYMENT OF DEFENSE EXPENSES.**

## DECLARATIONS

### EXCESS INDEMNITY POLICY

POLICY NUMBER: 24-MGU-16-A39492 ✓          RENEWAL OF: 24-MGU-15-A36515

ITEM 1.   **INSURED:**   Ally Financial Inc. ✓
500 Woodward Avenue
Detroit, MI 48226

ITEM 2.   **POLICY PERIOD**:
(a)   Inception Date:  12/15/2016 ✓
(b)   Expiration Date:  12/15/2017
at 12:01 a.m. at the Principal Address stated in ITEM 1.

ITEM 3.   **LIMIT OF LIABILITY (INCLUSIVE OF DEFENSE EXPENSES)**:
$15,000,000

ITEM 4.   **SCHEDULE OF UNDERLYING INSURANCE:** *See Endorsement #1*
See Attached Schedule of Underlying Insurance.

ITEM 5.   **PREMIUM:**   $1,581,903.00 ✓

ITEM 6.   **NOTICES REQUIRED TO BE GIVEN TO INSURER MUST BE ADDRESSED TO:**

| Street Address: | Facsimile Number: | E-mail Address: |
|---|---|---|
| Tokio Marine HCC – D&O Group | (860) 676-1737 | usclaims@tmhcc.com |
| 8 Forest Park Drive | | |
| Farmington, CT 06032 | | |
| Attn:  Claims Manager | | |

ITEM 7.   **ENDORSEMENTS ATTACHED AT ISSUANCE**
994-917  994-937  994-995  994-9006  994-9008  994-9036  994-1231  80016

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed on the Declarations Page by its President, a Secretary and a duly authorized representative of the Insurer.

Secretary          President          Authorized Representative

Date: February 20, 2017          USSIC 993 (04/2002)

This policy is exempt from the filing requirements of section 2236 of the insurance code of 1956, 1956 PA 218, MCL 500.2236.

ENDORSEMENT NUMBER: 1

**SCHEDULE OF UNDERLYING INSURANCE** 

To be attached to and made a part of Policy No. 24-MGU-16-A39492, issued to Ally Financial Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged it is hereby agreed and understood that the Schedule of Underlying Insurance on the Declarations page is amended to read as follows:

|  | **Insurer** | **Policy Number** | **Limits** |
|---|---|---|---|
| **Primary - D&O** | Federal Insurance Company | 8207-6455 | $25,000,000 |
| **Primary - FID** | Federal Insurance Company | 8207-6453 | $25,000,000 |
| **Primary - EPL** | Federal Insurance Company | 8207-6461 | $25,000,000 |
| **Primary - E&O** | Federal Insurance Company | 8207-7768 | $25,000,000 |

All other terms, conditions and limitations of this Policy will remain unchanged, including but not limited to the maximum aggregate **Limit of Liability** set forth in ITEM 3. of the Declarations.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By: _____
          Attorney-in-Fact

994-917
Ed. 04/00                               Page 1 of 1

ENDORSEMENT NUMBER: 2

**RECOGNITION OF DEPLETION OF UNDERLYING LIMITS** ✓
**(SUB-LIMIT IN UNDERLYING LIMITS)**

       To be attached to and made a part of Policy No. 24-MGU-16-A39492, issued to Ally Financial Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that:

(1)    If any limit of liability of the **Underlying Insurance** is subject to a sub-limit of liability, there shall be no coverage under this Policy for any claim that is subject to such sub-limit.

(2)    Notwithstanding the foregoing, the limits of liability of the **Underlying Insurance** shall be deemed to have been reduced, depleted or exhausted, as the case may be, by actual payment of claims or losses as to which the **Underlying Insurance** afford coverage, including without limitation any claims or losses subject to a sub-limit of liability.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

       Effective date of this endorsement:

           **By:** _____
                       Attorney-in-Fact

994-937 ✓
Ed. 01/02                       Page 1 of 1

ENDORSEMENT NUMBER:  3

**DELETE SECTION II.B
CANCELLATION OF UNDERLYING INSURANCE**

To be attached to and made a part of Policy No. 24-MGU-16-A39492, issued to Ally Financial Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that:

(1)     Section II.B of the Policy is deleted in its entirety.  However, nothing in this endorsement is intended, nor shall it be construed, to relieve the **Insured** of its obligation under Section VIII.B to give the Insurer written notice as soon as practicable of any cancellation of **Underlying Insurance**.  Moreover, in the event a policy of **Underlying Insurance** is cancelled, the Insurer shall not be liable under this Policy earlier or to any greater extent than it would have been had the policy of **Underlying Insurance** not been cancelled.

(2)     The second sentence of Section II.A is deleted and replaced with the following:

The Insurer shall not be liable under this Policy earlier or to any greater extent than it would have been if the **Insureds** had complied with this condition.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
           Attorney-in-Fact

994-995
Ed. 12/05                              Page 1 of 1

ENDORSEMENT NUMBER:  4

**TREATMENT OF INSUREDS' PAYMENTS AS
REDUCING OR EXHAUSTING UNDERLYING LIMIT**

To be attached to and made a part of Policy No. 24-MGU-16-A39492, issued to Ally Financial Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that:

(1)    Notwithstanding anything in the **Policy** to the contrary:

    (a)    If an issuer of a policy of **Underlying Insurance** becomes financially insolvent or bankrupt and, solely as a result of such financial insolvency or bankruptcy, fails to pay covered loss under such policy, and if the **Insureds** actually make payment for part or all of such loss, then the Insurer will treat such payment by the **Insureds** as if it had been made by such issuer for purposes of determining reduction or exhaustion (as the case may be) of such policy's limit of liability.

    (b)    If an issuer of a policy of **Underlying Insurance** fails to pay covered loss under such policy for any reason other than such issuer's financial insolvency or bankruptcy, then the Insurer will treat the **Insureds'** actual payment of such loss as if it had been made by such issuer for purposes of determining reduction or exhaustion (as the case may be) of such policy's limit of liability, but only if the **Insureds**:

        (i)    promptly notify the Insurer that the **Insureds** intend to make such payment; and

        (ii)    obtain the Insurer's written consent before making such payment, which consent will not be unreasonably withheld.

(2)    In no event shall any failure to pay on the part of an issuer of **Underlying Insurance** cause the Insurer to be liable under this Policy earlier or to any greater extent than the Insurer would have been if such issuer had paid its policy's full limit of liability.  Except as expressly provided in paragraph (1) above, nothing in this endorsement shall be deemed to waive any term, condition or limitation of this Policy or any policy of **Underlying Insurance**.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
            Attorney-in-Fact

994-9006                    Page 1 of 1
Ed. 12/06

ENDORSEMENT NUMBER: 5

**AMEND DEFINITION OF INSURED
(FOLLOW PRIMARY POLICY)**

To be attached to and made a part of Policy No. 24-MGU-16-A39492, issued to Ally Financial Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that DEFINITION A (under Section III) is deleted and replaced with the following:

     A.    **Insured** shall have the meaning ascribed to such term in the **Primary Policy**.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
              Attorney-in-Fact

994-9008
Ed. 01/07

Page 1 of 1

ENDORSEMENT NUMBER: 6

**DELETE SECTION II.B (CANCELLATION OF UNDERLYING INSURANCE)
AND AMEND SECTION IX (POLICY TERMINATION)** 

To be attached to and made a part of Policy No. 24-MGU-16-A39492, issued to
Ally Financial Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that:

(1)     Section II.B of the Policy is deleted in its entirety.  However, nothing in this endorsement is
intended, nor shall it be construed, to relieve the **Insured** of its obligation under Section VIII.B to
give the Insurer written notice as soon as practicable of any cancellation of **Underlying
Insurance**.  Moreover, in the event a policy of **Underlying Insurance** is cancelled, the Insurer
shall not be liable under this Policy earlier or to any greater extent than it would have been had the
policy of **Underlying Insurance** not been cancelled.

(2)     The second sentence of Section II.A (Maintenance of Underlying Insurance) is deleted and
replaced with the following:

The Insurer shall not be liable under this Policy earlier or to any greater extent than it would
have been if the **Insureds** had complied with this condition.

(3)     The following paragraph is added to Section IX:

This Policy is non-cancelable by the Insurer except for non-payment of premium.  The Insurer
may cancel this Policy for non-payment of premium by sending not less than ten days notice
of such cancellation to the entity named in ITEM 1 of the Declarations at such entity's last
known address.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective
with the Policy.

Effective date of this endorsement:

By:_____
Attorney-in-Fact

994-9036
Ed. 01/09

Page 1 of 1

ENDORSEMENT NUMBER:  7

**SPECIAL ENDORSEMENT**

To be attached to and made a part of Policy No. 24-MGU-16-A39492, issued to Ally Financial Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that:

(1)   The introductory paragraph to the Policy (beginning "In consideration of the payment of the premium" and ending "agree as follows") is deleted and replaced with the following:

In consideration of the payment of the premium, and in reliance upon all statements made in the **Application** and subject to the Declarations and the limitations, conditions, provisions, any endorsements to and all other terms of this Policy, the Insurer and the **Insureds** agree as follows:

(2)   The following Definition is added to the Policy:

**Application** shall have the same meaning in this Policy as given to it in the **Primary Policy**.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
                    Attorney-in-Fact

994-1231
Ed. 06/10

Page 1 of 1

ENDORSEMENT NUMBER: 8

**POLICYHOLDER DISCLOSURE – TERRORISM PREMIUM NOTICE**

To be attached to and made a part of Policy No. 24-MGU-16-A39492, issued to
Ally Financial Inc. by U.S. Specialty Insurance Company.

Your Policy contains coverage for certain losses caused by terrorism. We are required to notify you of the portion of the premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act, as amended in 2015 (hereinafter "TRIA"). TRIA also requires us to provide disclosure of federal participation in payment of terrorism losses resulting from an "act of terrorism" as defined by Section 102(1) of TRIA.

Section 102(1) of TRIA defines the term "act of terrorism" as any act that is certified by the Secretary of the Treasury of the United States – in concurrence with the Secretary of State of the United States and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Please be advised that the actual coverage provided by your Policy for acts of terrorism, as is true for all coverages, is limited by the terms, conditions, exclusions, limits and other provisions of your Policy, any endorsements to the Policy and generally applicable rules of law.

YOU SHOULD KNOW THAT, WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. UNDER THIS FORMULA, THE UNITED STATES GOVERNMENT generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

The amount of your premium that is attributable to coverage for terrorist acts certified under TRIA is $0.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By: _____

Attorney-in-Fact

80016  ✓
Ed. 01/15

Page 1 of 1

# U.S. SPECIALTY INSURANCE COMPANY

## Excess Indemnity Policy



**D&O Group**
8 Forest Park Drive, Farmington, Connecticut 06032
main 860 674 1900   facsimile 860 676 1737

# U.S. SPECIALTY INSURANCE COMPANY

### EXCESS INDEMNITY POLICY

#### This is a claims made policy.  Please read it carefully.

In consideration of the payment of the premium, and in reliance upon all statements made and information furnished to the Insurer and to the issuers of the **Underlying Insurance** and subject to the Declarations and the limitations, conditions, provisions, any endorsements to and all other terms of this Policy, the Insurer and the **Insureds** agree as follows: *Deleted / Replaced : Endr # 7 (1)*

I.   INSURING AGREEMENT

The Insurer shall provide the **Insureds** with insurance excess of the **Underlying Insurance** scheduled in ITEM 4 of the Declarations.  Except as specifically set forth in the terms, conditions or endorsements of this Policy, coverage hereunder shall apply in conformance with the terms, conditions, limitations and endorsements of the policy immediately underlying this Policy, except that coverage hereunder shall attach only after all **Underlying Insurance** has been exhausted by actual payment of claims or losses thereunder.

II.   PRIMARY AND UNDERLYING INSURANCE *Amended : Endr # 2 / Endr # 4*

A.   <u>Maintenance of **Underlying Insurance**</u>

All of the **Underlying Insurance** scheduled in ITEM 4 of the Declarations shall be maintained during the **Policy Period** in full effect except for any reduction of the limits of liability available under the **Underlying Insurance** solely by reason of actual payment of claims or losses thereunder. ~~Subject at all times to Section II.B of this Policy, the Insurer shall not be liable under this policy earlier or to any greater extent than it would have been if the Insureds had complied with this condition.~~ *Deleted / Replaced : Endr # 3 (2)*

B.   <u>Cancellation of **Underlying Insurance**</u> *Deleted : Endr # 3 (1)*

This Policy shall terminate immediately upon the cancellation of any one or more of the policies scheduled in ITEM 4 of the Declarations, whether cancelled by the **Insureds** or the applicable insurer.  Notice of cancellation or non-renewal of any such policies duly given by any of the applicable insurers shall serve as notice of the cancellation or non-renewal of this Policy by the Insurer.

C.   <u>Amendment of **Underlying Insurance**</u>

No amendment to any **Underlying Insurance** during the **Policy Period** shall be effective in extending the coverage or limits of liability afforded by this Policy unless the Insurer so agrees in writing.

III.   DEFINITIONS *Amended : Endr # 7 (2)*

A.   ~~**Insured** means any person or organization insured under the policy immediately underlying this Policy.~~ *Deleted / Replaced : Endr # 5*

B.   **Policy Period** means the period from the inception date to the expiration date set forth in ITEM 2 of the Declarations, or to any earlier cancellation date.

C.   **Primary Policy** means the policy scheduled as such in ITEM 4 of the Declarations.

**U.S. SPECIALTY INSURANCE COMPANY**

    D.    **Underlying Insurance** means all policies scheduled in ITEM 4 of the Declarations and any policies replacing them.

IV.    LIMITS OF LIABILITY

    A.    The amount or amounts stated in ITEM 3 of the Declarations are the limits of the Insurer's liability and shall be the maximum amount(s) payable by the Insurer under this Policy. The limits of liability available under this Policy to pay damages or settlements shall be reduced, and may be exhausted, by the payment of defense expenses.

    B.    In the event of the reduction of the limits of liability of the **Underlying Insurance** solely as the result of actual payment of claims or losses thereunder by the applicable insurers, this Policy shall, subject to the Insurer's limits of liability and to the other terms, conditions and endorsements of this Policy, continue to apply to claims or losses as excess insurance over the amount of insurance remaining under such **Underlying Insurance**.

    C.    In the event of the exhaustion of all of the limits of liability of such **Underlying Insurance** solely as the result of actual payment of claims or losses thereunder, the remaining limits available under this Policy shall, subject to the Insurer's limits of liability and to the other terms, conditions and endorsements of this Policy, continue for subsequent claims or losses as primary insurance. Under such circumstances, any retention or deductible specified in the **Primary Policy** shall also apply to this Policy.

V.    SETTLEMENT

The **Insureds** shall not admit liability for or settle any claim for any amount that would involve the coverage afforded by this Policy without the Insurer's prior written consent.

VI.    CLAIM PARTICIPATION

The Insurer may, at its sole discretion, elect to participate in the investigation, settlement and/or defense of any claim against the **Insureds** even if the **Underlying Insurance** has not been exhausted.

VII.    SUBROGATION AND RECOVERIES

    A.    In the event of any payment under this Policy, the Insurer shall be subrogated to all the **Insureds'** rights of recovery against any person or organization, and the **Insureds** shall execute and deliver all instruments and papers and do whatever else is necessary to secure such rights.

    B.    Any amount recovered after payment under this Policy shall be apportioned in the inverse order of payment to the extent of actual payment. The expenses of all such recovery proceedings shall be apportioned in the same ratio as the recoveries.

VIII.    NOTICES

    A.    If the **Insureds** give any notice of any matter under the **Underlying Insurance**, the **Insureds** must also give the Insurer written notice of such matter in the same manner as required by the terms and conditions of the **Primary Policy**, except that such written notice must be sent to the Insurer at the address set forth in ITEM 6 of the Declarations.

    B.    The **Insureds** shall give the Insurer notice in writing as soon as practicable of:

**U.S. SPECIALTY INSURANCE COMPANY**

     1.    the cancellation of any **Underlying Insurance**, or

     2.    any additional or return premiums charged or allowed in connection with any **Underlying Insurance**.

IX.    POLICY TERMINATION *Amended: Endt # 6 (3)*

A.    This **Policy** may be canceled by the **Insureds** at any time either by surrender of this **Policy** or by written notice stating when thereafter such cancellation is to be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice and this policy shall terminate at the date and hour specified in such notice.

B.    The Insurer shall refund the unearned premium computed at the customary short rate if the **Policy** is canceled by the **Insureds**.

X.    CONFORMITY TO STATUTE

Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy are hereby amended to conform to such laws.

XI.    AUTHORIZATION AND NOTICES

The person or entity named in ITEM 1 of the Declarations shall be the sole agent, and shall act on behalf, of the **Insureds** with respect to all matters under this Policy, including but not limited to giving and receiving notices and other communication, effecting or accepting any endorsements to or notice of cancellation of this Policy, paying premium and receiving any return premiums.

XII.    NO ALTERATIONS WITHOUT ENDORSEMENT

No change in or modification of this Policy shall be effective unless made by endorsement signed by an authorized employee of the Insurer or any of its agents relating to this Policy.

In witness whereof the Insurer has caused this Policy to be executed by its authorized officers, but this Policy will not be valid unless countersigned on the Declarations Page by a duly authorized representative of the Insurer.

Secretary                 President

*Amended: Endt # 9 - Policyholder Disclosure*

**Omodio, Beth Ann**

| | |
|---|---|
| **From:** | Huelbig, Paul <Paul.S.Huelbig@marsh.com> |
| **Sent:** | Tuesday, March 07, 2017 7:25 AM |
| **To:** | Blumentritt, Martin |
| **Cc:** | Munch, Phillip; Omodio, Beth Ann |
| **Subject:** | ALLY - HCC 15x25 Excess Blended Policy |
| **Attachments:** | Ally Financial Inc_1. 24-MGU-16-A39492 DEC Endorsements and Policy Langu....pdf |

Martin,

Attached is HCC's 15x25 Excess Blended policy for the 12/15/16 to 12/15/17 policy period.  We have reviewed the policy and found it to be in order.

Please be advised that these policies are written on a CLAIM FIRST MADE forms.

DIRECTORS & OFFICERS - In accordance with Section 11 (Reporting & Notice) of the primary Federal Insurance Company D&O policy, the Insured shall, as a condition precedent to exercising any right to coverage under this Policy, give to the Company or any authorized agent of the Company within the State of Michigan written notice of any Claim as soon as practicable, but in no event later than the earliest of the following dates:
(1) ninety (90) days after the date on which any member of the Risk Management Department or General Counsel Department of the Parent Organization first becomes aware that the Claim has been made;
(2) sixty (60) days after the effective date of expiration or termination, if this Policy expires (or is otherwise terminated) without being renewed and if no Extended Reporting Period is purchased, or
(3) the expiration date of the Extended Reporting Period, if purchase;
provided that if the Company sends written notice to the Insured, at any time before the date set forth in Subsection 11 a (1) with respect to any Claim, stating that this Policy is being terminated for nonpayment of premium, the Insured shall give to the Company written notice of such Claim prior to the effective date of such termination.

FIDUCIARY - In accordance with Section 13 (Reporting & Notice) of the primary Federal Insurance Company Fiduciary policy, the Insureds shall, as a condition precedent to exercising their rights under this Policy, give the Company written notice as soon as practicable after any member of the office of risk management or the office of the general counsel of the Parent Organization first becomes aware of any Claim made against Insureds for a Wrongful Act, but in no event later than:
(1) ninety (90) days after the effective date of expiration or termination if this Policy expires (or is otherwise terminated) without being renewed and if no Extended
Reporting Period is purchased; or
(2) the expiration date of the Extended Reporting Period, if purchased;
provided that if the Company sends written notice to the Parent Organization stating that this coverage section is being terminated for non-payment of premium, the Insureds
shall give to the Company written notice of such Claim prior to the effective date of such termination.

BANKERS PROFESSIONAL - In accordance with Section 8 (Reporting & Notice) of the primary Federal Insurance Company BPL policy, as amended by endorsement, 8a. Subject to Subsection 8b, if a Claim is made against an Insured, then the Insured shall, as a condition precedent to exercising any right to coverage under this Policy, give to the Company written notice of such Claim in the form of a bordereau report no later than thirty (30) days following the end of the Semi-Annual Reporting Period during which any member of the Risk Management Department or Office of the General Counsel of the Parent Organization first received notice of such Claim. Such bordereau report submitted pursuant to this Subsection 8a shall contain information including, but not limited to, a description of the Claim, the nature of the alleged Wrongful Act, the nature of the alleged damage, the names of the claimants, and the manner in which the Insured first

1

became aware of the Claim. Upon the request of the Company, the insured shall forward to the Company every demand, notice, summons, complaint or other process received by any Insured or Insured representative in connection with any Claim for which notice is submitted in a bordereau report under this Subsection 8a.  Notwithstanding the foregoing, if this Policy expires (or is otherwise terminated) without being renewed and no Extended Reporting Period is purchased, the Insured shall, as a condition precedent to exercising any right to coverage under this Policy, give written notice to the Company of any Claim made against the Insured which has not yet been reported to the Company pursuant to this Subsection 8a as soon as practicable but in no event later than sixty (60) days after the effective date of such expiration or termination. If this Policy expires (or is otherwise terminated) without being renewed and the Extended Reporting Period is purchased, the Insured shall, as a condition precedent to exercising any right to coverage under this Policy, give written notice to the Company of any Claim made against the Insured which has not yet been reported to the Company pursuant to this Subsection 8a as soon as  practicable but in no event later than the expiration date of the Extended Reporting Period.  Notwithstanding any statutory, administrative or common law obligations governing claim handling practices, the Company shall be entitled to fully reserve its rights (including, but not limited to, denial of coverage) in connection with any Claim for which notice is provided to the Company pursuant to this Subsection 8a.

