## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ALLY FINANCIAL, INC., | |
| Plaintiff, | |
| v. | No. 1:22-cv-00064-MPT |
| U.S. SPECIALTY INSURANCE COMPANY, | JURY TRIAL DEMANDED |
| Defendant. | |

## <u>AMENDED COMPLAINT</u>

Plaintiff Ally Financial, Inc. ("Ally") files this Amended Complaint against Defendant U.S. Specialty Insurance Company ("U.S. Specialty"), alleging as follows:

## <u>NATURE OF ACTION</u>

1.      Ally files this insurance coverage lawsuit against its excess insurer, U.S. Specialty, seeking damages for breach of insurance contract and declaratory relief regarding the interpretation of that contract.

2.      Specifically, this action concerns U.S. Specialty's failure and refusal to honor its contractual obligations under an excess bankers professional liability insurance policy that it sold to Ally to reimburse Ally for the defense costs and fees and settlement liability that Ally paid for  consumer class action counterclaims against Ally in the civil action styled *Ally Financial Inc. v. Alberta Haskins and David Duncan*, Case No. 16JE-AC01713-01 in the Circuit Court of Jefferson County, Missouri (the "Class Action").

3.      Ally ultimately entered into a Class Action Settlement Agreement and Release to settle the Class Action, whereby Ally was required to pay $71.2 million to class counsel for fees and costs, $16.3 million in cash to the classes, and provide $700 million in additional

compensatory damages to the classes (the "Class Action Settlement"). Ally also paid more than $3 million in costs and fees to defend the Class Action.

4.      Although Ally's loss in the Class Action far exceeded the retention that Ally self-insured and the limits of liability in the underlying primary bankers professional liability insurance policy that generally set the terms and conditions of Ally's professional liability program for the applicable policy year, thereby triggering coverage under U.S. Specialty's excess policy, U.S. Specialty has breached its coverage obligations. U.S. Specialty has asserted legally deficient coverage positions to excuse its breach, including construing the underlying primary policy's Prior Acts Exclusion in a manner that fails to give effect to the wording of that exclusion.

5.      Ally seeks a declaration that the Prior Acts Exclusion does not bar coverage under U.S. Specialty's excess policy for all or any portion of Ally's defense costs and fees in the Class Action and for the Class Action Settlement ("Loss").

6.      Ally also seeks damages, costs and fees, as well as interest, for U.S. Specialty's breach of its insurance contract.

## **PARTIES**

7.      Ally is a corporation organized under the laws of the State of Delaware, with its principal place of business in Detroit, Michigan.

8.      U.S. Specialty is an insurance company organized under the laws of Texas, with its principal place of business in Texas. U.S. Specialty has written insurance policies covering risks for Delaware citizens and is otherwise transacting insurance business in the State of Delaware.

## JURISDICTION AND VENUE

9.      The subject matter jurisdiction of this Court is based upon 28 U.S.C. § 1332, in that there is complete diversity of citizenship among the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.      This Court has personal jurisdiction over U.S. Specialty because, at all relevant times, U.S. Specialty has engaged in business activities in the State of Delaware and has otherwise purposefully availed itself of this jurisdiction.

11.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because U.S. Specialty is subject to personal jurisdiction in this District.

## FACTUAL BACKGROUND

### The Underlying Class Action

12.      In or about March 2017, Alberta Haskins and David Duncan ("the Class Representatives") brought counterclaims against Ally in the Class Action (the "Counterclaim"). Attached hereto as Exhibit A is a true and correct copy of Defendants' Second Amended Answer and Counterclaim.  Exhibits referenced therein are not attached. The Counterclaim asserted claims and sought relief against Ally for alleged violations of the Uniform Commercial Code as enacted in various states, as well as Missouri Chapter 408 and Missouri Chapter 365, for allegedly failing to provide presale and post-sale notices to borrowers before and after their personal property (such as, a motor vehicle) was repossessed and sold in the form and manner required under the UCC, among other allegations.

13.      On or about December 22, 2020, Ally reached a settlement in principle to settle the Class Action, which was followed by a written term sheet dated as of December 31, 2020.

- 3 -

14.     On March 17, 2021, Ally finalized a settlement agreement and release to settle the Class Action (the "Settlement Agreement"). Attached hereto as Exhibit B is a true and correct copy of the Settlement Agreement.

