**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ALLY FINANCIAL, INC.,

                Plaintiff,

v.

U.S. SPECIALTY INSURANCE COMPANY,

                Defendant.

No. 1:22-cv-00064-MPT

**PLAINTIFF ALLY FINANCIAL, INC.'S OPENING BRIEF IN SUPPORT OF ITS
MOTION FOR JUDGMENT ON THE PLEADINGS AS TO COUNT I OF ITS
AMENDED COMPLAINT AND AS TO DEFENDANT'S SECOND AFFIRMATIVE
<u>DEFENSE IN ITS ANSWER AND AFFIRMATIVE DEFENSES</u>**

Dated:  September 30, 2022

OF COUNSEL:
REED SMITH LLP
David M. Halbreich (admitted *pro hac vice*)
355 South Grand Avenue
Suite 2900
Los Angeles, CA  90071
Telephone: (213) 457-8000
Email:  dhalbreich@reedsmith.com

Courtney C.T. Horrigan (admitted *pro hac vice*)
Douglas Baker (admitted *pro hac vice*)
Robert J. Tritschler (admitted *pro hac vice*)
225 Fifth Avenue
Pittsburgh, PA  15222
Telephone: (412) 288-3131
Email:  chorrigan@reedsmith.com
Email:  douglas.baker@reedsmith.com
Email:  rtritschler@reedsmith.com

Miranda A. Jannuzzi (admitted *pro hac vice*)
Three Logan Square
1717 Arch Street, Ste. 3100
Philadelphia, PA  19103
Telephone: (215) 851-8100
Email:  mjannuzzi@reedsmith.com

REED SMITH LLP
Brian M. Rostocki (No. 4599)
Anne M. Steadman (No. 6221)
1201 Market Street, Suite 1500
Wilmington, DE 19801
Telephone:  (302) 778-7500
Email:  brostrocki@reedsmith.com
Email:  asteadman@reedsmith.com

*Counsel for Plaintiff Ally Financial, Inc.*

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................. 1

NATURE AND STAGE OF THE PROCEEDINGS ................................. 3

SUMMARY OF ARGUMENT .............................................................. 4

STATEMENT OF FACTS ..................................................................... 5

    A.    Ally's Automotive Finance Operations ...................................... 5

    B.    Ally's Insurance Coverage................................................... 6

    C.    The Federal Primary Policy .................................................. 7

    D.    The U.S. Specialty Policy ..................................................... 9

    E.    The Underlying Class Action................................................. 10

    F.    U.S. Specialty's Wrongful Denial of Coverage................................ 12

ARGUMENT ...................................................................................... 13

    A.    Legal Standards................................................................. 13

        i.    Motion for Judgment on the Pleadings ..................................... 13

        ii.    Principles of Insurance Policy Construction............................... 14

    B.    The Class Action is covered under the U.S. Specialty Policy. .......................... 14

    C.    The Prior Acts Exclusion does not bar coverage under the U.S. Specialty Policy for Ally's Loss. ................................................................... 15

        i.    The repossession notices are distinct as to each customer and each customer's claim must be considered separately. ..................................... 15

        ii.    The repossession notices Ally sent to one class member did not "arise out of" or "cause" Ally to send repossession notices to another class member.......................................................... 17

            a.    Paragraph (i) of the Prior Acts Exclusion does not apply to the later customer claims because none of those claims are "based upon, arising from, or in consequence of" any earlier-sent repossession notices. ..................................... 18

            b.    Paragraph (ii) of the Prior Acts Exclusion does not apply because none of the later-sent repossession notices are "causally connected" to any earlier-sent repossession notices. ................................................................. 20

            c.    U.S. Specialty should not escape any of its $15 million limits of liability to cover a portion of Ally's nearly $800 million Loss. ........................................................... 24

CONCLUSION.................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ally Financial Inc. v. Alberta Haskins and David Duncan*,
    Case No. 16JE-AC01713 (Mo. Cir. Ct., Jefferson Cty.) ........................................................10

*Ally Financial Inc. v. Alberta Haskins and David Duncan*,
    Case No. 16JE-AC01713-01 (Mo. Cir. Ct., Jefferson Cty.) ...................................................11

*Alstrin v. St. Paul Mercury Ins. Co.*,
    179 F. Supp. 2d 376 (D. Del. 2002) .......................................................................................14

*In re Amarin Corp. PLC Sec. Litig.*,
    2021 U.S. Dist. LEXIS 59840 (D.N.J. Mar. 29, 2021).............................................................6

*Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*,
    586 F.3d 803 (10th Cir. 2009) ...............................................................................................22

*Evraz Claymont Steel, Inc., NA v. Harleysville Mut. Ins. Co.*,
    2011 Del. Super. LEXIS 539 (Del. Super. Ct. Nov. 30, 2011)...............................................14

*KT4 v. Palantir Techs.*,
    2021 Del. Super. LEXIS 502 (Del. Super. Ct. June 24, 2021) ...............................................13

*Lorillard Tobacco Co. v. Am. Legacy Found.*,
    903 A.2d 728 (Del. 2006) .......................................................................................................14

*MGIC Indemnity Corp. v. Weisman*,
    803 F.2d 500 (9th Cir. 1986) .................................................................................................13

*Monzo v. Nationwide Prop. & Cas. Ins. Co.*,
    249 A.3d 106 (Del. 2021) .................................................................................................14, 24

*Professional Solutions Insurance Co. v. Mohrlang*,
    2009 U.S. Dist. LEXIS 14187 (D. Colo. Feb. 10, 2009)...........................................21, 22, 24

*Reynolds v. Del. State Univ.*,
    2020 U.S. Dist. LEXIS 111894 (D. Del. June 25, 2020)........................................................13

*RSUI Indem. Co. v. Murdock*,
    248 A.3d 887 (Del. 2021) ............................................................................................ *passim*

*Sikirica v. Nationwide Ins. Co.*,
    416 F.3d 214 (3d Cir. 2005)...................................................................................................13

*SodexoMAGIC, LLC v. Drexel Univ.*,
  24 F.4th 183 (3d Cir. 2022) ............................................................................13

*Sonitrol Holding Co. v. Marceau Investissements*,
  607 A.2d 1177 (Del. 1992) ..............................................................................14

*Southmark Prime Plus, L.P. v. Falzone*,
  776 F. Supp. 888 (D. Del. 1991) ......................................................................13

*Sycamore Partners Management, LP v. Endurance American Insurance Co.*,
  2021 Del. Super. LEXIS 584 (Del. Super. Ct. Sept. 10, 2021) ..................18, 19, 20

**Statutes**

28 U.S.C. § 1332 ...................................................................................................3

28 U.S.C. § 1441 ...................................................................................................3

28 U.S.C. § 1446 ...................................................................................................3

**Other Authorities**

Merriam-Webster's Collegiate Dictionary 196 (11th ed. 2007) ............................18, 21

## PRELIMINARY STATEMENT

This is an insurance coverage action.  Plaintiff Ally Financial, Inc. ("Ally") purchased insurance coverage from Defendant U.S. Specialty Insurance Company ("U.S. Specialty") in connection with Ally's auto-finance business.  The coverage at issue in this case—bankers professional liability coverage—covers losses on account of claims brought by or on behalf of Ally's customers alleging that Ally did something wrong in connection with the servicing of those customers' accounts.  Under the policy, such acts are covered unless U.S. Specialty can demonstrate that the acts took place before December 15, 2013.  The provision containing this cutoff date is referred to as the Prior Acts Exclusion.

