# EXHIBIT 1

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

**Form 10-K**

☑     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2021, or

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number: 1-3754

# ALLY FINANCIAL INC.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **38-0572512** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**Ally Detroit Center
500 Woodward Ave.
Floor 10, Detroit, Michigan
48226**
(Address of principal executive offices)
(Zip Code)

**(866) 710-4623**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.01 per share | ALLY | NYSE |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer ☑ | Accelerated filer ☐ | Non-accelerated filer ☐ | Smaller reporting company ☐ |
| | | | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☑

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☑

The aggregate market value of the Registrant's common stock (Common Stock) held on June 30, 2021 by non-affiliated entities was approximately $18.1 billion (based on the June 30, 2021 closing price of Common Stock of $49.84 per share as reported on the New York Stock Exchange). At February 23, 2022, the number of shares outstanding of the Registrant's common stock was 333,195,505 shares.

Documents incorporated by reference: portions of the Registrant's Proxy Statement for the annual meeting of stockholders to be held on May 3, 2022, are incorporated by reference in this Form 10-K in response to Items 10, 11, 12, 13, and 14 of Part III.

1

Table of Contents

# Part I

Ally Financial Inc. • Form 10-K

## Item 1.   Business

## Our Business

Ally Financial Inc. (together with its consolidated subsidiaries unless the context otherwise requires, Ally, the Company, or we, us, or our) is a leading digital financial-services company with $182.1 billion in assets as of December 31, 2021. As a customer-centric company with passionate customer service and innovative financial solutions, we are relentlessly focused on "Doing it Right" and being a trusted financial-services provider to our consumer, commercial, and corporate customers. We are one of the largest full-service automotive finance operations in the United States and offer a wide range of financial services and insurance products to automotive dealerships and consumers. Our award-winning digital direct bank (Ally Bank, Member FDIC and Equal Housing Lender) offers mortgage lending, point-of-sale personal lending, consumer credit cards, and a variety of deposit and other banking products, including savings, money-market, and checking accounts, CDs, and IRAs. Additionally, we offer securities-brokerage and investment-advisory services through Ally Invest. Our corporate-finance business offers capital for equity sponsors and middle-market companies.

We are a Delaware corporation and are registered as a BHC under the BHC Act, and an FHC under the GLB Act. Our primary business lines are Dealer Financial Services, which is composed of our Automotive Finance and Insurance operations, Mortgage Finance, and Corporate Finance. Corporate and Other primarily consists of centralized corporate treasury activities, the management of our legacy mortgage portfolio, the activity related to Ally Invest, Ally Lending, and reclassifications and eliminations between the reportable operating segments. Additionally, beginning in December 2021 with the acquisition of Fair Square, which we rebranded Ally Credit Card, financial information related to our credit card business is included within Corporate and Other. Ally Bank's assets and operating results are included within our Automotive Finance, Mortgage Finance, and Corporate Finance segments, as well as Corporate and Other, based on its underlying business activities. As of December 31, 2021, Ally Bank had total assets of $172.8 billion, and total nonaffiliate deposits of $141.6 billion.

Our long-term strategic objectives are centered around differentiating our company as a relentless ally for the financial well-being of our consumer, commercial, and corporate customers by (1) leveraging our "Do it Right" purpose-driven culture as we drive enhanced value for our customers, communities, employees, and stockholders, (2) growing and diversifying our leading automotive, insurance, and digital-bank platforms through increased scale and expanded product solutions, (3) driving ongoing customer growth and relationship deepening, (4) operating under efficient, disciplined risk management and capital allocation approaches, (5) out-executing our competition and creating differentiated advantages through continuous investment and evolution among our leading experiences, products, and brand, and (6) delivering long-term value evident through sustainable financial results and stockholder returns. We seek to extend our leading position in automotive finance in the United States by continuing to provide automotive dealers and their retail customers with premium service, a comprehensive product suite, consistent funding, and competitive pricing—reflecting our commitment to the automotive industry. Within our Automotive Finance and Insurance operations, we are also focused on strengthening our network of dealer relationships and pursuing digital distribution channels for our products and services, including through our operation of a direct-lending platform and our work with dealers innovating in digital transactions—all while maintaining an appropriate level of risk appetite. Within our other banking operations—including Mortgage Finance and Corporate Finance—we seek to expand our consumer and commercial banking products and services while providing a high level of customer service. Ally Lending currently serves medical, retail, and home improvement service providers by enabling promotional and fixed rate installment-loan products through a digital application process at point-of-sale. We continue to focus on delivering significant and sustainable growth and retention in deposit customers and balances while optimizing our cost of funds. At Ally Invest, we seek to augment our securities-brokerage and investment-advisory services to more comprehensively assist our customers in managing their savings and wealth. Additionally, we acquired Fair Square in December 2021, which provides us with a scalable, digital-first credit card platform, and advances our evolution as a leading digital consumer bank. Ally Credit Card (formerly Fair Square) features leading-edge technology, and a proprietary, analytics-based underwriting model. We believe the addition of credit card to our suite of products enhances our ability to grow and deepen both new and existing customer relationships.

Unless the context otherwise requires, the following definitions apply. The term "loans" means the following consumer and commercial products associated with our direct and indirect financing activities: loans, retail installment sales contracts, lines of credit, and other financing products excluding operating leases. The term "operating leases" means consumer- and commercial-vehicle lease agreements where Ally is the lessor and the lessee is generally not obligated to acquire ownership of the vehicle at lease-end or compensate Ally for the vehicle's residual value. The terms "lend," "finance," and "originate" mean our direct extension or origination of loans, our purchase or acquisition of loans, or our purchase of operating leases as applicable. The term "consumer" means all consumer products associated with our loan and operating-lease activities and all commercial retail installment sales contracts. The term "commercial" means all commercial products associated with our loan activities, other than commercial retail installment sales contracts. The term "partnerships" means business arrangements rather than partnerships as defined by law.

For further details and information related to our business segments and the products and services they provide, refer to the MD&A in Part II, Item 7 of this report, and Note 26 to the Consolidated Financial Statements.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

## Overview

Ally Financial Inc. (together with its consolidated subsidiaries unless the context otherwise requires, Ally, the Company, we, us, or our) is a digital financial-services company committed to its promise to "Do It Right" for its consumer, commercial, and corporate customers. Ally is composed of an industry-leading independent automotive finance and insurance operation, an award-winning digital direct bank (Ally Bank, Member FDIC and Equal Housing Lender, which offers mortgage lending, point-of-sale personal lending, and a variety of deposit and other banking products), a consumer credit card business, a corporate finance business for equity sponsors and middle-market companies, and securities brokerage and investment advisory services. A relentless ally for all things money, Ally helps people save well and earn well, so they can spend for what matters. We are a Delaware corporation and are registered as a BHC under the BHC Act, and an FHC under the GLB Act.

## Our Business

### Dealer Financial Services

Dealer Financial Services is composed of our Automotive Finance and Insurance segments. Our primary customers are automotive dealers, which are independently owned businesses. A dealer may sell or lease a vehicle for cash but, more typically, enters into a retail installment sales contract or operating lease with the customer and then sells the retail installment sales contract or the operating lease and the leased vehicle, as applicable, to Ally or another automotive-finance provider. The purchase by Ally or another provider is commonly described as indirect automotive lending to the customer.

Our Dealer Financial Services business is one of the largest full-service automotive finance operations in the country and offers a wide range of financial services and insurance products to automotive dealerships and their customers. We have deep dealer relationships that have been built throughout our over 100-year history, and we are leveraging competitive strengths to expand our dealer footprint. Our dealer-centric business model encourages dealers to use our broad range of products through incentive programs like our Ally Dealer Rewards program. Our automotive finance services include purchasing retail installment sales contracts and operating leases from dealers, extending automotive loans directly to consumers, offering term loans to dealers, financing dealer floorplans and providing other lines of credit to dealers, supplying warehouse lines to automotive retailers, offering automotive-fleet financing, providing financing to companies and municipalities for the purchase or lease of vehicles, and supplying vehicle-remarketing services. We also offer retail VSCs and commercial insurance primarily covering dealers' vehicle inventories. We are a leading provider of VSCs, GAP, and VMCs.

### *Automotive Finance*

Our Automotive Finance operations provide U.S.-based automotive financing services to consumers, automotive dealers, other businesses, and municipalities. Our dealer-focused business model, value-added products and services, full-spectrum financing, and business expertise proven over many credit cycles make us a premier automotive finance company. At December 31, 2021, our Automotive Finance operations had $103.7 billion of assets and generated $5.5 billion of total net revenue in 2021. For consumers, we provide financing for new and used vehicles. In addition, our CSG provides automotive financing for small businesses and municipalities. At December 31, 2021, our CSG had $8.6 billion of loans outstanding. Through our commercial automotive financing operations, we fund dealer purchases of new and used vehicles through wholesale floorplan financing. We manage commercial account servicing on approximately 2,700 dealers that utilize our floorplan inventory lending or other commercial loans. We serviced $84.8 billion consumer loan and operating leases at December 31, 2021, and our commercial automotive loan portfolio was approximately $16.1 billion at December 31, 2021. The extensive infrastructure, technology, and analytics of our servicing operations as well as the experience of our servicing personnel enhance our ability to minimize our loan losses and enable us to deliver a favorable customer experience to both our dealers and retail customers. During 2021, we continued to reposition our origination profile to focus on capital optimization and risk-adjusted returns. In 2021, total consumer automotive originations were $46.3 billion, an increase of $11.1 billion compared to 2020. The shorter-term duration consumer automotive loan and variable-rate commercial loan portfolios offer attractive asset classes where we continue to optimize risk-adjusted returns through origination mix management and pricing and underwriting discipline.

Our success as an automotive finance provider is driven by the consistent and broad range of products and services we offer to dealers. The automotive marketplace is dynamic and evolving, including substantial investments in electrification by automobile manufacturers and suppliers. Ally remains focused on meeting the needs of both our dealer and consumer customers and continuing to strengthen and expand upon the approximately 21,100 dealer relationships we have. We continue to identify and cultivate relationships with automotive retailers including those with leading eCommerce platforms. We also operate Clearlane, our online direct-lending platform, which provides a digital platform for consumers seeking direct financing. We believe these actions will enable us to respond to the growing trends for a more streamlined and digital automotive financing process to serve both dealers and consumers. Furthermore, our strong and expansive dealer relationships, comprehensive suite of products and services, full-spectrum financing, and depth of experience position us to evolve with future shifts in automobile technologies, including electrification. Ally has and continues to provide automobile financing for hybrid and battery-electric vehicles today, and is well positioned to remain a leader in automotive financing as we believe the vast majority of these vehicles will be sold through dealerships with whom we have an established relationship.

The Growth channel was established to focus on developing dealer relationships beyond those relationships that primarily were developed through our previous role as a captive finance company for GM and Stellantis. The Growth channel was expanded to include direct-to-consumer financing through Clearlane and other channels and our arrangements with online automotive retailers. We have established relationships with thousands of Growth channel dealers through our customer-centric approach and specialized incentive programs designed to drive loyalty amongst dealers to our products and services. The success of the Growth channel has been a key enabler in

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

### Servicing

We have historically serviced all retail contracts and operating leases we originated. However, our expansion into direct-to-consumer lending and other relationships have resulted in the employment of third-party servicers for a small portion of the portfolio. On occasion, we have sold a portion of the retail contracts we originated through whole-loan sales and securitizations, but generally retained the right to service and earn a servicing fee for our servicing functions.

Servicing activities consist largely of collecting and processing customer payments, responding to customer concerns and inquiries, processing customer requests (including those for payoff quotes, total-loss handling, and payment modifications), maintaining a perfected security interest in the financed vehicle, engaging in collections activity, and disposing of off-lease and repossessed vehicles. Servicing activities are generally consistent across our Automotive Finance operations; however, certain practices may be influenced by state laws.

Our customers have the option to receive monthly billing statements and remit payment by mail or through electronic fund transfers, or to establish online web-based account administration through Ally Auto Online Services. Customer payments are processed by regional third-party processing centers that electronically transfer payment information to customers' accounts.

Collections activity includes initiating contact with customers who fail to comply with the terms of the retail contract or operating lease agreement by sending reminder notices or contacting customers via various channels when an account becomes 3 to 7 days past due. The type of collection treatment and level of intensity increases as the account becomes more delinquent. The nature and timing of these activities depend on the repayment risk of the account.