8b. Notwithstanding Subsection 8a, if a Claim is made against any Insured and: (1) such Claim constitutes or becomes a Mass or Class Action; (2) such Claim constitutes a criminal proceeding commenced by the service of an indictment or similar document; (3) the Office of the General Counsel of the Parent Organization reasonably believes that Loss on account of such Claim will equal or exceed $12,500,000; or (4) such Claim is scheduled to proceed to trial within one hundred twenty (120) days, then the Insured shall, as a condition precedent to exercising any right to coverage under this Policy, give to the Company written notice of any such Claim as soon as practicable, after any member of the Risk Management Department or Office of the General Counsel of the Parent Organization first received notice of the Claim, separate and apart from any bordereau report required under Subsection 8a. Such written notice shall contain information including, but not limited to, a description of the Claim, the nature of the alleged Wrongful Act, the nature of the alleged damage, the names of the claimants and the manner in which a member of the Parent Organization's Risk Management Department or Office of the General Counsel first received notice of the Claim. The Insureds shall immediately forward to the Company every demand, notice, summons, complaint or other process received by any Insured or Insured representative in connection with any Claim for which notice is required under this Subsection 8b.  Notwithstanding the foregoing, if this Policy expires (or is otherwise terminated) without being renewed and if no Extended Reporting Period is purchased, the Insured shall, as a condition precedent to exercising any right to coverage under this Policy, give written notice to the Company of any Claim made against any Insured which has not yet been reported to the Company pursuant to this Subsection 8b as soon as practicable but in no event later than sixty (60) days after the effective date of such expiration or termination. If this Policy expires (or is otherwise terminated) without being renewed and the Extended Reporting Period is purchased, the Insured shall, as a condition precedent to exercising any right to coverage under this Policy, give written notice to the Company of any Claim made against the Insured which has not yet been reported to the Company pursuant to this Subsection 8b as soon as practicable but in no event later than the expiration date of the Extended Reporting Period.

8c. If during the Policy Period an Insured: (1) becomes aware of circumstances which could give rise to a Claim and gives written notice of such circumstances to the Company; or (2) receives a written request to toll or waive a statute of limitations applicable to a Wrongful Act before or during the Policy Period and gives written notice of such request and of such alleged Wrongful Act to the Company, then any Claim subsequently arising from the circumstances referred to in Subsection 8c(1), or from such Wrongful Act referred to in Subsection 8c(2), shall be deemed to have been first made during the Policy Period in which the written notice described in Subsection 8c(1) or (2) was first given by an Insured to the Company, provided any such subsequent Claim is reported to the Company in the manner set forth in Subsection 8a or 8b, as applicable. In providing written notice to the Company pursuant to Subsection 8c(1) or (2), the Insured shall include a description of the circumstances or Wrongful Act, the nature of any alleged Wrongful Act, the nature of the alleged or potential damages, the names of all potential claimants, the names of all potential parties, and the manner in which the member of the Parent Organization's Risk Management Department or Office of the General Counsel first received notice of the circumstances or Wrongful Act.

8d. The Insured shall, as a condition precedent to exercising any right to coverage under this Policy, give to the Company such information, assistance and cooperation as the Company may reasonably require. Without limiting the generality of the preceding sentence: (1) the Insured shall provide the Company with all information required under Subsections 8a, 8b or 8c, as applicable; (2) with respect to any Claim reported pursuant to Subsection 8a that at any time thereafter becomes a Mass or Class Action, the Insured shall give the Company written notice that such Claim constitutes a Mass or Class Action as soon as practicable but in no event later than sixty (60) days after such Claim becomes a Mass or Class Action, and shall immediately forward to the Company every demand, notice, summons, complaint or other process received by any Insured or Insured representative in connection with any such Claim; (3) with respect to any Claim reported pursuant to Subsection 8a that at any time thereafter the Office of the General Counsel of the Parent Organization reasonably believes that Loss on account of such Claim will equal or exceed $ 12,500,000, the Insured shall give the Company written notice thereof as soon as practicable, and shall immediately forward to the Company every demand, notice, summons, complaint or other process received by any Insured or Insured representative in connection with any such Claim; and (4) with respect to any Claim reported pursuant to Subsection 8a that at any time thereafter is scheduled to proceed to trial within one hundred twenty (120) days, the Insured shall give the Company written notice thereof as soon as practicable, and shall immediately forward to the Company every demand, notice, summons, complaint or other process received by any Insured or Insured representative in connection with any such Claim.

EMPLOYMENT PRACTICES - In accordance with Section 12 (Reporting & Notice) of the primary Federal Insurance Company EPL policy, as amended by endorsement,

(a)(i) Subject to subparagraph (a)(ii) below, if a Claim is made against any Insured, the Insureds shall, as a condition precedent to exercising any right to coverage under this coverage section, give to the Company written notice of such Claim in the form of a bordereau report no later than thirty (30) days following the end of the Semi-Annual Reporting Period during which any member of the Parent Organization's general counsel department, human resources department or risk management department first received notice of such Claim. Such bordereau report submitted pursuant to this subparagraph (a)(i) shall contain information including, but not limited to, a description of the Claim, the nature of the alleged Wrongful Act, the nature of

the alleged damage, the names of the claimants and the manner in which the Insured first became aware of the Claim. Upon the request of the Company, the Insureds shall forward to the Company every demand, notice, summons, complaint or other process received by any Insured or Insured representative in connection

with any Claim for which notice is submitted in a bordereau report under this subparagraph (a)(i). Notwithstanding the foregoing, if this coverage section expires (or is otherwise terminated) without being renewed and if no Extended Reporting Period is purchased, the Insureds shall, as a condition precedent to exercising any right to coverage under this coverage section, give written notice to the Company of

any Claim made against any Insured which has not yet been reported to the Company pursuant to this subparagraph (a)(i) as soon as practicable but in no event later than sixty (60) days after the effective date of such expiration or termination. If this coverage section expires (or is otherwise terminated) without being renewed and the Extended Reporting Period is purchased, the Insureds shall, as a condition precedent to exercising any right to coverage under this coverage section, give written notice to the Company of any Claim made against any Insured which has not yet been reported to the Company pursuant to this subparagraph (a)(i) as soon as practicable but in no event later than the expiration date of the Extended Reporting Period.

For the purposes of this subparagraph (a)(i), Semi-Annual Reporting Period means each period of six (6) consecutive calendar months commencing on: December 15, 2013 and June 15, 2014

Notwithstanding any statutory, administrative or common law obligations governing claim handling practices, the Company shall be entitled to fully reserve its rights including, but not limited to, denial of coverage, in connection with any Claim for which written notice is provided in the form of a bordereau report under this subparagraph (a)(i).

(ii) If a Claim is made against any Insured and: (A) such Claim constitutes a Mass or Class Action; or (B) the Insured reasonably believes that Loss on account of such Claim will meet or exceed $1,000,000, then the Insureds shall, as a condition precedent to exercising any right to coverage under this coverage section, give to the Company written notice of any such Claim as soon as practicable, after any member of the Parent Organization's general counsel department,

3

human resources department or risk management department first became aware of the Claim, separate and apart from any bordereau report required under subparagraph (a)(i) above. Such written notice shall contain information including, but not limited to, a description of the Claim, the nature of the alleged Wrongful Act, the nature of the alleged damage, the names of the claimants and the manner in which the member of the Parent Organization's general counsel department, human resources department or risk management department first became aware of the Claim. The Insureds shall immediately forward to the Company every demand, notice, summons, complaint or other process received by any Insured or Insured representative in connection with any Claim for which notice is required under this subparagraph (a)(ii). Notwithstanding the foregoing, if this coverage section expires (or is otherwise terminated) without being renewed and if no Extended Reporting Period is purchased, the Insureds shall, as a condition precedent to exercising any right to coverage under this coverage section, give written notice to the Company of any Claim made against any Insured which has not yet been reported to the Company pursuant to this subparagraph (a)(ii) as soon as practicable but in no event later than sixty (60) days after the effective date of such expiration or termination. If this coverage section expires (or is otherwise terminated) without being renewed and the Extended Reporting Period is purchased, the Insureds shall, as a condition precedent to exercising any right to coverage under this coverage section, give written notice to the Company of any Claim made against any Insured which has not yet been reported to the Company pursuant to this subparagraph (a)(ii) as soon as practicable after any member of the Parent Organization's general counsel department, human resources department or risk management department first became aware of the Claim but in no event later than the expiration date of the Extended Reporting Period.

(iii) Written notice of any Claim provided to the Company by the Insureds pursuant to subparagraph (a)(i) or (a)(ii) above shall be treated as notice under only this coverage section and shall not constitute notice to the Company under any other coverage section or policy.

(b) The Insureds shall, as a condition precedent to exercising any right to coverage under this coverage section, give to the Company such information, assistance and cooperation as the Company may reasonably require, including but not limited to the following: (i) The Insureds shall give the Company such information described in subparagraph (a)(i) and (a)(ii) above; (ii) If a Claim has been reported to the Company in any bordereau report pursuant to subparagraph (a)(i) above and at any time thereafter such Claim becomes a Mass or Class Action, the Insureds shall give the Company written notice that such Claim constitutes a Mass or Class Action as soon as practicable but in no event later than sixty (60) days after such Claim becomes a Mass or Class Action. The Insureds shall immediately forward to the Company every demand, notice, summons, complaint or other process received by any Insured or Insured representative in connection with any such Claim; and (iii) If a Claim has been reported to the Company in any bordereau report pursuant to subparagraph (a)(i) above and at any time thereafter: (A) any member of the Parent Organization's general counsel department, human resources department or risk management department reasonably believes that Loss on account of such Claim will meet or exceed $1,000,000; or (B) a trial in connection with such Claim is scheduled to proceed within sixty (60) days, the Insureds shall give the Company written notice that any condition set forth in clauses (A) or (B) above applies to such Claim as soon as practicable after any such condition applies. The Insureds shall immediately forward to the Company every demand, notice, summons, complaint or other process received by any Insured or Insured representative in connection with any such Claim.

Please be aware that late reporting could result in a disclaimer of coverage from the insurer.

Please do not hesitate contacting us if you have any questions.

Regards,
Paul

*Paul Huelbig*
*Managing Director*
*US Banking and Capital Markets Practice Leader -- FINPRO*

*Marsh USA, Inc.*
*1166 Avenue of the Americas*
*New York, NY 10036*
*Office: 212-345-6697*
*Mobile: 917-513-2420*
*Paul.S.Huelbig@marsh.com*

---

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This e-mail transmission and any attachments that accompany it may
contain information that is privileged, confidential or otherwise
exempt from disclosure under applicable law and is intended solely for
the use of the individual(s) to whom it was intended to be addressed.
If you have received this e-mail by mistake, or you are not the
intended recipient, any disclosure, dissemination, distribution,
copying or other use or retention of this communication or its
substance is prohibited. If you have received this communication in
error, please immediately reply to the author via e-mail that you
received this message by mistake and also permanently delete the
original and all copies of this e-mail and any attachments from your
computer. Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# EXHIBIT D

**Corporate Insurance Programs**
**Policy Review Checklist**

Reviewer's Name _PHIL MUNCH_          Date _3/21/17_

Insurance Program _Mamr Liability - Fiduciary_     Corrections to Insurer?     YES   NO   N/A

Broker/Contact _Marsh - Paul Huebig_          Corrections Received?     YES   NO   N/A

Policy Reissued?     YES   NO   N/A

Broker Re-cap Items     YES   NO   N/A          Comments _____

| | Current Policy | Current Binder | Previous Year Policy |
|---|---|---|---|
| Insurer/Parent Co. | Chubb | Chubb | Chubb |
| Policy/Binder No. | 8207-6453 | 8207-6453 | 8207-6453 |
| Policy Period | 12/15/14 - 12/15/17 | 12/15/14 - 12/15/17 | 12/15/15 - 12/15/16 |
| Policy Limit | $25mm primary | $25mm primary | $15mm primary (prenagr |
| Retention/Deductible | $1mm | $1mm | $1mm |
| Policy Form No. | 1702-1079 (ed 10-93) | "N/A" | 17-02-1079 (10-73) |
| Policy Premium | $55,096.00 | $55,096.00 | $35,723.00 |
| Commission | 12.5% | 12.50% | 12.5% |

**Endorsements**

| New | Not Carried Forward |
|---|---|
| endorsements amending definition of defense costs and subrogation to broaden coverage | |

**Notable Changes**

| Broadens Coverage | Reduces Coverage |
|---|---|
| amend 807-370, 17-02-5603 to broaden endorsement language | |

**List of Corrections / Questions to Insurer**

Missing: 17-02-8717 (3/02) notice of loss control services
99-10-0786 (9/02) notice to purchasers of employment practices
liability coverage or fiduciary liability                pM 3/21

Federal Insurance Company
Excise tax ——> no

CHUBB®

March 9, 2017

Jon Kaye
MARSH USA, INC
1166 AVE OF AMERICAS 37F
NEW YORK, NY 10036-0000

RE:   ALLY FINANCIAL INC.

Insuring Company: Federal Insurance Company

Dear Jon:

Enclosed is our DFI Primary Professional Liability Policy for the above referenced Insured.

I want to thank you for the opportunity to underwrite this account.

Please let me know if I can be of further assistance.

Sincerely,

J. Scott Usilton

CHUBB

djk

**DFI Primary Professional Liability**

PREMIUM BILL

Insured:   ALLY FINANCIAL INC.                         Date:   03/09/2017

Producer:   MARSH USA, INC
                  1166 AVE OF AMERICAS 37F
                  NEW YORK, NY 10036-0000

Company:   Federal Insurance Company

THIS BILLING IS TO BE ATTACHED TO AND FORM A PART OF THE POLICY REFERENCED BELOW.

Product:       DFI Primary Professional Liability

Policy Number:     8207-6453

Policy Period:  December 15, 2016 to December 15, 2017

NOTE: - PLEASE RETURN THIS BILL WITH REMITTANCE AND NOTE HEREON ANY CHANGES. BILL WILL BE RECEIPTED AND RETURNED TO YOU PROMPTLY UPON REQUEST.

PLEASE REMIT TO PRODUCER INDICATED ABOVE.

| Product | Effective Date | Premium |
|---|---|---|
| FIDUCIARY LIABILITY | 12/15/16 | $55,096.00 |
| | | |
| | | |

* For Kentucky policies, amount displayed includes tax and collection fees.

| | |
|---|---|
| **TOTAL POLICY PREMIUM** | $55,096.00 |
| **TOTAL INSTALLMENT PREMIUM DUE** | $55,096.00 |

WHEN REMITTING PLEASE INDICATE POLICY OR CERTIFICATE NUMBER

Form 14-02-1324i (Rev. 1/99)

**DFI Primary Professional Liability**

PREMIUM BILL

Insured:   ALLY FINANCIAL INC.                                    Date:   03/09/2017

Producer:   MARSH USA, INC
            1166 AVE OF AMERICAS 37F
            NEW YORK, NY 10036-0000

Company:   Federal Insurance Company

THIS BILLING IS TO BE ATTACHED TO AND FORM A PART OF THE POLICY REFERENCED BELOW.

Product:        DFI Primary Professional Liability

Policy Number: 8207-6453

Policy Period:   December 15, 2016 to December 15, 2017

NOTE: - PLEASE RETURN THIS BILL WITH REMITTANCE AND NOTE HEREON ANY CHANGES. BILL
WILL BE RECEIPTED AND RETURNED TO YOU PROMPTLY UPON REQUEST.

PLEASE REMIT TO PRODUCER INDICATED ABOVE.

| Product | Effective Date | Commission Rate | Premium |
|---------|----------------|-----------------|---------|
| FIDUCIARY LIABILITY | 12/15/16 | 12.50 % | $55,096.00 |
| | | | |
| | | | |

* For Kentucky policies, amount displayed includes tax and collection fees.

| | |
|---|---|
| **TOTAL POLICY PREMIUM** | $55,096.00 |
| **TOTAL INSTALLMENT PREMIUM DUE** | $55,096.00 |

WHEN REMITTING PLEASE INDICATE POLICY OR CERTIFICATE NUMBER

Form 14-02-1324 (Rev. 1/99)

# POLICYHOLDER
# DISCLOSURE NOTICE OF
# TERRORISM INSURANCE COVERAGE
### (for policies with no terrorism exclusion or sublimit)
### Insuring Company: Federal Insurance Company

You are hereby notified that, under the Terrorism Risk Insurance Act (the "Act"), this policy makes available to you insurance for losses arising out of certain acts of terrorism. Terrorism is defined as any act certified by the Secretary of the Treasury of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that the insurance provided by your policy for losses caused by acts of terrorism is partially reimbursed by the United States under the formula set forth in the Act.  Under this formula, the United States pays 85% of covered terrorism losses that exceed the statutorily established deductible to be paid by the insurance company providing the coverage. Beginning in 2016, the Federal share will be reduced by 1% per year until it reaches 80%, where it will remain.

However, if aggregate insured losses attributable to terrorist acts certified under the Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

10-02-1281 (Ed. 03/2015)

If aggregate insured losses attributable to terrorist acts certified under the Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

The portion of your policy's annual premium that is attributable to insurance for such acts of terrorism is: $ -0-.

If you have any questions about this notice, please contact your agent or broker.

10-02-1281 (Ed. 03/2015)

# IMPORTANT NOTICE TO POLICYHOLDERS

Insuring Company: Federal Insurance Company

All of the members of the Chubb Group of Insurance companies doing business in the United States (hereinafter "Chubb") distribute their products through licensed insurance brokers and agents ("producers").  Detailed information regarding the types of compensation paid by Chubb to producers on US insurance transactions is available under the Producer Compensation link located at the bottom of the page at www.chubb.com, or by calling 1-866-588-9478.  Additional information may be available from your producer.

Thank you for choosing Chubb.

10-02-1295 (ed. 6/2007)

**Notice to Purchasers of Employment Practices Liability Coverage or Fiduciary Liability Coverage**

Insuring Company: Federal Insurance Company

As a purchaser of an Employment Practices Liability Policy or a Fiduciary Liability Policy, please note that the Company has the right and duty to defend any Claim (as such term is defined in the Definitions section of this Policy) covered by this Policy, unless this Policy has been amended by written endorsement.  Defense counsel for any such Claim shall be selected by the Company from the Company's list of approved defense firms.  Please also note that, as a condition precedent to any right to coverage under this Policy, all Claims must be reported to the Company in writing in the manner and within the time provided in the Reporting and Notice provisions of this Policy.

For a list of approved defense firms, please contact your insurance agent or broker, or access such list by using the following internet address:

　　　　http://csi.chubb.com/panel_counsel.asp

Please note that the Company reserves the right to modify such list at any time without notice.

99-10-0768 (Ed. 9/2004)

## NOTICE OF LOSS CONTROL SERVICES

Insuring Company: Federal Insurance Company

As a Chubb policyholder, we would like to let you know that we have valuable loss prevention information available to you.

Available to you are copies of a booklet entitled "Fiduciary Liability Loss Prevention" by Dan A. Bailey, a partner in the law firm of Arter & Hadden.  This booklet discusses general principles governing liability and potential exposures for those in the role of trustee or fiduciary.  It also contains information that may be helpful to you in your loss prevention efforts.

As this booklet notes, it is important that you consult competent council to design and implement your loss control programs.

If you have any questions or would like to obtain a copy of the booklet, please call 1-866-282-9001 or email: formsordering@chubb.com.

**CHUBB®** Chubb Group of Insurance Companies

15 Mountain View Road, Warren, New Jersey 07059

**DECLARATIONS**
**FIDUCIARY LIABILITY POLICY**

**ITEM 1.   Parent Organization** (Name and Address):

ALLY FINANCIAL INC.
500 Woodward Avenue
Detroit, MI 48226

Policy Number:        8207-6453

**FEDERAL INSURANCE COMPANY**
Incorporated under the laws of Indiana, a stock
insurance company, herein called the Company

Capital Center, 251 North Illinois, Suite 1100
lindianapolis, IN 46204-1427

---

**THIS IS A CLAIMS MADE POLICY.  EXCEPT AS OTHERWISE PROVIDED, THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD. PLEASE READ CAREFULLY.**

**ITEM 2.**   Limits of Liability:

| | | |
|---|---|---|
| (A) | Each **Loss** | $ 25,000,000.00 |
| (B) | Each **Policy Period** | $ 25,000,000.00 |

**NOTE:  THE LIMITS OF LIABILITY AND ANY DEDUCTIBLE AMOUNTS ARE REDUCED OR EXHAUSTED BY DEFENSE COSTS.**

**ITEM 3.**   Deductible Amounts:

| | | |
|---|---|---|
| (A) | Non-Indemnifiable **Loss** | $           0.00 |
| (B) | Indemnifiable **Loss** | $  1,000,000.00 |

**ITEM 4.   Policy Period:** from: 12:01 a.m. on December 15, 2016
to: 12:01 a.m. on December 15, 2017
Local time at the address shown in ITEM 1.

**ITEM 5.   Sponsor Organization:**

Ally Financial Inc. and its Subsidiaries

GMACI Holdings LLC and its Subsidiaries

**ITEM 6.   Benefit Programs** included as **Insureds** and any other additional **Insureds**:

As per the definitions of Benefit Programs, Sponsored Plan and Insured Plan

**ITEM 7.**   Extended Reporting Period:

| | | |
|---|---|---|
| (A) | Additional Premium: | 150% of Annual Premium |
| (B) | Additional Period: | One Year |

**ITEM 8.**   Pending or Prior Date:          December 15, 2013

**ITEM 9.**   Continuity Date:                  December 15, 2013

**ITEM 10.**   Termination of Prior Policies:      8207-6453 (December 15, 2015 - December 15, 2016)

---



**IN WITNESS THEREOF, THE COMPANY** issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by a duly authorized representative of the Company.