15.     The Missouri state court preliminarily approved the Settlement Agreement by order dated March 19, 2021.

16.     The Missouri state court subsequently issued an Amended Final Approval Order on September 8, 2021 fully and finally approving the Settlement Agreement.  Attached hereto as Exhibit C is a true and correct copy of the Amended Final Approval Order.

17.     Subject to the exclusions set forth in ¶ 3.3,  the Settlement Agreement provides the following two classes (the "Classes"):

> 3.1     **Nationwide Class**. The "Nationwide Class" means and is composed of each Person (a) who was named as a borrower, co-borrower, obligor, co-obligor, buyer, co-buyer, purchaser, co-purchaser, guarantor, owner, or co-owner in a Covered Contract, (b) whose Covered Contract was secured by Collateral, (c) whose Collateral was repossessed, voluntarily or involuntarily, and (d) whose Collateral was disposed of during the Class Period.
>
> 3.2     **Missouri Class**. The "Missouri Class" means and is composed of each Person (a) who obtained a Missouri Certificate of Title for a motor vehicle identifying Ally as the lienholder as a result of entering into a Covered Contract, or who was named as a borrower, co-borrower, obligor, co-obligor, buyer, co-buyer, purchaser, copurchaser, guarantor, owner, or co-owner with a Missouri address in a Covered Contract, (b) whose Covered Contract was secured by Collateral, (c) whose Collateral was repossessed, voluntarily or involuntarily, and (d) whose Collateral was disposed of during the Class Period.

Settlement Agreement, ¶¶ 3.1-3.2.

18.     "Covered Contract" is defined at ¶ 2.16 of the Settlement Agreement as "any loan, promissory note, financing agreement, or installment sale contract that is or was with, assigned to, or owned by Ally."

- 4 -

19.    "Class Period" is defined at ¶¶ 2.10 and 3.4 of the Settlement Agreement, in relevant part, as:

> the period from and after (a) the date shown on Exhibit A to the Court's Order on Disputed Statutes of Limitation entered on November 25, 2019, for the state of the applicable Class Member's address as stated on the related Covered Contract, to and including (b) the entry date of the Preliminary Approval Order.

20.    The November 25, 2019 Order on Disputed Statutes of Limitation set forth the following applicable statutes of limitation:

### Exhibit A - Class Period

| Consumer's State in Presale Notice | Disposition on or after this Date | Consumer's State in Presale Notice | Disposition on or after this Date |
|---|---|---|---|
| Alabama | June 17, 2010 | Montana | June 17, 2014 |
| Alaska | June 17, 2013 | Nebraska | June 17, 2012 |
| Arizona | June 17, 2012 | Nevada | June 17, 2013 |
| Arkansas | June 17, 2013 | New Hampshire | June 17, 2013 |
| California | June 17, 2013 | New Jersey | June 17, 2010 |
| Colorado | June 17, 2013 | New Mexico | June 17, 2012 |
| Connecticut | June 17, 2010 | New York | June 17, 2013 |
| Delaware | June 17, 2013 | North Carolina | June 17, 2013 |
| District of Columbia | June 17, 2013 | North Dakota | June 17, 2010 |
| Florida | June 17, 2012 | Ohio | June 17, 2010 |
| Georgia | June 17, 1996 | Oklahoma | June 17, 2013 |
| Hawaii | June 17, 2010 | Oregon | June 17, 2010 |
| Idaho | June 17, 2013 | Pennsylvania | June 17, 2010 |
| Illinois | June 17, 2011 | Rhode Island | June 17, 2006 |
| Indiana | June 17, 2006 | South Carolina | June 17, 2013 |
| Iowa | June 17, 2014 | South Dakota | June 17, 2010 |
| Kansas | June 17, 2013 | Tennessee | June 17, 2015 |
| Kentucky | June 17, 2006 | Texas | June 17, 2012 |
| Louisiana | June 17, 2016 | Utah | June 17, 2013 |
| Maine | June 17, 2010 | Vermont | June 17, 2010 |
| Maryland | June 17, 2013 | Virginia | June 17, 2014 |
| Massachusetts | June 17, 2012 | Washington | June 17, 2013 |
| Michigan | June 17, 2010 | West Virginia | June 17, 2006 |
| Minnesota | June 17, 2010 | Wisconsin | June 17, 2013 |
| Mississippi | June 17, 2013 | Wyoming | June 17, 2008 |
| Missouri | June 17, 2010 | | |

Attached hereto as Exhibit D is a true and correct copy of the Order on Disputed Statutes of Limitation.