In 2017, two customers filed a putative class-action counterclaim (the "Class Action") against Ally in a collection lawsuit that Ally had filed in Missouri state court concerning the balance owing on their joint auto-finance account. The counterclaim alleged that Ally sent them improper notices in connection with the repossession and subsequent sale of their vehicle following their loan default.   The gist of the claim was that Ally told the customers in their notices that they had to pay their accumulated arrearage in certified funds to get their vehicle back after repossession.  In 2018, the Missouri court certified a nationwide class and a Missouri sub-class.  The classes included customers who received alleged defective repossession notices from Ally anywhere between 2003 to 2021, depending on state-specific statutes of limitations for the asserted claims.  In 2021, while admitting no liability, Ally settled with the classes and agreed to pay $87.5 million in cash and forgive $700 million in outstanding deficiency balances on individual class-member accounts.  Defense costs exceeded $3 million.

Ally made a claim upon U.S. Specialty for coverage under its policy in connection with the defense and settlement of the Class Action.  Contrary to the policy, U.S. Specialty denied Ally's claim.  In doing so, U.S. Specialty relied on the Prior Acts Exclusion, an exclusion that

operates to bar coverage for claims involving alleged acts that occurred before December 15, 2013. U.S. Specialty claimed that because the named plaintiffs in the Class Action (and a small percentage of others) received their repossession notices before December 15, 2013, coverage for *all* of the alleged wrongful acts in the class—even those occurring *after* December 15, 2013— was barred completely.  Thus, U.S. Specialty is seeking to bar coverage for the litigation based on the repossession notice dates of a small minority of class members, and irrespective of the independent servicing of each customer's account.  U.S. Specialty is wrong.

U.S. Specialty ignores that a class action is a mechanism that allows a municipality of actual and potential individual lawsuits to be resolved together in order to promote judicial efficiency.  The Class Action here was one litigation, but that litigation resolved a multitude of customer claims.

U.S. Specialty also ignores the narrow scope of the exclusion.  The Prior Acts Exclusion plainly limits its reach to claims "based upon, arising from, or in consequence of" or "causally connected to" alleged wrongful acts occurring *before* December 15, 2013.  The overwhelming majority of the class members' claims relate to alleged wrongful acts that occurred *after* that date.  Further, Ally's dissemination of notices to class members after December 15, 2013 are neither based upon nor causally connected to Ally's earlier dissemination of notices to the named class claimants (or any other customer for that matter).  Each customer claim involves separate notices sent to different customers at different times in different places on different loans that were independently serviced by Ally.  The sending of a notice to the named class claimants cannot be said to have caused Ally to send notices to other class members related to their individual accounts.  Put another way, what do the repossession notices concerning the named plaintiffs' vehicle have to do with the notices Ally sent to other class members after December

- 2 -

15, 2013 relating to different accounts, different vehicles, and where the repossession and sale occurred several years later?  Nothing.

The policy even anticipated that certain portions of a claim could be covered while other portions would not.  The policy included an allocation clause that required Ally and U.S. Specialty to allocate amounts between covered and noncovered matters, with U.S. Specialty paying the covered matters.  Not only has U.S. Specialty incorrectly sought to use the Prior Acts Exclusion to bar Ally's claim, it has failed to adhere to the Policy's allocation provision.

Accordingly, the Prior Acts Exclusion does not bar coverage for Ally's loss on account of those class-member claims that arose out of alleged defective notices sent *after* December 15, 2013.  Further, given the court-confirmed $787.5 million settlement and the fact that the lion's share of class-member claims are not barred under the exclusion, the Prior Acts Exclusion does not operate to allow U.S. Specialty to escape any of its $15 million policy limits.

## NATURE AND STAGE OF THE PROCEEDINGS

On November 24, 2021, Ally filed this insurance coverage action against U.S. Specialty in the Superior Court of the State of Delaware.[1]  On January 18, 2022, U.S. Specialty removed this action to this Court, pursuant to 28 U.S.C. §§ 1332, 1441 and 1446.[2]  On July 1, 2022, Ally filed an Amended Complaint.[3]  On July 22, 2022, U.S. Specialty filed an Answer and Affirmative Defenses to the Amended Complaint.[4]  Subsequently, upon the parties' stipulation, the Court ordered a briefing schedule for cross-motions for judgment on the pleadings.[5]

---

[1] D.I. 1, Ex. A.  While Ally originally named two additional insurer defendants, Ally subsequently dismissed its claims against those insurers.  *See* D.I. 6 and D.I. 17.
[2] D.I. 1.
[3] D.I. 25.
[4] D.I. 28.
[5] D.I. 30.

## SUMMARY OF ARGUMENT

1.      The Class Action squarely falls within the basic coverage provided by U.S. Specialty's policy, as incorporated from the Federal primary policy.

2.      Nevertheless, U.S. Specialty has denied coverage for Ally's defense costs and settlement liability in the Class Action, claiming that the following Prior Acts Exclusion acts as a get-out-of-jail free card.  The Prior Acts Exclusion states:

> The Company shall not be liable for **Loss** on account of any **Claim** based upon, arising from, or in consequence of:
>
> (1)      any **Wrongful Act** committed, attempted, or allegedly committed or attempted prior to December 15, 2013; or
>
> (2)      any **Wrongful Act** committed, attempted, or allegedly committed or attempted subsequent to December 15, 2013 that is causally connected to a **Wrongful Act** committed, attempted, or allegedly committed or attempted prior to December 15, 2013.

3.      Given its plain language, the exclusion only applies to a customer claim for alleged Wrongful Acts committed by Ally after December 15, 2013 if those alleged Wrongful Acts were "based upon, arising from, or in consequence of" or "causally connected" to acts before that date.

4.      In trying to argue that hundreds of thousands of individual customer communications all are based upon communications as to other customers that took place before December 15, 2013 (the prior acts date), U.S. Specialty ignores that the different definitions in the policy, all of which are insurance-company wording, and which all focus on individual acts to individual customers arising out of individually provided services.  When properly construing the policy language in context and within its reasonable meaning, Ally's dissemination of repossession notices to each customer is a distinct alleged wrongful act.

5.      Further, none of the class-member claims for later-sent repossession notices are "based upon" or "causally connected" to earlier-sent notices to different customers on their

different loans.  This is because Ally's servicing activities as to its customers are independent of

one another, with Ally's decisions and acts varying depending on the unique facts specific to

each particular customer and loan.  In other words, one customer's account has nothing to do

with another customer's account.  No post-December 15, 2013 activity related to Ally's

customers was based upon or causally connected to activity relating to different customers on

different accounts occurring before December 15, 2013.  Thus, the Prior Acts Exclusion does not

apply to Ally's loss on account of any of the class-member claims that arose *after* the prior acts

date.