During the collections process, we may offer a payment extension to a customer experiencing temporary financial difficulty. A payment extension enables the customer to delay monthly payments for 30, 60, or 90 days. Extensions granted to a customer typically do not exceed 90 days in the aggregate during any 12-month period or 180 days in aggregate over the life of the contract. During the extension period, finance charges continue to accrue. If the customer's financial difficulty is not temporary but we believe the customer is willing and able to repay their loan at a lower payment amount, we may offer to modify the remaining obligation, extending the term and lowering the scheduled monthly payment. In those cases, the outstanding balance generally remains unchanged. The use of extensions and modifications helps us mitigate financial loss. Extensions may assist in cases where we believe the customer will recover from short-term financial difficulty and resume regularly scheduled payments. Modifications may also be utilized in cases where we believe customers can fulfill the obligation with lower payments over a longer period. Before offering an extension or modification, we evaluate and take into account the capacity of the customer to meet the revised payment terms. Generally, we believe extensions that fall within our policy guidelines to represent more than an insignificant delay in payment, and therefore, they are not considered a TDR. Although the granting of an extension could delay the eventual charge-off of an account, typically we are able to repossess and sell the related collateral, thereby mitigating the loss. At December 31, 2021, 18.8% of the total amount outstanding in the servicing portfolio had been granted an extension or was rewritten, compared to 30.9% at December 31, 2020. This decrease was largely due to the impacts caused by the COVID-19 pandemic and our related relief-programs to support our customers during the year ended December 31, 2020. These programs have since been terminated.

Subject to legal considerations, we generally begin repossession activity once an account is at least 90 days past due. Repossession may occur earlier if we determine the customer is unwilling to pay, the vehicle is in danger of being damaged or hidden, or the customer voluntarily surrenders the vehicle. Approved third-party repossession vendors handle the repossession activity. Generally, after repossession, the customer is given a period of time to redeem the vehicle or reinstate the contract by paying off the account or bringing the account current, respectively. If the vehicle is not redeemed or the contract is not reinstated, the vehicle is sold at auction. Generally, the proceeds do not cover the unpaid balance, including unpaid earned finance charges and allowable expenses, and the resulting deficiency is charged-off. Asset recovery centers pursue collections on accounts that have been charged-off, including those accounts where the vehicle was repossessed, and skip accounts where the vehicle cannot be located.

Our total consumer automotive serviced portfolio, as well as our consumer automotive on-balance-sheet serviced portfolio, was $84.8 billion and $80.2 billion at December 31, 2021, and 2020, respectively.

### Remarketing and Sales of Leased Vehicles

When we acquire an operating lease, we assume ownership of the vehicle from the dealer. Neither the consumer nor the dealer is responsible for the value of the vehicle at the time of lease termination. When vehicles are not purchased by customers or the receiving dealer at scheduled lease termination, the vehicle is returned to us for remarketing. We generally bear the risk of loss to the extent the value of a leased vehicle upon remarketing is below the expected residual value. Conversely, we may recognize a remarketing gain when the proceeds from a returned vehicle are greater than the expected residual value. Our ability to efficiently process and effectively market off-lease vehicles affects the disposal costs and the proceeds realized from vehicle sales. Our methods of vehicle sales at lease termination primarily include the following:

- **Sale to dealer** — After the lessee declines an option to purchase the off-lease vehicle, the dealer who accepts it has the opportunity to purchase it directly from us at a price we define.

- **Internet auctions** — Once the lessee and the dealer decline to purchase the off-lease vehicle, we offer it to dealers and other third parties through our proprietary internet site (SmartAuction). Through SmartAuction, we seek to maximize the net sales proceeds from an off-lease vehicle by reducing the time between vehicle return and ultimate disposition, reducing holding costs, and broadening the number of prospective buyers. We use SmartAuction for our own vehicles and make it available for third-party use.

Ally Financial Inc. • Form 10-K

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized, this 25th day of February, 2022.

**Ally Financial Inc.**
**(Registrant)**

/S/ JEFFREY J. BROWN

Jeffrey J. Brown
*Chief Executive Officer*

Pursuant to the requirements of the Securities Exchange Act of 1934, this Annual Report on Form 10-K has been signed below by the following persons on behalf of the Registrant and in the capacities indicated, this 25th day of February, 2022.

| | |
|---|---|
| /S/ JEFFREY J. BROWN | /S/ JENNIFER A. LACLAIR |
| Jeffrey J. Brown | Jennifer A. LaClair |
| *Chief Executive Officer* | *Chief Financial Officer* |

/S/ DAVID J. DEBRUNNER

David J. DeBrunner
*Vice President, Controller, and Chief Accounting Officer*

205

Ally Financial Inc. • Form 10-K

| /S/ FRANKLIN W. HOBBS |
| --- |

Franklin W. Hobbs
*Ally Chairman*

| /S/ KENNETH J. BACON |
| --- |

Kenneth J. Bacon
*Director*

| /S/ MAUREEN A. BREAKIRON-EVANS |
| --- |

Maureen A. Breakiron-Evans
*Director*

| /S/ JEFFREY J. BROWN |
| --- |

Jeffrey J. Brown
*Chief Executive Officer and Director*

| /S/ WILLIAM H. CARY |
| --- |

William H. Cary
*Director*

| /S/ MAYREE C. CLARK |
| --- |

Mayree C. Clark
*Director*

| /S/ KIM S. FENNEBRESQUE |
| --- |

Kim S. Fennebresque
*Director*

| /S/ MARJORIE MAGNER |
| --- |

Marjorie Magner
*Director*

| /S/ BRIAN H. SHARPLES |
| --- |

Brian H. Sharples
*Director*

| /S/ JOHN J. STACK |
| --- |

John J. Stack
*Director*

| /S/ MICHAEL F. STEIB |
| --- |

Michael F. Steib
*Director*

206

# EXHIBIT 2

**16JE-AC01713**

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

### IN THE CIRCUIT COURT OF JEFFERSON COUNTY, MISSOURI
### ASSOCIATE DIVISION

| | | |
|---|---|---|
| Ally Financial Inc. f/k/a GMAC , | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. |
| | ) | |
| v. | ) | Division No. |
| | ) | |
| ALBERTA HASKINS, | ) | |
| DAVID DUNCAN, | ) | |
| | ) | |
| *Defendant(s)* | ) | |
| | ) | |

#### PETITION ON DEFICIENCY

Plaintiff Ally Financial Inc. f/k/a GMAC , by counsel, states the following as its Petition against Defendant(s) ALBERTA HASKINS DAVID DUNCAN :

1.  Plaintiff is a legal entity organized pursuant to law.

2.  Defendant(s) (is) (are) believed to reside in the county in which this action is brought.

3.  *Jurisdiction and venue are proper because the Defendant(s) resides in this county.*

4.  Defendant(s) executed a Retail Installment Contract and Security Agreement ("Contract") to purchase a vehicle ("Vehicle") which assigned all rights to the Plaintiff herein for good value received. (Exhibit A)

5.  Pursuant to the Contract, Defendant(s) agreed to pay monthly installments. Defendant(s) breached the Contract by failure to pay as agreed.

6.  Upon breach by Defendant(s), Plaintiff sent a Notice of Right to Cure to Defendant(s). Defendant(s) failed to cure the default within the time specified in the Notice. Plaintiff exercised its rights to accelerate the balance due and from the Defendant(s) with the entire balance due and owing. (Exhibit B1).

7.  Defendant(s) failed to cure as allowed under governing law, as a result Plaintiff exercised its rights and regained possession of the vehicle.

8.  After repossession but prior to the sale of the collateral, Plaintiff mailed Defendant(s) notice of repossession and intent to sell collateral. (Exhibit B2)

9.  Thereafter, Plaintiff sold the Vehicle under UCC Article 9.

10. The Vehicle's sale was conducted in a commercially fair and reasonable manner, and Defendant(s) has not objected to the sale.

11. After all just credits and setoffs, including a credit for sale of the Vehicle, there is an unpaid deficiency balance due and owing Plaintiff in the amount of $3,953.81, which is $3,953.81 principal and $.00 interest . (Exhibit C. Affidavit).

WHEREFORE Plaintiff respectfully prays for judgment against Defendant(s) in the amount of $3,953.81, plus interest at the statutory rate, for a total of $3,953.81 plus costs of this action, and for any other relief deemed just and proper.

Respectfully submitted,

Ally Financial Inc. f/k/a GMAC

By: 
Katherine M. Garringer MO#65917
Thomas R. Ryczek          #64132
Matthew W. Parker #68671

14840437                                      pmautodf.wpd

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

Jonathan M. Craig MO#68016
Michael J. Schilling MO#67686
Brumbaugh & Quandahl, P.C.
106 West 11th Street, Suite 1260
Kansas City, Missouri 64105
(800) 887-4747 phone
(816) 817-0915 fax
bqmo@bqlaw.com
ATTORNEY FOR PLAINTIFF

pmauto.frm
Def - MO 1/16



14840437                    pmautodf.wpd

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

RETAIL INSTALMENT SALE CONTRACT
**GMAC FLEXIBLE FINANCE PLAN**

Contract Number   G127 37919

| Buyer's Name and Address (Include County and Zip Code) | Creditor (Seller Name and Address) |
|---|---|
| DAVID DUNCAN<br>5681 MEADOW DRIVE<br>HILLSBORO MO 63050 | SAPAUGH MOTORS INC.<br>1507 MCNUTT RD<br>HERCULANEUM MO 63048-0667 |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle described below for cash or on credit. By signing this contract, you agree to buy the vehicle on credit under the agreements on the front and back of this contract. The Annual Percentage Rate may be negotiable with the Creditor. This contract is figured on a daily basis at the Annual Percentage Rate on the unpaid balance of the Amount Financed.

Description of Vehicle. You agree to buy and the Creditor agrees to sell the following vehicle

| New or Used | Year | Make and Model | Body Type | Vehicle Identification No. | Primary Use For Which Purchased |
|---|---|---|---|---|---|
| USED | 2006 | CHEVROLET TRUCK COLORADO | | 757388 | personal / agriculture / business |

### FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate | FINANCE CHARGE<br>The dollar amount the credit will cost you | Amount Financed<br>The amount of credit provided to you or on your behalf | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled | Total Sale Price<br>The total cost of your purchase on credit, including your downpayment of $2212.51 |
|---|---|---|---|---|
| 12.25 % | $6395.86 | $17509.49 | $23905.35 | $26117.86 |

Your Payment Schedule Will Be:

| Number of Payments | Amount of Payments | When Payments Are Due | Or as Follows |
|---|---|---|---|
| 63 | 379.45 | Monthly beginning 04/15/2008 | |

Late Charge. If a payment due is more than $25 and is not received in full within 15 days after it is due, you will pay a late charge of 5% of the part of the payment that is late, with a minimum charge of $10 and a maximum charge of $25.

Prepayment. If you pay off all your debt early you will not have to pay a penalty.

Security Interest. You are giving a security interest in the vehicle being purchased.

Additional Information. See the other side of this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date, and security interest.

**ITEMIZATION OF AMOUNT FINANCED**

| | | |
|---|---|---|
| 1 Cash Price (including any accessories, services, and taxes) | | $16995.00 (1) |
| 2 Total Downpayment of | | |
| Gross trade-in $ 6500.00 | Payoff by seller $ 5687.49 | |
| Net tradein $ 812.51 | Cash $ 1400.00 | |
| Other (Describe) $ N/A | | |
| Year Make Model | | |
| Net Trade-in is $ 1999 CHEVROLET TAHOE | | $2212.51 (2) |
| 3 Unpaid Balance of Cash Price (1 minus 2) | | $14782.49 (3) |
| 4 Other Charges including Amounts Paid to Others on Your Behalf (Seller may be keeping part of these amounts) | | |
| A Cost of Required Physical Damage Insurance Paid to the Insurance Company Below Covering Damage to the Vehicle | $ N/A | |
| B Cost of Optional Mechanical Repair Insurance Paid to the Insurance Company Named Below Covering Certain Mechanical Repairs | $ N/A | |
| C Cost of Optional Credit Insurance Paid to the Insurance Company or Companies Named Below Life $ N/A  Disability, Accident and Health $ N/A | $ N/A | |
| D Official Fees Paid to Government Agencies | $ N/A | |
| E Taxes Not Included in Cash Price | $ N/A | |
| F Government License and/or Registration Fees (Describe) | $ N/A | |
| G Government Certificate of Title Fees | $ N/A | |
| H Other Charges (Seller must identify who and receive payment) SVC CONTRACT $1600.00 | $ 1919.00 | |
| to N/A for N/A | $ N/A | |
| to SAPAUGH MOTORS INC. for GAP PROTECTION | $ 699.00 | |
| to N/A for N/A | $ N/A | |
| to SAPAUGH MOTORS INC. for PROCESSING FEE | $ 109.00 | |
| to N/A for N/A | $ N/A | |
| I Net trade-in payoff to | | |
| Total Other Charges and Amounts Paid to Others on Your Behalf | | $ 2727.00 (4) |
| 5 Amount Financed (Unpaid Balance) (3 + 4) | | $ 17509.49 (5) |

THE INSURANCE, IF ANY, REFERRED TO IN THIS CONTRACT DOES NOT INCLUDE COVERAGE FOR BODILY INJURY AND PROPERTY DAMAGE CAUSED TO OTHERS.