President

Secretary

03/09/2017

Date

Authorized Representative

**CHUBB**

In consideration of payment of the premium and subject to the Declarations, limitations, conditions, provisions and other terms of this Policy, the Company agrees as follows:

*Insuring Clause*

1.  The Company shall pay on behalf of each of the **Insureds** all **Loss** for which the **Insured** becomes legally obligated to pay on account of any **Claim** first made against the **Insured** during the **Policy Period** or, if exercised, the Extended Reporting Period, for a **Wrongful Act** committed, attempted, or allegedly committed or attempted, before or during the **Policy Period** by an **Insured** or by any person for whose **Wrongful Acts** the **Insured** is legally responsible.

*Estates and Legal Representatives*

*deleted and replaced by endorsement # 2*

2.  ~~Subject~~ otherwise to the limitations, conditions, provisions and other terms of this Policy, ~~coverage shall~~ extend to **Claims** for the **Wrongful Acts** of **Insured Persons** made against ~~the estates,~~ heirs, legal representatives or assigns of **Insured Persons** who are ~~deceased  or~~ against the legal representatives or assigns of **Insured Persons** who are ~~Incompetent,~~ insolvent or bankrupt.

*Defense Provisions*

*deleted and replaced by endorsement # 31*

3.  The Company shall have the right and duty to defend any **Claim** covered by this Policy. Coverage shall apply even if any of the allegations are groundless, false or fraudulent. The Company's duty to defend shall cease upon exhaustion of the Company's applicable Limits of Liability set forth in ITEM 2. of the Declarations for this Policy.

    **Defense Costs** incurred by the Company, or by the **Insured** with the written consent of the Company, are part of and not in addition to the Company's applicable Limit of Liability set forth in ITEM 2. of the Declarations for this Policy, and the payment by the Company of **Defense Costs** reduces such applicable Limit of Liability.

    The **Insureds** agree to provide the Company with all information, assistance and cooperation which the Company reasonably requests and agree that in the event of a **Claim** the **Insureds** will do nothing that may prejudice the Company's position or its potential or actual rights of recovery.

    The **Insureds** agree not to settle any **Claim**, incur any **Defense Costs** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the Company's written consent, which shall not be unreasonably withheld. The Company shall not be liable for any settlement, **Defense Costs**, assumed obligation or admission to which it has not consented.

**CHUBB**

*Investigation and Settlement*

*deleted and replaced by endorsement #9*

4. The Company may make any investigation it deems necessary and may, with the written consent of the **Insured**, make any settlement of a **Claim** it deems expedient. If the **Insured** withholds consent to such settlement, the Company's liability for all **Loss** on account of such **Claim** shall not exceed the amount for which the Company could have settled such **Claim** plus costs, charges and expenses accrued as of the date such settlement was proposed in writing by the Company to the **Insured**.

**CHUBB**

**Extended Reporting Period**

*deleted and replaced by endorsement #8*

5.   If the Company terminates or refuses to renew this Policy other than for nonpayment of premium, the **Insureds** shall have the right, upon payment of the additional premium in ITEM 7.(A) of the Declarations for this Policy, to an extension of the coverage granted by this Policy for the period in ITEM 7.(B) of the Declarations for this Policy (Extended Reporting Period) following the effective date of termination or nonrenewal, but only for any **Wrongful Act** committed, attempted, or allegedly committed or attempted, prior to the effective date of termination or nonrenewal. This right of extension shall lapse unless written notice of such election, together with payment of the additional premium due, is received by the Company within thirty (30) days following the effective date of termination or nonrenewal. Any **Claim** made during the Extended Reporting Period shall be deemed to have been made during the immediately preceding **Policy Period**.

If the **Insured** terminates or declines to accept renewal, the Company may, if requested, at its sole option, grant an Extended Reporting Period. The offer of renewal terms and conditions or premiums different from those in effect prior to renewal shall not constitute refusal to renew.

**Exclusions**

6.   A.   The Company shall not be liable for **Loss** on account of any **Claim** made against any **Insured**:

*deleted and replaced by endorsement #30*

(1)   based upon, arising from, or in consequence of any circumstance if written notice of such circumstance has been given under any policy of which this Policy is a renewal or replacement and if such prior policy affords coverage (or would afford such coverage except for the exhaustion of its limit of liability) for such **Loss**, in whole or in part, as a result of such notice,

(2)   based upon, arising from, or in consequence of any deliberately fraudulent act or omission or any willful violation of any statute or regulation by such **Insured**, if a judgment or other final adjudication adverse to the **Insured** establishes such a deliberately fraudulent act or omission or willful violation,

*deleted by endorsement #25*

(3)   for libel or slander,

*deleted and replaced by endorsement #17*

(4)   for bodily injury, mental or emotional distress, sickness, disease or death of any person or damage to or destruction of any tangible property including loss of use thereof,

(5)   based upon, arising from, or in consequence of liability of others assumed by the **Insured** under any contract or agreement, either oral or written, except to the extent that the **Insured** would have been liable in the absence of the contract or agreement or unless the liability was assumed in accordance with or under the agreement or declaration of trust pursuant to which the **Benefit Program** was established,

*deleted and replaced by endorsement #26*

(6)   based upon, arising from, or in consequence of the failure of the **Insured** to comply with any law governing workers' compensation, unemployment, social security or disability benefits or any similar law, except the Consolidated Omnibus Budget Reconciliation Act of 1985 and amendments thereto,

**CHUBB·**

(7)   based upon, arising from, or in consequence of any demand, suit or other proceeding pending, or order, decree or judgment entered against any **Insured**, on or prior to the Pending or Prior Date set forth in ITEM 8. of the Declarations for this Policy, or the same or any substantially similar fact, circumstance or situation underlying or alleged therein,

**CHUBB**

---

**Exclusions**
**(continued)**

*[handwritten: replaced by endorsement #12]*

(8) based upon, arising from, or in consequence of such **Insured** having gained in fact any personal profit, remuneration or advantage to which such **Insured** was not legally entitled, or

*[handwritten: deleted and replaced by endorsement #20]*

(9) based upon, arising from, or in consequence of: (a) the actual, alleged or threatened discharge, release, escape or disposal of **Pollutants** into or on real or personal property, water or the atmosphere, or (b) any direction or request that the **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so; including but not limited to any **Claim** for financial loss to the **Sponsor Organization**, its security holders or creditors or any **Benefit Program** based upon, arising from or in consequence of the matters described in (a) or (b) of this exclusion.

B. The Company shall not be liable for that part of **Loss**, other than **Defense Costs**:

*[handwritten: deleted and replaced by endorsement #26]*

(1) which constitutes fines or penalties or the multiple portion of any multiplied damage award, other than the five percent or less, or the twenty percent or less, civil penalties imposed upon an **Insured** as a fiduciary under Section 502 (i) or (l), respectively, of the Employee Retirement Income Security Act of 1974, as amended,

(2) which is based upon, arising from, or in consequence of the failure to collect from employers contributions owed to a **Benefit Program**, unless the failure is because of the negligence of an **Insured**,

*[handwritten: deleted by endorsement #25]*

(3) which constitutes the return or reversion to any employer of any contribution or asset of a **Benefit Program**, or

*[handwritten: deleted and replaced by endorsement #26]*

(4) which constitutes benefits due or to become due under the terms of a **Benefit Program** unless, and to the extent that, (a) the **Insured** is a natural person and the benefits are payable by such **Insured** as a personal obligation, and (b) recovery for the benefits is based upon a covered **Wrongful Act**.

---

**Severability of Exclusions**

7. With respect to the Exclusions in Section 6.A. and 6.B. of this Policy, no fact pertaining to or knowledge possessed by any **Insured** shall be imputed to any other **Insured** to determine if coverage is available.

---

**Limits of Liability and Deductible**

8. For purposes of this Policy, all **Loss** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** of any **Insured** shall be deemed one **Loss**, and such **Loss** shall be deemed to have originated in the earliest **Policy Period** in which a **Claim** is first made against any **Insured** alleging any such **Wrongful Act** or **Interrelated Wrongful Acts**.

The Company's maximum liability for each **Loss** shall be the Limit of Liability for each **Loss** set forth in ITEM 2.(A) of the Declarations for this Policy. The Company's maximum aggregate liability for all **Loss** on account of all **Claims**

---

**CHUBB**

first made during the same **Policy Period** shall be the Limit of Liability for each **Policy Period** set forth in ITEM 2.(B) of the Declarations for this Policy.

**CHUBB**

---

*Limits of Liability*
*and Deductible*
*(continued)*

The Company's liability hereunder shall apply only to that part of each **Loss** which is excess of the Deductible Amounts set forth in ITEM 3. of the Declarations for this Policy and such Deductible Amounts shall be borne by the **Insureds** uninsured and at their own risk. The Deductible Amount for Non-Indemnifiable **Loss** set for in ITEM 3.(A) of the Declarations for this Policy shall apply to **Loss** incurred by any **Insured** other than the **Sponsor Organization** or any **Benefit Program** for which the **Sponsor Organization** is not permitted or required to indemnify or is permitted or required to indemnify but does not do so by reason of **Financial Impairment**. The Deductible Amount for Indemnifiable **Loss** set forth in ITEM 3.(B) of the Declarations for this Policy shall apply to all other **Loss**.

If a part of a single **Loss** is subject to the Deductible Amount for Non-Indemnifiable **Loss** and part of the same **Loss** is subject to the Deductible Amount for Indemnifiable **Loss**, the maximum Deductible Amount applicable to such **Loss** shall be the Deductible Amount for Indemnifiable **Loss**.

The **Sponsor Organization** shall be deemed permitted or required to indemnify an **Insured**, and the shareholder and board of director resolutions of the **Sponsor Organization** shall be deemed to provide indemnification to an **Insured**, to the fullest extent authorized by the **Sponsor Organization's** by-laws or certificate of incorporation in effect at the inception of this Policy, or any subsequently amended or superseding by-laws or certificate of incorporation of the **Sponsor Organization** to the extent such subsequent document expands or broadens and does not limit or restrict such indemnification authorization.

For purposes of this Section 8. only, the Extended Reporting Period, if exercised, shall be part of and not in addition to the immediately preceding **Policy Period**.

*Other Insurance*

*deleted and replaced by endorsement #16*

*deleted and replaced by endorsement #28*

9. If any **Loss** arising from any **Claim** made against any **Insured** is insured under any other valid policy(ies), prior or current, then this Policy shall cover such **Loss**, subject to its limitations, conditions, provisions and other terms, only to the extent that the amount of such **Loss** is in excess of the amount of payment from such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limit of Liability provided in this Policy.

---

**CHUBB**

---

*Acquisition or Creation of Another Entity or Benefit Program*

*deleted and replaced by endorsement #15*

10. If during the **Policy Period** the **Sponsor Organization** creates or acquires a **Subsidiary** or **Benefit Program** or otherwise becomes a fiduciary of or responsible for the **Administration** of any **Benefit Program** ("Inception Event"), and if the **Sponsor Organization** shall give written notice to the Company of the Inception Event as soon as practicable together with such information as the Company may require and shall pay any reasonable additional premium required by the Company, coverage shall be afforded, subject to the terms and conditions of this Policy, from the date of the Inception Event for such **Subsidiary, Benefit Program**, and any **Insured Persons** of such **Benefit Program**, but only for **Wrongful Acts** committed, attempted, or allegedly committed or attempted, after the date of the Inception Event, unless the Company agrees by endorsement to provide coverage for **Wrongful Acts** committed, attempted, or allegedly committed or attempted, prior to such date. Any such coverage shall be specifically excess of the amount of payment from any other insurance available to such **Benefit Program, Insured Persons** or **Sponsor Organization**.

---

**CHUBB***

*Acquisition or Creation of Another Entity or Benefit Program*
*(continued)*

Notwithstanding the foregoing, no coverage shall be afforded pursuant to this Section 10. with respect to any employee stock ownership plan or any **Insured Persons** or **Sponsor Organization** thereof unless the Company, by specific endorsement hereto, agrees to afford such coverage. Any such coverage shall be at the terms and conditions and for the premium set forth in such endorsement.

*Acquisition by Another Entity*

*amended by endorsement #24*

11.   If (a) the **Sponsor Organization** merges into or consolidates with another organization, (b) another organization or person or group of organizations and/or persons acting in concert acquires securities or voting rights which result in ownership or voting control by the other organization(s) or person(s) or more than 50% of the outstanding securities representing the present right to vote for election of directors of the **Sponsor Organization**, or (c) the responsibilities of the **Sponsor Organization** for the **Administration** of, or as a fiduciary of, any **Benefit Program** is fully assumed by any other person and/or entity, coverage under this Policy for such **Sponsor Organization, Benefit Program** and the **Insured Persons** thereof who were **Insureds** prior to such acquisition, merger, consolidation or assumption of responsibilities shall continue until termination of the Policy subject to the following:

(1)   for the merged, consolidated or acquired **Sponsor Organization** and any **Benefit Program** thereof, and for any **Benefit Program** described in subparagraph (c) above, coverage shall continue only with respect to **Claims** for **Wrongful Acts** committed, attempted, or allegedly committed or attempted prior to such merger, consolidation, acquisition, or assumption of responsibilities; or

(2)   for **Insured Persons** of the merged, consolidated, or acquired **Sponsor Organization** or any **Benefit Program** thereof, and for **Insured Persons** of any **Benefit Program** described in subparagraph (c) above, coverage shall continue with respect to **Claims** for **Wrongful Acts** committed, attempted or allegedly committed or attempted prior to the date the **Insured Person** ceases to be a trustee, director, officer and/or employee of any **Sponsor Organization** not so merged, consolidated or acquired.

The **Sponsor Organization** shall give written notice to the Company of such merger, consolidation, acquisition or assumption of responsibilities as soon as practicable together with such information as the Company may require. Any such continuing coverage shall be specifically excess of the amount of payment from any other insurance available to such **Sponsor Organization, Benefit Program** or **Insured Persons**.

**CHUBB**

*Termination of
Benefits Program*

*deleted, and
replaced by
endorsement #19*

12.  If the **Sponsor Organization** terminates any **Benefit Program** before or after the Inception Date of this Policy, coverage under this Policy with respect to such terminated **Benefit Program** shall continue until termination of this Policy for those who were **Insureds** at the time of such **Benefit Program** termination, or who would have been **Insureds** at the time of such termination if this Policy had been in effect, with respect to **Wrongful Acts** committed, attempted or allegedly committed or attempted by such **Insureds** prior to or after the date of such **Benefit Program** termination. The **Insureds** shall give written notice to the Company of such **Benefit Program** termination as soon as is practicable together with such information as the Company may require.

# CHUBB·

*Reporting and Notice*   13.   ~~The **Insureds** shall, as a condition precedent to exercising their rights under this Policy, give to the Company written notice as soon as practicable of any **Claim** made against any of them for a **Wrongful Act**.~~

*replaced by endorsement #7 section I*

*deleted and replaced by endorsement #32*

If during the **Policy Period** or Extended Reporting Period (if exercised) an **Insured** becomes aware of circumstances which could give rise to a **Claim** and gives written notice of such circumstance(s) to the Company, then any **Claims** subsequently arising from such circumstances shall be considered to have been made during the **Policy Period** or the Extended Reporting Period in which the circumstances were first reported to the Company.

The **Insureds** shall, as a condition precedent to exercising their rights under this Policy, give to the Company such information and cooperation as it may reasonably require, including but not limited to a description of the **Claim** or circumstances, the nature of the alleged **Wrongful Act**, the nature of the alleged or potential damage, the names of the actual or potential claimants, and the manner in which the **Insured** first became aware of the **Claim** or circumstances.

*Representations and Severability*   14.   In granting coverage to any one of the **Insureds**, the Company has relied upon the declarations and statements in the written application for this Policy and upon any declarations and statements in the original written application submitted to another insurer in respect of the prior coverage incepting as of the Continuity Date set forth in ITEM 9. of the Declarations for this Policy. All such declarations and statements are the basis of such coverage and shall be considered as incorporated in and constituting part of this Policy.

*deleted and replaced by endorsement #27*

Such written application(s) for coverage shall be construed as a separate application for coverage by each **Insured**. With respect to the declarations and statements contained in such written application(s) for coverage, no statement in the application or knowledge possessed by any **Insured** shall be imputed to any other **Insured** for the purpose of determining if coverage is available.

*Territory*   15.   Coverage shall extend anywhere in the world.

*Notice*   16.   Notice to the Company under this Policy shall be given in writing addressed to:

*addition of language via endorsement #7*

| Notice of **Claim**: | All Other Notices: |
| --- | --- |
| National Claims Department<br>Chubb Group of Insurance Companies<br>Companies<br>15 Mountain View Road<br>Warren, N.J. 07059 | Department of Financial Institutions<br>Chubb   Group   of   Insurance<br>Companies<br>15 Mountain View Road<br>Warren, N.J. 07059 |

Such notice shall be effective on the date of receipt by the Company at such address.

*Valuation and Foreign Currency*   17.   All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. Except as otherwise provided in this Policy, if judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States of America dollars, payment



under this Policy shall be made in United States dollars at the rate of exchange published in <u>The Wall Street Journal</u> on the date the final judgment is reached, the amount of settlement is agreed upon or the other element of **Loss** is due, respectively.

**CHUBB**

*Subrogation*

*deleted and replaced by endorsement #33*

18. In the event of any payment under this Policy, the Company shall be subrogated to the extent of such payment to all the **Insured's** rights of recovery, and the **Insured** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Company effectively to bring suit in the name of the **Insured**.

*Action Against the Company*

19. No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this Policy. No person or organization shall have any right under this Policy to join the Company as a party to any action against the **Insured** to determine the **Insured's** liability nor shall the Company be impleaded by the **Insured** or his legal representatives.

*Bankruptcy or Insolvency*

20. Bankruptcy or insolvency of an **Insured** or of the estate of an **Insured** shall not relieve the Company of its obligations nor deprive the Company of its rights under this Policy.

*Authorization Clause*

*deleted and replaced by endorsement #29*

21. By acceptance of this Policy, the **Parent Organization** agrees to act on behalf of all **Insureds** with respect to the giving and receiving of notice of **Claim** or termination, the payment of premiums and the receiving of any return premiums that may become due under this Policy, the negotiation, agreement to and acceptance of endorsements, and the giving or receiving of any notice provided for in this Policy (except the giving of notice to apply for the Extended Reporting Period), and the **Insureds** agree that the **Parent Organization** shall act on their behalf.

*Alteration and Assignment*

22. No change in, modification of, or assignment of interest under this Policy shall be effective except when made by a written endorsement to this Policy which is signed by an authorized employee of Chubb.

*Termination of the Policy*

*deleted and replaced by endorsement #4*

*deleted and replaced by endorsement #10*

23. This Policy shall terminate at the earliest of the following times:

a. sixty (60) days after the receipt by the **Parent Organization** of a written notice of termination from the Company,

b. upon the receipt by the Company of written notice of termination from the **Parent Organization**,

c. upon expiration of the **Policy Period** as set forth in ITEM 4. of Declarations of this Policy, or

d. at such other time as may be agreed upon by the Company and the **Parent Organization**.

The Company shall refund the unearned premium computed at customary short rates if the Policy is terminated by the **Parent Organization**. Under any other circumstances the refund shall be computed pro rata.



CHUBB·

**Termination of**
**Prior Policies**

24. Any policies issued by the Company or its affiliates and specified in ITEM 10. of the Declarations of this Policy shall terminate, if not already terminated, as of the inception date of this Policy.

**Definitions**

25. When used in this Policy:

*amended*
*by endorsement #13*

a. **Administration** means giving advice to employees or effecting enrollment, termination or cancellation of employees under a **Benefit Program**.

b. **Benefit Program** means:

   (1) any **Sponsored Plan**, or

   (2) any **Insured Plan**.

c. **Claim** means:

*deleted and*
*replaced by*
*endorsement #10*

   (1) a civil proceeding commenced by the service of a complaint or similar pleading,

   (2) a criminal proceeding commenced by a return of an indictment, or

   (3) a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document,

   against any **Insured** for a **Wrongful Act**, including any appeal therefrom.

d. **Defense Costs** means that part of **Loss** consisting of reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, officers or employees of the **Insured**) incurred in defending or investigating **Claims** and the premium for appeal, attachment or similar bonds.

e. **Employee Benefit Plan** means any plan so defined in the Employee Retirement Income Security Act of 1974, as amended.

f. **Financial Impairment** means the status of the **Sponsor Organization** resulting from:

   (1) the appointment by any state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate the **Sponsor Organization**, or

   (2) the **Sponsor Organization** becoming a debtor in possession.

g. **Insureds,** means any one or more:

   (1) **Sponsor Organization,**

   (2) **Benefit Program,**

   (3) **Insured Person,** or

**CHUBB**

    (4)   any other person or organization designated as an additional **Insured** by endorsement to this Policy.

  h.  **Insured Persons**, means any one or more:

*deleted and replaced by endorsement #22*

    (1)   natural persons serving as a past, present or future trustee, director, officer or employee of the **Sponsor Organization** or of any **Sponsored Plan**, and

**CHUBB**

---

*Definitions*
*(continued)*

(2)   any other natural person acting as a past, present or future fiduciary of a **Sponsored Plan** and named in ITEM 6. of the Declarations for this Policy.

i.   **Insured Plan** means any government-mandated insurance program for workers' compensation, unemployment, social security or disability benefits for employees of the **Sponsor Organization**.