21.     The class member data used by the settlement administrator to administer the Class Action Settlement demonstrates that the Classes wfere made up of more than 560,000 different customers and auto loans.[1]

22.     The Settlement Agreement required Ally to pay $87,500,000 in cash, with $71.2 million paid to counsel for the Classes ("Class Counsel") for fees and costs and $16.3 million paid in cash to the Classes. The Settlement Agreement also required Ally to provide $700 million in additional compensatory damages to the Classes as a result of Ally's agreement that the Classes would not be required to pay back Ally $700 million in outstanding deficiency balances on their accounts. Settlement Agreement, ¶ 4; Amended Final Approval Order, ¶ 16.

23.     In fully and finally approving the Settlement Agreement, the Missouri state court determined that the Settlement Agreement was "fair, reasonable, and adequate." Amended Final Approval Order, ¶ 8.

24.     The Missouri state court also determined that the $71.2 million in fees and costs awarded to Class Counsel was reasonable. Amended Final Approval Order, ¶ 16. In reaching this conclusion, the court found that Class Counsel "achieved exceptional results on behalf of the Classes with the total quantifiable benefit conferred on the Classes exceeding $787,500,000," and that the fee award was "less than that granted in similar cases involving complex litigation." *Id.* The court also found that "the issues involved were novel and complex," that Class Counsel were "experienced and highly skilled class action and consumer litigators," and that "[t]he demands of the settlement approval process and class administration forced Class Counsel to dedicate considerable resources" to the Class Action. *Id.*

---

[1] A copy of the document setting forth the class member data is not being filed with the Amended Complaint because it is a confidential document that contains personal information regarding the class members.

25.     In addition to the above settlement amounts, Ally also paid more than $3,000,000 in defense costs for the Class Action.

26.     U.S. Specialty has denied coverage for and refused to reimburse Ally for its Loss in connection with the Class Action and Class Action Settlement.

### Ally's Insurance Coverage for the Class Action

27.     U.S. Specialty issued Policy Number 24-MGU-16-A39492 to Ally for the policy period December 15, 2016 to December 15, 2017 (the "U.S. Specialty Policy"). Attached hereto as Exhibit E is a true and correct copy of the U.S. Specialty Policy.

28.     The U.S. Specialty Policy provides, in relevant part, limits of liability of $15 million, excess of $25 million of underlying bankers professional liability insurance and a $25 million self-insured retention.

29.     The Insuring Agreement of the U.S. Specialty Policy provides that: "The Insurer shall provide the **Insureds** with insurance excess of the **Underlying Insurance** scheduled in ITEM 4 of the Declarations."  U.S. Specialty Policy, § I.

30.     Ally is an "**Insured**" under the U.S. Specialty Policy.  *See* U.S. Specialty Policy, End. 5; *id.*, § III.C; *see also* paragraphs 35-37, *infra*.

31.     The U.S. Specialty Policy defines "**Underlying Insurance**" to include, in relevant part, a primary bankers professional liability policy, policy no. 8207-7768, issued by Federal Insurance Company for the policy period December 15, 2016 to December 15, 2017 (the "Federal Primary Policy").  *See* U.S. Specialty Policy, § III.C; *id.*, Decls., ITEM 4; *id.*, End. 1.  Attached hereto as Exhibit F is a true and correct copy of the Federal Primary Policy.

32.     The Insuring Agreement of the U.S. Specialty Policy also provides that:

> Except as specifically set forth in the terms, conditions or endorsements of this Policy, coverage hereunder shall apply in conformance with the

> terms, conditions, limitations and endorsements of the policy
> immediately underlying this Policy, except that coverage hereunder shall
> attach only after all **Underlying Insurance** has been exhausted by actual
> payment of claims or losses thereunder.

U.S. Specialty Policy, § I.

33.     In other words, the U.S. Specialty Policy generally follows and adopts the
coverage grants, definitions, exclusions, and other provisions set forth in the Federal Primary
Policy.

34.     The Federal Primary Policy provides, in relevant part, BPL Services Liability
Coverage to Ally, per Endorsement 15, ¶ 1, which states:

> The Company shall pay, on behalf of an **Insured**, **Loss** on account of any
> **BPL Claim** first made against such **Insured** during the **Policy Period** or,
> if exercised, during the Extended Reporting Period, for a **BPL Wrongful
> Act** committed by an **Insured** or any person for whose acts the **Insured**
> is legally liable solely while performing **BPL Services**, including failure
> to perform **BPL Services**.