6.     U.S. Specialty, as a matter of law, has the burden of demonstrating unequivocally

that its construction of the exclusion is the only reasonable construction.  Because U.S. Specialty

cannot meet that burden, Ally is entitled to a declaration that the Prior Acts Exclusion does not

bar coverage for Ally's loss on account of the claims of class members where Ally's alleged

wrongful acts post-date December 15, 2013.

7.     Further, coverage under U.S. Specialty's policy attaches after Ally's loss exceeds

$50 million—the sum of the underlying self-insured retention and the limits of the "primary"

(first) insurance policy in the coverage tower.  Here, given that Ally paid more than $90 million

in cash out of pocket (inclusive of defense costs) and the total value of the settlement alone was

$787.5 million, a simple calculation demonstrates that the Prior Acts Exclusion does not operate

to allow U.S. Specialty to escape any of its $15 million of coverage.

### STATEMENT OF FACTS

**A.     Ally's Automotive Finance Operations**

At all relevant times, Ally (along with its subsidiaries) has been a digital-financial

services company with one of the largest full-service automotive finance operations in the United

States.[6]  As part of these operations, Ally provides consumers with financing for new and used vehicles.[7]  Ally also engages in servicing activities related to auto loans, including: collecting and processing customer payments, responding to customer concerns and inquiries, processing customer requests, engaging in collections activity, and disposing of repossessed vehicles.[8] Collections activity includes: initiating contact with customers who fail to comply with the terms of their auto loans.[9]  Servicing activities as to each customer vary depending on the facts specific to that customer and loan, including the repayment risk of each account.[10]  For instance: (i) the type of collection treatment will vary as an account becomes more delinquent; (ii) the nature and timing of collection activities depends on the repayment risk of the account; (iii) Ally may, on a customer-by-customer basis, offer payment extensions or offer to modify a remaining loan obligation for a customer experiencing temporary financial difficulty; and (iv) the timing of repossession may be impacted by facts specific to each particular customer.[11]

## B.    Ally's Insurance Coverage

Ally purchased a tower of management liability insurance, including bankers professional liability, from Federal Insurance Company ("Federal"), U.S. Specialty, and others for the December 15, 2016 to December 15, 2017 Policy Period.[12]  A "tower" of insurance simply

---

[6] *See, e.g.*, Relevant Excerpts of Ally Financial Inc. Annual Report (Form 10-K) (Feb. 25, 2022) at 5, attached as Exhibit 1.  Courts within the Third Circuit routinely permit judicial notice of public records, including SEC filings.  *See In re Amarin Corp. PLC Sec. Litig.*, 2021 U.S. Dist. LEXIS 59840, at *23 (D.N.J. Mar. 29, 2021) ("The Third Circuit permits a district court to judicially notice SEC filings and public disclosures.").

[7] Ex. 1 at 41.

[8] *See id.* at 58.

[9] *See id.*

[10] *See id.*

[11] *Id.*

[12] *See, e.g.*, D.I. 25, Ex. E at Decls. (ITEM 2) and End. 1; D.I. 25, Ex. F at Decls. (ITEM 5); *see also* D.I. 28, ¶¶ 27, 31 (admitting Exhibits E and F to the Amended Complaint are true and correct copies of the policies, the latter admission on information and belief).

means that different insurance companies will be required to provide coverage at escalating levels of losses incurred by the insured.  The Federal policy was the primary policy in the tower, and generally set forth the terms and conditions for the excess carriers in the tower except as noted.[13]  Ally and Federal have resolved all coverage issues.[14]

## C.  The Federal Primary Policy

Federal issued BPL for Financial Institutions Policy No. 8207-7768 for the period December 15, 2016 to December 15, 2017 (the "Federal Primary Policy").[15]  Once Ally pays the first $25 million of loss, the Federal Primary Policy then provides $25 million in insurance.[16] The Federal Primary Policy contains five Insuring Clauses.  The relevant one for this case is: BPL (Bankers Professional Liability) Services Liability Coverage.

The Insuring Clause of the BPL Services Liability Coverage provides:

> The Company shall pay, on behalf of an **Insured**, **Loss** on account of any **BPL Claim** first made against such **Insured** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **BPL Wrongful Act** committed by an **Insured** or any person for whose acts the **Insured** is legally liable solely while performing **BPL Services**, including failure to perform **BPL Services**.[17]

Ally is an "**Insured**" under the Federal Primary Policy.[18]

The key definitions for the BPL Services Liability Coverage are:

| Term | Definition |
|------|------------|
| **BPL Claim** | ". . . [A] civil proceeding commenced by the service of a complaint . . . brought by or on behalf of a **BPL Customer** against an **Insured** for a **BPL Wrongful Act** . . . ."[19] |

---

[13] *See* D.I. 25, Ex. E at § I, § III.C, Decls. (ITEM 4), and End. 1.
[14] *See* D.I. 25, ¶ 53; *see* D.I. 28, ¶ 53 (admitting U.S. Specialty received a copy of the confidential settlement between Ally and the primary carrier).
[15] D.I. 25, Ex. F at Decls (ITEM 5).
[16] *See id.* at Decls. (ITEMS 2 and 4).
[17] *Id.* at End. 15, ¶ 1.
[18] D.I. 25, ¶ 37; D.I. 28, ¶ 37.
[19] D.I. 25, Ex. F at End. 15, ¶ 2.

| BPL Customer | "[A]ny person or entity that: a. has or had a written agreement with the **Organization**[20] . . . to receive **BPL Services** permitted by law or regulation. . . ."[21] |
|---|---|
| **BPL Services** | "[T]hose services, including **Loan Servicing**, performed or required to be performed by an **Insured** for or on behalf of _a_ **BPL Customer**[.]<br><br> *      *      * <br>**BPL Services** does not include any **Broker-Dealer Services**, **Insurance Services**, **Insurance Agent and Broker Services**, or **Lending Services**."[22] |
| **BPL Wrongful Act** | "[A]ny error, misstatement, misleading statement, act, omission, neglect, or breach of duty that: a.  is committed, attempted, or allegedly committed or attempted, before or during the **Policy Period** by an **Insured** or any person for whose acts the **Insured** is legally liable; and b.  arises solely from the performance of **BPL Services**."[23] |
| **Claim** | "[A]ny **BPL Claim** . . . ."[24] |
| **Loan Servicing** | "[T]he servicing of any loan, lease or extension of credit (whether consumer, commercial, mortgage banking or otherwise, but not including financing for investment banking, or leveraged or management buyouts). . . **Loan Servicing** shall also include, but solely with respect to the servicing of a loan, lease or extension of credit: foreclosure activities, management and preservation of collateral, or administration or liquidation of real estate properties."[25] |
| **Loss** | "[T]he amount that an **Insured** becomes legally obligated to pay on account of any covered **Claim**, including but not limited to damages . . ., judgments, settlements, pre-judgment and post-judgment interest and **Defense Costs**. . . ."[26] |
| **Policy Period** | December 15, 2016 to December 15, 2017.[27] |