See the other side of this contract for other important agreements, including your agreement to give the Creditor a security interest in insurance premiums and proceeds.

**Notice to the Buyer.**

Do not sign this contract before you read it or if it contains any blank spaces. You are entitled to an exact copy of the contract you sign. Under the law you have the right to pay off in advance the full amount due to and obtain a partial refund of the Finance Charge.

*The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.*

| Buyer Signs X [signature] | Date 03/05/08 |
|---|---|

Co-Buyers and Other Owners—A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the terms of the security interest given to the Creditor in this contract.

| Other owner signs here X | Date 03/05/08 |
|---|---|
| Creditor Signs X [signature] | By X | Title |

Seller assigns its interest in this contract to ☒ GMAC ☐ ___ under the terms of Seller's agreement(s) with assignee.

Assigned with recourse / Assigned without recourse or with limited recourse

SAPAUGH MOTORS INC.

2108 FR MO 4/2007 (For use in the State of Missouri)
Copyright 2008 GMAC. All Rights Reserved.

Notice: See Other Side

ORIGINAL



EXHIBIT "A"

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

**OTHER IMPORTANT AGREEMENTS**

**Finance Charge.** The Finance Charge is figured on a daily basis at the Annual Percentage Rate on the unpaid balance of the Amount Financed. The Creditor will apply each payment first to the earned and unpaid part of the Finance Charge and then to the unpaid balance of the Amount Financed.

**Late Payments and Early Payments.** The amounts shown on the front of the contract for the Finance Charge, Total of Payments and the Total Sale Price are based on the assumption that you will make every payment on the day it is due. Your Finance Charge, Total of Payments and Total Sale Price will be more if you pay late and less if you pay early. If all your scheduled payments are equal, changes will take the form of more or fewer payments of the same amount, with a smaller final payment. If your final scheduled payment is larger than your earlier scheduled payments, changes will take the form of a larger or smaller final payment. The Creditor will send you a notice before the due date of the final scheduled payment. The notice will show the amount of the unpaid balance and the new payment schedule.

**Ownership and Risk of Loss.** You agree to pay the Creditor all you owe under this contract even if the vehicle is damaged, destroyed or missing. You agree not to remove the vehicle from the United States or Canada, or to sell, rent, lease or otherwise transfer any interest in the vehicle or this contract without the Creditor's written permission. You agree not to expose the vehicle to misuse, seizure, or confiscation, or other involuntary transfer, even if the vehicle was not the subject of judicial or administrative action. You will make sure the Creditor's security interest (lien) on the vehicle is shown on the title. If the Creditor pays any repair bills, storage bills, taxes, fines, or other charges on the vehicle, you agree to repay the amount when the Creditor asks for it.

**Security Interest.** You give the Creditor a security interest in (1) the vehicle and all parts or goods installed in it, (2) all money or goods received (proceeds) for the vehicle, (3) all insurance, maintenance, service, or other contracts the Creditor finances for you, and (4) all proceeds from insurance, maintenance, service, or other contracts the Creditor finances for you. This includes any refunds of premiums or charges from the contracts. This secures payment of all you owe on this contract. It also secures your other agreements in this contract.

**Prepayment.** You may prepay the unpaid balance of the Amount Financed in full or in part at any time without penalty. If you do so, you must pay the earned and unpaid part of the Finance Charge and all other earned amounts due up to the date of payment.

**Required Physical Damage Insurance.** You agree to have physical damage insurance covering loss or damage to the vehicle for the term of this contract. Unless you provide the Creditor with evidence of the insurance coverage required by this contract, the Creditor may buy insurance at your expense to protect the Creditor's interests in your vehicle. This insurance may, but need not, protect your interests. The coverage that the Creditor buys may not pay any claim that you make or any claim that is made against you in connection with the vehicle. You may later cancel any insurance the Creditor buys, but only after providing the Creditor with evidence that you have obtained insurance required by this contract. If the Creditor buys insurance for the vehicle, you will be responsible for the costs of that insurance, including the insurance premium, finance charges and any other charges the Creditor may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to your total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance you may be able to obtain on your own.

If the Creditor buys insurance for the vehicle, you must pay a finance charge on the premium at the Annual Percentage Rate shown on the front of this contract. You agree to pay the premium and finance charge in equal installments with the payments shown on the payment schedule.

If the vehicle is lost or damaged, you agree that the Creditor may use any insurance settlement to reduce what you owe or repair the vehicle.

**Late Charge.** You will have to pay a late charge on each payment received by the Creditor more than fifteen days late. The charge is shown on the front. Acceptance of a late payment or late charge does not excuse your late payment or mean that you can keep making payments after they are due. The Creditor may also take the steps set forth below if there is any late payment.

**Optional Insurance, Maintenance, Service, or Other Contracts.** This contract may contain charges for optional insurance, maintenance, service, or other contracts. If the Creditor repossesses the vehicle, the Creditor may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle. If the vehicle is a total loss because it is confiscated, damaged, or stolen, the Creditor may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.

**Insurance, Maintenance, Service, or Other Contract Charges Returned to Creditor.** If the Creditor gets a refund of insurance, maintenance, service or other contract charges, you agree that the Creditor may subtract the refund from what you owe.

**Required Repayment in Full Before the Scheduled Date.** If you fail to pay any payment when due, if a proceeding in bankruptcy, receivership or insolvency is started by you or against you or your property, or if you break any of the agreements in this contract that significantly impair the Creditor's prospect of payment, performance, or ability to realize upon the collateral (default), the Creditor can demand that you pay all you owe on this contract at once (not just past due payments), after giving you any notice required by law. The amount you owe will be the unpaid balance of the Amount Financed plus the earned and unpaid part of the Finance Charge, any late charges, and, as allowed by law, any amounts due because you did not keep contract promises.

**Repossession of the Vehicle for Failure to Pay.** Repossession means that, if you fail to pay according to the payment schedule or if you break any of the agreements in this contract (default), the Creditor can take the vehicle from you, after giving you any notice required by law. To take the vehicle the Creditor can enter your property, or the property where it is stored, so long as it is done peacefully. If there is any personal property in the vehicle, such as clothing, the Creditor can store it for you. Any accessories, equipment or replacement parts will remain with the vehicle.

**Getting the Vehicle Back After Repossession.** If the Creditor repossesses the vehicle, you have the right to get it back (redeem) by paying the entire amount you owe on the contract (not just past due payments). The amount you owe will be the unpaid balance of the Amount Financed plus the earned and unpaid part of the Finance Charge, any late charges, and all other earned amounts due, including the cost of taking and storing the vehicle and other expenses that the Seller or the Creditor has had. To the extent allowed by law, you must also cure any default in addition to nonpayment of what you owe. Your right to redeem will end when the vehicle is sold.

**Sale of the Repossessed Vehicle.** The Creditor will send you a written notice of sale at least 10 days before selling the vehicle. If you do not redeem the vehicle by the date on the notice, the Creditor can sell it. The Creditor will use the net proceeds of the sale to pay all or part of your debt.

The net proceeds of sale will be figured this way: Any late charges and any charges for taking and storing the vehicle, cleaning and advertising etc., and any attorney fees and court costs will be subtracted from the selling price.

If you owe the Creditor less than the net proceeds of sale, the Creditor will pay you the difference, unless required to pay it to someone else. For example, the Creditor may be required to pay a lender who has given you a loan and also taken a security interest in the vehicle.

If you owe more than the net proceeds of sale, you will pay the Creditor the difference between the net proceeds of sale and what you owe when the Creditor asks for it. If you do not pay this amount when asked, you may also be charged interest at the highest lawful rate until you do pay all you owe to the Creditor.

**Collection Costs.** If the Creditor hires an attorney to collect what you owe, you will pay the attorney's reasonable fee and any court costs. The attorney's fee will not exceed 15% of the amount that you owe.

**Delay in Enforcing Rights and Changes of this Contract.** The Creditor can delay or refrain from enforcing any of its rights under this contract without losing them. For example, the Creditor can extend the time for making some payments without extending others. Any change in terms of this contract must be in writing and signed by the Creditor. No oral changes are binding. If any part of the contract is not valid, all other parts will remain enforceable.

**Warranties Seller Disclaims.** You understand that the Seller is not offering any warranties and that there are no implied warranties of merchantability, of fitness for a particular purpose, or any other warranties, express or implied by the Seller, covering the vehicle unless the Seller extends a written warranty or service contract within 90 days from the date of this contract.

An implied warranty of merchantability generally means that the vehicle is fit for the ordinary purpose for which such vehicles are generally used. A warranty of fitness for a particular purpose is a warranty that may arise when the Seller has reason to know the particular purpose for which you require the vehicle and you rely on the Seller's skill or judgment to furnish a suitable vehicle.

This provision does not affect any warranties covering the vehicle which may be provided by the vehicle manufacturer.

**Used Car Buyers Guide.** The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.

**Spanish Translation:**
Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

The preceding NOTICE applies only to goods or services obtained primarily for personal, family, or household use. In all other cases, Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against the Seller, or against the manufacturer of the vehicle or equipment obtained under this contract.

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM



P.O. BOX 380902
BLOOMINGTON MN 55438-0902

August 3, 2012

PHONE: 1-888-925-2559

ALBERTA HASKINS
9681 MEADOW DR
HILLSBORO MO 63050



Re: Account Number : ▓▓▓▓▓7919
Retail Installment Sale Contract

Dear ALBERTA HASKINS:

$764.06 is the AMOUNT NOW DUE.

August 27, 2012 is the LAST DAY FOR PAYMENT.

You are late in making your payment(s).  If you pay the AMOUNT NOW DUE  (above) by the LAST DAY FOR PAYMENT (above), you may continue with the contract as though you were not late.  If you do not pay by this date, we may exercise our rights under the law.

If you voluntarily surrender possession of the following specified collateral,  you could still owe additional money after the money received from the sale of the collateral is deducted from the total amount you owe.

2008 CHEV ▓▓▓▓▓▓▓▓8257388

If you are late again in making your payments, we may exercise our rights without sending you another notice like this one.  Although we may have accepted late payments from you previously, if your remaining payments are not made on a timely basis, Ally intends to pursue its default remedies, which may include repossession.

If you have any questions, please write or contact us at the number above Monday through Friday from 8:00 AM to 6:00 PM ET.

Sincerely,
Ally Financial



EXHIBIT
"B1"

TRD

GCURE MO2 01 (Rev. 10/04)                                                                                                    495279-00134

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM



P.O. BOX 380902
BLOOMINGTON MN 55438-0902

August 3, 2012

PHONE: 1-888-925-2559

DAVID DUNCAN
9397 ELM LOOP DR
PEVELY MO 63070

Re: Account Number : ████████7919
Retail Installment Sale Contract

Dear DAVID DUNCAN:

$764.08 is the AMOUNT NOW DUE.

August 27, 2012 is the LAST DAY FOR PAYMENT.

You are late in making your payment(s). If you pay the AMOUNT NOW DUE (above) by the
LAST DAY FOR PAYMENT (above), you may continue with the contract as though you were
not late. If you do not pay by this date, we may exercise our rights under the law.

If you voluntarily surrender possession of the following specified collateral, you could still owe
additional money after the money received from the sale of the collateral is deducted from the
total amount you owe.

2006 CHEV ██████████257388

If you are late again in making your payments, we may exercise our rights without sending you
another notice like this one. Although we may have accepted late payments from you
previously, if your remaining payments are not made on a timely basis, Ally intends to pursue
its default remedies, which may include repossession.

If you have any questions, please write or contact us at the number above Monday through
Friday from 8:00 AM to 6:00 PM ET.