*deleted and replaced by endorsement #21*

j.   ~~**Interrelated Wrongful Acts**~~ means all causally connected **Wrongful Acts**.

*deleted and replaced by endorsement #26*

k.   ~~**Loss**~~ means the total amount which any **Insured** becomes legally obligated to pay on account of each **Claim** and for all **Claims** in each **Policy Period** and the Extended Reporting Period, if exercised, made against them for **Wrongful Acts** for which coverage applies, including, but not limited to, damages, judgments, settlements, costs and **Defense Costs**. **Loss** does not include matters uninsurable under the law pursuant to which this Policy is construed.

l.   **Parent Organization** means the organization designated in ITEM 1. of the Declarations of this Policy.

m.   **Pension Benefit Plan** means any plan so defined in the Employment Retirement Income Security Act of 1974, as amended.

n.   **Policy Period** means the period of time specified in ITEM 4. of the Declarations of this Policy, subject to prior termination in accordance with Section 23. If this period is less than or greater than one year, then the Limit of Liability specified in the Declarations for this Policy shall be Company's maximum Limit of Liability under this Policy for the entire period.

o.   **Pollutants** means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by, or identified on a list of hazardous substances issued by the United States Environmental Protection Agency or a state, county, municipality or locality counterpart thereof. Such substances shall include, without limitation, solids, liquids, gaseous or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials. **Pollutants** shall also mean any other air emissions, odor, waste water, oil and oil products, infectious or medical waste, asbestos and asbestos products and any noise.

*deleted and replaced by endorsement #22*

p.   ~~**Sponsor Organization**~~ means any organization designated in ITEM 5. of the Declarations of this Policy.

q.   **Sponsored Plan** means:

---

**CHUBB**

(1)  an **Employee Benefit Plan** which is operated solely by the **Sponsor Organization** or jointly by the **Sponsor Organization** and a labor organization for the benefit of the employees of the **Sponsor Organization** located anywhere in the world and which existed at the Inception Date of this Policy or any Policy of which this Policy is a renewal or which is created or acquired after the inception of this Policy, subject to the provisions outlined in this Policy,

(2)  any other plan, fund, or program specifically included as a **Sponsored Plan** and any **Benefit Program** and named in ITEM 6. of the Declarations for this Policy; provided however, **Sponsored Plan** shall not include any multi-employer plan, as defined in the Employee Retirement Income Security Act of 1974, as amended, or

**CHUBB**

*Definitions*
*(continued)*

(3) any other employee benefit plan or program not subject to Title 1 of the Employee Retirement Income Security Act of 1974, as amended, sponsored solely by the **Sponsor Organization** for the benefit of the employees of the **Sponsor Organization**.

*deleted and replaced by endorsement #22*

r. ~~Subsidiary, means any organization in which more than 50% of the outstanding securities or voting rights representing the present right to vote for election of directors is owned or controlled, directly or indirectly, in any combination, by one or more **Sponsor Organization**.~~

s. **Welfare Benefit Plan** means any plan so defined in the Employee Retirement Income Security Act of 1974, as amended.

t. **Wrongful Act** means:

(1) with respect to **Sponsored Plan**,

    i. any breach of the responsibilities, obligations or duties imposed upon fiduciaries of the **Sponsored Plan** by the Employee Retirement Income Security Act of 1974, as amended, or by the common or statutory law of the United States, or any state or other jurisdiction anywhere in the world,

    ii. any other matter claimed against the **Sponsor Organization** or an **Insured Person** solely because of the **Sponsor Organization's** or the **Insured Person's** service as a fiduciary of any **Sponsored Plan**, or

    iii. any negligent act, error or omission in the **Administration** of any **Sponsored Plan**, and

(2) with respect to an Insured Plan, any negligent act, error or omission in the **Administration** of any **Insured Plan**.

For the purposes of the definitions, the singular includes the plural and the plural includes the singular, unless otherwise indicated.

**ENDORSEMENT**

Effective date of
this endorsement:  December 15, 2016

Company:   Federal Insurance Company

Endorsement No. 1

To be attached to and
form a part of Policy No. 8207-6453

Issued to:   ALLY FINANCIAL INC.

---

### NOTICE TO MICHIGAN INSUREDS

THIS POLICY IS EXEMPT FROM THE FILING REQUIREMENTS OF SECTION 2236 OF THE INSURANCE CODE OF 1956, 1956 PA 218, MCL 500.2236.



14-02-10003 (ed. 8/2004)            Page 1

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: December 15, 2016

Federal Insurance Company

Endorsement/Rider No. 2

To be attached to and
form a part of Policy No. 8207-6453

Issued to:  ALLY FINANCIAL INC.

SPOUSAL AND DOMESTIC PARTNER EXTENSION ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)     Section 2., Estates and Legal Representatives, of this Policy is deleted and replaced with the following:

*Spouses, Estates and Legal Representatives*

2.   Subject otherwise to the limitations, conditions, provisions and other terms of this Policy, coverage shall extend to **Claims** for the **Wrongful Acts** of an **Insured Person** made against:

(a) the estates, heirs, legal representatives or assigns of such **Insured Person** if such **Insured Person** is deceased or the legal representatives or assigns of such **Insured Person** if such **Insured Person** is incompetent, insolvent or bankrupt; or

(b) the lawful spouse or **Domestic Partner** of such **Insured Person** solely by reason of such spouse or **Domestic Partner's** status as a spouse or **Domestic Partner**, or such spouse or **Domestic Partner's** ownership interest in property which the claimant seeks as recovery for an alleged **Wrongful Act** of such **Insured Person**.

All terms and conditions of this Policy, including without limitation the Retention, applicable to **Loss** incurred by the **Insured Persons**, shall also apply to loss incurred by the estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** of such **Insured Persons**. The coverage provided by this Section 2 shall not apply with respect to any loss arising from an act or omission by an **Insured Person's** estate, heirs, legal representatives, assigns, spouse or **Domestic Partner**.

(2)     For the purposes of this endorsement, **Domestic Partner** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the **Parent Organization**.



The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: December 15, 2016

Federal Insurance Company

Endorsement/Rider No. 3

To be attached to and
form a part of Policy No. 8207-6453

Issued to:  ALLY FINANCIAL INC.

## COMPLIANCE WITH APPLICABLE TRADE SANCTION LAWS

It is agreed that this insurance does not apply to the extent that trade or economic sanctions or other similar laws or regulations prohibit the coverage provided by this insurance.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

14-02-9228 (2/2010)                    Page 1

Effective date of
this endorsement:   December 15, 2016

**Federal Insurance Company**

Endorsement No.:   4

To be attached to and form a part of Policy
Number:                 8207-6453

Issued to:   ALLY FINANCIAL INC.

---

### MICHIGAN AMENDATORY ENDORSEMENT

It is agreed that Section 23., Termination of the Policy, is deleted in its entirety and replaced with the following:

23.   Termination of the Policy

This Policy shall terminate at the earliest of the following times:

a.   sixty (60) days after mailing, postage prepaid, to the **Insured** at its address last known by the Company or an authorized agent of the Company, a notice of termination from the Company,

b.   upon the receipt by the Company or an authorized agent of the Company, of written notice of termination from the **Parent Organization**,

c.   upon expiration of the **Policy Period** as set forth in ITEM 4. of the Declarations of this Policy, or

d.   at such other time as may be agreed upon by the Company and the **Parent Organization.**

The Company shall refund the excess of paid premium above the pro rata if the Policy is terminated by the **Insured.** Under any other circumstances the refund shall be computed pro rata. However, the minimum earned premium on any connected policy shall not be less than the greater of $25.00 or the pro rata premium.

The mailing of any notice of cancellation shall be prima facie proof of notice.   Delivery of written notice shall be equivalent to mailing.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Date:  March 9, 2017

By _____
            Authorized Representative

Fiduciary Liability Policy
Form 17-02-1154 (Rev. 3-98)                                                                                    Page 1

Effective date of
this endorsement:   December 15, 2016

**Federal Insurance Company**

Endorsement No.:   5

To be attached to and form a part of Policy
Number:                8207-6453

Issued to:   ALLY FINANCIAL INC.

---

### PRIOR ACTS EXCLUSION ENDORSEMENT

It is agreed that the Company shall not be liable for **Loss** on account of any **Claim** based upon, arising from, or in consequence of **Wrongful Acts** or **Interrelated Wrongful Acts** where all or any part of such acts were committed, attempted or allegedly committed or attempted prior to December 15, 2013.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Date:   March 9, 2017

By _____
         Authorized Representative

[Form 17-02-1220 (Ed. 3/2004) rev.                                                              Page 1

Effective date of
this endorsement:   December 15, 2016

**Federal Insurance Company**

Endorsement No.:   6

To be attached to and form a part of Policy
Number:               8207-6453

Issued to:   ALLY FINANCIAL INC.

---

### MICHIGAN AMENDATORY ENDORSEMENT

It is agreed that Section 9., Other Insurance, is deleted in its entirety and replaced with the following:

9.     Other Insurance

If any **Loss** arising from any **Claim** made against any **Insured Persons** is insured under any other valid policy(ies), prior or current, then the Company shall not be liable under this Policy for a greater proportion of such **Loss** than would be payable if each insurer contributes an equal share until the share of each insurer equal to the lowest applicable limit of liability under any one policy or the full amount of the **Loss** is paid. With respect to any amount of **Loss** not so paid, the remaining insurers shall then continue to contribute equally to the remaining amount of the **Loss** until each such insurer has paid its limit of liability in full or the full amount of the **Loss** is paid, whichever occurs first.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Date:   March 9, 2017                                          By _____
                                                                          Authorized Representative

Fiduciary Liability Policy
Form 17-02-1257 (Ed. 10-93)                                                                    Page 1

Effective date of
this endorsement:   December 15, 2016

**Federal Insurance Company**

Endorsement No.:   7

To be attached to and form a part of Policy
Number:                    8207-6453

Issued to:   ALLY FINANCIAL INC.

---

## MICHIGAN AMENDATORY ENDORSEMENT - NOTICE

It is agreed that:

1.    Section 13., Reporting and Notice, is amended by deleting the first paragraph in its entirety and
      replacing it with the following:

      The **Insureds** shall, as a condition precedent to exercising their rights under this Policy, give to the
      Company or any authorized agent of the Company within the state of Michigan notice as soon as
      practicable of any **Claim** made against any of them for a **Wrongful Act.**

2.    By adding to Section 16., Notice, the following:

      Notice of Claim given to the Company as noted above or any authorized agent of the Company
      shall be deemed notice to the Company.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Date:   March 9, 2017                                 By _____
                                                                    Authorized Representative

Fiduciary Liability Policy
Form 17-02-1258-R (Ed. 10-93)                                                      Page 1

Effective date of
this endorsement:   December 15, 2016

**Federal Insurance Company**

Endorsement No.:   8

To be attached to and form a part of Policy
Number:              8207-6453

Issued to:   ALLY FINANCIAL INC.

---

## BILATERAL ERP ENDORSEMENT

It is agreed that Section 5., Extended Reporting Period, is deleted in its entirety and replaced with the following:

Extended Reporting Period

5.   If the Company or the **Insured** terminates or refuses to renew this Policy, the **Parent Organization** and the **Insured Persons** shall have the right, upon payment of the additional premium set forth in ITEM 7.(A) of the Declarations for this Policy, to an extension of coverage granted by this Policy for the period set forth in ITEM 7.(B) of the Declarations for this Policy (Extended Reporting Period) following the effective date of termination or nonrenewal, but only for any **Wrongful Act** committed, attempted, or allegedly committed or attempted, prior to the effective date of termination or nonrenewal.   This right of extension shall lapse unless written notice of such election, together with payment of the additional premium due, is received by the Company within thirty (30) days following the effective date of termination or nonrenewal.   Any **Claim** made during the Extended Reporting Period shall be deemed to have been made during the immediately preceding **Policy Period**. The offer of renewal terms and conditions or premiums different from those in effect prior to renewal shall not constitute refusal to renew.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Date:   March 9, 2017                          By _____
                                                        Authorized Representative

Fiduciary Liability Policy
Form 17-02-1517 (Ed. 12-97)                                          Page 1

Effective date of
this endorsement:   December 15, 2016

**Federal Insurance Company**

Endorsement No.:   9

To be attached to and form a part of Policy
Number:              8207-6453

Issued to:   ALLY FINANCIAL INC.

---

### AMENDING INVESTIGATION AND SETTLEMENT ENDORSEMENT

It is agreed that Section 4., Investigation and Settlement, is deleted in its entirety and replaced with the following:

Investigation and Settlement

4.    The Company may make any investigation it deems necessary and may, with the written consent of the **Insured**, make any settlement of a **Claim** it deems expedient.


ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.


Date:  March 9, 2017                                        By_____
                                                                          Authorized Representative

Fiduciary Liability Policy
Form 17-02-2400 (Ed. 12-00)                                                     Page 1

Effective date of
this endorsement:  December 15, 2016

**Federal Insurance Company**

Endorsement No.:  10

To be attached to and form a part of Policy
Number:                    8207-6453

Issued to:   ALLY FINANCIAL INC.

---

### AMENDING TERMINATION-NONCANCELLABLE BY THE COMPANY EXCEPT FOR NON-PAYMENT/NON-RENEWAL ENDORSEMENT

It is agreed that Section 23., Termination of Policy, is deleted in its entirety and replaced with the following:

Termination of Policy

23.   This Policy shall terminate at the earliest of the following times:

    a.   fifteen (15) days after receipt by the **Parent Organization** of written notice from the Company of termination resulting from non-payment of premium;

    b.   upon receipt by the Company of written notice of termination from the **Parent Organization**;

    c.   upon expiration of the **Policy Period** as set forth in ITEM 4. of the Declarations of this Policy;

    d.   sixty (60) days after receipt by the **Parent Organization** of the Company's notice of nonrenewal.  Such notice shall be in conformance with applicable state laws and regulations; or

    e.   at such time as may be agreed upon by the Company and the **Parent Organization.**

The Company shall refund the unearned premium computed at customary short rates if the policy is terminated by the **Parent Organization** for any reason other than an acquisition of the **Parent Organization** by another organization.   Under any other circumstances the refund shall be computed pro-rata.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Date:  March 9, 2017

By _____
             Authorized Representative

Fiduciary Liability Policy
Form 17-02-2403 (Ed. 6/2004) rev.

Page 1

Effective date of
this endorsement:   December 15, 2016

**Federal Insurance Company**

Endorsement No.:   11

To be attached to and form a part of Policy
Number:              8207-6453

Issued to:   ALLY FINANCIAL INC.

---

### AMENDMENT OF COMPANY - PRIOR & PENDING LITIGATION ENDORSEMENT

It is agreed that:

1.   ITEM 5., **Sponsor Organization**, as set forth on the Declarations is amended to include the following:

**Sponsor Organization**

Provident Insurance PLC

2.   With respect to the coverage provided by this endorsement, the Company shall not be liable to make any payment for **Loss** in connection with any claim made against any **Insured** that is based upon, arising out of, relating to, in consequence of, or in any way involving:

a.   any litigation occurring prior to, or pending as of December 15, 2013 including (but not limited to) claims, demands, causes of action, legal or quasi-legal proceedings, decrees, or judgments against the **Insured** which the **Insured** has received notice or otherwise had knowledge as of December 15, 2013; or

b.   any subsequent litigation arising from, or based on substantially the same matters as alleged in the pleadings of such prior or pending litigation; or

c.   any **Wrongful Act** of the **Insured** which gave rise to such prior or pending litigation.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Date:   March 9, 2017

By _____
Authorized Representative

Fiduciary Liability Policy
Form 17-02-2404 (Ed. 12-00)                                                                 Page 1

Effective date of
this endorsement:   December 15, 2016

**Federal Insurance Company**

Endorsement No.:   12

To be attached to and form a part of Policy
Number:                8207-6453

Issued to:   ALLY FINANCIAL INC.

## MODIFIED EXCLUSION (8) – FINAL ADJUDICATION ENDORSEMENT

It is agreed that Section 6.A., Exclusions, is amended by deleting Exclusion (8) in its entirety and replacing it with the following:

(8)        based upon, arising from, or in consequence of such **Insured** having gained any personal profit, remuneration or advantage to which **Insured** was not legally entitled, provided, however, this exclusion shall not apply unless a judgement or other final adjudication to such **Insured** establishes that such **Claim** was brought about or contributed to by having gained any personal profit, remuneration or advantage to which such **Insured** was not legally entitled; or

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Date:  March 9, 2017

By _____
        Authorized Representative

Fiduciary Liability Policy
Form 17-02-4738 (Ed. 5-02)

Page 1

Effective date of
this endorsement:  December 15, 2016

**Federal Insurance Company**

Endorsement No.:  13

To be attached to and form a part of Policy
Number:          8207-6453

Issued to:   ALLY FINANCIAL INC.

---

### AMEND DEFINITION OF ADMINISTRATION ENDORSEMENT

It is agreed that the term **Administration** as defined in Section 25 Definitions of this Policy is amended to read in its entirety as follows:

    a.    **Administration** means:

        (1)    advising, counseling or giving notice to employees, participants or beneficiaries with respect to any **Benefit Program**;

        (2)    providing interpretations with respect to any **Benefit Program**; or

        (3)    handling of records or effecting enrollment, termination or cancellation of employees, participants or beneficiaries under any **Benefit Program**.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Date:  March 9, 2017

By _____
             Authorized Representative

17-02-6560 (6/2004) REV.

Page 1

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: December 15, 2016

Federal Insurance Company

Endorsement/Rider No. 14

To be attached to and
form a part of Policy No. 8207-6453

Issued to:  ALLY FINANCIAL INC.

PRIORITY OF PAYMENTS ENDORSEMENT

In consideration of the premium charged, it is agreed that with respect to any **Claim** first made against the **Insureds** during the **Policy Period**, regardless of whether such **Claim** is first made before or after the effective date of this endorsement:

If a liquidation or reorganization proceeding is commenced by or against the **Sponsor Organization** pursuant to the United States Bankruptcy Code or any similar state, local or foreign law and in the event payment of **Loss** is due under this coverage section but, in the sole discretion of the Company, the amount of such **Loss** in the aggregate potentially exceeds the remaining available Limit of Liability for this coverage section, the Company shall:

(a)  first pay such covered **Loss** incurred by the **Insured Persons** and the **Sponsored Plans**; then

(b)  to the extent of any remaining amount of the Limit of Liability available after payment under (a) above, pay such covered **Loss** incurred by the **Sponsor Organization**.

Except as otherwise provided in this paragraph of this endorsement, the Company may pay covered **Loss** as it becomes due under this coverage section without regard to the potential for other future payment obligations under this coverage section.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: December 15, 2016

Federal Insurance Company

Endorsement/Rider No. 15

To be attached to and
form a part of Policy No. 8207-6453

Issued to:  ALLY FINANCIAL INC.

---

AMENDED ACQUISITION – PERCENTAGE THRESHOLD INCREASED ENDORSEMENT

In consideration of the premium charged, it is agreed that Section 10., Acquisition or Creation of Another Entity or Benefit Program, of this Policy is deleted and replaced with the following:

10.     Acquisition or Creation of Another Entity or Benefit Program

If during the **Policy Period** the **Sponsor Organization** acquires or creates a **Subsidiary** or **Benefit Program** or otherwise becomes a fiduciary of or responsible for the **Administration** of any **Benefit Program**, coverage shall apply to the newly acquired or newly created **Subsidiary**, **Benefit Program** and any **Insured Persons** thereof subject to the terms and conditions of the Policy, but only with respect to **Wrongful Acts** committed, attempted, or allegedly committed or attempted after such acquisition or creation date.

If the total assets of any such acquired organization or **Benefit Program** or new **Subsidiary** or **Benefit Program** exceed fifteen percent (15%) of the total assets of the **Parent Organization** (as reflected in the most recent audited consolidated financial statements of such organization and the **Parent Organization**, respectively, as of the date of such acquisition or creation), the **Parent Organization** shall give written notice of such acquisition or creation to the Company as soon as practicable, but in no event later than ninety (90) days after the date of such acquisition or creation, together with such other information as the Company may require and shall pay any reasonable additional premium required by the Company.  If the **Parent Organization** fails to give such notice within the time specified in the preceding sentence, or fails to pay the additional premium required by the Company, coverage for such acquired or created organization or **Benefit Program** and its **Insureds** shall terminate with respect to **Claims** first made more than ninety (90) days after such acquisition or creation.  Coverage for any acquired or created organization or **Benefit Program** described in this paragraph, and for the **Insureds** of such organization or **Benefit Program**, shall be subject to such additional or different terms, conditions and limitations of coverage as the Company in its sole discretion may require.

Notwithstanding the foregoing, no coverage shall be afforded pursuant to this Section 10. with respect to any employee stock ownership plan (ESOP) or any **Insured Persons** or **Sponsor Organization** thereof unless the Company, by specific endorsement hereto, agrees to afford such coverage.  Any such coverage shall be at the terms and conditions and for the premium set forth in such endorsement.



Q07-330 (02/2007)                    Page 1

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: December 15, 2016

Federal Insurance Company

Endorsement/Rider No. 16

To be attached to and
form a part of Policy No. 8207-6453

Issued to:  ALLY FINANCIAL INC.

---

VOLUNTARY SETTLEMENT PROGRAM COVERAGE ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)    Section 1., Insuring Clause, is amended by adding the following:

Voluntary Settlement Program Coverage

The Company shall pay, on behalf of the **Insureds**, **Settlement Fees** and **Defense Costs** with respect to a **Settlement Program Notice** first given to the Company during the **Policy Period**, or, if exercised, during the Extended Reporting Period, provided (i) the **Settlement Fees** and **Defense Costs** are incurred after such **Settlement Program Notice** is first given to the Company, and (ii) the Company's maximum liability for all **Settlement Fees** and **Defense Costs** with respect to all **Settlement Program Notices** first given to the Company during the **Policy Period** (including the Extended Reporting Period, if applicable) shall be $250,000.00. Such amount shall be part of, and not in addition to, the Limit of Liability otherwise applicable to this Policy.