35.     The Federal Primary Policy defines "**Insured**" to include "the **Organization**,"
which itself is defined to include "the **Parent Organization**."  Federal Primary Policy, § 2; *id.*,
End. 17.

36.     "**Parent Organization**" is defined by the Federal Primary Policy as "the entity
that is named in ITEM 1 of the Declarations as legally constituted at the inception date of this
Policy."  Federal Primary Policy, § 2.  ITEM 1 of the Declarations of the Federal Primary Policy
names Ally Financial Inc. as the Parent Organization.  *Id.*, Decls.

37.     Ally qualifies as an "**Insured**" under the Federal Primary Policy.  *See* paragraphs
35-36, *supra*.

38.     The Federal Primary Policy defines "**Policy Period**," in relevant part, as "the
period of time specified in ITEM 5 of the Declarations."  Federal Primary Policy, § 2.  ITEM 5

of the Declarations of the Federal Primary Policy sets the Policy Period as December 15, 2016

to December 15, 2017.  *Id.*, Decls.

39.   The Federal Primary Policy defines "**Loss**" as:

the amount that an **Insured** becomes legally obligated to pay on account
of any covered **Claim**, including but not limited to damages (including
punitive, multiplied or exemplary damages if and to the extent that such
punitive, multiplied or exemplary damages are insurable under the law of
the jurisdiction most favorable to the insurability of such damages
provided such jurisdiction has a substantial relationship to the relevant
**Insured**, to the Company, or to the **Claim** giving rise to the damages),
judgments, settlements, pre-judgment and post-judgment interest and
**Defense Costs**.  **Loss** does not include:

a.   any amount not indemnified by the **Organization** for which an
**Insured Person** is absolved from payment by reason of any
covenant, agreement or court order;

b.   any costs incurred by an **Insured** to comply with any order for
injunctive or other non-monetary relief, or to comply with an
agreement to provide such relief;

c.   any amount incurred by an **Insured** in the defense or
investigation of any action, proceeding, investigation or demand
that is not then a covered **Claim** even if:

(1)   such amount also benefits the defense of a covered **Claim**;
or

(2)   such action, proceeding, investigation or demand
subsequently gives rise to a covered **Claim**;

d.   taxes, fines or penalties, except as provided above with respect to
punitive, multiplied or exemplary damages;

e.   any amount not insurable under the law pursuant to which this
Policy is construed;

f.   any amount allocated to noncovered loss pursuant to Section 10;

g.   regular or overtime wages, salaries or fees of **Insured Persons**;

h.   diminution in value or damages resulting from the diminution in
value of money, securities, property or any other item of value
unless caused by a **Wrongful Act** of an **Insured** in the execution
or implementation of investment advice or investment decisions;

i.   loss of the actual money, securities, property or other items of
value in the custody or control of an **Insured**;

- 9 -

      j.        amounts otherwise reimbursable to an **Insured** by any trust, estate, plan or fund or any similar entity or the sponsor of any such trust, estate, plan or fund or any similar entity;

      k.      principal, interest or other moneys whether paid, accrued or due as the result of any loan, lease or extension of credit; or

      l.       any amount which in fact constitutes disgorgement, including restitution.

Federal Primary Policy, End. 19, ¶ 4.

40.     The Federal Primary Policy defines "**Defense Costs**" as "that part of **Loss** consisting of reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of the directors, officers or employees of the **Organization**) incurred in defending, investigating or appealing any **Claim** and the premium for appeal, attachment or similar bonds." Federal Primary Policy, End. 25.

41.     The Federal Primary Policy defines "**BPL Claim**" to mean:

      a.     a written demand for monetary damages or non-monetary relief;

      b.     a civil proceeding commenced by the service of a complaint or similar pleading;

      c.     an arbitration or mediation proceeding, including any foreign equivalent thereof, commenced by receipt of a written request or demand for arbitration or mediation, including any foreign equivalent thereof,

brought by or on behalf of a **BPL Customer** against an **Insured** for a **BPL Wrongful Act**, including any appeal therefrom; or

      d.     a criminal proceeding commenced by the service of an indictment or similar document, against an **Insured** for a **BPL Wrongful Act**, including any appeal therefrom.

**BPL Claim** does not include any **Broker-Dealer Claim**, **Insurance Services Claim**, **Insurance Agent and Broker Services Claim**, or **Lending Claim**.

Except as may otherwise be provided in Section 6, Section 7 or Subsection 8b of this Policy, a **BPL Claim** shall be deemed to have first been made when such **BPL Claim** is commenced as set forth in this

definition (or, in the case of a written demand for monetary damages or non-monetary relief, when such demand is first received by an **Insured**).