The Prior Acts Exclusion in the Federal Primary Policy reads as follows[28]:

---

[20] Ally qualifies as the "**Organization**" as it is the "**Parent Organization**," as named in the Declarations of the Federal Primary Policy.  _See id._ at End. 17, § 2, and Decls. (ITEM 1).
[21] _Id._ at End. 15, ¶ 2.
[22] _Id._ (emphasis added).  While **BPL Services** is defined to exclude, _inter alia,_ "**Lending Services**," that term specifically excludes **BPL Services**, which are the type of professional services at issue here.  _See id._
[23] _Id._
[24] _Id._ at End. 19, ¶ 2.
[25] _Id._ at End. 19, ¶ 3.
[26] _Id._ at End. 19, ¶ 4.
[27] _Id._ at Decls. (ITEM 5).
[28] _Id._ at End. 2.

The Company shall not be liable for **Loss** on account of any **Claim** based upon, arising from, or in consequence of:

(1)     any **Wrongful Act** committed, attempted, or allegedly committed or attempted prior to December 15, 2013; or

(2)     any **Wrongful Act** committed, attempted, or allegedly committed or attempted subsequent to December 15, 2013 that is causally connected to a **Wrongful Act** committed, attempted, or allegedly committed or attempted prior to December 15, 2013.

For purposes of the BPL Services Liability Coverage, "**Claim**" includes any **BPL Claim**[29] and "**Wrongful Act**" includes any **BPL Wrongful Act**.[30]

The Federal Primary Policy also contains an "Allocation" provision, which states:

If both **Loss** covered by this Policy and loss not covered by this Policy are incurred, either because a **Claim** against an **Insured** includes both covered and noncovered matters or because a **Claim** is made against both an **Insured** and others, then the **Insured** and the Company shall allocate such amount between covered **Loss** and noncovered loss based upon the relative legal and financial exposures of the parties to covered and noncovered matters and, in the event of a settlement in such **Claim**, also based upon the relative benefits to the parties from such settlement. The Company shall not be liable under this Policy for the portion of such amount allocated to noncovered loss. . . .[31]

## D.     The U.S. Specialty Policy

U.S. Specialty issued Policy Number 24-MGU-16-A39492 to Ally for the period December 15, 2016 to December 15, 2017 (the "U.S. Specialty Policy") for a $1,581,903 premium.[32]  The U.S. Specialty Policy is a first-layer excess policy providing $15 million in coverage after Ally or Federal pay $50 million in self-insured retention and underlying limits.[33] The U.S. Specialty Policy generally adopts the Federal Primary Policy's terms and provisions.[34]

---

[29] *Id.* at End. 19, ¶ 2.

[30] *Id.* at End. 19, ¶ 6.

[31] *Id.* at § 10.

[32] D.I. 25, ¶ 27; D.I. 28, ¶ 27; *see also* D.I. 25, Ex. E at Decls. (ITEMS 2 and 5).

[33] D.I. 25, Ex. E at § I, Decls. (ITEMS 3 and 4), End. 1, and End. 4; D.I. 25, Ex. F at Decls. (ITEMS 2 and 4).  In other words, U.S. Specialty is obligated to pay for covered **Loss** starting at $50 million of **Loss** and up to $65 million of **Loss**.

[34] *See* D.I. 25, Ex. E at § I.

E.      **The Underlying Class Action**

In March 2016, Ally filed suit against Alberta Haskins and David Duncan in connection

with a deficiency balance owing on their joint auto-finance account.[35]  That civil action was

styled *Ally Financial Inc. v. Alberta Haskins and David Duncan*, Case No. 16JE-AC01713 in the

Circuit Court of Jefferson County, Missouri.[36]  In March 2017, Haskins and Duncan brought a

consumer class action counterclaim (the "Class Action") against Ally (the **BPL Claim**), seeking

damages for alleged violations of the Uniform Commercial Code ("UCC") and Missouri

Chapters 408 and 365.[37]  The customers alleged that Ally sent non-compliant presale and post-

sale notices to each putative class member before and after their personal property (a motor

vehicle) was repossessed and sold.[38]  The gist of the claim was that Ally told the customers that

they had to pay their accumulated arrearage in certified funds to get their vehicle back after

repossession.[39]  In 2018, the Missouri court certified the case as a class action.[40]

While admitting no liability, Ally settled the Class Action on March 17, 2021.[41]  The

Settlement Agreement created two classes, which included customers receiving alleged defective

repossession notices from Ally anywhere between 2003 and 2021, depending on state-specific

---

[35] *See* Petition on Deficiency dated Mar. 30, 2016 in *Ally Financial Inc. v. Alberta Haskins and David Duncan,* Case No. 16JE-AC01713 (Mo. Cir. Ct., Jefferson Cty.), attached as Exhibit 2.
[36] *Id.*
[37] D.I. 25, ¶¶ 2, 12 and Ex. A at Counterclaim; D.I. 28, ¶ 12 (admitting on information and belief that Exhibit A to the Amended Complaint is a true and correct copy of the Counterclaim).  Once the Counterclaim was filed, the case number was changed by adding an "01" designation: 16JE-AC01713-01.
[38] *See* D.I. 25, ¶ 12 and Ex. A at Counterclaim, pp. 3-4, ¶¶ 2, 4 and p. 5, ¶ 6.
[39] *See id.* at Counterclaim, p. 11, ¶¶ 42-43.
[40] *See* Order dated May 9, 2018 in *Ally Financial Inc. v. Alberta Haskins and David Duncan*, Case No. 16JE-AC01713-01 (Mo. Cir. Ct., Jefferson Cty.), attached as Exhibit 3.
[41] D.I. 25, ¶ 14; D.I. 28, ¶ 14 (admitting on information and belief that Exhibit B to the Amended Complaint is a true and correct copy of the Settlement Agreement).

statutes of limitations for the asserted claims.[42]  The class member data used by the settlement administrator confirms that the classes consisted of more than 555,000 different customers, each of whom alleged receipt of purportedly defective notices based upon repossession-sales dates between November 20, 2003 and March 19, 2021.  Over 80 percent of the claims alleged misconduct with respect to repossession sales occurring *after* the prior acts date.[43]

Ally's **Loss** in connection with the Class Action settlement consists of the following:

| Amount | Description |
| --- | --- |
| More than $3 million | **Defense Costs**[44] |
| $87.5 million | Cash payment, divided as follows:<br>• $71.2 million paid to counsel for the Classes for fees and costs;<br>• $16.3 million paid in cash to the Classes[45] |
| $700 million | Additional compensatory damages as a result of Ally's forgiveness of $700 million in outstanding deficiency balances on individual customer accounts[46] |

The Missouri court approved the settlement on September 8, 2021, finding that the Settlement Agreement was "*fair, reasonable, and adequate.*"[47]  The court also determined that

---

[42] *See* D.I. 25, ¶¶ 15, 17-20; D.I. 25, Ex. B at ¶¶ 2.10, 3.1-3.4; D.I. 25, Ex. D; *see also* Redacted Confidential Settlement Administration Data, attached as Exhibit 4 (redacted to protect confidential personal identifying information).