Sincerely,
Ally Financial

TRD

GCURE MO2 01 (Rev. 10/04)                                                                                495279-00135

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM



P.O. Box 380903
Bloomington, MN 55438-0903
(877) 845-8862



September 20, 2012

ALBERTA HASKINS
9681 MEADOW DR
HILLSBORO, MO  63050



## NOTICE OF OUR PLAN TO SELL PROPERTY

Subject: Account Number ▓▓▓▓▓7919

We have your vehicle (a 2006 CHEV COLORADO with VIN ▓▓▓▓▓▓257388), because you broke promises in our agreement.

We will sell your vehicle at private sale sometime after October 5, 2012.  A sale could include a lease.

The money that we get from the sale (after paying our costs) will reduce the amount you owe.  If we get less money than you owe, you will still owe us the difference.  If we get more money than you owe, you will get the extra money, unless we must pay it to someone else.

You can get the property back at any time before we sell it by paying us the full amount you owe (not just the past due payments), including our expenses.  To learn the exact amount you must pay, call us at the telephone number at the top of this letter.

If you want us to explain to you in writing how we have figured the amount that you owe us, you may call us at the telephone number at the top of this letter or write us at the address at the top of this letter and request a written explanation.

If you need more information about the sale, call us at the telephone number at the top of this letter, or write us at the address at the top of this letter.

We are sending this notice to the following other people who have an interest in your vehicle or who owe money under your agreement:

None



EXHIBIT
"B2"

#511956-00092

ALBERTA HASKINS
7919
September 20, 2012
Page 2

**Additional information:**

As of the date of this letter, you can get your vehicle back by paying the total amount indicated below. The amount of finance charges you owe will increase each day you pay after the date of this letter.

| | | |
|---|---|---|
| Unpaid balance | $ | 5,990.15 |
| Earned and unpaid finance charge | + | 210.63 |
| Unearned insurance premium* | - | 49.86 |
| Other credits | - | 0.00 |
| Late charges | + | 67.61 |
| Expenses (Retaking and holding the vehicle $380.00) | + | 380.00 |
| TOTAL | $ | 6,598.53 |

The longer you wait, the more you may have to pay to get your vehicle back. Only reasonable expenses may be charged. They must be the direct result of taking, storing, and selling the vehicle. We may also charge you the costs of getting it ready for sale and reasonable attorney fees, as the law permits. If you do not get your vehicle back by the end of the day on September 30, 2012, we intend to apply for a repossession title in our name. You will still be able to get your vehicle back anytime before we sell it as described above even after we apply for and receive a repossession title in our name.

You must pay the amount required in certified funds.

Your vehicle will be at ABC St. Louis, 721 S 45th St, Centreville, IL, 62207 until you do what is required to get it back or we move it in preparation for sale.

We must send you any extra money owed to you from the sale of your vehicle within a reasonable time. If you do not get the money, you may have the right to sue for it plus any penalties fixed by law.

If you do not do what is required to get your vehicle back, we will cancel any physical damage insurance or service contract that is part of your contract. Make sure any other coverage you no longer want is canceled. Call the insurance company or the dealer to do this. You have a right to credit for any refunds.

Contact us at the telephone number at the top of this letter for more information about getting your vehicle back.

Sincerely,
Ally Financial

*The insurance premium rebate is for credit insurance if it was part of your contract. It is also for any limited physical damage insurance.

511956-00092

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

**ally**

P.O. Box 380903
Bloomington, MN 55438-0903
(877) 845-8862

September 20, 2012

DAVID DUNCAN
9397 ELM LOOP DR
PEVELY, MO 63070





## NOTICE OF OUR PLAN TO SELL PROPERTY

Subject:  Account Number ███████7919

We have your vehicle (a 2006 CHEV COLORADO  with VIN ███████████257388), because you broke promises in our agreement.

We will sell your vehicle at private sale sometime after October 5, 2012.  A sale could include a lease.

The money that we get from the sale (after paying our costs) will reduce the amount you owe.  If we get less money than you owe, you will still owe us the difference.  If we get more money than you owe, you will get the extra money, unless we must pay it to someone else.

You can get the property back at any time before we sell it by paying us the full amount you owe (not just the past due payments), including our expenses.  To learn the exact amount you must pay, call us at the telephone number at the top of this letter.

If you want us to explain to you in writing how we have figured the amount that you owe us, you may call us at the telephone number at the top of this letter or write us at the address at the top of this letter and request a written explanation.

If you need more information about the sale, call us at the telephone number at the top of this letter, or write us at the address at the top of this letter.

We are sending this notice to the following other people who have an interest in your vehicle or who owe money under your agreement:

None

#511956-00093

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

DAVID DUNCAN
7919
September 20, 2012
Page 2

**Additional information:**

As of the date of this letter, you can get your vehicle back by paying the total amount indicated below. The amount of finance charges you owe will increase each day you pay after the date of this letter.

| | | |
|---|---|---|
| Unpaid balance | $ | 5,990.15 |
| Earned and unpaid finance charge | + | 210.63 |
| Unearned insurance premium* | – | 49.86 |
| Other credits | – | 0.00 |
| Late charges | + | 67.61 |
| Expenses (Retaking and holding the vehicle $380.00) | + | 380.00 |
| TOTAL | $ | 6,598.53 |

The longer you wait, the more you may have to pay to get your vehicle back. Only reasonable expenses may be charged. They must be the direct result of taking, storing, and selling the vehicle. We may also charge you the costs of getting it ready for sale and reasonable attorney fees, as the law permits. If you do not get your vehicle back by the end of the day on September 30, 2012, we intend to apply for a repossession title in our name. You will still be able to get your vehicle back anytime before we sell it as described above even after we apply for and receive a repossession title in our name.

You must pay the amount required in certified funds.

Your vehicle will be at ABC St. Louis, 721 S 45th St, Centreville, IL, 62207 until you do what is required to get it back or we move it in preparation for sale.

We must send you any extra money owed to you from the sale of your vehicle within a reasonable time. If you do not get the money, you may have the right to sue for it plus any penalties fixed by law.

If you do not do what is required to get your vehicle back, we will cancel any physical damage insurance or service contract that is part of your contract. Make sure any other coverage you no longer want is canceled. Call the insurance company or the dealer to do this. You have a right to credit for any refunds.

Contact us at the telephone number at the top of this letter for more information about getting your vehicle back.

Sincerely,
Ally Financial

*The insurance premium rebate is for credit insurance if it was part of your contract. It is also for any limited physical damage insurance.

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

ALLY FINANCIAL INC. F/K/A GMAC,
Plaintiff,

vs.

ALBERTA HASKINS and DAVID DUNCAN,
Defendants

*14840437*
*MO*

## AFFIDAVIT AS TO AMOUNTS DUE AND OWING
## AND MILITARY SERVICE OF DEFENDANT(S)

STATE OF TEXAS
COUNTY OF DENTON

BEFORE ME this day personally appeared _____**Helena Webb**_____ (Affiant)
who first being duly sworn (or affirmed), deposes on personal knowledge and says:

1.  Affiant is over 18 years old and competent to make this affidavit. Affiant is authorized to execute this affidavit on behalf of the Plaintiff as an employee of Ally Servicing LLC. Ally Servicing LLC is an affiliate of the Plaintiff and is responsible for the servicing and administration of the account that is the subject of the above-styled action ("Account"). The Account relates to credit given to and owed by Defendants to Plaintiff.

2.  Ally Servicing LLC maintains the Plaintiff's records for the Account in its capacity as Plaintiff's servicer in the ordinary course of its business. As part of Affiant's job responsibilities, Affiant has access to business records related to the Account. Affiant, as a custodian of the attached business records for the Plaintiff, makes this affidavit based on his/her personal knowledge of the manner and method by which the Plaintiff creates and maintains the attached business records. Such business records were made at or near the time by, or from information transmitted by, a person with knowledge, kept in the course of regularly conducted business activity and it was the regular practice of Ally Servicing LLC to make such business records on the Plaintiff's behalf.

3.  Defendants failed to pay the amounts due on the Account. Attached as Exhibit 1 is a true and correct copy of the notification mailed to Defendants regarding the remaining obligation under the Account as of the date of such notification. Attached as Exhibit 2 is a true and correct copy of certain business records of the Plaintiff which reflect that as of the date of this affidavit, the outstanding balance justly owed to Plaintiff by Defendants, exclusive of all set-offs and just grounds of defense, is $3,953.81. The outstanding balance justly owed includes any and all payments, credits, rebates, adjustments and charges posted to the Account after the date of Exhibit 1. The outstanding balance justly owed equals the amount in the "Total Outstanding Balance" field less any court costs, service of process fees or other legal costs incurred by Plaintiff in the instant action but not yet awarded by the Court. Such legal costs, if any, will be identified as an entry or entries with a "Description" of "Legal Costs" on the attached Exhibit 2.



Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

4.    Affiant reviewed certain business records of the Plaintiff to determine whether the Defendants are in military service. Such business records do not indicate that the Defendants are in military service. In addition, Ally Servicing LLC obtained a certificate as to military service of the Defendants from the Defense Manpower Data Center (DMDC). Attached as Exhibit 3 is/are true and correct copy(ies) of the DMDC certificate(s). Based upon the foregoing, Affiant states that Defendants are not in military service.

FURTHER AFFIANT SAYETH NOT.

_____

Affiant Name (Printed)        Helena Webb
Title of Affiant: **Portfolio Coordinator**

The foregoing instrument was sworn to (or affirmed) and subscribed before me this 6th day
of January , 2016 by _____Helena Webb_____ (Affiant)
who ( X ) is personally known to me or (  ) produced _____ as
identification.

Type/Print Name Here: **Mary K Mann**
NOTARY PUBLIC, State of Texas
My commission expires: 10/4/18

MARY K. MANN
Notary Public, State of Texas
My Commission Expires
October 04, 2018

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM



P.O. Box 380901
Bloomington, MN 55438-0901
(800) 241-0172

October 29, 2012

DAVID DUNCAN
9397 ELM LOOP DR
PEVELY, MO  63070





## How We Calculated Your Surplus or Deficiency

Subject:  Account Number ██ ▪ ▪▪▪7919

Your 2006 CHEV COLORADO, VIN 1GCCS196X68257388, was sold on October 18, 2012.  As of the date of this letter, the amount you still owe us under the terms of your contract is $3,953.81. This amount was calculated as follows:

| | | | |
|---|---|---:|---:|
| Unpaid balance before subtracting money from sale | | S | 6,293.92 |
| This amount was calculated as of October 18, 2012 | | | |
| Money from sale | | - | 2,850.00 |
| Unpaid balance minus money from sale | | S | 3,443.92 |
| Known expenses of taking, holding, preparing for sale, processing, and selling vehicle, attorney fees, and other legal expenses: | | | |
| Repossessing & transporting | S 380.00 | | |
| Storage & reconditioning | 72.00 | | |
| Selling costs | 109.66 | | |
| Title & registration fees | 36.99 | | |
| Attorney fees and legal expenses the law permits | 0.00 | | |
| Total expenses | | + | 598.65 |
| Known credits: | | | |
| Rebate of unearned insurance premiums | S 88.76 | | |
| Extended service contract refunds | 0.00 | | |
| Insurance and service contract claims | 0.00 | | |
| Total credits | | | 88.76 |
| Deficiency/(surplus) | | S | 3,953.81 |

The amount of any deficiency/surplus shown above may change because of future additional credits, rebates, or charges.  Any deficiency shown above may also change because of additional interest accruing after the date of this letter.

Additional Information:

Your vehicle was sold at private sale.

## REDACTED

EXHIBIT 1

#525471-00025

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

DAVID DUNCAN
■■■■■■7919
October 29, 2012
Page 2



The deficiency/surplus, shown above, may also be calculated as follows:

| | | |
|---|---|---|
| Unpaid balance as of October 18, 2012 | $ | 6,293.92 |
| Rebate of unearned insurance premiums | - | 88.76 |
| Other credits (see detail above) | - | 0.00 |
| Amount due after rebates and credits | $ | 6,205.16 |
| Money from sale | - | 2,850.00 |
| Known expenses of taking, holding, preparing for sale, processing, and selling vehicle, attorney fees, and other legal expenses (see detail above) + | | 598.65 |
| Deficiency/(surplus) as of October 18, 2012 | $ | 3,953.81 |

For more information about this transaction or to make payment arrangements, you may call us at the telephone number at the top of this letter or write us at the address at the top of this letter.