(2)    Section 25., Definitions, is amended as follows:

(a)    The following definitions are added:

**Settlement Fees** means any fees, fines, penalties or sanctions paid by an **Insureds** to a governmental authority pursuant to a **Settlement Program** for the actual or alleged inadvertent non-compliance by a **Benefit Program** with any statute, rule or regulation; provided **Settlement Fees** shall not include (a) any costs to correct the non-compliance, or any other charges, expenses, taxes or damages; or (b) any fees, fines, penalties or sanctions relating the an **Benefit Program** which, as of the earlier of the inception of this coverage section or the inception of the first policy in an uninterrupted series of policies issued by the Company of which this coverage section is a direct or indirect renewal or replacement, any **Insured Persons** knew to be actually or allegedly non-compliant.

**Settlement Program** means any voluntary compliance resolution program or similar voluntary settlement program administered by the U.S. Internal Revenue Service or the U.S. Department of Labor, including but not limited to, the Employee Plans Compliance Resolution System, the Audit Closing Agreement Program, the Voluntary Compliance Resolution Program, the Walk-in Closing Agreement Program, the Administrative Policy Regarding Self-Correction, the Tax Sheltered Annuity Voluntary Correction Program, the Delinquent Filer Voluntary Compliance Program, and the Voluntary Fiduciary Correction Program, or any similar program administered by a governmental authority located outside the United States.

**Settlement Program Notice** means prior written notice to the Company by the **Insured** of the **Insured's** intent to enter into a **Settlement Program**.

(b)    The definition of **Loss** is amended to include the following:

**Loss** also means, solely with respect to the Voluntary Settlement Program Coverage afforded pursuant to this endorsement, **Settlement Fees**.

(3)    Solely with respect to the Voluntary Settlement Program Coverage afforded herein, Section 13. Reporting and Notice is amended to include the following:

With respect to the Voluntary Settlement Program Coverage, if during the **Policy Period** an **Insured** gives written notice to the Company of a **Settlement Program Notice**, then any **Claim** subsequently arising from the **Settlement Program Notice** shall be deemed to have been first made during the **Policy Period** in which the written notice was first given by an **Insured** to the Company, provided any such subsequent **Claim** is reported to the **Company** as set forth in this Section 13. With respect to any such subsequent **Claim**, no coverage under this Section shall apply to loss incurred prior to the date such subsequent **Claim** is actually made.

(4)    Solely with respect to the Voluntary Settlement Program Coverage afforded herein, Section 8. Limits of Liability and Deductible, the third paragraph is deleted and replaced with the following:

The Company's liability hereunder shall apply only to that part of each **Loss** which is excess of the Deductible Amounts set forth in ITEM 3. of the Declarations for this Policy and such Deductible Amounts shall be borne by the **Insureds** uninsured and at their own risk. The Deductible Amount for Voluntary Settlement Program Coverage shall be the deductible amount shown in Item 3.(C) of the Declarations for this Policy.

(5)    Item 3., Deductible Amount, of the Declarations is amended to add the following Deductible Amount applicable to the Voluntary Settlement Program Coverage:

(C)    Deductible Amount: Voluntary Settlement Program Coverage:    $0.00

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: December 15, 2016

Federal Insurance Company

Endorsement/Rider No. 17

To be attached to and
form a part of Policy No. 8207-6453

Issued to:  ALLY FINANCIAL INC.

---

### BODILY INJURY/PROPERTY DAMAGE EXCLUSION ENDORSEMENT

In consideration of the premium charged, it is agreed that Exclusion (4) of Section 6.A., Exclusions, is deleted and replaced with the following:

(4)   for bodily injury, sickness, disease or death of any person or damage to or destruction of any tangible property including loss of use thereof;

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.



_____
Authorized Representative

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: December 15, 2016

Federal Insurance Company

Endorsement/Rider No. 18

To be attached to and
form a part of Policy No. 8207-6453

Issued to:  ALLY FINANCIAL INC.

AMEND DEFINITION OF CLAIM ENDORSEMENT

In consideration of the premium charged, it is agreed that the term **Claim,** as defined in Section 25.,
Definitions, of this Policy, is deleted and replaced with the following:

**Claim** means:

    (1)    a written demand for monetary damages or non-monetary relief;

    (2)    a civil proceeding commenced by the service of a complaint or similar pleading;

    (3)    a criminal proceeding commenced by a return of an indictment or information;

    (4)    a formal civil administrative or civil regulatory proceeding commenced by the filing of
           a notice  of charges or similar document or by the entry of a formal investigative order
           or similar document;

    (5)    a written notice of commencement of a fact-finding investigation by the U.S.
           Department of Labor, the U.S. Pension Benefit Guaranty Corporation, or any similar
           governmental authority located outside the United States, including but not limited to
           the Pensions Ombudsman appointed by the United Kingdom Secretary of State for
           Social Services, the United Kingdom Occupational Pensions Regulatory Authority; or

    (6)    an arbitration or mediation commenced by receipt of a written demand for arbitration, demand for
           mediation or similar document;

against any **Insured** for a **Wrongful Act**, including any appeal therefrom.



Q07-336 (02/2007)              Page 1

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: December 15, 2016

Federal Insurance Company

Endorsement/Rider No. 19

To be attached to and
form a part of Policy No. 8207-6453

Issued to:  ALLY FINANCIAL INC.

AMEND TERMINATION OF BENEFITS PROGRAM ENDORSEMENT

In consideration for the premium charged, it is agreed that Section 12, **Termination of Benefits Program** is deleted in its entirety and replaced with the following:

12.    If the **Sponsor Organization** terminates any **Benefit Program** before or after the Inception Date of this Policy, coverage under this Policy with respect to such terminated **Benefit Program** shall continue until termination of this Policy for those who were **Insureds** at the time of such **Benefit Program** termination, or who would have been **Insureds** at the time of such termination if this Policy had been in effect, with respect to **Wrongful Acts** committed, attempted or allegedly committed or attempted by such **Insureds** prior to or after the date of such **Benefit Program** termination.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

Q07-337 (02/2007)                    Page 1

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: December 15, 2016

Federal Insurance Company

Endorsement/Rider No. 20

To be attached to and
form a part of Policy No. 8207-6453

Issued to:  ALLY FINANCIAL INC.

---

AMEND POLLUTION EXCLUSION ENDORSEMENT

In consideration of the premium charged, it is agreed that Exclusion (9) of Section 6.A., Exclusions, of this Policy is deleted and replaced with the following:

A. (9)    based upon, arising from or in consequence of:

    (i)    any actual, alleged, or threatened exposure to, or generation, storage, transportation, discharge, emission, release, dispersal, escape, treatment, removal or disposal of any **Pollutants**; or

    (ii)    any regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any **Pollutants**, or any action taken in contemplation or anticipation of any such regulation, order, direction or request,

including but not limited to any **Claim** for financial loss to the **Sponsor Organization** or **Sponsored Plan** or creditors based upon, arising from or in consequence of any matter described in subparagraph (i) or (ii) of this Exclusion A.(9); provided that this Exclusion A.(9) shall not apply to:

    (a)    any **Claim** by or on behalf of a beneficiary of or participant in any **Sponsored Plan** based upon, arising from or in consequence of the diminution in value of any securities owned by the **Sponsored Plan** in any organization other than the **Sponsor Organization**, if such diminution in value is allegedly as a result of the matters described in (i) or (ii) above; or

    (b)    **Loss** (other than fees or expenses incurred in testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing **Pollutants**) incurred by an **Insured Person** for which the **Sponsor Organization** is not permitted or required by common or statutory law to indemnify or for which the **Sponsor Organization** is not able to indemnify by reason of **Financial Impairment**;



Q07-338 (02/2007)                    Page 1

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: December 15, 2016

Federal Insurance Company

Endorsement/Rider No. 21

To be attached to and
form a part of Policy No. 8207-6453

Issued to:  ALLY FINANCIAL INC.

---

AMEND DEFINITION OF INTERRELATED WRONGFUL ACTS ENDORSEMENT

In consideration of the premium charged, it is agreed the term **Interrelated Wrongful Acts**, as defined in Section 25., Definitions, is deleted and replaced with the following:

**Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.



_____
Authorized Representative

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: December 15, 2016

Federal Insurance Company

Endorsement/Rider No. 22

To be attached to and
form a part of Policy No. 8207-6453

Issued to: ALLY FINANCIAL INC.

---

AMEND DEFINITIONS ENDORSEMENT

In consideration of the premium charged, it is agreed that Section 25., Definitions, of this Policy is amended as follows:

(1)　The definition of **Insured Person** is deleted and replaced with the following:



　　**Insured Person** means:

　　(a)　any past, present or future **Executive**, **Employee** or natural person trustee of the **Sponsor Organization** or of the **Sponsored Plan**; and

　　(b)　any past, present or future natural person trustee or fiduciary of a multi-employer plan, if such person in such capacity is added as an **Insured Person** by specific written endorsement to this Policy.

(2)　The definition of **Sponsor Organization** is deleted and replaced with the following:



　　**Sponsor Organization** means collectively, those organizations designated in Item 5. of the Declarations of this Policy, including such organization in its capacity as a debtor in possession under the United States bankruptcy law or in an equivalent status under the law of any other country.

(3)　The definition of **Sponsored Plan** is deleted and replaced with the following:

　　**Sponsored Plan** means:

　　(a)　any Employee Benefit Plan, Pension Benefit Plan or Welfare Benefit Plan, as each are defined in **ERISA**, which is operated solely by the **Sponsor Organization** or jointly by the **Sponsor Organization** and a labor organization solely for the benefit of the **Employees** or **Executives** of the **Sponsor Organization** located anywhere in the world and which existed on or before the inception date set forth in Item 4 of the Declarations or which is created or acquired after such inception date; provided:



　　　　(i)　any coverage with respect to any such Plan created or acquired during the **Policy Period** shall apply only for **Wrongful Acts** committed, attempted, or allegedly committed or attempted after the effective date of such creation or acquisition and shall be subject to Section 10 of this Policy, and

　　　　(ii)　any coverage with respect to an employee stock ownership plan created or acquired during the **Policy Period** shall be further subject to Section 10 of this Policy;

(b)     any other employee benefit plan or program not subject to **ERISA** which is sponsored solely by the **Sponsor Organization** for the benefit of the **Employees** or **Executives**, including any fringe benefit or excess benefit plan;

(c)     any other plan or program otherwise described in paragraphs (a) or (b) above while such plan or program is being actively developed, formed or proposed by the **Sponsor Organization** prior to the formal creation of such plan or program; provided, however, no coverage is afforded under this Policy for any **Claim** against an **Insured** in a settlor or similar uninsured capacity with respect to any plan or program; and

(d)     any other plan, fund, or program specifically included as a **Sponsored Plan** by endorsement to this Policy.



**Sponsored Plan** shall not include any employee stock ownership plan created or acquired by the **Sponsor Organization** during the **Policy Period** (except as otherwise provided in Section 10 of this Policy), or any multi-employer plan created before or during the **Policy Period.**

(4)     The definition of **Subsidiary** is deleted and replaced with the following:

**Subsidiary**, either in the singular or plural, means any organization while more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to vote for election of or to appoint directors or **Managers** of such organization are owned or controlled, directly or indirectly, in any combination, by one or more **Sponsor Organizations**.

**Subsidiary** also means any non-profit corporation, community chest, fund organization or foundation exempt from federal income tax as any organization described in Section 501(c)(3), Internal Revenue Code of 1986 that is sponsored by one or more **Sponsor Organizations**.

(5)     The following definitions are added:

**Employee** means any natural person whose labor or service is engaged by and directed by the **Sponsor Organization** or any **Sponsored Plan**, including part-time, seasonal, leased and temporary employees as well as volunteers. **Employee** shall not include any independent contractor.

**ERISA** means the Employee Retirement Income Security Act of 1974, the English Pension Scheme Act 1993, the English Pensions Act 1995, all as amended, any similar common or statutory law anywhere in the world, and any rules or regulations promulgated under any such Acts or law.

**Executive** means any natural person who was, now is or shall become:

(a)     a duly elected or appointed director, officer, **Manager**, or in-house general counsel of any **Sponsored Plan** or any **Sponsor Organization** incorporated in the United States of America; or

(b)     a holder of a position equivalent to any position described in (a) above in a **Sponsor Organization** that is chartered in any jurisdiction other than the United States of America.

**Manager** means any natural person who was, now is or shall become a manager, member of the Board of Managers or equivalent executive of a **Sponsor Organization** that is a limited liability company.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: December 15, 2016

Federal Insurance Company

Endorsement/Rider No. 23

To be attached to and
form a part of Policy No. 8207-6453

Issued to:  ALLY FINANCIAL INC.

SHARED AGGREGATE LIMITS ENDORSEMENT

It is agreed that in addition to this Policy, the Company has issued to the **Insured** all Policies and Bonds listed below. It is expressly acknowledged by the **Insured** that the premium for this Policy and all Policies and Bonds listed below has been negotiated with the understanding that this Policy and all Policies and Bonds listed below combine and share a single aggregate limit of liability. Therefore, in consideration of the premium charged:

1. The Company and the **Insured** agreed that the Company's maximum aggregate limit of liability for all **Loss** under this Policy, and for all payments of **Loss** under all Policies and Bonds listed below, in the aggregate, shall not exceed $25,000,000.

2. It is agreed that the Company shall have no obligation under this Policy to make any payment of **Loss** to the extent that the amount of such **Loss**, when added to the amount of any **Loss** paid under this Policy and any **Loss** paid under any Policies and Bonds listed below, would exceed $25,000,000.  Any payment of **Loss** under any Policies and Bonds listed below shall reduce the Limits of Liability available under this Policy for the payment of any **Loss** during the **Policy Period**.

3. If the Company shall have paid **Loss** under this Policy and **Loss** under any Policies and Bonds listed below in an aggregate amount equaling $25,000,000 any and all obligations of the Company under this Policy and the Policies and Bonds listed below shall be completely fulfilled and extinguished, and the Company shall have no further obligations of any kind or nature under this Policy and the Policies and Bonds listed below.

4. If a **Loss** is covered by this Policy and one or more of the Policies and Bonds listed below, and if more than one deductible amount applies to such **Loss**, the largest applicable deductible amount shall be the deductible amount applicable to such **Loss**.

   | Policy/Bond Type | Policy/Bond Number |
   |---|---|
   | Executive Liability & Indemnification Policy (B/C) | 8207-6455 |
   | Employment Practices Liability Policy | 8207-6461 |
   | Bankers Professional Liablity Policy | 8207-7768 |

5. Any **Loss** covered under both this Policy and any Policy or Bond listed in paragraph 4. above, shall be first covered under Executive Liability and Indemnification policy # 8207-6455, subject to the terms, conditions and limitations of that Policy, and paid under that policy in the order set forth in Endorsement No. 23 of Executive Liability and Indemnification policy # 8207-6455.

6.    For the purposes of this Endorsement, **Loss** shall include **Loss** as defined in this Policy and any Bond or Policy listed above and **Single Loss** as defined in any Bond listed above.

THIS ENDORSEMENT DOES NOT INCREASE THE LIMITS OF LIABILITY, AS SET FORTH IN THE DECLARATIONS.

Name and Address of Insured:

ALLY FINANCIAL INC.
500 Woodward Avenue
Detroit, MI 48226

_____
Signature of Insured's Representative

_____
Position/Title

_____
Date

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: December 15, 2016

Federal Insurance Company

Endorsement/Rider No. 24

To be attached to and
form a part of Policy No. 8207-6453

Issued to:  ALLY FINANCIAL INC.

---

AMEND CHANGE IN CONTROL PROVISION FOR INITIAL PUBLIC OFFERING ENDORSEMENT

In consideration of the premium charged, it is agreed that Section 11., Acquisition by Another Entity, is amended by adding the following:

(1)     The initial public offering of common stock by the **Sponsor Organization** shall not be deemed an event which will cause the cessation of coverage pursuant to Section 11. (b), Acquisition by Another Entity, of this Policy with respect to any actual or alleged **Wrongful Act** committed, attempted or allegedly committed or attempted after such event:

(2)     Notwithstanding paragraph (1) of this endorsement, the **Sponsor Organization** shall have the right to determine that the event described in paragraph (1) of this endorsement shall cause the cessation of coverage pursuant to the terms of Section 11. (b), Acquisition by Another Entity, of this Policy.  If the **Sponsor Organization** determines that such event shall cause the cessation of coverage, then the coverage under this Policy shall continue until the expiration of the **Policy Period**, but only with respect to **Claims** for **Wrongful Acts** committed, attempted, or allegedly committed or attempted, by **Insureds** prior to the effective date of the Registration Statement of such initial public offering of common stock.

If the **Sponsor Organization** determines that such event shall cause the cessation of coverage, then:

a)     the **Sponsor Organization** shall give written notice of such determination to the Company as soon as practicable but no later than the effective date of the Registration Statement of the initial public offering of common stock by the **Sponsor Organization**, and

b)     the entire premium for the Policy shall be deemed fully earned immediately as of the effective date of the Registration Statement of the initial public offering of common stock by the **Sponsor Organization**.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: December 15, 2016

Federal Insurance Company

Endorsement/Rider No. 25

To be attached to and
form a part of Policy No. 8207-6453

Issued to:  ALLY FINANCIAL INC.

---

DELETE EXCLUSIONS 6.A. (3) and 6.B. (3)  ENDORSEMENT

In consideration of the premium charged, it is agreed that Exclusions 6.A. (3) and 6.B. (3) are deleted in their entirety.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.



_____
Authorized Representative

Q11-125 (01/2011)                Page 1

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: December 15, 2016

Federal Insurance Company

Endorsement/Rider No. 26

To be attached to and
form a part of Policy No. 8207-6453

Issued to:  ALLY FINANCIAL INC.

---

AMENDED DEFINITION OF LOSS AND HIPAA EXTENSION ENDORSEMENT
(WITH PUNITIVE DAMAGES AND UK FINES AND PENALITES)

In consideration of the premium charged, it is agreed that:

(1)     The term **Loss** as defined in Section 25., Definitions, of this policy is deleted and replaced with the following:

> **Loss** means the total amount which any **Insured** becomes legally obligated to pay on account of each **Claim** and for all **Claims** in each **Policy Period** and the Extended Reporting Period, if exercised, made against them for **Wrongful Acts** for which coverage applies, including, but not limited to, damages, judgments, settlements, pre- and post-judgment interest, costs and **Defense Costs**. **Loss** does not include matters uninsurable under the law pursuant to which this Policy is construed.



> With respect to any coverage for punitive, multiplied or exemplary damages in any **Claim**, the law of the jurisdiction most favorable to the insurability of those damages shall control for the purpose of resolving any dispute between the Company and the **Insured** regarding whether such damages are insurable, provided that such jurisdiction is where:

>> (1)  those damages were awarded or imposed,

>> (2)  any **Wrongful Act** occurred for which such damages were awarded or imposed,

>> (3)  any **Sponsor Organization** is incorporated or has its principal place of business, or

>> (4)  the Company is incorporated or has its principal place of business.

(2)     Exclusion (6) of Section 6.A., Exclusions, is deleted and replaced with the following:

A. (6)  based upon, arising from, or in consequence of the failure of the **Insured** to comply with any law governing workers' compensation, unemployment, social security or disability benefits law, except:

>> a.      the Consolidated Omnibus Budget Reconciliation Act of 1985 and any amendments thereto; or

>> b.      the Health Insurance Portability and Accountability Act of 1996 and any rules or regulations promulgated thereunder ("HIPAA").

(3)　　Exclusion (1) of Section 6.B., Exclusions, is deleted and replaced with the following:

B. (1)　which constitutes fines or penalties or the multiple portion of any multiplied damage award, other than:



      a.　　the five percent or less, or the twenty percent or less, civil money penalties imposed upon an **Insured** as a fiduciary under Section 502 (i) or (l), respectively, of the Employee Retirement Income Security Act of 1974, as amended; or

      b.　　civil money penalties imposed upon an **Insured** for such **Insured's** violation of the privacy provisions of the Health Insurance Portability and Accountability Act of 1996 and any rules or regulations promulgated thereunder ("HIPAA"); provided that:

            (i)　　the Company's maximum aggregate liability for all such civil money penalties on account of all **Claims** shall be $ 100,000.00, which amount shall be part of, and not in addition to, the Company's maximum aggregate liability for all **Loss** on account of all **Claims** set forth in ITEM 2.(B) of the Declarations for this Policy, and

            (ii)　　the Deductible Amount set forth in Item 3 of the Declarations shall not apply.

      c.　　punitive or exemplary damages or the multiple portion of any multiplied damage award if such damages are insurable under applicable law, and

      d.　　any civil penalties imposed by the Pension Ombudsman appointed by the United Kingdom Secretary of State for Work and Pensions or any successor thereto, by the United Kingdom Occupational Pensions Regulatory Authority, or the Pensions Regulator or any successor thereto, pursuant to the Pension Scheme Act 1993, the Pensions Act 1995, the Pensions Act 2004, or rules or regulations thereunder; provided any coverage for such civil penalties applies only if the funds or assets of the subject **Plan** are not used to fund, pay or reimburse the premium for this coverage section,

(4)　　Exclusion (4) of Section 6.B., Exclusions, is deleted and replaced with the following:

B. (4)　which constitutes benefits due or to become due under the terms of a **Sponsored Plan** or **Insured Plan**, or benefits which would be due if such **Sponsored Plan** or **Insured Plan** complied with all applicable law, including but not limited to **Loss** resulting from the payment of plaintiff attorneys' fees based upon a percentage of such benefits or payable from a common fund established to pay such benefits, unless, and to the extent that:



      a.　　the **Insured** is natural person and the benefits are payable by such **Insured** as a personal obligation, and

      b.　　recovery for benefits is based upon a covered **Wrongful Act**.