Federal Primary Policy, End. 15, ¶ 2.

42.     The Federal Primary Policy defines "**BPL Customer**" to mean:

any person or entity that:

a.      has or had a written agreement with the **Organization**;

b.      submitted a written application to the **Organization**; or

c.      is a named beneficiary of any account held by the **Organization**'s Trust Department and who is entitled

to receive **BPL Services** permitted by law or regulation.

**BPL Customer** shall also include any person or entity that is a borrower of any **BPL Customer** for which **BPL Customer** the **Organization** provides **Loan Servicing**.

Federal Primary Policy, End. 15, ¶ 2.

43.     The Federal Primary Policy defines "**BPL Services**" to mean:

those services, including **Loan Servicing**, performed or required to be performed by an **Insured** for or on behalf of a **BPL Customer**:

a.      for a fee, commission or other monetary consideration;

b.      where a fee, commission or other monetary consideration would usually be received by the **Insured** but for business or other reasons is waived by the **Insured**; or

c.      for other remuneration which inures to the benefit of such **Insured**.

**BPL Services** does not include any **Broker-Dealer Services**, **Insurance Services**, **Insurance Agent and Broker Services**, or **Lending Services**.

Federal Primary Policy, End. 15, ¶ 2.

44.     The Federal Primary Policy defines "**BPL Wrongful Act**" to mean:

any error, misstatement, misleading statement, act, omission, neglect, or breach of duty that:

a.      is committed, attempted, or allegedly committed or attempted, before or during the **Policy Period** by an **Insured** or any person

for whose acts the **Insured** is legally liable; and

b.    arises solely from the performance of **BPL Services**.

Federal Primary Policy, End. 15, ¶ 2.

45.    The Federal Primary Policy defines "**Loan Servicing**" to mean:

> the servicing of any loan, lease or extension of credit (whether consumer, commercial, mortgage banking or otherwise, but not including financing for investment banking, or leveraged or management buyouts). **Loan Servicing** includes but is not limited to the following servicing activities: record keeping, billing and disbursements of principal or interest, receipt or payment of insurance premiums and taxes, credit reporting or statements of creditworthiness, determination of the depreciation amount of property (but not projections of or an appraisal for residual or future value of property), master servicing activities in connection with **Securitized Debt Instruments**, or any similar administrative activity. **Loan Servicing** shall also include, but solely with respect to the servicing of a loan, lease or extension of credit: foreclosure activities, management and preservation of collateral, or administration or liquidation of real estate properties.

Federal Primary Policy, End. 19, ¶ 3.

46.    The Federal Primary Policy contains a "Prior Acts Exclusion" that reads as follows:

> The Company shall not be liable for **Loss** on account of any **Claim** based upon, arising from, or in consequence of:
>
> (1)    any **Wrongful Act** committed, attempted, or allegedly committed or attempted prior to December 15, 2013; or
>
> (2)    any **Wrongful Act** committed, attempted, or allegedly committed or attempted subsequent to December 15, 2013 that is causally connected to a **Wrongful Act** committed, attempted, or allegedly committed or attempted prior to December 15, 2013.

Federal Primary Policy, End. 2.

47.    "**Claim**," as amended by Endorsement 19, ¶ 2, is defined by the Federal Primary Policy as "any **BPL Claim**, **Broker-Dealer Claim**, **Insurance Services Claim**, **Insurance Agent and Broker Claim**, or **Lending Claim**."

48.    "**Wrongful Act**," as amended by Endorsement 19, ¶ 6, is defined by the Federal Primary Policy as "any **BPL Wrongful Act**, **Broker-Dealer Wrongful Act**, **Insurance Services Wrongful Act**, **Insurance Agent and Broker Wrongful Act**, or **Lending Wrongful Act**."