[43] D.I. 25, ¶¶ 21, 54; *see also* Ex. 4.  Ally does not believe this data is subject to dispute, but in any event, resolution of any factual issues is not necessary for the Court to construe the relevant contractual language.

[44] D.I. 25, ¶ 25.  The Federal Primary Policy defines "**Defense Costs**," in relevant part, as "that part of **Loss** consisting of reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses . . . incurred in defending, investigating or appealing any **Claim** . . . ."  D.I. 25, Ex. F at End. 25.

[45] D.I. 25, ¶ 22; D.I. 25, Ex. B, at ¶ 4.1; D.I. 25, Ex. C, at ¶ 16; D.I. 28, ¶ 16 (admitting on information and belief that Exhibit C to the Amended Complaint is a true and correct copy of the Amended Final Approval Order in the Class Action).

[46] D.I. 25, ¶ 22; D.I. 25, Ex. B, at ¶ 4.2.

[47] D.I. 25, Ex. C, at ¶ 8 (emphasis added).

the $71.2 million in fees and costs awarded to Class counsel was reasonable, especially in light of the amount of the benefit conferred on the classes:

> The Court finds and concludes that the [$71.2 million] Fee Award and Cost Award to Class Counsel for work and services for the Litigation and settlement is reasonable, and regarding this finding, specifically finds: . . .
>
> b. Through their settlement negotiations, and by obtaining preliminary and final approval of the Agreement, Class Counsel and Class Representatives achieved exceptional results on behalf of the Classes *with the total quantifiable benefit conferred on the Classes exceeding $787,500,000. . . .*[48]

## F.    U.S. Specialty's Wrongful Denial of Coverage

Ally made a claim upon U.S. Specialty for coverage under its policy for covered **Loss** on account of the Class Action.[49]  U.S. Specialty has never challenged whether the Class Action meets the definition of a **BPL Claim**.[50]  Instead, U.S. Specialty wrongly claims that the Prior Acts Exclusion bars all coverage for the Class Action, even for loss in connection with the claims of the more than 450,000 customer-class members who received alleged defective notices *after* the prior acts date.[51]  U.S. Specialty erroneously relies on the dates of the notices to Haskins and Duncan (and a small percentage of other class members) as well as an improper reading and application of the exclusionary language.[52]  U.S. Specialty wrongly argues that because Ally's communications with the customer-class members were based on form repossession notices, the exclusion operates to bar coverage for each individual customer communication.[53]

---

[48] *Id.* at ¶ 16 (emphasis added).
[49] *See* D.I. 25, ¶ 61.
[50] D.I. 25, ¶ 51; D.I. 28, ¶ 51.
[51] *See* D.I. 28, Second Defense at p. 17.
[52] *See* D.I. 25, ¶¶ 65, 67; *see also* U.S. Specialty's Letter dated Feb. 28, 2021, attached as Exhibit 5, at 3; U.S. Specialty's Letter dated Oct. 25, 2021, attached as Exhibit 6, at 3, 5.
[53] *See* Ex. 6 at 3, 5.

## ARGUMENT

**A.    Legal Standards**

### i.    Motion for Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) permits a party to seek judgment on the pleadings when there are no material issues of fact and the moving party demonstrates that it is entitled to judgment as a matter of law.[54]  Courts may consider the pleadings, exhibits thereto, documents incorporated by reference, and public records subject to judicial notice.[55]

### ii.    Principles of Insurance Policy Construction

Under Delaware law,[56] "insurance contracts should be interpreted as providing broad coverage to align with the insured's reasonable expectations."[57]  Policy exclusions are construed strictly and narrowly against the insurance company, and must be "specific, clear, plain, conspicuous and not contrary to public policy."[58]  Exclusions are not read to eviscerate the coverage the insured reasonably expects, and must be construed as part of the policy as a whole

---

[54] *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005).

[55] *See Reynolds v. Del. State Univ.*, 2020 U.S. Dist. LEXIS 111894, at *4 (D. Del. June 25, 2020) (report and recommendation); *Southmark Prime Plus, L.P. v. Falzone*, 776 F. Supp. 888, 891-92 (D. Del. 1991) (noting court "may take judicial notice of additional facts where appropriate" in deciding motion for judgment on the pleadings); *see also MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) ("On a motion to dismiss, we may take judicial notice of matters of public record outside the pleadings.").

[56] Because the Court's jurisdiction is based upon diversity of citizenship, the Court must follow the prevailing Delaware rules to resolve any conflict of law questions.  *See SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022) ("In exercising diversity jurisdiction, a federal court employs the choice-of-law principles of its forum state to determine which substantive law governs whether a party is entitled to judgment as a matter of law.").  For purposes of the matters at issue in this Motion, there does not appear to be any relevant conflict between the law of Delaware—the state where Ally is incorporated—and the law of Michigan—the state where Ally's principal place of business is located.  *See* D.I. 25, ¶ 7.  Therefore, Ally will apply Delaware law. *See, e.g.*, *KT4 v. Palantir Techs.*, 2021 Del. Super. LEXIS 502, at *32-33 (Del. Super. Ct. June 24, 2021) (finding that Delaware law—the law of the forum—applies where there is no conflict between the laws of potentially applicable states).

[57] *RSUI Indem. Co. v. Murdock*, 248 A.3d 887, 906 (Del. 2021).

[58] *Id.* (internal quotation marks omitted).

so that all provisions in the policy have meaning.[59]   The insurance company bears the burden of proof on all coverage exclusions regardless of where within the policy the exclusion appears.[60]

Undefined phrases in insurance policies are given their plain and ordinary meaning, and Delaware courts routinely refer to dictionary definitions to determine the common meaning of undefined policy terms.[61]   In the event policy language is ambiguous, it must be strictly construed against the insurance company and in favor of coverage.[62]   In other words, "if there is more than one reasonable interpretation of an insurance policy, Delaware courts apply the interpretation that favors coverage."[63]

**B.      The Class Action is covered under the U.S. Specialty Policy.**

The Class Action clearly falls within the U.S. Specialty Policy's basic insuring agreement.  First, the Class Action Counterclaim filed in March 2017 is a **BPL Claim**, as it was brought within the U.S. Specialty Policy Period by two **BPL Customers**—Haskins and Duncan—on behalf of a putative class for alleged **BPL Wrongful Acts** committed by Ally while performing **BPL Services**—the dissemination of purportedly defective repossession notices in connection with servicing the customers' joint auto-finance loan.[64]

---

[59] *See, e.g.*, *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992) ("Under general principles of contract law, a contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless."); *see, e.g.*, *Alstrin v. St. Paul Mercury Ins. Co.*, 179 F. Supp. 2d 376, 399 (D. Del. 2002) (applying Delaware and Illinois law) (refusing to apply exclusion to securities coverage at issue where it would eviscerate coverage for the majority of securities claims).
[60] *See Murdock*, 248 A.3d at 906.
[61] *See, e.g.*, *Evraz Claymont Steel, Inc., NA v. Harleysville Mut. Ins. Co.*, 2011 Del. Super. LEXIS 539, at *11 n.31 (Del. Super. Ct. Nov. 30, 2011); *see, e.g.*, *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract.").
[62] *Monzo v. Nationwide Prop. & Cas. Ins. Co.*, 249 A.3d 106, 118 (Del. 2021).
[63] *Id.*
[64] *See* notes 19, 21-23, *supra*.