Sincerely,
Ally Financial

REDACTED

EXHIBIT 1

525471-0002S

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM



P.O. Box 380901
Bloomington, MN 55438-0901
(800) 241-0172

October 29, 2012

ALBERTA HASKINS
9681 MEADOW DR
HILLSBORO, MO  63050



I.II...II.II....I.I.II....II.I.I.II...I.I.II...I.II..II.I.II

## How We Calculated Your Surplus or Deficiency

Subject:  Account Number ▮▮▮▮▮▮▮7919

Your 2006 CHEV COLORADO, VIN 1GCCS196X68257388, was sold on October 18, 2012.  As of the date of this letter, the amount you still owe us under the terms of your contract is $3,953.81. This amount was calculated as follows:

| | | | |
|---|---|---|---|
| Unpaid balance before subtracting money from sale | | $ | 6,293.92 |
| This amount was calculated as of October 18, 2012 | | | |
| Money from sale | | - | 2,850.00 |
| Unpaid balance minus money from sale | | $ | 3,443.92 |
| Known expenses of taking, holding, preparing for sale, processing, and selling vehicle, attorney fees, and other legal expenses: | | | |
| Repossessing & transporting | $  380.00 | | |
| Storage & reconditioning | 72.00 | | |
| Selling costs | 109.66 | | |
| Title & registration fees | 36.99 | | |
| Attorney fees and legal expenses the law permits | 0.00 | | |
| Total expenses | | - | 598.65 |
| Known credits: | | | |
| Rebate of unearned insurance premiums | $  88.76 | | |
| Extended service contract refunds | 0.00 | | |
| Insurance and service contract claims | 0.00 | | |
| Total credits | | - | 88.76 |
| Deficiency/(surplus) | | $ | 3,953.81 |

The amount of any deficiency/surplus shown above may change because of future additional credits, rebates, or charges.  Any deficiency shown above may also change because of additional interest accruing after the date of this letter.

Additional Information:

Your vehicle was sold at private sale.

## REDACTED

## EXHIBIT 1

#525471-00024

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

ALBERTA HASKINS
▮▮▮▮7919
October 29, 2012
Page 2



The deficiency/surplus, shown above, may also be calculated as follows:

| | | |
|---|---|---|
| Unpaid balance as of October 18, 2012 | $ | 6,293.92 |
| Rebate of unearned insurance premiums | - | 88.76 |
| Other credits (see detail above) | - | 0.00 |
| Amount due after rebates and credits | $ | 6,205.16 |
| Money from sale | - | 2,850.00 |
| Known expenses of taking, holding, preparing for sale, processing, and selling vehicle, attorney fees, and other legal expenses (see detail above) | + | 598.65 |
| Deficiency/(surplus) as of October 18, 2012 | $ | 3,953.81 |

For more information about this transaction or to make payment arrangements, you may call us at the telephone number at the top of this letter or write us at the address at the top of this letter.

Sincerely,
Ally Financial

REDACTED

EXHIBIT 1

525471-00024

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM



EXHIBIT 2

REDACTED

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

Department of Defense Manpower Data Center

Results as of : Jan-06-2016 08:34:14 AM

SCRA 3.0



**Status Report**
**Pursuant to Servicemembers Civil Relief Act**

Last Name: <u>HASKINS</u>
First Name: <u>ALBERTA</u>
Middle Name:
Active Duty Status As Of: <u>Jan-06-2016</u>

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

*Mary M. Snavely-Dixon*

Mary M. Snavely-Dixon, Director
Department of Defense - Manpower Data Center
4800 Mark Center Drive, Suite 04E25
Arlington, VA 22350

# EXHIBIT 3

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. ý 501 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940). DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate. In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service via this URL: https://kb.defense.gov/PublicQueries/publicQuestions/FaqsAnswers.jsp?Subject=Locating Service Members or Getting a Mailing Addresss. If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you. See 50 USC App. ý 521(c).

This response reflects the following information:  (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days  preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"

Active duty status as reported in this certificate is defined in accordance with 10 USC § 101(d)(1).  Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available.  In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC § 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds.  All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support.  This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs).  Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate.  SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods.  Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC § 101(d)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections.  Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service.  Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction.  The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected

WARNING:  This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester.  Providing erroneous information will cause an erroneous certificate to be provided.

## Certificate ID: P5N58224W2BBN60

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

Department of Defense Manpower Data Center

Results as of : Jan-06-2016 08:55:04 AM

SCRA 3.0



Status Report
Pursuant to Servicemembers Civil Relief Act

Last Name: <u>DUNCAN</u>
First Name: <u>DAVID</u>
Middle Name:
Active Duty Status As Of: <u>Jan-06-2016</u>

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Last Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

*Mary M. Snavely-Dixon*

Mary M. Snavely-Dixon, Director
Department of Defense - Manpower Data Center
4800 Mark Center Drive, Suite 04E25
Arlington, VA 22350

# EXHIBIT 3

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. § 501 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940). DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate. In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service via this URL: https://b.defense.gov/PublicQueries/publicQuestions/FaqsAnswers.jsp?Subject=Locating Service Members or Getting a Mailing Addresss. If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you. See 50 USC App. § 521(c).

This response reflects the following information: (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"

Active duty status as reported in this certificate is defined in accordance with 10 USC § 101(d) (1). Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available. In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC § 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds. All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support. This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs). Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate. SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods. Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC § 101(c)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction. The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected.

WARNING: This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester. Providing erroneous information will cause an erroneous certificate to be provided.

Certificate ID: O5JAC284A2BBI50

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

**THE CIRCUIT COURT OF JEFFERSON COUNTY, MISSOURI**
**ASSOCIATE DIVISION**

Ally Financial Inc. f/k/a GMAC ,                         Case No.

       Plaintiff,

vs.

ALBERTA HASKINS,
DAVID DUNCAN,

       Defendant(s).

**AFFIDAVIT FOR DEFAULT PURSUANT**
**TO SERVICE MEMBER CIVIL RELIEF ACT**

On or about March 28, 2016 the DMDC Military Verification website, which is hosted by the Director of the Department of Defense Human Resources Activity Defense Manpower Data Center (DMDC), was accessed. Attached hereto is a true and accurate copy of the information which was received from the DMDC.  According to the information obtained from the DMDC Military Verification website,

☐      The Defendant(s) is not an active member of the Military.

☐      The Defendant(s) is an active Member of the Military.

☐      Based upon the information we have, the DMDC is unable to determine whether or not the Defendant(s) is or is not an active member of the Military.

■      Based upon the information which we furnished the DMDC does not possess any information indicating the individual status.

Executed on:   March 28, 2016        BY: _____

          .            BRUMBAUGH  & QUANDAHL, P.C. LLO
                        Katherine M. Garringer MO#65917
                        Jonathan M. Craig MO#68016
                        Michael J. Schilling MO#67686
                        Thomas A. Ryczek MO #64132
                        106 West 11th Street, Suite 1260
                        Kansas City, MO 64105
                        (800) 887-4747 phone
                        (816) 817-0915 fax
                        bqmo@bqlaw.com
                        Attorneys for Plaintiff


Matthew W. Parker  Mo # 868671

*********7919
PMOAFF.frm

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

Department of Defense Manpower Data Center

Results as of : Mar-28-2016 11:29:16 AM

SCRA 3.0



### Status Report
### Pursuant to Servicemembers Civil Relief Act

Last Name: <u>DUNCAN</u>

First Name: <u>DAVID</u>

Middle Name:

Active Duty Status As Of: <u>Mar-28-2016</u>

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individual's active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

*Mary M. Snavely-Dixon*

Mary M. Snavely-Dixon, Director
Department of Defense - Manpower Data Center
4800 Mark Center Drive, Suite 04E25
Arlington, VA 22350

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. § 501 et seq. as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940). DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate. In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service via this URL: https://scra.dmdc.osd.mil/PublicQueries/publicQuestions/FaqsAnswers.jsp?Subject=Locating Service Members or Getting a Mailing Address. If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you.  See 50 USC App. § 521(c).

This response reflects the following information:  (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days  preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"

Active duty status as reported in this certificate is defined in accordance with 10 USC § 101(d) (1).  Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available.  In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC § 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds.  All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support.  This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs).  Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate.  SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods. Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC § 101(d)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction.  The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected

WARNING:  This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester.  Providing erroneous information will cause an erroneous certificate to be provided.

## Certificate ID: IBJC1BDCW2B6K40

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

Department of Defense Manpower Data Center

Results as of : Mar-29-2016 01:21:54 PM

SCRA 3.0



**Status Report**
**Pursuant to Servicemembers Civil Relief Act**

Last Name: <u>DUNCAN</u>
First Name: <u>DAVID</u>
Middle Name:
Active Duty Status As Of: <u>Mar-29-2016</u>

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

*Mary M. Snavely-Dixon*

Mary M. Snavely-Dixon, Director
Department of Defense - Manpower Data Center
4800 Mark Center Drive, Suite 04E25
Arlington, VA 22350

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. § 501 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940). DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate. In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service via this URL: https://kb.defense.gov/PublicQueries/publicQuestions/FaqsAnswers.jsp?Subject=Locating Service Members or Getting a Mailing Address. If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you. See 50 USC App. § 521(c).

This response reflects the following information: (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"

Active duty status as reported in this certificate is defined in accordance with 10 USC § 101(d) (1). Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available. In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC § 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds. All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support. This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs). Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate. SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods. Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC § 101(d)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction. The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected

WARNING: This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester. Providing erroneous information will cause an erroneous certificate to be provided.

Certificate ID: JB34468EB23E560

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

Department of Defense Manpower Data Center

Results as of : Mar-28-2016 11:29:14 AM

SCRA 3.0



**Status Report**
**Pursuant to Servicemembers Civil Relief Act**

Last Name: <u>HASKINS</u>
First Name: <u>ALBERTA</u>
Middle Name:
Active Duty Status As Of: <u>Mar-28-2016</u>

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

*Mary M. Snavely-Dixon*

Mary M. Snavely-Dixon, Director
Department of Defense - Manpower Data Center
4800 Mark Center Drive, Suite 04E25
Arlington, VA 22350

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. ÿ 501 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940). DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate. In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service via this URL: https://kb.defense.gov/PublicQueries/publicQuestions/FaqsAnswers.jsp?Subject=Locating Service Members or Getting a Mailing Address. If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you.  See 50 USC App. ÿ 521(c).

This response reflects the following information:  (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days  preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"

Active duty status as reported in this certificate is defined in accordance with 10 USC § 101(d) (1).  Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available.  In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC § 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds.  All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support.  This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs).  Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate.  SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods. Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC § 101(d)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections.  Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction.  The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected.

WARNING:  This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester.  Providing erroneous information will cause an erroneous certificate to be provided.

Certificate ID: HBYFGBECJ2B5110

Department of Defense Manpower Data Center

Results as of : Mar-29-2016 01:21:51 PM

SCRA 3.0



**Status Report**
**Pursuant to Servicemembers Civil Relief Act**

Last Name: <u>HASKINS</u>
First Name: <u>ALBERTA</u>
Middle Name:
Active Duty Status As Of: <u>Mar-29-2016</u>

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

*Mary M. Snavely-Dixon*

Mary M. Snavely-Dixon, Director
Department of Defense - Manpower Data Center
4800 Mark Center Drive, Suite 04E25
Arlington, VA 22350

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

Electronically Filed - Jefferson - March 30, 2016 - 02:02 PM

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. ý 501 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940). DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate. In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service via this URL: https://kb.defense.gov/PublicQueries/publicQuestions/FaqsAnswers.jsp?Subject=Locating Service Members or Getting a Mailing Address. If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you. See 50 USC App. ý 521(c).

This response reflects the following information: (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"

Active duty status as reported in this certificate is defined in accordance with 10 USC § 101(d) (1). Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available. In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC § 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds. All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support. This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs). Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate. SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods. Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC § 101(d)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction. The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected

WARNING: This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester. Providing erroneous information will cause an erroneous certificate to be provided.

Certificate ID: FBK4A67EP23EU50

# EXHIBIT 3

CIRCUIT COURT OF JEFFERSON COUNTY
STATE OF MISSOURI

| | | |
|---|---|---|
| Ally Financial Inc., | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16JE-AC01713-01 |
| | ) | |
| | ) | Division: 3 |
| Alberta Haskins and, | ) | |
| David Duncan, | ) | |
| | ) | |
|     Defendants. | ) | |

## ORDER

On February 8, 2018, this matter came before the Court on Counterclaimants' Motion for Class Certification, filed May 11, 2017. After considering the parties' briefing and oral argument, the Court **GRANTS** Counterclaimants' Motion for Class Certification is **GRANTED**.