It is agreed that benefits due as described in the preceding paragraph shall not include investment loss.

(5)　　The term **Wrongful Act**, as defined in Section 25., Definitions, is amended to include the following with respect to any **Sponsored Plan**:

iv.   any breach of responsibilities, obligations or duties imposed upon fiduciaries of the **Sponsored Plan** by the Health Insurance Portability and Accountability Act of 1996 and any rules or regulations promulgated thereunder ("HIPAA"); or

v.   any other violation of HIPAA by the **Sponsor Organization** or an **Insured Person** due solely to such **Sponsor Organization's** or such **Insured Person's** service as a fiduciary of any **Sponsored Plan**; or

vi.   any actual or alleged negligent violation of HIPAA by any **Insured** in the **Administration** of any **Sponsored Plan**.


The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.


_____
Authorized Representative

**ENDORSEMENT/RIDER**

Effective date of
this endorsement: December 15, 2016

Company:  Federal Insurance Company

Endorsement No. 27

To be attached to and
form a part of Policy No. 8207-6453

Issued to:  ALLY FINANCIAL INC.

---

AMEND REPRESENTATIONS AND SEVERABILITY ENDORSEMENT

In consideration of the premium charged, it is agreed that Section 14. Representations and Severability of this Policy is deleted and replaced with the following:

14.     Representations and Severability

The **Insureds** acknowledge and agree that in issuing this Policy the Company has relied upon the statements, representations and information in the **Application** and that all such statements, representations and information are the basis for this Policy and are to be considered as incorporated into this Policy. All of the **Insureds** acknowledge and agree that all such statements, representations and information:

1.  are true and accurate;

2.  were made or provided in order to induce the Company to issue this Policy; and

3.  are material to the Company's acceptance of the risk to which this Policy applies.

In the event that any of the statements, representations or information in the **Application** are not true and accurate, materially affect the acceptance of the risk to which this Policy applies, and are made with the intent to deceive, this Policy shall be void with respect to (i) any **Insured Person** who knew as of the effective date of the **Application** the facts that were not truthfully and accurately disclosed (whether or not the **Insured Person** knew of such untruthful disclosure in the **Application**), (ii) any **Sponsor Organization** or **Sponsored Plan** to which knowledge of such facts is imputed, and (iii) any **Sponsor Organization** to the extent it indemnifies an **Insured Person** who had knowledge of such facts, whether or not knowledge of such facts is also imputed to that **Sponsor Organization**. For purposes of the preceding sentence:

(a)     the knowledge of any **Insured Person** who is a past, present or future chief financial officer or chief executive officer of the **Parent Organization** shall be imputed to such **Sponsor Organization** and its **Subsidiaries** and their respective **Sponsored Plans**;

(b)     the knowledge of the person(s) who signed the **Application** for this Policy shall be imputed to all **Sponsor Organizations**, **Subsidiaries**, and **Sponsored Plans**; and

(c)     except as provided in (a) and (b) above, the knowledge of an **Insured Person** shall not be imputed to any other **Insured**.

Notwithstanding the foregoing, solely with respect to **Non-Indemnifiable Loss** (as defined below), this Policy shall not be rescinded with respect to any **Insured Person** who, as of the inception date of this Policy, did not know the facts that were not truthfully and accurately disclosed in the **Application**, provided that the coverage afforded pursuant to this paragraph shall be subject to all terms, conditions, exclusions and limitations of this Policy.

For purposes of the foregoing amended Section 14., the following terms shall apply:

"**Non-Indemnifiable Loss**" means:

(A) **Loss** for which a **Sponsor Organization**, **Subsidiary** or **Sponsored Plan** has neither indemnified nor is permitted or required to indemnify an **Insured Person** pursuant to statutory or common law, contract or the charter, bylaws, operating agreement or similar documents of a **Sponsor Organization, Subsidiary** or **Sponsored Plan**.

(B) **Loss** for which a **Sponsor Organization**, **Subsidiary** or **Sponsored Plan** is unable to indemnify an **Insured Person** by reason of **Financial Impairment.**

"**Application**" means:

(A)     any portion of an application given to the Company for this Policy including any attachments, written information and materials provided to the Company by or on behalf of an **Insured** for the purposes of the Company's underwriting of this Coverage Part; and

(B)     all schedules filed with the U.S. Department of The Treasury Internal Revenue Service, the U.S. Department of Labor Employee Benefits Security Administration and the Pension Benefit Guarantee Corporation, and the audited financial statements last filed for all **Sponsored Plans**.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

_____
Authorized Representative

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: December 15, 2016

Federal Insurance Company

Endorsement/Rider No. 28

To be attached to and
form a part of Policy No. 8207-6453

Issued to:  ALLY FINANCIAL INC.

---

AMEND OTHER INSURANCE ENDORSEMENT

In consideration of the premium charged, it is agreed that Section 9, Other Insurance, is deleted in its entirety and replaced with the following:

9.    If any **Loss** arising from any **Claim** made against any **Insured** is insured under any other valid and collectible policy(ies), prior or current, then this Policy shall cover such **Loss**, subject to its limitations, conditions, provisions and other terms, only to the extent that the amount of such **Loss** is in excess of the amount of payment from such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limit of Liability provided in this Policy.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

Q12-81 (01/2012)                     Page 1

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: December 15, 2016

Federal Insurance Company

Endorsement/Rider No. 29

To be attached to and
form a part of Policy No. 8207-6453

Issued to:  ALLY FINANCIAL INC.

---

AMEND AUTHORIZATION CLAUSE ENDORSEMENT

In consideration of the premium charged, it is agreed that Section 21, Authorization Clause is deleted and replaced with the following:

21.     By acceptance of this Policy, the **Parent Organization** agrees to act on behalf of all **Insureds** with respect to: the giving and receiving of notice of **Claim** or termination; the payment of premiums and the receiving of any return premiums that may become due under this Policy; the negotiation, agreement to and acceptance of endorsements; the giving or receiving of any notice provided for in this Policy (except the giving of notice to apply for the Extended Reporting Period); the adjustment of loss amounts; and the receipt or enforcement of payment of loss (and the **Parent Organization** further agrees that it shall be responsible for application of any such payment as provided in this Policy).  The **Insureds** agree that the **Parent Organization** shall act on their behalf.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Bond shall remain unchanged.

_____
Authorized Representative

Q13-1551 (12/2013)                 Page 1

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: December 15, 2016

Federal Insurance Company

Endorsement/Rider No. 30

To be attached to and
form a part of Policy No. 8207-6453

Issued to: ALLY FINANCIAL INC.

---

AMEND PRIOR NOTICE EXCLUSION ENDORSEMENT

In consideration of the premium charged, it is agreed that Exclusion A.(1) of Section 6, Exclusions, of this Policy is deleted and replaced with the following:

   (1)   based upon, arising from, or in consequence of any circumstance if written notice of such circumstance has been given and accepted under any policy of which this Policy is a renewal or replacement and if such prior policy affords coverage (or would afford such coverage except for the exhaustion of its limit of liability) for such **Loss**, in whole or in part, as a result of such notice,

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: December 15, 2016

Federal Insurance Company

Endorsement/Rider No. 31

To be attached to and
form a part of Policy No. 8207-6453

Issued to:  ALLY FINANCIAL INC.

## DELETE DUTY TO DEFEND ENDORSEMENT

In consideration of the premium charged, it is agreed that Section 3., Defense Provisions, is deleted in its
entirety and replaced with the following:

Defense Provisions

3. Subject to this Section, it shall be the duty of the **Insured** and not the duty of the Company to defend
   **Claims** made against the **Insured**.

   The Company shall have the right and shall be given the opportunity to effectively associate with the
   **Insured** in the investigation, defense and settlement, including but not limited to the negotiation of a
   settlement, of any **Claim** that appears reasonably likely to be covered in whole or in part by this
   Policy.

   **Defense Costs** are part of and not in addition to the Company's applicable Limit of Liability set forth
   in ITEM 2. of the Declarations for this Policy, and the payment by the Company of **Defense Costs**
   reduces such applicable Limit of Liability.

   The **Insureds** agree to provide the Company with all information, assistance and cooperation which
   the Company reasonably requests and agree that in the event of a **Claim** the **Insureds** will do
   nothing that may prejudice the Company's position or its potential or actual rights of recovery.  The
   failure of an **Insured Person** to follow this provision will not affect other **Insured Persons** that are
   cooperating.

   The **Insureds** agree not to settle any **Claim**, incur any **Defense Costs** or otherwise assume any
   contractual obligation or admit any liability with respect to any **Claim** without the Company's written
   consent, which shall not be unreasonably withheld. The Company shall not be liable for any
   settlement, **Defense Costs**, assumed obligation or admission to which it has not consented.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms
and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Q17-228 (02/2017)          Page 1

_____
Authorized Representative

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: December 15, 2016

Federal Insurance Company

Endorsement/Rider No. 32

To be attached to and
form a part of Policy No. 8207-6453

Issued to:  ALLY FINANCIAL INC.

---

AMENDED REPORTING AND NOTICE ENDORSEMENT

In consideration of the premium charged, it is agreed that Section 13., Reporting and Notice, is deleted and replaced with the following:

13.    The **Insureds** shall, as a condition precedent to exercising their rights under this Policy, give the Company written notice as soon as practicable after any member of the office of risk management or the office of the general counsel of the **Parent Organization** first becomes aware of any **Claim**, or request to toll or waive a statute of limitations, made against **Insureds** for a **Wrongful Act**, but in no event later than:

(i)    ninety (90) days after the effective date of expiration or termination if this Policy expires (or is otherwise terminated) without being renewed and if no Extended Reporting Period is purchased; or

(ii)    the expiration date of the Extended Reporting Period, if purchased;



provided that if the Company sends written notice to the **Parent Organization** stating that this coverage section is being terminated for non-payment of premium, the **Insureds** shall give to the Company written notice of such **Claim** prior to the effective date of such termination.

If during the **Policy Period** or the Extended Reporting Period (if exercised) any member of the office of risk management or the office of the general counsel of the **Parent Organization** becomes aware of circumstances which could give rise to a **Claim** and gives written notice of such circumstances to the Company during the **Policy Period** or the Extended Reporting Period, then any **Claims** subsequently arising from such circumstances shall be considered to have been made during the **Policy Period** or the Extended Reporting Period in which the circumstances were first reported to the Company.  If the **Insured** fails to meet the notification requirements in this Section 13, the Company may accept late notice of a **Claim,** provided that the Company is not prejudiced by the late notification of such **Claim**.

The **Insureds** shall, as a condition precedent to exercising their rights under this Policy, give to the Company such information and cooperation as it may reasonably require, including but not limited to a description of the **Claim** or circumstances, the nature of the alleged **Wrongful Act**, the nature of the alleged or potential damage, the names of actual or potential claimants, and the manner in which the **Insured** first became aware of the **Claim** or circumstances.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.



_____

Authorized Representative

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: December 15, 2016

Federal Insurance Company

Endorsement/Rider No. 33

To be attached to and
form a part of Policy No. 8207-6453

Issued to:  ALLY FINANCIAL INC.

---

## AMEND SECTION 18. SUBROGATION

In consideration of the premium charged, it is agreed that Section 18, Subrogation, is deleted and replaced with the following:

18.  In the event of any payment under this Policy, the Company shall be subrogated to the extent of such payment to all the **Insured's** rights of recovery, and the **Insured** shall execute all papers required, and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Company effectively to bring suit in the name of the **Insured**; provided, however, the Company shall not subrogate directly against an **Insured Person** unless a judgment or other final adjudication adverse to the **Insured Person** establishes:  (1) a deliberately fraudulent act or omission or willful violation of any statute or regulation by such **Insured Person**; or, (2) that the **Insured Person** gained any personal profit, remuneration or advantage to which such **Insured Person** was not legally entitled.

The amount of any recovery obtained by the Company pursuant to this Section 18, less all costs incurred by the Company to obtain such recovery, shall be reinstated to the Limit of Liability set forth in Item 2 of the Declarations.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.



_____
Authorized Representative

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: December 15, 2016

Federal Insurance Company

Endorsement/Rider No. 34

To be attached to and
form a part of Policy No. 8207-6453

Issued to:  ALLY FINANCIAL INC.

AMEND DEFINITION OF DEFENSE COSTS

In consideration of the premium charged, it is agreed that Section 25, Definitions, subsection (d), **Defense Costs**, is deleted and replaced with the following:

d.      **Defense Costs** means that part of **Loss** consisting of reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of the directors, officers or employees of the **Sponsor Organization**) incurred in defending, investigating or appealing **Claims** and the premium for appeal, attachment or similar bonds.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

**Omodio, Beth Ann**

| | |
|---|---|
| **From:** | Huelbig, Paul <Paul.S.Huelbig@marsh.com> |
| **Sent:** | Thursday, March 09, 2017 9:38 AM |
| **To:** | Blumentritt, Martin |
| **Cc:** | Munch, Phillip; Omodio, Beth Ann |
| **Subject:** | ALLY - 2016/2017 CHUBB PRIMARY B&C D&O, BPL, EPL & PENSION FIDUCIARY |
| **Attachments:** | final fl policy.pdf; revised d&o fin.pdf; ally bpl.pdf; ally epl revised.pdf |

Martin,

Attached are Ally's primary Blended policies issued by Chubb for the period from 12/15/16 to 12/15/17. We have reviewed the policies and found them to be in order.

Please be advised that these policies are written on a CLAIM FIRST MADE forms.

DIRECTORS & OFFICERS - In accordance with Section 11 (Reporting & Notice) of the primary Federal Insurance Company D&O policy, the Insured shall, as a condition precedent to exercising any right to coverage under this Policy, give to the Company or any authorized agent of the Company within the State of Michigan written notice of any Claim as soon as practicable, but in no event later than the earliest of the following dates:
(1) ninety (90) days after the date on which any member of the Risk Management Department or General Counsel Department of the Parent Organization first becomes aware that the Claim has been made;
(2) sixty (60) days after the effective date of expiration or termination, if this Policy expires (or is otherwise terminated) without being renewed and if no Extended Reporting Period is purchased, or
(3) the expiration date of the Extended Reporting Period, if purchase;
provided that if the Company sends written notice to the Insured, at any time before the date set forth in Subsection 11 a (1) with respect to any Claim, stating that this Policy is being terminated for nonpayment of premium, the Insured shall give to the Company written notice of such Claim prior to the effective date of such termination.

FIDUCIARY - In accordance with Section 13 (Reporting & Notice) of the primary Federal Insurance Company Fiduciary policy, the Insureds shall, as a condition precedent to exercising their rights under this Policy, give the Company written notice as soon as practicable after any member of the office of risk management or the office of the general counsel of the Parent Organization first becomes aware of any Claim made against Insureds for a Wrongful Act, but in no event later than:
(1) ninety (90) days after the effective date of expiration or termination if this Policy expires (or is otherwise terminated) without being renewed and if no Extended
Reporting Period is purchased; or
(2) the expiration date of the Extended Reporting Period, if purchased;
provided that if the Company sends written notice to the Parent Organization stating that this coverage section is being terminated for non-payment of premium, the Insureds
shall give to the Company written notice of such Claim prior to the effective date of such termination.

BANKERS PROFESSIONAL - In accordance with Section 8 (Reporting & Notice) of the primary Federal Insurance Company BPL policy, as amended by endorsement, 8a. Subject to Subsection 8b, if a Claim is made against an Insured, then the Insured shall, as a condition precedent to exercising any right to coverage under this Policy, give to the Company written notice of such Claim in the form of a bordereau report no later than thirty (30) days following the end of the Semi-Annual Reporting Period during which any member of the Risk Management Department or Office of the General Counsel of the Parent Organization first received notice of such Claim. Such bordereau report submitted pursuant to this Subsection 8a shall contain information including, but not limited to, a description of the Claim, the nature of the alleged Wrongful Act, the nature of the alleged damage, the names of the claimants, and the manner in which the Insured first

became aware of the Claim. Upon the request of the Company, the Insured shall forward to the Company every demand, notice, summons, complaint or other process received by any Insured or Insured representative in connection with any Claim for which notice is submitted in a bordereau report under this Subsection 8a. Notwithstanding the foregoing, if this Policy expires (or is otherwise terminated) without being renewed and no Extended Reporting Period is purchased, the Insured shall, as a condition precedent to exercising any right to coverage under this Policy, give written notice to the Company of any Claim made against the Insured which has not yet been reported to the Company pursuant to this Subsection 8a as soon as practicable but in no event later than sixty (60) days after the effective date of such expiration or termination. If this Policy expires (or is otherwise terminated) without being renewed and the Extended Reporting Period is purchased, the Insured shall, as a condition precedent to exercising any right to coverage under this Policy, give written notice to the Company of any Claim made against the Insured which has not yet been reported to the Company pursuant to this Subsection 8a as soon as practicable but in no event later than the expiration date of the Extended Reporting Period. Notwithstanding any statutory, administrative or common law obligations governing claim handling practices, the Company shall be entitled to fully reserve its rights (including, but not limited to, denial of coverage) in connection with any Claim for which notice is provided to the Company pursuant to this Subsection 8a.

8b. Notwithstanding Subsection 8a, if a Claim is made against any Insured and: (1) such Claim constitutes or becomes a Mass or Class Action; (2) such Claim constitutes a criminal proceeding commenced by the service of an indictment or similar document; (3) the Office of the General Counsel of the Parent Organization reasonably believes that Loss on account of such Claim will equal or exceed $12,500,000; or (4) such Claim is scheduled to proceed to trial within one hundred twenty (120) days, then the Insured shall, as a condition precedent to exercising any right to coverage under this Policy, give to the Company written notice of any such Claim as soon as practicable, after any member of the Risk Management Department or Office of the General Counsel of the Parent Organization first received notice of the Claim, separate and apart from any bordereau report required under Subsection 8a. Such written notice shall contain information including, but not limited to, a description of the Claim, the nature of the alleged Wrongful Act, the nature of the alleged damage, the names of the claimants and the manner in which a member of the Parent Organization's Risk Management Department or Office of the General Counsel first received notice of the Claim. The Insureds shall immediately forward to the Company every demand, notice, summons, complaint or other process received by any Insured or Insured representative in connection with any Claim for which notice is required under this Subsection 8b. Notwithstanding the foregoing, if this Policy expires (or is otherwise terminated) without being renewed and if no Extended Reporting Period is purchased, the Insured shall, as a condition precedent to exercising any right to coverage under this Policy, give written notice to the Company of any Claim made against any Insured which has not yet been reported to the Company pursuant to this Subsection 8b as soon as practicable but in no event later than sixty (60) days after the effective date of such expiration or termination. If this Policy expires (or is otherwise terminated) without being renewed and the Extended Reporting Period is purchased, the Insured shall, as a condition precedent to exercising any right to coverage under this Policy, give written notice to the Company of any Claim made against the Insured which has not yet been reported to the Company pursuant to this Subsection 8b as soon as practicable but in no event later than the expiration date of the Extended Reporting Period.

8c. If during the Policy Period an Insured: (1) becomes aware of circumstances which could give rise to a Claim and gives written notice of such circumstances to the Company; or (2) receives a written request to toll or waive a statute of limitations applicable to a Wrongful Act before or during the Policy Period and gives written notice of such request and of such alleged Wrongful Act to the Company, then any Claim subsequently arising from the circumstances referred to in Subsection 8c(1), or from such Wrongful Act referred to in Subsection 8c(2), shall be deemed to have been first made during the Policy Period in which the written notice described in Subsection 8c(1) or (2) was first given by an Insured to the Company, provided any such subsequent Claim is reported to the Company in the manner set forth in Subsection 8a or 8b, as applicable. In providing written notice to the Company pursuant to Subsection 8c(1) or (2), the Insured shall include a description of the circumstances or Wrongful Act, the nature of any alleged Wrongful Act, the nature of the alleged or potential damages, the names of all potential claimants, the names of all potential parties, and the manner in which the member of the Parent Organization's Risk Management Department or Office of the General Counsel first received notice of the circumstances or Wrongful Act.

8d. The Insured shall, as a condition precedent to exercising any right to coverage under this Policy, give to the Company such information, assistance and cooperation as the Company may reasonably require. Without limiting the generality of the preceding sentence: (1) the Insured shall provide the Company with all information required under Subsections 8a, 8b or 8c, as applicable; (2) with respect to any Claim reported pursuant to Subsection 8a that at any time thereafter becomes a Mass or Class Action, the Insured shall give the Company written notice that such Claim constitutes a Mass or Class Action as soon as practicable but in no event later than sixty (60) days after such Claim becomes a Mass or Class Action, and shall immediately forward to the Company every demand, notice, summons, complaint or other process received by any Insured or Insured representative in connection with any such Claim; (3) with respect to any Claim reported pursuant to Subsection 8a that at any time thereafter the Office of the General Counsel of the Parent Organization reasonably believes that Loss on account of such Claim will equal or exceed $ 12,500,000, the Insured shall give the Company written notice thereof as soon as practicable, and shall immediately forward to the Company every demand, notice, summons, complaint or other process received by any Insured or Insured representative in connection with any such Claim; and (4) with respect to any Claim reported pursuant to Subsection 8a that at any time thereafter is scheduled to proceed to trial within one hundred twenty (120) days, the Insured shall give the Company written notice thereof as soon as practicable, and shall immediately forward to the Company every demand, notice, summons, complaint or other process received by any Insured or Insured representative in connection with any such Claim.