49.    The Federal Primary Policy also contains an "Allocation" provision, which states:

> If both **Loss** covered by this Policy and loss not covered by this Policy are incurred, either because a **Claim** against an **Insured** includes both covered and noncovered matters or because a **Claim** is made against both an **Insured** and others, then the **Insured** and the Company shall allocate such amount between covered **Loss** and noncovered loss based upon the relative legal and financial exposures of the parties to covered and noncovered matters and, in the event of a settlement in such **Claim**, also based upon the relative benefits to the parties from such settlement. The Company shall not be liable under this Policy for the portion of such amount allocated to noncovered loss.
>
> If the **Insured** and the Company agree on an allocation of **Defense Costs**, then the Company shall advance on a current basis **Defense Costs** allocated to covered **Loss**.  If the **Insured** and the Company cannot agree on an allocation:
>
> a.    No presumption as to allocation shall exist in any arbitration, suit or other proceeding;
>
> b.    The Company shall advance on a current basis **Defense Costs** which the Company believes to be covered under this Policy until a different allocation is negotiated, arbitrated or judicially determined; and
>
> c.    The Company, if requested by the **Insured**, shall submit the dispute to binding arbitration.   The rules of the American Arbitration Association shall apply except with respect to the selection of the arbitration panel, which shall consist of one arbitrator selected by the **Insured**, one arbitrator selected by the Company, and a third independent arbitrator selected by the first two arbitrators.
>
> Any negotiated, arbitrated or judicially determined allocation of **Defense Costs** on account of a **Claim** shall be applied retroactively to all **Defense Costs** on account of such **Claim**, notwithstanding any prior advancement to the contrary.  Any allocation or advancement of

> **Defense Costs** on account of a **Claim** shall not apply to or create any presumption with respect to the allocation of other **Loss** on account of such **Claim**.

Federal Primary Policy, § 10.

### The U.S. Specialty Policy Covers Ally's Loss in the Class Action

50.     The Class Action meets the definition of a **BPL Claim**, as it was brought by a **BPL Customer** against an **Insured** for an alleged **BPL Wrongful Act**, as these terms are defined by the Federal Primary Policy.

51.     U.S. Specialty has never challenged whether the Class Action meets the definition of a **BPL Claim** or whether Ally's insurance claim satisfies the BPL Services Liability Coverage insuring clause of the Federal Primary Policy.  U.S. Specialty has waived any right to now challenge either proposition.

52.     Ally's **Loss** paid in connection with the Class Action exceeds the self-insured retention and the limits of the Federal Primary Policy.

53.     Ally and Federal Insurance Company resolved their coverage dispute with respect to Ally's claim for coverage under the Federal Primary Policy for the Class Action, as demonstrated in a confidential written document that has been provided to U.S. Specialty.[2]

54.     The class member data used by the settlement administrator to administer the Class Action Settlement demonstrates that each of the individual class member claims at issue in the Class Action involved one or more alleged **BPL Wrongful Acts** that occurred at some point during a multi-year period.  The settlement administration data also shows that more than

---

[2] Ally and Illinois National Insurance Company, an original defendant in this action, have similarly resolved their coverage dispute, as reflected in D.I. 17, whereby Ally dismissed its claims against Illinois National Insurance Company with prejudice.

80% of the alleged **BPL Wrongful Acts** for the more than 560,000 class members at issue occurred *after* December 15, 2013, the cut-off date referenced in the Prior Acts Exclusion.

55.     The Prior Acts Exclusion does not bar coverage under the U.S. Specialty Policy for Ally's **Loss** in connection with the Class Action because the exclusion by its terms does not apply to any class member claims alleging **BPL Wrongful Acts** allegedly taking place after December 15, 2013.

56.     By its terms, the Prior Acts Exclusion does not apply to the class member claims for post-December 15, 2013 **BPL Wrongful Acts** because those claims involved alleged **BPL Wrongful Acts** that are neither "based upon, arising from, or in consequence of" nor "causally connected to" any **BPL Wrongful Act** committed, attempted, or allegedly committed or attempted prior to December 15, 2013.

57.     The Federal Primary Policy defines **BPL Wrongful Act** in terms of a *particular* customer/loan.  More specifically, **BPL Wrongful Act** is defined to require that Ally's alleged act or omission "arises solely from the performance of **BPL Services**."  Federal Primary Policy, End. 15, ¶ 2.  **BPL Services** is defined, in relevant part, as services provided to a singular customer: "services, including **Loan Servicing**, performed or required to be performed by an **Insured** for or on behalf of **a BPL Customer**."  *Id.* (emphasis added). **BPL Customer** is likewise defined in a singular sense: "any person or entity" that, *inter alia*, has or had a written agreement with Ally.  *See id.*  Thus, based on the relevant definitions set forth in the Federal Primary Policy, Ally's alleged acts as to each class member relating to his or her specific auto loan constitutes a separate and distinct **BPL Wrongful Act**.