- 14 -

Second, because Ally has shown that its **Loss** falls within coverage, U.S. Specialty has

the burden to show a coverage exclusion applies to escape its obligation.[65]  U.S. Specialty relies

primarily on the Prior Acts Exclusion.[66]  Its reliance on this exclusion is inappropriate.[67]

**C.      The Prior Acts Exclusion does not bar coverage under the U.S. Specialty Policy for Ally's Loss.**

The Prior Acts Exclusion at issue reads as follows:[68]

> The Company shall not be liable for **Loss** on account of any **Claim** based upon, arising from, or in consequence of:
>
> (1)      any **Wrongful Act** committed, attempted, or allegedly committed or attempted prior to December 15, 2013; or
>
> (2)      any **Wrongful Act** committed, attempted, or allegedly committed or attempted subsequent to December 15, 2013 that is causally connected to a **Wrongful Act** committed, attempted, or allegedly committed or attempted prior to December 15, 2013.

For purposes of the BPL Services Liability Coverage, the term "**Wrongful Act**" means

**BPL Wrongful Acts**.[69]

**i.      The repossession notices are distinct as to each customer and each customer's claim must be considered separately.**

As noted earlier, U.S. Specialty asserts that the Prior Acts Exclusion bars coverage for

the entire underlying settlement.  In arguing that hundreds of thousands of individual customer

communications all are based upon communications as to other customers that took place before

December 15, 2013, U.S. Specialty ignores that the different definitions in the policy all focus on

individual acts to individual customers arising out of individually provided services; U.S.

---

[65] *See Murdock*, 248 A.3d at 906.
[66] *See* D.I. 28, Second Defense at p. 17.
[67] Only the Prior Acts Exclusion is the focus of this Motion.
[68] D.I. 25, Ex. F at End. 2.
[69] *Id.* At End. 19, ¶6.

Specialty is trying to connect separate acts that do not share the requisite connection under the exclusionary language.

U.S. Specialty also ignores that a class action is a mechanism that allows a multiplicity of actual and potential individual lawsuits to be resolved together in order to promote judicial efficiency.[70]  The Class Action here was one litigation, but that litigation resolved a multitude of customer claims.  The policy language demands that each of those customer claims must be considered separately for purposes of the Prior Acts Exclusion.

The Federal Primary Policy defines a **BPL Wrongful Act** as follows:[71]

> **BPL Wrongful Act** means any error, misstatement, misleading statement, act, omission, neglect, or breach of duty that:
>
> a.    is committed, attempted, or allegedly committed or attempted, before or during the **Policy Period** by an **Insured** or any person for whose acts the **Insured** is legally liable; and
>
> b.    arises solely from the performance of **BPL Services**.

There is nothing in the above definition that evinces an intent to tie together separate wrongful acts or individual claims based on separate wrongful acts.  This is reinforced when considering the term alongside the definition of **BPL Services**: "services, including **Loan Servicing**, performed or required to be performed by an **Insured** *for or on behalf of a* **BPL Customer**."[72]  The only reasonable construction of the definitions is that coverage was intended to be provided for claims for specific acts—**BPL Wrongful Acts**—taken with regard to an individual customer—a **BPL Customer**—committed by Ally while performing **BPL Services**. **BPL Customer** is defined again in the singular: as "any person or entity" that has or had a

---

[70] The Class Actions Law Review (Camilla Sanger ed., Law Business Research Ltd., 4th ed. 2020) at 212.

[71] D.I. 25, Ex. F at End. 15, ¶ 2.

[72] *Id.* (emphasis added).

written agreement with Ally.[73]  Each of the relevant definitions focuses on the individual customer, service, or act.

As is evident from the Counterclaim, and as all understand from their own personal car buying experiences, communications between a servicer and a customer regarding a retail auto loan are always customer specific. What Ally allegedly says or does not say to customer X in 2017, for example, is not connected to, and does not arise out of, communications that Ally allegedly had with customer Y five years previously.  These communications involve different loans, different time periods, different vehicles, and different **BPL Wrongful Acts**.

The Class Action Counterclaim is based on separate **BPL Wrongful Acts** allegedly directed to each putative class member, and more than 80 percent of the class-member claims involved alleged **BPL Wrongful Acts** that occurred *after* the December 15, 2013 prior acts date.[74]  Thus, more than 450,000 of the approximately 555,000 class-member claims allege solely post-December 15, 2013 **BPL Wrongful Acts**.[75]  In seeking to eliminate all coverage, U.S. Specialty ignores that separate repossession notices were sent on different dates to individual customers based on their different loans.

### ii.     The repossession notices Ally sent to one class member did not "arise out of" or "cause" Ally to send repossession notices to another class member.

While U.S. Specialty bears the burden to establish an exclusion, it is clear as a matter of law that neither prong of the exclusion can properly be construed to apply to these facts.

---

[73] *See id.*
[74] *See* Ex. 4.
[75] *Id.*

a.  **Paragraph (i) of the Prior Acts Exclusion does not apply to the later customer claims because *none* of those claims are "based upon, arising from, or in consequence of" any earlier-sent repossession notices.**

The relevant inquiry in paragraph (i) is whether any class-member claim concerning notices sent after December 15, 2013 (post-December 15, 2013 **BPL Wrongful Acts**) is "based upon, arising from, or in consequence of" any notices sent to other customers before December 15, 2013 (pre-December 15, 2013 **BPL Wrongful Acts**).  As explained below, they are not.

The Federal Primary Policy does not define the phrase "based upon, arising from, or in consequence of."  Merriam-Webster Dictionary contains the following relevant definitions:

| Term | Definition |
|------|-----------|
| Basis | "something on which something else is established or based"[76] |
| Arise | "to originate from a source"[77] |
| In Consequence | "as a result"[78] |

Taken together, the plain meaning of the phrase "based upon, arising from, or in consequence of" thus necessarily requires U.S. Specialty to demonstrate that notices sent after the prior acts date are "based upon," "originate from," or are a "result of" notices sent to different customers before the prior acts date.