## BACKGROUND

Alberta Haskins and David Duncan (Counterclaimants) Motion for Class Certification (the "Motion") seeks class treatment of a claim against Ally Financial Inc. (Ally) for alleged unlawful and deceptive pattern of wrongdoing regarding collection, enforcement, repossession and disposition of collateral, and collection of alleged deficiencies.

Counterclaimants allege Ally's form presale and post-sale notices violated the Uniform Commercial Code (UCC).

Counterclaimants seek to represent all similarly situation consumers for Ally's alleged violations of the UCC and Missouri Chapter 408.

1



Counterclaimants allege because of Ally's deficient notices, they and all class members suffered harm to their credit worthiness, credit standing, credit capacity, character, and general reputation.

Counterclaimant seek actual damages not less than the minimum damages provided by the UCC due to Ally's failure to provide proper presale and post-sale notices.

Counterclaimants also seek a declaration that the form right to cure, presale, and post-sale notices used by Ally violate Missouri or other applicable law.

CONCLUSIONS OF LAW

Rule 52.08 "creates a categorical rule entitling a [party] whose suit meets the specified criteria to pursue [her] claim as a class action." *Shady Grove Orthopedic Associates v. Allstate Ins.*, 130 S. Ct. 1431, 1438 (2010) (discussing the federal counterpart to Rule 52.08). The criteria under Rule 52.08 are numerosity, commonality, typicality, adequacy, predominance, and superiority. *Hope v. Nissan N. Am., Inc.*, 353 S.W.3d 68, 74 (Mo. App. 2011). "At this preliminary stage of the litigation, courts favor certification as the class may be refined as the case progresses." *State ex rel. McKeage v. Cordonnier*, 357 S.W.3d 597, 601 (Mo. banc 2012).

**Rule 52.08(a)(1): Numerosity**.

Rule 52.08(a)(1) requires the class to be "so numerous that joinder of all members is impracticable." Mo. R. Civ. P. 52.08(a)(1). The record shows the classes consist of thousands (perhaps tens of thousands) of members, which is a sufficiently numerous

class. *Dale v. DaimlerChrysler Corp.,* 204 S.W.3d 151, 168 (Mo. App. 2006). Ally suggests numerosity cannot be satisfied because res judicata, judicial estoppel from prior bankruptcies, and offset would extinguish many class members claims. Ally provides no evidence suggesting how many, if any, class members would be subject to these alleged defenses. Regardless, defenses that go to the merits are not properly considered as part of the numerosity analysis. *Plubell v. Merck & Co., Inc.*, 289 S.W.3d 707, 716 (Mo. App. 2009) ("defenses that go to the merits of the case are not properly considered in class certification").

Counterclaimants' allegations and the testimony from an Ally employee show the class is sufficiently numerous.

Counterclaimants have met this requirement

**Rule 52.08(a)(2): Commonality**.

Rule 52.08(a)(2) requires "there are questions of law or fact common to the class." A single common issue may satisfy this requirement. *Dale*, 204 S.W.3d at 175 The common issue "need not be dispositive of the controversy or even be determinative of the liability issues involved." *Id.*

Ally suggests Counterclaimants' assertion that the notices are misleading "bespeaks a lack of commonality" because whether a notice misleads a borrower, assuming they acknowledge receiving it, is unique to the borrower.

However, the common issue identified by Counterclaimants are based on form documents generated by Ally, which do not vary in any material way (each presale

notice restricts redemption payments to certain methods outlined in the presale notice despite the contract containing no such restriction).

Counterclaimants have met this requirement

**Rule 52.08(a)(3): Typicality**.

Rule 52.08(a)(3) requires "the claims … of the representative parties are typical of the claims … of the class." "The commonality and typicality requirements often merge, because each serve as a guidepost for judging whether a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Lucas Subway MidMo, Inc. v. Mandatory Poster Agency, Inc.*, 524 S.W.3d 116, 130 (Mo. App. Apr. 25, 2017). Just as form documents support commonality, they likewise support typicality. Counterclaimants' claims are typical of the claims they assert on behalf of the class. The claims arise out of form documents typically employed by Ally in its transactions with Counterclaimants and the class members.

Counterclaimants have met this requirement

**Rule 52.08(a)(4): Adequacy**.

Rule 52.08(a)(4) requires a finding that "the representative parties will fairly and adequately protect the interests of the class." Mo. R. Civ. P. 52.08(a)(4).

4

Counterclaimants have no interests in this matter that would be antagonistic to the interests of the class and they have retained competent counsel with experience in class action litigation.

Counterclaimants have met this requirement

**Rule 52.08(b)(3): Predominance**.

Rule 52.08(b)(3) requires the Court to find "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." The common questions of law and fact that stem from language in form documents predominate over any individual issues, fancied or real. Even if there were state law variations regarding the UCC's presale notice provisions, "the mere existence of state law variations is not alone sufficient to preclude class certification." *McKeage*, 357 S.W.3d at 601. Predominance is qualitative, not quantitative. Ally's liability may be established by its form documents, and if as alleged by Counterclaimants, the presale and post-sale notices contain at least one of the same deficiencies as in their notices, this common issue would be the overriding one in the litigation even if many individual issues remained as alleged by Ally regarding burden of proof, choice-of-law, statute of limitation defenses, the consumer nature of the purchase, res judicata, compulsory counterclaims, offset, equitable recoupment, judicial estoppel, or other affirmative defenses. *Elsea v. US Engineering Co.*, 463 S.W.3d 409, 419 (Mo. App. 2015) ("A single common issue may be the overriding one in the litigation, despite the fact that the suit also entails numerous remaining individual questions."); *Craft v. Philip Morris Cos.,*

*Inc.,* 190 S.W.3d 368, 383 (Mo. App. 2005) ("Differences in the application of the statute of limitations to individual class members do not preclude certification."); *McKeage*, 357 S.W.3d at 600 ("predominance is not precluded when there needs to be an inquiry as to individual damages"); Newberg on Class Actions § 4:57 (5th ed.) (affirmative defenses "rarely defeat" predominance).

Counterclaimants have met this requirement

**Rule 52.08(b)(3): Superiority**.

Rule 52.08(b)(3) also requires the Court to find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 52.08(b)(3) lists four superiority factors:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(D) the difficulties likely to be encountered in the management of a class action.

The Court finds these factors all support class certification. A class action is superior to thousands and possibly hundreds of thousands of individual actions involving the same form documents. Absent a class action, there is little likelihood class members will know they have any claims against Ally like the claims being advanced. The class action device provides an effective procedural tool for advancing and enforcing the important

public policy considerations underlying the consumer protection statutes Counterclaimants seek to invoke, both for themselves and for the classes.

Counterclaimants have met this requirement

IT IS THEREFORE ORDERED THAT:

1.      The Motion for Class Certification is granted.

2.      Counterclaimants are appointed as the class representatives.

3.      Jesse Rochman, Martin L. Daesch, and James Onder are appointed as class counsel.

4.      The parties shall send notice to all members who can be identified through reasonable effort and submit a proposed notice complying with Rule 52.08(c)(3) to the Court for approval.

5.      Ally must furnish Counterclaimants with the names, last known addresses, telephone numbers, social security numbers for each class member within 30 days after this Order. This must be done in both hard copy and in a computer spreadsheet format accessible by Counterclaimants. Ally must also furnish Counterclaimants with copies of the installment contract, notice of lien application, and right to cure, presale, and post-sale notices for each class member in within the same time.

6.      Ally must inform Counterclaimants of its proposed statutes of limitations it used to generate the list for Class 1. If the Counterclaimants disagree with the proposed statutes of limitations, either party may file a motion with the Court for

determination of that issue.

7.    These classes are certified:

Class 1:

All persons within the applicable statute of limitations:

    a.  who are named as borrowers or buyers on a loan or financing agreement with Ally, assigned to Ally or owned by Ally;

    b.  whose loan or financing agreement was secured by collateral;

    c.  whose collateral was repossessed, voluntarily or involuntarily; and

    a.  whose collateral was disposed.

Class 2:

All persons:

    a.  who obtained a Missouri Certificate of Title for a motor vehicle identifying Ally as the lienholder, or who are named as borrowers or buyers with a Missouri address on a loan or financing agreement with Ally, assigned to Ally or owned by Ally;

    b.  whose loan or financing agreement was secured by a motor vehicle or other collateral;

    c.  whose motor vehicle or other collateral was repossessed, involuntarily or voluntarily; and

    d.  whose motor vehicle or other collateral was disposed from June 17, 2010, through the present.

SO ORDERED:

_____
Date

May 09, 2018, 4:47 pm **J3**

Judge Dianna Bartels

# EXHIBIT 4

# NATIVE FILE
# SUBMITTED
# CONVENTIONALLY

# EXHIBIT 5



Clyde & Co US LLP
1775 Pennsylvania Avenue NW
4th Floor
Washington, DC 20006
United States

Telephone: +1 202 747 5151
Facsimile: +1 202 747 5150
www.clydeco.com

Meredith E. Werner
meredith.werner@clydeco.us

Raymond D. Pinkham
ray.pinkham@clydeco.us

February 23, 2021

<u>**Via Email**</u>

Mr. Leland Coblentz
Ally Financial Inc.
200 Renaissance Center
Detroit, MI 48265
Leland.Coblentz@ally.com

| Re: | Insured: | **Ally Financial Inc.** |
|---|---|---|
| | Policy No.: | **24-MGU-16-A39492** |
| | Reference No.: | **A-17-032266** |
| | Matter: | ***Ally Financial Inc. v. Alberta Haskins and David Duncan*** |

Dear Mr. Coblentz:

This firm represents U.S. Specialty Insurance Company ("USSIC") in connection with Excess Indemnity Policy, Policy No. 24-MGU-16-A39492 (the "Excess Policy"), issued to Ally Financial Inc. ("Ally") for the claims-made period December 15, 2016 to December 15, 2017. We have addressed this to you as the representative of Ally for receipt of insurance materials. If you are not the appropriate person to whom such materials should be directed or if you would like any other party not already copied on this letter to receive future communications, please advise accordingly. Please send all communications concerning the above-referenced matter to our attention with a copy to Todd Richardson at Tokio Marine HCC, with the exception of notices of new claims, which should be directed to USSIC, in accordance with the terms of the Excess Policy. Also, please take note of the reference number indicated above and kindly refer to that number in all future correspondence.

On behalf of USSIC, this letter acknowledges receipt and addresses coverage for the Counterclaim filed by defendants Alberta Haskins and David Duncan filed in the matter captioned *Ally Financial Inc. v. Haskins, et al.*, Case No. 16JE-AC01713-01, pending in the Circuit Court of Jefferson County, State of Missouri (the "Haskins/Duncan Action"). USSIC has



Mr. Leland Coblentz
February 23, 2021
Page 2

also received and reviewed a copy of Chubb's August 26, 2020 coverage position regarding the Haskins/Duncan Action.

Please note that the discussion below necessarily is based on the limited information currently available to USSIC, and that USSIC invites the Insureds to provide any additional information or documentation that they believe may be relevant to its consideration of this matter. USSIC is not expressing any views on the merit of any allegations or assertions against any Insured, and this letter does not alter or amend the contents of the noticed communications or any terms of the Policies. This letter should be read in conjunction with the referenced documents and the Excess Policy.

**Coverage Discussion**

We have undertaken a preliminary review of this matter in light of the coverage available under the Excess Policy in order to identify possible coverage issues that may exist. Accordingly, we provide USSIC's initial view on coverage below. Please note that these views are not intended, by any means, to be exhaustive or exclusive, and we expressly reserve all of USSIC's rights under the Excess Policy, at law and otherwise, including, but not limited to, the right to raise additional policy terms and conditions as defenses to coverage when appropriate.