EMPLOYMENT PRACTICES - In accordance with Section 12 (Reporting & Notice) of the primary Federal Insurance Company EPL policy, as amended by endorsement,
(a)(i) Subject to subparagraph (a)(ii) below, if a Claim is made against any Insured, the Insureds shall, as a condition precedent to exercising any right to coverage under this coverage section, give to the Company written notice of such Claim in the form of a bordereau report no later than thirty (30) days following the end of the Semi-Annual Reporting Period during which any member of the Parent Organization's general counsel department, human resources department or risk management department first received notice of such Claim. Such bordereau report submitted pursuant to this subparagraph (a)(i) shall contain information including, but not limited to, a description of the Claim, the nature of the alleged Wrongful Act, the nature of
the alleged damage, the names of the claimants and the manner in which the Insured first became aware of the Claim. Upon the request of the Company, the Insureds shall forward to the Company every demand, notice, summons, complaint or other process received by any Insured or Insured representative in connection
with any Claim for which notice is submitted in a bordereau report under this subparagraph (a)(i). Notwithstanding the foregoing, if this coverage section expires (or is otherwise terminated) without being renewed and if no Extended Reporting Period is purchased, the Insureds shall, as a condition precedent to exercising any right to coverage under this coverage section, give written notice to the Company of
any Claim made against any Insured which has not yet been reported to the Company pursuant to this subparagraph (a)(i) as soon as practicable but in no event later than sixty (60) days after the effective date of such expiration or termination. If this coverage section expires (or is otherwise terminated) without being renewed and the Extended Reporting Period is purchased, the Insureds shall, as a condition precedent to exercising any right to coverage under this coverage section, give written notice to the Company of any Claim made against any Insured which has not yet been reported to the Company pursuant to this subparagraph (a)(i) as soon as practicable but in no event later than the expiration date of the Extended Reporting Period.

For the purposes of this subparagraph (a)(i), Semi-Annual Reporting Period means each period of six (6) consecutive calendar months commencing on: December 15, 2013 and June 15, 2014

Notwithstanding any statutory, administrative or common law obligations governing claim handling practices, the Company shall be entitled to fully reserve its rights including, but not limited to, denial of coverage, in connection with any Claim for which written notice is provided in the form of a bordereau report under this subparagraph (a)(i).

(ii) If a Claim is made against any Insured and: (A) such Claim constitutes a Mass or Class Action; or (B) the Insured reasonably believes that Loss on account of such Claim will meet or exceed $1,000,000, then the Insureds shall, as a condition precedent to exercising any right to coverage under this coverage section, give to the Company written notice of any such Claim as soon as practicable, after any member of the Parent Organization's general counsel department,

human resources department or risk management department first became aware of the Claim, separate and apart from any bordereau report required under subparagraph (a)(i) above. Such written notice shall contain information including, but not limited to, a description of the Claim, the nature of the alleged Wrongful Act, the nature of the alleged damage, the names of the claimants and the manner in which the member of the Parent Organization's general counsel department, human resources department or risk management department first became aware of the Claim. The Insureds shall immediately forward to the Company every demand, notice, summons, complaint or other process received by any Insured or Insured representative in connection with any Claim for which notice is required under this subparagraph (a)(ii). Notwithstanding the foregoing, if this coverage section expires (or is otherwise terminated) without being renewed and if no Extended Reporting Period is purchased, the Insureds shall, as a condition precedent to exercising any right to coverage under this coverage section, give written notice to the Company of any Claim made against any Insured which has not yet been reported to the Company pursuant to this subparagraph (a)(ii) as soon as practicable but in no event later than sixty (60) days after the effective date of such expiration or termination. If this coverage section expires (or is otherwise terminated) without being renewed and the Extended Reporting Period is purchased, the Insureds shall, as a condition precedent to exercising any right to coverage under this coverage section, give written notice to the Company of any Claim made against any Insured which has not yet been reported to the Company pursuant to this subparagraph (a)(ii) as soon as practicable after any member of the Parent Organization's general counsel department, human resources department or risk management department first became aware of the Claim but in no event later than the expiration date of the Extended Reporting Period.

(iii) Written notice of any Claim provided to the Company by the Insureds pursuant to subparagraph (a)(i) or (a)(ii) above shall be treated as notice under only this coverage section and shall not constitute notice to the Company under any other coverage section or policy.

(b) The Insureds shall, as a condition precedent to exercising any right to coverage under this coverage section, give to the Company such information, assistance and cooperation as the Company may reasonably require, including but not limited to the following: (i) The Insureds shall give the Company such information described in subparagraph (a)(i) and (a)(ii) above; (ii) If a Claim has been reported to the Company in any bordereau report pursuant to subparagraph (a)(i) above and at any time thereafter such Claim becomes a Mass or Class Action, the Insureds shall give the Company written notice that such Claim constitutes a Mass or Class Action as soon as practicable but in no event later than sixty (60) days after such Claim becomes a Mass or Class Action. The Insureds shall immediately forward to the Company every demand, notice, summons, complaint or other process received by any Insured or Insured representative in connection with any such Claim; and (iii) If a Claim has been reported to the Company in any bordereau report pursuant to subparagraph (a)(i) above and at any time thereafter: (A) any member of the Parent Organization's general counsel department, human resources department or risk management department reasonably believes that Loss on account of such Claim will meet or exceed $1,000,000; or (B) a trial in connection with such Claim is scheduled to proceed within sixty (60) days, the Insureds shall give the Company written notice that any condition set forth in clauses (A) or (B) above applies to such Claim as soon as practicable after any such condition applies. The Insureds shall immediately forward to the Company every demand, notice, summons, complaint or other process received by any Insured or Insured representative in connection with any such Claim.

Please be aware that late reporting could result in a disclaimer of coverage from the Insurer.

Please do not hesitate contacting us if you have any questions.

Regards,
Paul

*Paul Huelbig*
*Managing Director*
*US Banking and Capital Markets Practice Leader – FINPRO*

*Marsh USA, Inc.*
*1166 Avenue of the Americas*
*New York, NY 10036*
*Office: 212-345-6697*
*Mobile: 917-513-2420*
*Paul.S.Huelbig@marsh.com*

---

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This e-mail transmission and any attachments that accompany it may
contain information that is privileged, confidential or otherwise
exempt from disclosure under applicable law and is intended solely for
the use of the individual(s) to whom it was intended to be addressed.
If you have received this e-mail by mistake, or you are not the
intended recipient, any disclosure, dissemination, distribution,
copying or other use or retention of this communication or its
substance is prohibited. If you have received this communication in
error, please immediately reply to the author via e-mail that you
received this message by mistake and also permanently delete the
original and all copies of this e-mail and any attachments from your
computer. Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# EXHIBIT E

## Corporate Insurance Programs
## Policy Review Checklist

Reviewer's Name _Bao_                                    Date _3/15/17_

Insurance Program _MLB Blended_          **Corrections to Insurer?**     YES   (NO)   N/A

Broker/Contact _Marsh - Paul Huelbig_    **Corrections Received?**       YES   NO   (N/A)

                                          **Policy Reissued?**           YES   NO   (N/A)

Broker Re-cap Items     YES   (NO)   N/A     Comments _____

|  | Current Policy | Current Binder | Previous Year Policy |
|---|---|---|---|
| Insurer/Parent Co. | aig (Illinois National) | aig (Illinois National) | aig |
| Policy/Binder No. | 03-582-65-11 | 03-582-65-11 | 02-880-04-06 |
| Policy Period | 12/15/16 - 12/15/17 | 12/15/16 - 12/15/17 | 12/15/15 - 12/15/16 |
| Policy Limit | $15,000,000 x s $40,000,000 | $15,000,000 x s $40,000,000 | $15mm x s $40mm |
| Retention/Deductible | Underlying | $40,000,000 | Underlying |
| Policy Form No. | 103224 (03/10) | 103224 (03/10) | 103224 (03/10) |
| Policy Premium | $1,266,524 | $1,266,524 | $1,332,130 |
| Commission | Not Stated | 12.5% | Not Stated |

### Endorsements

| New | Not Carried Forward |
|---|---|
| - Rights Clause Amended   M116748 | n/a |
|  |  |
|  |  |

### Notable Changes

| Broadens Coverage | Reduces Coverage |
|---|---|
| n/a | n/a |
|  |  |
|  |  |

### List of Corrections / Questions to Insurer

| n/a |
|---|
|  |
|  |
|  |



### Illinois National Insurance Company
**A capital stock company**

Policy Number:    03-582-65-11 ✓          Replacement of:    02-880-04-56

# EXCESS EDGE®

**NOTICES:** *Depending on the terms, conditions and limitations of the **Followed Policy**, this policy may (1) only provide coverage for loss from claims first made or first made and reported during its **Policy Period**; (2) have its limit of liability reduced by the payment of defense costs and/or claim expenses, and (3) not impose a duty to defend on the **Insurer**. Please read the **Followed Policy** and this policy carefully and discuss the coverage provided thereunder and hereunder with your insurance agent or broker.*

## DECLARATIONS

| | |
|---|---|
| **Policyholder:** | ALLY FINANCIAL INC. ✓ |
| **Policyholder Address:** | 500 Woodward Avenue<br>Detroit, MI 48226 |
| **Policyholder Domicile:** | Michigan |
| **Insurer Address:** | 175 Water Street<br>New York, NY 10038 |
| **Claims Address:** e-mail: | c-claim@AIG.com |
| Mail: | AIG, Financial Lines Claims<br>P.O. Box 25947<br>Shawnee Mission, KS 66225 |

| | | |
|---|---|---|
| **Limit of Liability:** | $ | 15,000,000 |
| **Total Underlying Limits:** | $ | 40,000,000 ✓ |
| **Policy Period:** From: | | December 15, 2016 |
| To: | | December 15, 2017 |
| **Premium:** | $ | 1,265,524 |
| **TRIA Premium** | $ | 12,530 |

## SCHEDULE OF UNDERLYING COVERAGE

| Underlying Insurer | Underlying Policy | Underlying Limit | Underlying Policy Period |
|---|---|---|---|
| PLEASE SEE ATTACHED SCHEDULE OF UNDERLYING COVERAGE AND FOLLOWED POLICY ADDENDUM | | | |
| *Delete/Replaced - Schedule of Underlying Coverage* | | | |
| | | | |
| | | | |
| | | | |
| | | | |

The **Policy Period** incepts and expires as of 12:01 A.M. at the **Policyholder Address**. Terms with **"Bold"** typeface are used in this policy with the meanings and values ascribed to them herein; however, subject to the Changes clause, the **"Followed Policy"** means the policy in the Schedule with an **"*"** at the beginning of its row, but only with respect to the following **Followed Coverage Section(s):** PLEASE SEE ATTACHED SCHEDULE OF UNDERLYING COVERAGE AND FOLLOWED POLICY ADDENDUM. **'TRIA Premium'** means the premium for Certified Acts of Terrorism Coverage under Terrorism Risk Insurance Act, as amended. Amount indicated above is included in **Premium**. A copy of the TRIA disclosure sent with the original quote is attached hereto.

*1498161* ✓
103224 (02/10)                    -1-                    ℗ All rights reserved.

In consideration of the payment of the premium, Illinois National Insurance Company   (the **"Insurer"**) and insureds agree as follows:

**INSURING AGREEMENT**

This policy shall provide coverage in accordance with the same terms, conditions and limitations of the **Followed Policy**, as modified by and subject to the terms, conditions and limitations of this policy.

The **Insurer's** coverage obligations under this policy attach to the **Insurer** only after the **Total Underlying Limits** have been exhausted through payments by, on behalf of or in the place of the **Underlying Insurers** of amounts covered under the **Underlying Policies**. This policy shall continue in force as primary insurance only upon the exhaustion of the **Total Underlying Limits** by reason of such payments and satisfaction of any applicable retention. This policy shall recognize erosion of an **Underlying Limit** of an **Underlying Policy** through payments by others of covered amounts under that **Underlying Policy**. The risk of uncollectability of any part of the **Total Underlying Limits**, for any reason, is expressly retained by the **Policyholder** and any insureds, and is not insured under this policy or assumed by the **Insurer**.

**LIMIT OF LIABILITY**

The **Limit of Liability** is the aggregate limit of the **Insurer's** liability for all coverage under this policy.

**NOTICES**

Where the **Followed Policy** requires or permits notice to its insurer, the **Policyholder** or the insureds have the same obligations and rights to notify the **Insurer** under this policy, except that with respect to this policy, any notice to the **Insurer** must be directed as follows:  (i) for claims-related matters, by mail or e-mail to the **Claims Address**; and (ii) for all other notices, by mail to the **Insurer Address**.

**RIGHTS**

The **Insurer** shall have the same rights, privileges and protections afforded to the **Underlying Insurer** of the **Followed Policy** in accordance with the terms, conditions and limitations of the **Followed Policy**. The **Insurer** shall also have the right, in its sole discretion, but not the obligation, to effectively associate with the insureds in the defense and settlement of any claim that appears to be reasonably likely to involve the **Insurer**. The **Policyholder**, its subsidiaries and any insureds shall provide the **Insurer** with such information, assistance and cooperation as the **Insurer** may reasonably request and shall not do anything that prejudices the **Insurer's** position or potential rights of recovery. *Deleted/Replaced: Endt #6*

**RELIANCE**

The **Insurer** has issued this policy in reliance upon the completeness and accuracy of the applications, warranties, statements, the binders for the **Underlying Policies**, any attachments thereto and any other materials submitted for this policy, which shall be deemed attached hereto and made a part hereof. *Deleted/Replaced: Endt #4*

**CHANGES**

If, subsequent to the issuance of the **Followed Policy**, the terms, conditions or limitations of an **Underlying Policy** are modified, the insureds must notify the **Insurer** in writing, as soon as practicable, of such modification. If any changes to the **Followed Policy**: (i) expand coverage, (ii) change the policyholder name or address, or (iii) modify premium, this policy shall not follow those changes unless the **Insurer** reflects its agreement to do so in a written endorsement to this policy. *Deleted/Replaced: Endt #3*

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed by its President, Secretary and Authorized Representative. This Policy shall not be valid unless signed below at the time of issuance by an authorized representative of the insurer.

_____      _____      _____
PRESIDENT                              AUTHORIZED REPRESENTATIVE            SECRETARY

_____      _____      _____
COUNTERSIGNATURE                 DATE                COUNTERSIGNATURE LOCATION
(WHERE REQUIRED BY LAW)

MARSH USA INC.
1166 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-3712

*Amended: Endt #1 - Economic Sanctions*
*Endt #2 - State Amendatory Inconsistent*
*Endt #5 - Cancellation*

*1498161* ✓

103224 (02/10)                          -2-                          ⓒ All rights reserved.

## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM INSURANCE COVERAGE
### (RIGHT TO PURCHASE COVERAGE)

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, that you have a right to purchase insurance coverage for losses resulting from acts of terrorism. As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury-in consultation with the Secretary of Homeland Security, and the Attorney General of the United States-to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING JANUARY 1, 2018; 81% BEGINNING JANUARY 1, 2019 and 80% BEGINNING ON JANUARY 1, 2020, OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

## COPY OF DISCLOSURE SENT WITH ORIGINAL QUOTE

Insured Name: *ALLY FINANCIAL INC.*

Policy Number: *03-582-65-11*
Policy Period Effective Date From: *December 15, 2016*   To: *December 15, 2017*

℗ 2015 National Association of Insurance Commissioner

96555 (1/15) ✓

**SCHEDULE OF UNDERLYING COVERAGE AND FOLLOWED POLICY ADDENDUM**

In consideration of the premium charged, it is hereby understood and agreed that the Declarations are amended as follows:

1.   To delete the stated **SCHEDULE OF UNDERLYING COVERAGE** in its entirety and replace it with the following:

**SCHEDULE OF UNDERLYING COVERAGE**

| | Underlying Insurer | Underlying Policy | Underlying Limit | Underlying Policy Period |
|---|---|---|---|---|
| * | Federal Insurance Company | 8207-6455<br>8207-6453<br>8207-6461<br>8207-7768 | $25,000,000<br>Primary | 12/15/16 to 12/15/17 |
| | U.S. Specialty Insurance Company | 24-MGU-16-A39492 | $15,000,000 xs<br>$25,000,000 | 12/15/16 to 12/15/17 |
| | | | | |

2.   To delete the Definition of " **Followed Policy**" and replace it with the following:

"**Followed Policy**" means the policy in the Schedule with an "*" at the beginning of its row, but only with respect to the following **Followed Coverage Section(s)**: ALL.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

103496 (11/09)          1

© All rights reserved.

ENDORSEMENT# *1*

This endorsement, effective at *12:01 AM    December 15, 2016*    forms a part of
Policy number *03-582-65-11*
Issued to: *ALLY FINANCIAL INC.*

By: *Illinois National Insurance Company*

### ECONOMIC SANCTIONS ENDORSEMENT

*This endorsement modifies insurance provided under the following:*

Coverage shall only be provided and payment of loss under this policy shall only be made in full compliance with enforceable United Nations economic and trade sanctions and the trade and economic sanction laws or regulations of the European Union and the United States of America, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 001*

Page 1 of 1

119679 (9/15) *new version*

**ENDORSEMENT#** *2*

This endorsement, effective *12:01 AM     December 15, 2016*     forms a part of
policy number  *03-582-65-11*
issued to  *ALLY FINANCIAL INC.*

by  *Illinois National Insurance Company*

**STATE AMENDATORY INCONSISTENT**

In consideration of the premium charged, it is hereby understood and agreed as follows:

1. In the event that there is an inconsistency between any: (a) state amendatory  attached to this policy,  or any other  wording attached to  this policy to  comply with  applicable law; and (b)  any other term,  condition or limitation  of this policy;  then,  to  the extent permitted  by law,  subject to  the  limitations  below,  the  Insurer   will  resolve  the inconsistency by applying the terms, conditions or limitations that are more favorable to the policyholder.

2. This endorsement shall not apply to  the extent that: (a) any state  amendatory or other wording expressly limits  coverage in  order to  comply with  applicable law,  or (b)  any such amendatory or other compliance wording amends language applicable to premium. In such events, the state amendatory or other compliance wording will govern over any other term, condition or limitation of the policy.

3. "Policyholder" means the first Named Entity, Named  Organization, Named Corporation, Named Sponsor, Named  Insured  or  other policyholder  designated in  Item  1 of  the Declarations of this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

94039 (05/07)

© All rights reserved.

*END 2*

## ENDORSEMENT# 3

This endorsement, effective *12:01 AM*    *December 15, 2016*    forms a part of policy number  *03-582-65-11*
issued to    *ALLY FINANCIAL INC.*

by    *Illinois National Insurance Company*

### CHANGES CLAUSE AMENDED ✓
### (E-MAIL)

In consideration of the premium charged, it is hereby understood and agreed that the *CHANGES* Clause of the policy is hereby deleted in its entirety and replaced with the following:

> *CHANGES*    If, subsequent to the issuance of the **Followed Policy**, the terms, conditions or limitations of an **Underlying Policy** are modified, the **Insureds** must notify the Insurer in writing, as soon as practicable, of such modification. If any change to the **Followed Policy:** (i) expands coverage, (ii) changes the policyholder name or address, or (iii) modifies premium; then this policy shall not follow those changes unless the **Insurer** reflects its agreement to do so: (a) in a written endorsement to this policy, or (b) after review of the specific wording change, by e-mail from the underwriter assigned to this policy (or any of that underwriter's managers) at the time of such change to the **Followed Policy**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 3*

109977 (10/11) ✓

**ENDORSEMENT# 4**

This endorsement, effective *12:01 AM*      *December 15, 2016*      forms a part of
policy number  *03-582-65-11*
issued to   *ALLY FINANCIAL INC.*

by      *Illinois National Insurance Company*

**RELIANCE CLAUSE AMENDED**

In consideration of the premium charged, it is hereby understood and agreed that the *RELIANCE* Clause of the policy is hereby deleted in its entirety and replaced with the following:

   *RELIANCE*  In addition to any reliance provision in the **Followed Policy**, the **Insurer** has issued this policy also in reliance upon all materials and written statements submitted by or on behalf of the **Policyholder** to the **Insurer** in connection with the underwriting of this policy, which shall be deemed attached hereto and made a part hereof. Further, this policy shall follow any provisions in the **Followed Policy** regarding: (i) the severability and non-imputation of the statements, representations or warranties of any insured and (ii) the limitation and restrictions in rescission or voidance of the **Followed Policy**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

109978 (10/11)        *END 4*

**ENDORSEMENT# 5**

This endorsement, effective *12:01 AM       December 15, 2016*       forms a part of
policy number *03-582-65-11*
issued to   *ALLY FINANCIAL INC.*

by     *Illinois National Insurance Company*

**CANCELLATION ENDORSEMENT**
**POLICY NON-CANCELLABLE EXCEPT FOR NON-PAYMENT OF PREMIUM**

In consideration of the premium charged, it is hereby understood and agreed as follows:

1. Although this policy generally follows the terms and conditions of the **Followed Policy**,
   subject to the terms, conditions and exclusions of this policy, in no event shall this
   policy be construed to follow the following terms, conditions and/or endorsements of
   the **Followed Policy**:

   TERMS/CONDITIONS/ENDORSEMENTS          TITLE/DESCRIPTION
                                          Cancellation

2. The policy is amended to include the following Clause at the end thereof:

   *CANCELLATION*   This policy may not be canceled, except by the **Insurer** as
                    indicated below.