58.     Further, there is no causal connection between **BPL Wrongful Acts** as to each class member in the Class Action because the Counterclaim did not allege that Ally's act of

sending an allegedly defective notice to one class member on that customer's defaulted auto loan caused or brought about Ally's subsequent act of sending an allegedly defective notice to a different class member relating to his or her separate defaulted auto loan.

59.     U.S. Specialty has not and cannot meet its burden of proving that the Prior Acts Exclusion or any other exclusion or provision of the U.S. Specialty Policy or Federal Primary Policy bars coverage, in whole or in part, under the U.S. Specialty Policy for Ally's **Loss** in connection with the Class Action.

60.     Accordingly, U.S. Specialty has an immediate obligation to pay Ally the U.S. Specialty Policy's full limits of liability because Ally has suffered covered **Loss** that exceeds the underlying limits of liability of the U.S. Specialty Policy as a result of a covered **BPL Claim**.

## U.S. Specialty's Refusal to Pay For Ally's Covered Loss

61.     In June 2017, Ally, through its broker, promptly notified U.S. Specialty of its receipt of the Counterclaim.

62.     U.S. Specialty acknowledged receipt of Ally's notice of the Counterclaim.

63.     During the pendency of the Class Action, Ally provided regular updates to U.S. Specialty regarding the status of the case and settlement discussions.

64.     Ally also provided U.S. Specialty with notice of the settlement in principle of the Class Action on or about January 5, 2021.

65.     On February 23, 2021, U.S. Specialty provided Ally its initial coverage position, stating that the Prior Acts Exclusion bars all coverage.

66.     U.S. Specialty did not provide any comment to Ally regarding the settlement of the Class Action until the February 23, 2021 letter.

67.     On October 25, 2021, U.S. Specialty supplemented its initial coverage position and reaffirmed its view that there is no coverage under the U.S. Specialty Policy, because the Prior Acts Exclusion bars coverage for the Class Action in its entirety.

68.     All conditions and requirements imposed by the U.S. Specialty Policy on Ally, including, among other things, the retention(s), payment of premiums and timely notice of claims and settlement have been satisfied and/or have been waived and/or are subject to an estoppel or other avoidance against U.S. Specialty by reason of U.S. Specialty's conduct and/or by operation of law.

**COUNT I**
<u>(Declaratory Relief)</u>

69.     Ally repeats and re-alleges the foregoing allegations, which are incorporated, in full, by this reference.

70.     An actual, present and justiciable controversy exists between Ally and U.S. Specialty regarding the construction of the Prior Acts Exclusion, and whether that exclusion bars coverage under the U.S. Specialty Policy for any or all **Loss** that Ally has paid in connection with the Class Action.

71.     The Prior Acts Exclusion does not bar coverage under the U.S. Specialty Policy for Ally's **Loss** in connection with the Class Action because the exclusion by its terms does not apply to any of the class member claims alleging **BPL Wrongful Acts** allegedly taking place after December 15, 2013. The exclusion does not apply to those claims because: (i) based on the relevant definitions set forth in the Federal Primary Policy, Ally's alleged acts as to each class member relating to his or her specific auto loan constitutes a separate and distinct **BPL Wrongful Act**; and (ii) there is no causal connection between **BPL Wrongful Acts** as to each class member in the Class Action, so as to trigger the exclusion, because the Counterclaim did

- 17 -

not allege that Ally's act of sending an allegedly defective notice to one class member on that customer's defaulted auto loan caused or brought about Ally's subsequent act of sending an allegedly defective notice to a different class member relating to his or her separate defaulted auto loan.

72.    The class member data used by the settlement administrator to administer the Class Action Settlement demonstrates that more than 80% of the individual class member claims at issue in the Class Action are for post-December 15, 2013 **BPL Wrongful Acts**.

73.    Ally does not contend that any allocation is required or necessary. Nevertheless, a comparison of the amount of the Class Action Settlement, as confirmed by the Missouri state court's Amended Final Approval Order, and Ally's **Defense Costs**, with the settlement administration data, which contains details about each individual class member claim, demonstrates that even if allocation were to be required, U.S. Specialty's coverage obligation would extend to the full  limits of liability of the U.S. Specialty Policy.

74.    Ally is therefore entitled to a declaratory judgment by this Court that:

a.    The Prior Acts Exclusion does not apply to any of the class member claims for post-December 15, 2013 **BPL Wrongful Acts**; and

b.    The Prior Acts Exclusion does not bar coverage under the U.S. Specialty Policy for all or any portion of the **Loss** that Ally has paid in connection with the Class Action.