In *Sycamore Partners Management, LP v. Endurance American Insurance Co.*, the court considered application of two identical pending and prior litigation exclusions, which contained the same "based upon, arising from, or in consequence of" language as the Prior Acts Exclusion here and concluded it meant "originate in.[79]

---

[76] *See* https://www.merriam-webster.com/dictionary/basis.
[77] *See* https://www.merriam-webster.com/dictionary/arise.
[78] *See* https://www.merriam-webster.com/dictionary/in%20consequence.
[79] 2021 Del. Super. LEXIS 584, at *9-10 (Del. Super. Ct. Sept. 10, 2021).  The pending and prior litigation exclusions at issue applied to claims "based upon, arising from, or in consequence of any demand, suit, or other proceeding pending, or order, decree or judgment entered against any

- 18 -

*Sycamore Partners* involved the consideration of several policy provisions and exclusions in the context of two sets of claims against the subject insured: (1) creditor claims; and (2) prior stockholder derivative lawsuits.[80]  The court held, *inter alia*, that the policies' pending and prior litigation exclusions (which are far broader than the Prior Acts Exclusion here) did not apply to bar coverage for the later creditor claims because they involved different "Wrongful Acts" and thus the later claims did not "originate in" the factual circumstances that "formed" the prior stockholder suits.[81]  Given the different "Wrongful Acts" at issue, the court found that the "Wrongful Acts" integral to the prior suits "were not necessary for sustaining" the later claims.[82]  In reaching this conclusion, the court noted: "Had the Wrongful Acts underlying the [prior suits] never occurred, [the] creditors still would have been able to bring the [later claims.]"[83]  Thus, the court found the pending and prior litigation exclusions did not apply.[84]

Here, none of the class-member claims based on post-December 15, 2013 notices "originated" from any notices previously sent to other customers.  In the language of *Sycamore Partners*, the Counterclaim contains no allegations that any of Ally's pre-December 15, 2013 communications were "necessary for sustaining" later communications with different customers in the context of their unique loans.[85]  That is because each class member's claim is, by definition, based on *different* repossession notices: separate communications specific to that

---

Insured prior to December 31, 2016, or the same or substantially the same fact, circumstance or situation underlying or alleged therein."  *Id.* at *9-10, 41.

[80] *See id.* at *8-10, 12-13, 17-19.

[81] *Id.* at *34-35, 41-42.  The court's determination regarding the pending and prior litigation exclusions was based on the same reasons it set out regarding the policies' "Interrelated Claims Provision," which used similar "arising from" language.

[82] *Id.* at *36.

[83] *Id.*

[84] *Id.* at *41-42.

[85] *See generally* D.I. 25, Ex. A at Counterclaim.

particular customer's account.  The Counterclaim acknowledges the separation of each customer's loan and includes allegations recognizing that each customer had a distinct contract serviced by Ally.[86]  Further, Ally's servicing activities as to its customers are independent of one another, with Ally's decisions and actions varying depending on the unique facts specific to each particular customer and loan.[87]  Because each **BPL Wrongful Act** was made in independently servicing a particular customer's loan, the later class-member claims do not "originate" from earlier **BPL Wrongful Acts** as to other customers.

Where a notice sent to one class member after December 15, 2013 would still have been sent irrespective of whether Ally sent an earlier notice to a different class member regarding his different loan before December 15, 2013, the notices to each customer have no requisite connection to each other.  An act as to one customer could not have "originated" from or "formed" the basis of an act as to a different customer if the subsequent act would still have occurred in the absence of the prior act.[88]

> **b.** **Paragraph (ii) of the Prior Acts Exclusion does not apply because *none* of the later-sent repossession notices are "causally connected" to any earlier-sent repossession notices.**

Similarly, under the express language of paragraph (ii) of the Prior Acts Exclusion, unless the later-sent repossession notices are causally connected to the earlier-sent notices, the exclusion has no application.  A later repossession notice to one customer is *not* causally connected to an earlier repossession notice to a different customer on a different account.  If

---

[86] *See, e.g.*, *id.* at Counterclaim, pp. 3-4, ¶¶ 2, 4 and pp. 9-10, ¶¶ 35(a), 37(a) (alleging each customer/putative class member had a "loan or financing agreement" with Ally and that Ally sent allegedly defective notices to each putative class member).
[87] Ex. 1 at 58.
[88] *See Sycamore Partners*, 2021 Del. Super. LEXIS 584, at *36.

notice to the later customer would have been sent regardless of whether notice to the earlier customer was sent, then the earlier notice did not cause the later notice.

Federal did not define the phrase "causally connected" in its Primary Policy. Dictionaries contain the following relevant definitions:

| Term | Definition |
|------|------------|
| Causal | "expressing or indicating cause;"[89]<br><br>"if there is a causal connection or relationship between two events, one event causes the other"[90] |
| Cause | "something that brings about an effect or a result"[91] |

Thus, based on the plain meaning of the policy language, in order for a later-sent repossession notice to be "causally connected" to an earlier-sent repossession notice, the earlier communication must have caused or brought about the subsequent communication.

Federal courts have similarly defined "causally connected" in the context of insurance policy provisions. For instance, in *Professional Solutions Insurance Co. v. Mohrlang*, a Colorado federal court was confronted with interpreting a "related acts or omissions" provision, which had the potential to limit coverage under the circumstances.[92] The subject policy defined "related acts or omissions" to include "all acts or omissions in the rendering of professional services that are temporally, logically or *causally connected* by any common fact, circumstance, situation, transaction, event, advice or decision."[93] The court found that, "in common usage," the phrase "causally connected" means:

> connected where one person or thing brings about the other. *See* Merriam-Webster's Collegiate Dictionary 196 (11th ed. 2007) (defining "cause" as "something that brings about an effect or a result"). Therefore, for two things to

---

[89] *See* https://www.merriam-webster.com/dictionary/causal.
[90] *See* https://www.macmillandictionary.com/us/dictionary/american/causal.
[91] *See* https://www.merriam-webster.com/dictionary/cause.
[92] 2009 U.S. Dist. LEXIS 14187, at *10-11 (D. Colo. Feb. 10, 2009).
[93] *Id.* at *10 (emphasis added).

be causally connected, one must bring about the other.  Moreover, the common understanding of causation requires more than a "but-for" relationship between two things – if not for the first thing, the second would not have occurred.  Rather, it describes a situation where the first thing leads to the second in a direct and traceable way, and where no independent, significant thing interrupts the causal chain between the two.[94]

*Mohrlang* involved insurance coverage for two malpractice claims against an insured attorney.  The first malpractice claim concerned the attorney's negligent structuring of the sale of a business.  The second malpractice claim asserted a breach of the attorney's fiduciary duty in advising a different client to release a promissory note related to that business.[95]

The insurance company argued that the two alleged acts of malpractice—the inadequate sale documents and release of the promissory note—were related claims, and thus subject to a single policy limit.[96]  The court disagreed.  In relevant part, the court found that the acts of malpractice were not "causally connected" because the sale of the business was not the cause of the insured's breach of his fiduciary duties to the client concerning the promissory note.[97]  "Rather, the independent decision by the Insured, influenced by the interests of the new owners of [the business], was an independent, significant interruption to the causal chain between the sale and the Insured's breaches of his fiduciary duties to [the client]."[98]