As described above, USSIC issued the Excess Policy to Ally with a Policy Period of December 15, 2016 to December 15, 2017. The Policy contains limits of liability of $15,000,000, inclusive of defense expenses, and consistent with the insuring clause, "shall attach only after all Underlying Insurance has been exhausted by actual payment of claims or losses thereunder." Excess Policy, Declarations, Item 3 and Section I, as amended by Endorsement No. 4. Except as specifically set forth in the terms, conditions or endorsements of the Excess Policy, coverage under the Excess Policy shall apply in conformance with the terms, conditions, limitations and endorsements of the policy immediately underlying the Excess Policy. Excess Policy, Section I. The applicable Underlying Insurance is Federal Insurance Company BPL For Financial Institutions Policy, Policy No. 8207-7768 (the "Primary Policy"), which contains limits of liability of $25 million, with a Retention Amount of $25 million. Primary Policy, Declarations, Items 2 and 4.[1]

Pursuant to Section 1 of the Primary Policy, as amended by Endorsement 15, the BPL Services Liability Coverage part provides:

> The Company shall pay, on behalf of an Insured, Loss on account of any
> BPL Claim first made against such Insured during the Policy Period or, if

---

[1] The Schedule of Underlying Insurance in Endorsement No. 1 of the Excess Policy identifies Federal Insurance Company Policy Nos. 8207-6455, 8207-6453, 8207-6461, and 8207-7768. USSIC views the applicable Underlying Insurance for this matter as Federal Insurance Company Policy No. 8207-7768 and that Federal Policy No. 8207-7768 is the applicable policy immediately underlying the Excess Policy. If you disagree with this position, please let us know.



Mr. Leland Coblentz
February 23, 2021
Page 3

> exercised, during the Extended Reporting Period, for a BPL Wrongful
> Act committed by an Insured or any person for whose acts the Insured is
> legally liable solely while performing BPL Services, including failure to
> perform BPL Services.

Based on the allegations contained in the Haskins/Duncan Action, the Counterclaim appears to
allege a BPL Wrongful Act, pursuant to the Primary Policy.

As described above, we have received and reviewed a copy of Chubb's August 26, 2020
coverage position regarding the Haskins/Duncan Action. Based on its investigation to date,
USSIC adopts the views expressed by Chubb in that letter and reserves all of its rights under the
Excess Policy and otherwise, consistent with that letter. In its letter Chubb explains that the
allegations contained in the Haskins/Duncan Action fall within the Prior Acts Exclusion of the
Primary Policy to which the Excess Policy follows form. The Prior Acts Exclusion of the
Primary Policy excludes from coverage Loss on account of any Claim based upon, arising from,
or in consequence of: (1) any Wrongful Act committed, attempted, or allegedly committed or
attempted prior to December 15, 2013 or (2) any Wrongful Act committed, attempted, or
allegedly committed or attempted subsequent to December 15, 2013 that is causally connected to
a Wrongful Act committed attempted, or allegedly committed or attempted prior to December
15, 2013. Primary Policy, Endorsement No. 2. It is not disputed that Ally's pre-sale and post-
sale notices to the defendants/Counterclaim plaintiffs were prior to December 15, 2013. The
May 9, 2018 Class Certification Order makes clear that the claims of the class members are
causally connected. Specifically, it indicates that the class sufficiently meets the commonality
and typicality requirements due to the form documents generated by Ally, "which do not vary in
any material way[.]" The Class Certification Order also states that the Motion for Class
Certification alleged an "unlawful and deceptive pattern of wrongdoing." Accordingly, in the
event that the Underlying Insurance has been exhausted by actual payment of claims or losses
thereunder or by payment by the Insureds as described in Endorsement No. 4, the Prior Acts
Exclusion in the Primary Policy potentially implicates the availability of coverage under the
Excess Policy. USSIC invites the Insured to submit any information or documentation that it
believes demonstrates that the claims of the class members in the Haskins/Duncan Action are not
causally connected, which USSIC will review under a continuing reservation of rights.

USSIC would also like to direct your attention to other terms and conditions of the Excess Policy
and/or the Primary Policy which may impact coverage.

First, Section V of the Excess Policy states that the "Insureds shall not admit liability for or settle
any claim for any amount that would involve the coverage afforded by this Policy without the
Insurer's prior written consent." In addition, Section 9 of the Primary Policy, as amended by
Endorsement 28, states:

> Except as provided in Subsection 9d, the Insured agrees not to settle or
> offer to settle any Claim, incur any Defense Costs or otherwise assume



Mr. Leland Coblentz
February 23, 2021
Page 4

> any contractual obligation or admit any liability with respect to any
> Claim without the Company's prior written consent, which shall not be
> unreasonably withheld.    The Company shall not be liable for any
> settlement, any Defense Costs, any element of Loss incurred, any
> obligation assumed, or any admission made, by any Insured without the
> Company's prior written consent.

Primary Policy, Section 9.(c).  USSIC was first advised by Ally on December 21, 2020 that Ally had already participated in two prior mediation sessions regarding the Haskins/Duncan Action. USSIC was also advised on December 21, 2020 that Ally's last offer was a bracket of $25 million to $150 million.  Ally neither sought nor received USSIC's prior written consent for any settlement offers made.  It is our understanding that Ally settled the Haskins/Duncan Action for $87.5 million on December 22, 2020, pending final court approval.  Ally did not seek, and USSIC did not provide prior written consent for any such settlement and, accordingly, USSIC reserves all rights pursuant to Section V of the Excess Policy and Section 9 of the Primary Policy.

Second, we direct your attention to Section VIII of the Excess Policy, which states:

> If the Insureds give any notice of any matter under the Underlying
> Insurance, the Insureds must also give the Insurer written notice of such
> matter in the same manner as required by the terms and conditions of the
> Primary Policy, except that such written notice must be sent to the Insurer
> at the address set forth in ITEM 6 of the Declarations.

Section 8 of the Primary Policy, as amended by Endorsement No. 28, states that if a Claim is made against an Insured and such Claim constitutes or becomes a Mass or Class Action:

> then the Insured shall, as a condition precedent to exercising any right to
> coverage under this Policy, give to the Company written notice of any
> such Claim as soon as practicable, after any member of the Risk
> Management Department or Office of the General Counsel of the Parent
> Organization first received notice of the Claim, separate and apart from
> any bordereau report required under Subsection 8a.  Such written notice
> shall contain information including, but not limited to, a description of
> the Claim, the nature of the alleged Wrongful Act, the nature of the
> alleged damage, the names of the claimants and the manner in which a
> member of the Parent Organization's Risk Management Department or
> Office of the General Counsel first received notice of the Claim.  The
> Insureds shall immediately forward to the Company every demand,
> notice, summons, complaint or other process received by any Insured or
> Insured representative in connection with any Claim for which notice is
> required under this Subsection 8b.



Mr. Leland Coblentz
February 23, 2021
Page 5

* * *

The Insured shall, as a condition precedent to exercising any right to coverage under this Policy, give to the Company such information, assistance and cooperation as the Company may reasonably require. Without limiting the generality of the preceding sentence:

(1) the Insured shall provide the Company with all information required under Subsections 8a, 8b or 8c, as applicable;

(2) with respect to any Claim reported pursuant to Subsection 8a that at any time thereafter becomes a Mass or Class Action, the Insured shall give the Company written notice that such Claim constitutes a Mass or Class Action as soon as practicable but in no event later than sixty (60) days after such Claim becomes a Mass or Class Action, and shall immediately forward to the Company every demand, notice, summons, complaint or other process received by any Insured or Insured representative in connection with any such Claim[.]

Primary Policy, Section 8. USSIC reserves all rights to the extent that any notice provided by Ally did not comply with Section VIII of the Excess Policy and/or Section 8 of the Primary Policy.

Third, Section 2 of the Primary Policy, as amended by Endorsement 19, provides that Loss does not include, among other things, "any costs incurred by an Insured to comply with any order for injunctive or other non-monetary relief, or to comply with an agreement to provide such relief[,]" "taxes, fines or penalties, except as provided above with respect to punitive, multiplied or exemplary damages[,]" "any amount not insurable under the law pursuant to which this Policy is construed[,]" and "any amount which in fact constitutes disgorgement, including restitution." The Haskins/Duncan Action seeks relief including, but not limited to, statutory damages, certain injunctive relief, and wrongfully charged interest. USSIC reserves all rights to the extent that any such relief sought does not constitute covered Loss.

We would also direct your attention to Section 10 of the Primary Policy, which states:

If both Loss covered by this Policy and loss not covered by this Policy are incurred, either because a Claim against an Insured includes both covered and noncovered matters or because a Claim is made against both an Insured and others, then the Insured and the company shall allocate such amount between covered Loss and noncovered loss based upon the relative legal and financial exposures of the parties to covered and noncovered matters and, in the event of a settlement in such Claim, also



Mr. Leland Coblentz
February 23, 2021
Page 6

based upon the relative benefits to the parties from such settlement. The Company shall not be liable under this Policy for the portion of such amount allocated to noncovered Loss.

USSIC reserves all rights to allocate between covered Loss and noncovered loss, pursuant to Section 10 of the Primary Policy.

\* \* \*

As set forth above, no coverage is currently available under the Excess Policy for the Haskins/Duncan Action. This letter is not intended to be exhaustive or exclusive with respect to the coverage available for noticed matters, and USSIC reserves the right to supplement its views on coverage as additional information becomes available or as developments warrant. USSIC acknowledges that the Insureds likewise reserve their rights.

Please feel free to contact us if you wish to discuss any aspect of this matter or if any Insured wishes to provide any additional information that may be pertinent to USSIC's review of coverage for this matter.

Sincerely,

CLYDE & CO US LLP

By _Meredith Werk._

Meredith E. Werner
Raymond D. Pinkham

cc: Damien Brew (via email)
Todd Richardson (via email)

# EXHIBIT 6

# CLYDE&CO

Clyde & Co US LLP
1775 Pennsylvania Avenue NW
4th Floor
Washington, DC 20006
United States

Telephone: +1 202 747 5151
Facsimile: +1 202 747 5150
www.clydeco.com

Meredith E. Werner
meredith.werner@clydeco.us

Raymond D. Pinkham
ray.pinkham@clydeco.us

October 25, 2021

**Via Email**

David M. Halbreich
Lilit Asadourian
Reed Smith LLP
355 South Grand Avenue
Suite 2900
Los Angeles, CA  90071
dhalbreich@reedsmith.com
lasadourian@reedsmith.com

| Re: | Insured: | **Ally Financial Inc.** |
|-----|----------|---------------------|
| | Policy No.: | **24-MGU-16-A39492** |
| | Reference No.: | **A-17-032266** |
| | Matter: | **_Ally Financial Inc. v. Alberta Haskins and David Duncan_** |

Dear Mr. Halbreich and Ms. Asadourian:

As you may know, this firm represents U.S. Specialty Insurance Company ("USSIC") in connection with Excess Indemnity Policy No. 24-MGU-16-A39492 (the "Excess Policy"), issued to Ally Financial Inc. ("Ally") for the claims-made period December 15, 2016 to December 15, 2017.[1]

USSIC provided its coverage position on February 23, 2021, in connection with the Counterclaim filed by defendants Alberta Haskins and David Duncan filed in the matter captioned *Ally Financial Inc. v. Haskins, et al.*, Case No. 16JE-AC01713-01 in the Circuit Court of Jefferson County, State of Missouri (the "Haskins/Duncan Action").  No response has been received by USSIC in connection with the February 23 letter.  This letter supplements USSIC's

---

[1] The applicable Underlying Insurance is Federal Insurance Company BPL For Financial Institutions Policy No. 8207-7768 (the "Primary Policy").



David M. Halbreich
Lilit Asadourian
October 25, 2021
Page 2

previous coverage letter and addresses the arguments made in your April 20, 2021 letter to John
Varley at Chubb, which was forwarded to USSIC by Marsh on July 13, 2021.

USSIC has carefully considered Ally's arguments, as set forth in your letter to Chubb. For the
reasons detailed below, USSIC continues to believe that the Prior Acts Exclusion bars coverage
for the Haskin/Duncan Action in its entirety. Coverage is also precluded because Ally
negotiated and entered into an $87 million settlement agreement without seeking or procuring
USSIC's written consent, against the express requirements of the Policy and because the notice
received by USSIC from Ally did not conform to the Policy requirements.

**The Prior Acts Exclusion**

The Prior Acts Exclusion states that the Company shall not be liable for Loss on account of any
claim based upon, arising from, or in consequence of:

    i.      any Wrongful Act committed, attempted, or allegedly committed or attempted
            prior to December 15, 2013; or

    ii.     any Wrongful Act committed, attempted, or allegedly committed or attempted
            subsequent to December 1, 2013 that is causally connected to a Wrongful Act
            committed, attempted, or allegedly committed or attempted prior to December 15,
            2013.

Primary Policy, Endorsement No. 2. The two prongs of the Prior Acts Exclusion operate
independently and if either of the two prongs is satisfied, coverage is excluded. Although your
letter focuses exclusively on prong two, in this case, both prongs are satisfied.