                    This policy may only be canceled by or on behalf of the
                    **Insurer** in the event of non-payment of premium by the
                    **Policyholder**. In the event of non-payment of premium by the
                    **Policyholder**, the **Insurer** may cancel this policy by delivering
                    to the **Policyholder** or by mailing to the **Policyholder**, by
                    registered, certified, or other first class mail, at the
                    **Policyholder Address**, written notice stating when, not less
                    than 15 days thereafter, the cancellation shall be effective.
                    The mailing of such notice as aforesaid shall be sufficient
                    proof of notice. The **Policy Period** terminates at the date and
                    hour specified in such notice, or at the date and time of
                    surrender. The premium set forth in the Declarations shall be
                    fully earned as of the inception date of this policy.   The
                    **Insurer** shall have the right to such premium amount even if
                    the policy is cancelled for nonpayment.

                    If the period of limitation relating to the giving of notice as
                    set forth in this Clause is also set forth in any law controlling
                    the construction thereof, then such period shall be deemed to
                    be amended to be equal to the minimum period of limitation
                    set forth in the controlling law.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

103420 (11/09)                © All rights reserved.
                              *END 5*

ENDORSEMENT# 6

This endorsement, effective  12:01 AM      December 15, 2016        forms a part of
policy number   03-582-65-11
issued to    ALLY FINANCIAL INC.

by      Illinois National Insurance Company
                                                                    √
                        **RIGHTS CLAUSE AMENDED**

In consideration of the premium charged, it is hereby understood and agreed that the *RIGHTS* Clause of the policy is deleted in its entirety and replaced with the following:

> The **Insurer** shall have the same rights, privileges and protections afforded to the **Underlying Insurer** of the **Followed Policy** in accordance with the terms, conditions and limitations of the **Followed Policy**. The **Insurer** shall also have the right, in its sole discretion, but not the obligation, to effectively associate with the insureds in the defense and settlement of any claim that appears to be reasonably likely to involve the **Insurer**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
M116748  √                              *END 6*

**ENDORSEMENT#** *7*

This endorsement, effective *12:01 AM     December 15, 2016*          forms a part of
policy number   *03-582-65-11*
issued to *ALLY FINANCIAL INC.*

by    *Illinois National Insurance Company*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| | 03/03 | NOTICE TO MICHIGAN INSUREDS |
| 103224 ✓ | 02/10 | EXCESS DEC AND POLICY - ADMITTED |
| 96555 ✓ | 01/15 | TRIA DEC DISCLOSURE FORM |
| 103496 ✓ | 11/09 | SCHEDULE OF UNDERLYING COVERAGE AND FOLLOWED POLICY ADDENDUM |
| 119679 ✓ | 09/15 | ECONOMIC SANCTIONS ENDORSEMENT |
| 94039 ✓ | 05/07 | STATE AMENDATORY INCONSISTENT |
| 109977 ✓ | 10/11 | CHANGES CLAUSE AMENDED |
| 109978 ✓ | 10/11 | RELIANCE CLAUSE AMENDED |
| 103420 ✓ | 11/09 | CANCELLATION ENDORSEMENT |
| M116748 ✓ | | RIGHTS CLAUSE AMENDED |
| 78859 ✓ | 10/01 | FORMS INDEX ENDORSEMENT |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 007*



## CLAIM REPORTING FORM

Issuing Company: *Illinois National Insurance Company*

Reported under Policy/Bond Number:  *03-582-65-11*   Date: _____

Type of Coverage: D&O _____ E&O _____ Fidelity _____ (complete the Fidelity Supplemental on the next page)

Insured's Name, as given on Policy Declarations (Face Page):

*ALLY FINANCIAL INC.* _____

_____

_____

Contact Person: _____

Title: _____

Phone: _(_____)_____-_____Ext_____

eMail: _____ @ _____

Case or Claimant Name: _____

_____

If the party involved is different from "Insured" Name (as given on Policy Declarations) state relationship:

_____

Insurance Broker/Agent: *MARSH USA INC.* _____

Address: *1166 AVENUE OF THE AMERICAS, NEW YORK, NY 10036-3712* _____

Address: _____

Contact: *JON KAYE* _____   Phone: _____

eMail: *paul.s.huelbig@marsh.com* _____

Send Notice of Claims to:   AIG                       Phone: (888) 602-5246
                            Financial Lines Claims    Fax:    (866) 227-1750
                            P.O. Box 25947            Email: c-Claim@AIG.com
                            Shawnee Mission, KS 66225



# CLAIM REPORTING FORM
# FIDELITY SUPPLEMENTAL
**(Only complete this supplemental if the Claim is being reported under Fidelity Coverage)**

Issuing Company: *Illinois National Insurance Company*

Reported under Policy/Bond Number:   *03-582-65-11*

Date of Discovery: _____   Estimated Amount of loss: _____

Cause of Loss:

| | | | | |
|---|---|---|---|---|
| Employee Dishonesty | _____ | Computer Fraud | _____ |
| Funds Transfer | _____ | Robbery/Burglary | _____ |
| ID Theft | _____ | Forgery | _____ |
| Client Property | _____ | In Transit | _____ |
| ERISA | _____ | Credit Card Forgery | _____ |
| Other | _____ | if Other, describe: | _____ |

Send Notice Of Claims To:   AIG
Financial Lines Claims
P.O. Box 25947
Shawnee Mission, KS 66225

Phone: (888) 602-5246
Fax:    (866) 227-1750
Email: c-Claim@AIG.com

*centralized Customer Link and Information Management*

**POLICYHOLDER NOTICE**

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG). The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy. You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aig.com/producer-compensation or by calling 1-800-706-3102.

91222 (9/16)

**NOTICE TO MICHIGAN INSUREDS**

**MICHIGAN DISCLAIMER**
**Michigan Senate Bill 1213**
**Exempt Commercial Policyholder**

The following notice is being provided in compliance with Michigan Law:

**This policy is exempt from the filing requirements of section 2236 of the insurance code of 1956, 1956 PA 218, MCL 500.2236.**

# EXHIBIT F

## Corporate Insurance Programs
## Policy Review Checklist

Reviewer's Name _Bao_     Date _3/15/17_

Insurance Program _MLB Blended_     Corrections to Insurer?   YES  (NO)  N/A

Broker/Contact _Marsh - Andrew Calder_     Corrections Received?   YES  NO  (N/A)

Policy Reissued?   YES  NO  (N/A)

Broker Re-cap Items   YES  (NO)  N/A     Comments _____

| | Current Policy | Current Binder | Previous Year Policy |
|---|---|---|---|
| Insurer/Parent Co. | Markel BDA Limited | Markel BDA | Markel BDA |
| Policy/Binder No. | 1353272-8469-PL77-2016 | 1353272-8469-PL77-2016 | 1335248-7726-PL77-2015 |
| Policy Period | 12/15/16-12/15/17 | 12/15/16-12/15/17 | 12/15/15-12/15/16 |
| Policy Limit | $15,000,000 x $ $55,000,000 | $15,000,000 x $ $55,000,000 | $15mm x $55mm |
| Retention/Deductible | Underlying | Underlying | Underlying |
| Policy Form No. | BMEX 11.16 | MBL PL77-2012 | follow form primary |
| Policy Premium | $1,138,100 | $1,138,100 | $1,198,900 |
| Commission | Not Stated | 18% | Not Stated |

### Endorsements

| New | Not Carried Forward |
|---|---|
| - Markel Reliance | n/a |
| - Markel non Follow form | |
| - Arbitration Clause | ✓ |

### Notable Changes

| Broadens Coverage | Reduces Coverage |
|---|---|
| n/a | n/a |
| ✓ | ✓ |

### List of Corrections / Questions to Insurer

| n/a |
|---|
| ✓ |

## BM Excess Uni-Form (BMEX) – 11.16
## DECLARATIONS

Issued by:  Markel Bermuda Limited (hereinafter "Insurer")    Policy Number ("Policy"): 1353272-8469-PLFF-2016

**Item 1.**        **Policyholder:**    Ally Financial Inc.
                **Mailing Address:** 500 Woodward Ave, Detroit, MI 48226, U.S.A.

**Item 2. Policy Period:**
         From:  12:01 AM on:    December 15, 2016 (the "Inception Date")
         To:     12:01 AM on:    December 15, 2017 (the "Expiration Date")
         (Both dates local time at the address shown in Item 1)

**Item 3. (a) Limit of Liability:**
                (i)     $15,000,000        per claim
                (ii)    $15,000,000        in the aggregate

         **(b) Excess of Underlying Limits:**
                (i)     $55,000,000        per claim
                (ii)    $55,000,000        in the aggregate

**Item 4.   Premium:**  $1,138,100

**Item 5.   Pending & Prior Litigation Date:**  December 15, 2013
         This Policy follows the Pending & Prior Litigation exclusion of the Followed Policy, except to the extent a
         different date is indicated above.

**Item 6.   Retroactive Date:** N/A

**Item 7.   A.      Extended Reporting Period:** Per the Followed Policy
         **B.      Extended Reporting Period Premium:** Per the % in the Followed Policy

**Item 8. Followed Policy:**

| Insurer | Policy Number | Limit | Period |
|---|---|---|---|
| Federal Insurance Company | 8207-6455 (D&O)<br>8207-6453 (FID)<br>8207-6461 (EPL)<br>8207-7768 (BPL/E&O) | $25,000,000 | December 15, 2016 to December 15, 2017 |

**Item 9. Underlying Policies:** *Amended: End # 1*
         [As held on file/See Schedule of Underlying Policies]

**Item 10.  Notices**

| Notice of claim to the Insurer: | All other notices to the Insurer: |
|---|---|
| Markel Bermuda Limited<br>2 Front Street<br>P.O. Box 2565<br>Hamilton HM KX Bermuda<br>Telephone 441 296 8800<br>Email:PLbermudaclaims@markelcorp.com | Email: PLbermudaclaims@markelcorp.com |




**Item 11.**   Endorsements Attached at Inception Date of Policy:
1.   Schedule of Underlying Endorsement ✓
2.   Markel Reliance Endorsement ✓
3.   Markel Non Follow Form (State Amendatory) Endorsement ✓
4.   Arbitration Endorsement ✓

**Item 12.**   Primary Policy Self-Insured Retention:   BPL -          $25,000,000
                                                      Fiduciary - $1,000,000
                                                      D&O -        $10,000,000
                                                      EPL -        $2,500,000

IN WITNESS WHEREOF, this Policy has been made, entered into and executed by the undersigned in Hamilton, Bermuda this February 23, 2017

Ben Munro, Senior Vice President



## BM Excess Uni-Form (BMEX) - 11.16

~~In consideration of the payment of the premium, the Insureds and the Insurer, agree as follows:~~ *Deleted/Replaced: Endr #2*

**I. INSURING AGREEMENT**: This Policy shall provide the Insureds with coverage excess of the Underlying Limits in accordance with the same terms, conditions, definitions, exclusions and limitations of the Followed Policy, except as otherwise provided in this Policy.  Any defined terms in the Followed Policy shall have the same meaning in this Policy.

**II. LIMIT OF LIABILITY AND MAINTENANCE OF UNDERLYING INSURANCE**:  The Limit of Liability set forth in Item 3(a)(i) of the Declarations is the limit of the Insurer's liability for each claim and the Limit of Liability set forth in Item 3(a)(ii) is the limit of the Insurer's liability in the aggregate for all coverage under this Policy in excess of the Underlying Limits.  Liability shall attach to the Insurer only after the full amount of the Underlying Limits has been exhausted by:

   i.   the insurers of the Underlying Policies, the Insureds, and/or any other source having paid such limits;

   ii.  the insurers of a difference-in-conditions policy that is excess of this Policy having paid such limits; and/or

   iii. a provision in the Underlying Policies which exhausts or reduces the limit of liability and/or retentions in the Underlying Policies by reason of any amount paid or payable under another policy issued by the insurers of the Underlying Policies or a subsidiary, associate, affiliate or parent of the insurers of the Underlying Policies.

In the event of the exhaustion of all the Underlying Limits as provided above including satisfaction of any applicable retention thereunder, this Policy shall continue in force as primary insurance. If the Followed Policy provides coverage that is subject to a sub-limit of liability, then this Policy will recognize any payment made pursuant to that sub-limit as eroding the Underlying Limits. However, this Policy shall not pay any loss that is subject to a sub-limit under any Underlying Policy unless such coverage is provided pursuant to an endorsement to this Policy.

**III. DEFENSE, SETTLEMENT AND CONDITIONS**:  The Insurer shall have the same rights, privileges and protections afforded to the insurers of the Followed Policy in accordance with such policy's terms and conditions. The Insurer shall also have the right, but not the obligation, to effectively associate with the Insureds in the investigation, settlement or defense of any claim that is reasonably likely to involve the Limits of Liability of this Policy.

The Insureds shall give the Insurer notice in the same manner as required or permitted by the terms and conditions of the Followed Policy.  Such notice shall be provided to the Insurer at the address referenced in the Notices section of the Declarations.  Notice to an insurer of the Followed Policy is not notice to the Insurer.

No amendment to the Followed Policy that is made subsequent to the issuance of that policy shall be effective in broadening the coverage afforded by this Policy, without the written consent of the Insurer, which consent shall not be unreasonably withheld.

**IV. PUNITIVE DAMAGES**:  This Policy shall cover punitive damages to the same extent punitive damages are covered under the Followed Policy; provided, however, if such damages would otherwise have been covered by the Followed Policy but for the law of the applicable jurisdiction determining the insurability of such punitive damages, then this Policy shall provide coverage for such punitive damages if insurable under either the internal laws of England and Wales or Bermuda.

*Amended: Markel Non Follow Form - Endr # 3*
         *Arbitration Clause - Endr # 4*

MARKEL

## SCHEDULE OF UNDERLYING POLICIES ✓

It is hereby understood and agreed that Item 9 of the Declarations reads as follows:

**Item 9:**      Schedule of Underlying Insurance:

|      | Carrier | Policy Period | Limits | Attachment |
|------|---------|---------------|--------|------------|
| i.   | Federal Insurance Company (D&O) | December 15, 2016 – December 15, 2017 | $25M | Per **Item 12** of the Dec. page |
| ii.  | Federal Insurance Company (BPL) | December 15, 2016 – December 15, 2017 | $25M | Per **Item 12** of the Dec. page |
| iii. | Federal Insurance Company (EPL) | December 15, 2016 – December 15, 2017 | $25M | Per **Item 12** of the Dec. page |
| iv.  | Federal Insurance Company (FID) | December 15, 2016 – December 15, 2017 | $25M | Per **Item 12** of the Dec. page |
| v.   | U.S. Specialty Insurance Company | December 15, 2016 – December 15, 2017 | $15M | $25M |
| vi.  | Illinois National Insurance Company | December 15, 2016 – December 15, 2017 | $15M | $40M |

**All other terms and conditions of the POLICY remain unchanged.**

The effective date of this endorsement is December 15, 2016
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No. 1353272-8469-PLFF-2016 of MARKEL BERMUDA LIMITED.

Issued to:      Ally Financial Inc.

Date of Issue:   February 23, 2017

End No.:      1



## MARKEL RELIANCE ENDORSEMENT ✓

In consideration of the premium, it is hereby understood and agreed that the Policy is amended as follows:

The Preamble of this Policy is deleted and replaced by the following:

> In consideration of the payment of premium and in reliance on the statements, representations and information provided in the Application, as that term defined or interpreted in the Followed Policy(ies), the Insureds and Insurer, agree as follows:

**All other terms and conditions of the POLICY remain unchanged.**

**The effective date of this endorsement is December 15, 2016**
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No. 1353272-8469-PLFF-2016 of MARKEL BERMUDA LIMITED.

| | |
|---|---|
| Issued to: | Ally Financial Inc. |
| Date of Issue: | February 23, 2017 |
| End No.: | 2 |



## MARKEL NON FOLLOW FORM
### (State Amendatory)
### ENDORSEMENT

In consideration of the premium, it is hereby understood and agreed that the Policy does not follow State Amendatory Endorsements, which currently attach, or may be attached in future, to the Followed Policy.

**All other terms and conditions of the POLICY remain unchanged.**

The effective date of this endorsement is December 15, 2016
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No. 1353272-8469-PLFF-2016 of MARKEL BERMUDA LIMITED.

Issued to:              Ally Financial Inc.

Date of Issue:          February 23, 2017

End No.:                3



BM Excess Uni-Form (BMEX) – 11.16

## ARBITRATION CLAUSE ENDORSEMENT ✓

In consideration of the payment of the premium, it is agreed that the following clause is added to this Policy:

### 1.   ARBITRATION

(a)   Any dispute, controversy or claim arising out of or relating to this Policy or the breach, termination or invalidity of this Policy shall be finally and fully determined in an arbitration proceeding under the provisions of the English Arbitration Act of 1996 ("Act") and/or any statutory modifications or amendments thereto, for the time being in force, by a Board composed of three arbitrators to be selected for each controversy as follows:

Any party may, in the event of such a dispute, controversy or claim, notify the other party or parties to such dispute, controversy or claim of its desire to arbitrate the matter, and at the time of such notification the party desiring arbitration shall notify any other party or parties of the name of the arbitrator selected by it. The other party who has been so notified shall within thirty (30) calendar days thereafter select an arbitrator and notify the party desiring arbitration of the name of such second arbitrator. If the party notified of a desire for arbitration shall fail or refuse to nominate the second arbitrator within thirty (30) calendar days following the receipt of such notification, the party who first served notice of a desire to arbitrate will, within an additional period of thirty (30) calendar days, apply to a judge of the High Court of Justice of England and Wales for the appointment of a second arbitrator and in such a case the arbitrator appointed by such a judge shall be deemed to have been nominated by the party or parties who failed to select the second arbitrator. The two arbitrators, chosen as above provided, shall within thirty (30) calendar days after the appointment of the second arbitrator choose a third arbitrator.  In the event of the failure of the first two arbitrators to agree on a third arbitrator within said thirty (30) calendar day period, either of the parties may within a period of thirty (30) calendar days thereafter, after notice to the other party or parties, apply to a judge of the High Court of Justice of England and Wales for the appointment of a third arbitrator and in such case the person so appointed shall be deemed and shall act as the third arbitrator.  Upon acceptance of the appointment by said third arbitrator, the Board of Arbitration for the controversy in question shall be deemed fixed.  All claims, demands, denials of claims and notices pursuant to this Clause shall be provided to the Insurer's address referenced in the Declarations.

(b)   The arbitration hearing shall be located, at the election of the Insured parties, in London, England; Hamilton, Bermuda; Toronto, Ontario, Canada; or Vancouver, British Columbia, Canada or any other agreeable location outside of the United States.  The Board of Arbitration shall fix, by a notice in writing to the parties involved, a reasonable time and place for the hearing and may prescribe reasonable rules and regulations governing the course and conduct of the arbitration proceeding, including without limitation, discovery by the parties.

(c)   The Board shall, within ninety (90) calendar days following the conclusion of the hearing, render its decision on the matter or matters in controversy in writing and



BM Excess Uni-Form (BMEX) - 11.16

shall cause a copy thereof to be served on all the parties thereto.  In case the Board fails to reach a unanimous decision, the decision of the majority of the members of the Board shall be deemed to be the decision of the Board and the same shall be final and binding on the parties thereto.  Such decision shall be a complete defense to any attempted appeal or litigation of such decision in the absence of fraud or collusion.  Without limiting the foregoing, the parties waive any right to appeal to, and/or seek collateral review of the decision of the Board of Arbitration by, any court or other body to the fullest extent permitted by applicable law, including, without limitation, application or appeal under sections 45 and 69 of the Act.

Any order as to the costs of the arbitration shall be in the sole discretion of the Board who may direct to whom and by whom and in what manner they should be paid.

**All other terms and conditions of the POLICY remain unchanged.**

The effective date of this endorsement is December 15, 2016
(at 12:01 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)

This endorsement is attached to and made a part of Policy No. 1353272-8469-PLFF-2016 of MARKEL BERMUDA LIMITED.

| | |
|---|---|
| Issued to: | Ally Financial Inc. |
| Date of Issue: | February 21, 2017 |
| End No.: | 4 |



# BOWRING MARSH

**Andrew D. Calder**
Managing Director

Bowring Marsh (Bermuda) Ltd.
Power House, 7 Par-la-Ville Road
Hamilton HM 11, Bermuda
441 299 8843 Fax  441 292 2091
Andrew.D.Calder@marsh.com
www.marsh.com

March 6, 2017

Martin H. Blumentritt
Ally Financial Inc.
500 Woodward Avenue,
Detroit, MI 48226

Subject:   Bermuda Blended Policies
              Policy Period: December 15, 2016 – December 15, 2017

Enclosed please find the above captioned policies.  We have reviewed the policies and found them to be consistent with the terms that were bound.

Coverage was renewed with:

- Markel Bermuda Limited with a limit of $15,000,000 excess of $55,000,000.
- Allied World Assurance Company, Ltd., with a limit of $10,000,000 excess of $70,000,000.
- Endurance Specialty Insurance Ltd., with a limit of $15,000,000 excess of $100,000,000.

This letter represents a synopsis of coverage and is provided as a reference only.  The actual policy, including endorsements determines coverage.  It contains exclusions, limitations and other provisions not referenced (or only briefly summarized) here and the policy should be consulted for full coverage terms, conditions and requirements.  It is important that you review the policies and advise us at your earliest opportunity of anything which you believe is not in accordance with the negotiated coverage and terms.

We appreciate the opportunity to be of service.  Please call if you have any questions.

Kindest Regards,

Andrew D Calder
Managing Director
Bowring Marsh (Bermuda) Ltd.

Cc:  Phillip.Munch@ally.com
Allison Gallagher / Paul Huelbig / Jon Kaye

MMC  Marsh & McLennan Companies