## COUNT II
### (Breach of Contract)

75.    Ally repeats and re-alleges the foregoing allegations, which are incorporated, in full, by this reference.

76.     The U.S. Specialty Policy is a valid and enforceable insurance contract for which Ally paid a substantial premium.

77.     Ally notified U.S. Specialty of the Class Action and of the Class Action Settlement pursuant to the terms of the U.S. Specialty Policy and/or applicable law.

78.     U.S. Specialty has not and cannot meet its burden of proving that any exclusion or provision of the U.S. Specialty Policy or Federal Primary Policy bars coverage, in whole or in part, for Ally's **Loss** in connection with the Class Action.

79.     Ally has satisfied all conditions and requirements imposed by the U.S. Specialty Policy and Federal Primary Policy and/or U.S. Specialty has waived compliance with such conditions and/or should be estopped from asserting that Ally did not meet such conditions.

80.     Ally has exhausted and/or satisfied any self-insured retentions, deductibles, underlying limits or other sums required to be exhausted and/or satisfied by the terms and conditions of the U.S. Specialty Policy such that U.S. Specialty currently is obligated to Ally with respect to the **Loss** Ally has paid in connection with the Class Action.

81.     U.S. Specialty has wrongfully failed and refused to reimburse Ally's **Loss** in connection with the Class Action.

82.     By its conduct, including, but not limited to, its failure and refusal to reimburse Ally's **Loss** in connection with the Class Action, U.S. Specialty has breached its policy with Ally.

83.     As a direct result of the foregoing breach of contract, Ally has been denied the benefits of insurance coverage for which U.S. Specialty collected substantial premium, and has suffered damages in an amount to be proven at trial, including all incidental and consequential damages proximately resulting from U.S. Specialty's breach of contract.

## **PRAYER FOR RELIEF**

WHEREFORE, Ally respectfully prays for the Court to enter judgment in its favor and against U.S. Specialty as follows:

(a) With respect to Count I, a judgment declaring that:

  i. The Prior Acts Exclusion does not apply to any of the class members claim for post-December 15, 2013 **BPL Wrongful Acts**; and

  ii. The Prior Acts Exclusion does not bar coverage under the U.S. Specialty Policy for all or any portion of the **Loss** that Ally has paid in connection with the Class Action;

(b) With respect to Count II, award monetary damages against U.S. Specialty for its breach of contract in an amount to be determined at trial proximately resulting from its breach of contract;

(c) Award Ally its costs and expenses, including but not limited to its attorneys' fees in bringing and pursuing this action;

(d) Award Ally pre-judgment and post-judgment interest; and

(e) Award Ally any other and further relief to which it is entitled.

**JURY DEMAND**

Ally hereby demands a trial by jury in this action for any and all issues so triable.

Dated:  July 1, 2022

OF COUNSEL:                                          REED SMITH LLP

                                                    */s/ Brian M. Rostocki*
                                                    Brian M. Rostocki (No. 4599)
REED SMITH LLP                                      Anne M. Steadman (No. 6221)
David M. Halbreich (admitted *pro hac vice*)        1201 Market Street, Suite 1500
355 South Grand Avenue                              Wilmington, DE 19801
Suite 2900                                          Telephone:  (302) 778-7500
Los Angeles, CA  90071                              Email:  brostrocki@reedsmith.com
Telephone: (213) 457-8000                           Email:  asteadman@reedsmith.com
Email: dhalbreich@reedsmith.com
                                                    *Counsel for Plaintiff Ally Financial, Inc.*
Courtney C.T. Horrigan (admitted *pro hac vice*)
Robert J. Tritschler (admitted *pro hac vice*)
225 Fifth Avenue
Pittsburgh, PA  15222
Telephone: (412) 288-3131
Email: chorrigan@reedsmith.com
Email: rtritschler@reedswmith.com

Miranda A. Jannuzzi (admitted *pro hac vice*)
Three Logan Square
1717 Arch Street, Ste. 3100
Philadelphia, PA  19103
Telephone: (215) 851-8100
Email: mjannuzzi@reedsmith.com

## **CERTIFICATE OF SERVICE**

I, Brian M. Rostocki, hereby certify that on July 1, 2022 a copy of the **Amended Complaint** was served via CM/ECF on the following counsel of record:

PHILLIPS, MCLAUGHLIN & HALL, P.A.
John C. Phillips, Jr.
David A. Bilson
1200 North Broom Street
Wilmington, DE 19806

*/s/ Brian M. Rostocki*
Brian M. Rostocki (No. 4599)