Similar to *Mohrlang*, with regard to part (ii) of the exclusion, Ally's pre-December 15, 2013 acts of sending repossession notices to certain of its customers did not *cause* Ally to later send repossession notices to *different* customers on their *different* loan accounts, let alone in a direct and uninterrupted causal chain.  Indeed, as noted above, the Counterclaim expressly

---

[94] *Id.* at *32-33; *see also Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 810-812 (10th Cir. 2009) (citing *Mohrlang* and noting that *Mohrlang* court "defined causally connected as 'where one person or thing brings about the other,'" but deciding issue on different basis).
[95] *Mohrlang*, 2009 U.S. Dist. LEXIS 14187, at *2-8.
[96] *See id.* at *10-11.
[97] *Id.* at *36.
[98] *Id.*

- 22 -

acknowledges the separation of each customer's loan.[99]  Further, the Counterclaim contains *no* allegations that Ally's act of sending a purportedly defective notice to one class member on that customer's defaulted auto loan "caused" or "brought about" Ally's subsequent act of sending an allegedly defective notice to a different class member relating to his or her separate defaulted auto loan.[100]  Nor could the Counterclaim have credibly done so given that Ally's servicing activities as to its customers are independent of one another, with Ally's decisions and actions varying depending on the unique facts specific to each particular customer and loan.[101]  Ally's communications with each customer were independent acts made solely on the basis of each particular customer's loan account, and were not caused by Ally's decisions to send notices to any other customer relating to that customer's distinct loan.

By way of a more concrete example, consider two hypothetical class members who received allegedly defective notices, one before December 15, 2013 ("Class Member A") and one after ("Class Member B").  These class members had different accounts with Ally.  Ally separately serviced those accounts, and engaged in servicing activities based on the facts unique to each of those customers and loans, and irrespective of Ally's servicing activities on any other customer's loan.[102]  Given the independent servicing of these two accounts, Ally's acts of sending notices to Class Member A did not result in Ally later taking similar, but separate actions of sending notices to Class Member B.  That is because the actions are completely

---

[99] *See* note 86, *supra*.
[100] *See generally* D.I. 25, Ex. A at Counterclaim.
[101] *See* Ex. 1 at 58.
[102] *See id.*

independent of one another, and thus the first action did not "lead[] to the second in a direct and traceable way. . . ."[103]

### c.    U.S. Specialty should not escape any of its $15 million limits of liability to cover a portion of Ally's nearly $800 million Loss.

As previously set forth, Ally's **Loss** in connection with the Class Action, including **Defense Costs**, was more than $790.5 million.[104]  The court overseeing the Class Action confirmed the Settlement Agreement was "fair, reasonable, and adequate" and found "the total quantifiable benefit conferred on the Classes exceed[ed] $787,500,000."[105]  Coverage under the U.S. Specialty Policy attaches after Ally's **Loss** exceeds $50 million—the sum of the underlying self-insured retention and the limits of the Federal Primary Policy.[106]  Ally has, thus, paid **Loss** far in excess of the underlying $50 million dollars of coverage/retention.

For all of the reasons above, the Prior Acts Exclusion by its terms does *not* apply to any of the class-member claims based on repossession notices sent after December 15, 2013.  Those claims comprise more than 80 percent of the claims at issue in the Class Action.  Thus, even if the Class Action involves both covered and noncovered matters, the policy, through the Allocation provision,[107] specifically contemplates that U.S. Specialty would *not* escape providing coverage.  Rather, U.S. Specialty still must pay the *covered matters*.  U.S. Specialty's failure to

---

[103] *See Mohrlang*, 2009 U.S. Dist. LEXIS 14187, at *32-33.  While Ally believes its interpretation of the Prior Acts Exclusion is the only reasonable one, to the extent the Court were to determine the exclusion is ambiguous, Ally's interpretation would still prevail.  That is because ambiguities must be construed in favor of Ally.  *See Monzo*, 249 A.3d at 118.
[104] *See* notes 44-46, *supra*.
[105] D.I. 25, Ex. C, at ¶¶ 8, 16.
[106] *See* D.I. 25, Ex. E at § I, Decls. (ITEMS 3 and 4), and End. 1; D.I. 25, Ex. F at Decls. (ITEMS 2 and 4).
[107] *See* D.I. 25, Ex. F at § 10.

make any effort to allocate is contrary to both the spirit and letter of the exclusionary language and allocation provision.

Given that Ally paid more than $90 million in cash out of pocket and the total value of the settlement alone was $787.5 million, a simple calculation confirms that if the Court construes the Prior Acts Exclusion as drafted, and properly gives effect to the definition of **BPL Wrongful Acts** as acts directed to a specific customer, the Prior Acts Exclusion does not operate to allow U.S. Specialty to escape any of its $15 million of coverage.

<u>**CONCLUSION**</u>

For the reasons set forth above, this Court should grant Ally's Motion for Judgment on the Pleadings and enter judgment in Ally's favor on: (i) Count I of Ally's Amended Complaint; and (ii) U.S. Specialty's Second Affirmative Defense.  In this regard, the Court should also declare that: (i) the Prior Acts Exclusion does not as a matter of law bar coverage for any class-member claim in the Class Action that was based on repossession notices sent after December 15, 2013; and (ii) the Prior Acts Exclusion does not as a matter of law operate to allow U.S. Specialty to escape any of its $15 million of coverage.

Dated:  September 30, 2022

OF COUNSEL:

REED SMITH LLP
David M. Halbreich (admitted *pro hac vice*)
355 South Grand Avenue
Suite 2900
Los Angeles, CA  90071
Telephone: (213) 457-8000
Email:  dhalbreich@reedsmith.com

Respectfully submitted,

REED SMITH LLP

*/s/ Brian M. Rostocki*
Brian M. Rostocki (No. 4599)
Anne M. Steadman (No. 6221)
1201 Market Street, Suite 1500
Wilmington, DE 19801
Telephone:  (302) 778-7500
Email:  brostrocki@reedsmith.com
Email:  asteadman@reedsmith.com

*Counsel for Plaintiff Ally Financial, Inc.*

Courtney C.T. Horrigan (admitted *pro hac vice*)
Douglas Baker (admitted *pro hac vice*)
Robert J. Tritschler (admitted *pro hac vice*)
225 Fifth Avenue
Pittsburgh, PA  15222
Telephone: (412) 288-3131
Email:  chorrigan@reedsmith.com
Email:  douglas.baker@reedsmith.com
Email:  rtritschler@reedsmith.com

Miranda A. Jannuzzi (admitted *pro hac vice*)
Three Logan Square
1717 Arch Street, Ste. 3100
Philadelphia, PA  19103
Telephone: (215) 851-8100
Email:  mjannuzzi@reedsmith.com