    1.   The post-December 15, 2013 notices are based upon, arise from and/or are in
        consequence of the pre-December 15, 2013 notices.

As noted above, the first prong includes broad prefatory language, which bars coverage for any
claim based upon, arising from, or in consequence of any Wrongful Act committed, attempted,
or allegedly committed or attempted prior to December 15, 2013.

It is not disputed that Ally's allegedly defective pre-sale and post-sale notices were sent to the
defendants / Counterclaim plaintiffs, as well as other members of the class, both prior to and
after December 15, 2013. The allegations in the Counterclaim make clear that the Wrongful
Acts at issue were part of a standard practice, policy and pattern of conduct. In particular, the
Counterclaim states the following:

    •   "This is a consumer class action against Ally, and its predecessors or successors, seeking
       relief to redress an unlawful and deceptive pattern of wrongdoing followed by Ally



David M. Halbreich
Lilit Asadourian
October 25, 2021
Page 3

regarding collection, enforcement, repossession and disposition of collateral, and collection of alleged deficiencies." Counterclaim at ¶ 1 (emphasis added).

- "Ally's failure to provide a statutorily compliant post-sale notice <u>is part of a pattern, or consistent with a practice</u>, of noncompliance." *Id.* at ¶ 25 (emphasis added).

- "Ally has maintained <u>a practice and policy</u> of reporting derogatory information regarding the class members to local consumer reporting agencies and the three national consumer credit reporting agencies." *Id.* at ¶ 30 (emphasis added).

- "Ally has a <u>company policy</u> of requiring redemption by certified funds after Ally has repossessed collateral. <u>This policy</u> is not in the class members' consumer credit contracts and is first communicated to the class members in the presale notice. *Id.* at ¶ 40 (emphasis added).

- "Ally's failure to provide a statutorily complaint post-sale notice is <u>part of a pattern, or consistent with a practice, of noncompliance because Ally mailed the same noncompliant post-sale notice to Defendants and the Class</u>." *Id.* at ¶ 88 (emphasis added).

Moreover, the May 9, 2018 Class Certification Order indicates that the allegedly defective notices were based on <u>form documents generated by Ally</u>, "which do not vary in any material way[.]" The Class Certification Order also states that the Motion for Class Certification alleged an "unlawful and deceptive pattern of wrongdoing."

Accordingly, the post-December 15, 2013 notices are based upon, arise from and/or are in consequence of the pre-December 15, 2013 notices and are excluded by the Prior Acts Exclusion.

In an attempt to circumvent this conclusion, your letter asserts that, to the extent Delaware law applies, Delaware courts apply a "fundamentally identical" standard with respect to relatedness issues. The terms "fundamentally identical" appear nowhere in the policy and the plain language must be applied as written. Recognizing that, the Delaware Superior Court recently reasoned in the *Sycamore* case that "… neither the Delaware Supreme Court nor any other jurisdiction has adopted fundamentally identical as the standard governing all relatedness inquiries, regardless of the contractual language at issue. To apply indiscriminately that type of gloss to otherwise unambiguous policy language arguably could contravene Delaware law requiring this Court to interpret insurance policies according to their plain language and to avoid grafting public policy limitations into contracts in the absence of a policy pronouncement by the General Assembly." *Sycamore Partners Management, L.P. v. Endurance American Ins. Co.*, 2021 WL 4130631 (Del. Super. Ct. Sep. 10, 2021).



David M. Halbreich
Lilit Asadourian
October 25, 2021
Page 4

In *Sycamore*, the court interpreted the meaning of an Interrelated Claims Provision that barred coverage for claims "arising from" Interrelated Wrongful Acts. The *Sycamore* court explained that the "Supreme Court [of Delaware] has provided interpretive guidance for construing the undefined phrasal verbs that orient the Interrelated Claims Provision. In the insurance context, the Supreme Court has defined 'arising out of' to mean 'some meaningful linkage.'"[2] *Id.* at *12.

In this case, there is certainly a "meaningful linkage" between the pre- and post-December 15, 2013 claims because all of the class claims are based on or arise from allegedly defective pre- and post-sale notices, which, according to the Class Certification, were based on form documents generated by Ally, which do not vary in any material way.

In order to be successful in its coverage argument, Ally would have to argue that the post-December 15, 2013 claims are "based upon, arising from, or in consequence of the same or related acts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events" as the pre-December 15, 2013 claims for purposes of the Related Claims provision, and at the same time also argue that the post-December 15, 2013 claims are not "based upon, arising from, or in consequence of: (1) any Wrongful Act committed, attempted, or allegedly committed or attempted prior to December 15, 2013" for purposes of the Prior Acts Exclusion. Therefore, if the pre- and post-December 15, 2013 claims constitute Related Claims, as Ally has implicitly concluded, as evidenced by its seeking of coverage for the entire class settlement, the same reasoning would apply in connection with the Prior Acts Exclusion. Accordingly, based on the plain language of the Policy, no coverage is available for the Haskins/Duncan Action due to the application of the first prong of the Prior Acts Exclusion.

2. The post-December 15, 2013 Wrongful Acts are "causally connected" to the pre-December 15, 2013 Wrongful Acts.

The second prong of the Prior Acts Exclusion likewise bars coverage because the post-December 15, 2013 Wrongful Acts are "causally connected" to the pre-December 15, 2013 Wrongful Acts.

As noted in your letter, the phrase "causally connected" is not defined in the Primary Policy and, as the *Sycamore* court noted, in the coverage context, the Delaware Supreme Court has rejected narrow interpretations of undefined phrasal verbs. *Sycamore* at *12 n. 98 (citing *Pac. Ins. Co. v. Liberty Mut. Ins. Co.*, 956 A.2d 1246, 1256 n. 42 (Del. 2008)).

Case law supports the conclusion that the pre-and post-December 15, 2013 claims based on the allegedly defective notices are causally connected. In *Continental Cas. Co. v. Howard Hoffman and Associates*, 955 N.E.2d 151 (Ill. App. 2011), the Illinois Appellate Court affirmed the trial

---

[2] The *Sycamore* court ultimately concluded that the relevant claims in that case were not interrelated because they involved different allegations and different Wrongful Acts.



David M. Halbreich
Lilit Asadourian
October 25, 2021
Page 5

court's decision that a $100,000 limit of liability applied because certain claims were related under the relevant lawyer's professional liability policy. In *Hoffman*, the defendants informed Continental that a nonlawyer employee of the firm had embezzled significant funds from at least 16 probate estates that were represented by the firm and that 12 of the estates had asserted claims for losses. Continental contended that a single $100,000 limit applied to all claims arising out of the embezzlement scheme, while the firm contended that it faced multiple, unrelated claims and that the $300,000 aggregate limit should apply. Under the policy, "Related Claims" was defined as "all claims arising out a single act or omissions or arising out of related acts or omissions in the rendering of legal services." "Related Acts or Omissions" was defined as "all acts or omissions in the rendering of legal services that are temporally, logically, or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision."

Causally connected was not defined in the policy, but the *Hoffman* court explained that "causally" is defined as "expressing or indicating cause," while a "cause" is defined as a "person, thing, fact, or condition that brings about an effect" or "the necessary antecedent of an effect." The *Hoffman* court concluded that "it is clear that all of the various assertions that the Hoffman defendants somehow failed to manage litigation involving the various estates or improperly supervised the actions of Ms. Stachura – however specifically pled – are allegations of acts and omissions logically and causally connected by the embezzlement scheme." (emphasis added). In addition, the court explained that based on the specific language of the Continental policy, "all of the allegations against the Hoffman defendants are logically and causally connected by Ms. Stachura's scheme to embezzle."

Similarly, in the circumstances of this case, each of the Class Members' claims are causally connected because they have the same cause, the allegedly defective notices, which plaintiffs allege are part of a practice, policy and pattern of wrongdoing. Suggesting that one notice had to cause another takes too narrow a view and is not faithful to the Policy's language. Each Class Members' damages had the same cause and "flow from" the allegedly defective notices, which were form documents that did not vary in any material way. Accordingly, under either part (i) or part (ii) of the Prior Acts Exclusion, coverage is excluded under the Policy.

**Consent and Notice Issues**

Although not addressed in your April 20, 2021 letter to Chubb, we note further that coverage for the Duncan and Haskins settlement is barred by the failure to procure USSIC's written consent and by the failure to provide proper notice under the Policy. First, with respect to the prior written consent requirement, Section V of the Excess Policy states that the "Insureds shall not admit liability for or settle any claim for any amount that would involve the coverage afforded by this Policy without the Insurer's prior written consent." In addition, Section 9 of the Primary Policy, as amended by Endorsement 28, states:



David M. Halbreich
Lilit Asadourian
October 25, 2021
Page 6

> Except as provided in Subsection 9d, the Insured agrees not to settle or offer to settle any Claim, incur any Defense Costs or otherwise assume any contractual obligation or admit any liability with respect to any Claim without the Company's prior written consent, which shall not be unreasonably withheld. The Company shall not be liable for any settlement, any Defense Costs, any element of Loss incurred, any obligation assumed, or any admission made, by any Insured without the Company's prior written consent.

Primary Policy, Section 9.(c). USSIC was first advised by Ally on December 21, 2020 that Ally had already participated in two prior mediation sessions regarding the Haskins/Duncan Action. USSIC was also advised on December 21, 2020 that Ally's last offer was a bracket of $25 million to $150 million. Ally neither sought nor received USSIC's prior written consent for any settlement offers made. It is our understanding that Ally settled the Haskins/Duncan Action for $87.5 million on December 22, 2020, which has been approved by the court. Ally did not seek, and USSIC did not provide prior written consent for any such settlement and, accordingly, Section V of the Excess Policy and Section 9 of the Primary Policy, which are conditions precedent to coverage, were not satisfied.

With respect to notice of the claim, Section VIII of the Excess Policy states:

> If the Insureds give any notice of any matter under the Underlying Insurance, the Insureds must also give the Insurer written notice of such matter in the same manner as required by the terms and conditions of the Primary Policy, except that such written notice must be sent to the Insurer at the address set forth in ITEM 6 of the Declarations.

Section 8 of the Primary Policy, as amended by Endorsement No. 28, states that if a Claim is made against an Insured and such Claim constitutes or becomes a Mass or Class Action:

> then the Insured shall, as a condition precedent to exercising any right to coverage under this Policy, give to the Company written notice of any such Claim as soon as practicable, after any member of the Risk Management Department or Office of the General Counsel of the Parent Organization first received notice of the Claim, separate and apart from any bordereau report required under Subsection 8a. Such written notice shall contain information including, but not limited to, a description of the Claim, the nature of the alleged Wrongful Act, the nature of the alleged damage, the names of the claimants and the manner in which a member of the Parent Organization's Risk Management Department or Office of the General Counsel first received notice of the Claim. The Insureds shall immediately forward to the Company every demand, notice, summons, complaint or



David M. Halbreich
Lilit Asadourian
October 25, 2021
Page 7

> other process received by any Insured or Insured representative in connection with any Claim for which notice is required under this Subsection 8b.
>
> \* \* \*
>
> The Insured shall, as a condition precedent to exercising any right to coverage under this Policy, give to the Company such information, assistance and cooperation as the Company may reasonably require. Without limiting the generality of the preceding sentence:
>
> (1) the Insured shall provide the Company with all information required under Subsections 8a, 8b or 8c, as applicable;
>
> (2) with respect to any Claim reported pursuant to Subsection 8a that at any time thereafter becomes a Mass or Class Action, the Insured shall give the Company written notice that such Claim constitutes a Mass or Class Action as soon as practicable but in no event later than sixty (60) days after such Claim becomes a Mass or Class Action, and shall immediately forward to the Company every demand, notice, summons, complaint or other process received by any Insured or Insured representative in connection with any such Claim[.]

Primary Policy, Section 8. Ally did not break the Duncan/Haskins matter out of the bordereau until after it became a class action and, therefore, did not comply with the notice as soon as practicable requirement. The lawsuit was filed as a class action in March 2017, reported on the bordereau in June 2017 and reported outside of the bordereau more than two years later in January 2020.

As set forth above, no coverage is currently available under the Excess Policy for the Haskins/Duncan Action. USSIC continues to reserves all rights under the Policy and applicable law.

CLYDE&CO

David M. Halbreich
Lilit Asadourian
October 25, 2021
Page 8

Sincerely,

CLYDE & CO US LLP

By _Meredith E. Werner_

Meredith E. Werner
Raymond D. Pinkham

cc:   Damien Brew (via email)
      Todd Richardson (via email)